**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

**ALEX BERENSON,**

          **Plaintiff**,

    v.

**JOSEPH R. BIDEN, JR.**, President of the
United States, in his official capacity;

**ANDREW M. SLAVITT**, in his individual
capacity;

**SENIOR ADVISOR TO THE COVID-19
RESPONSE COORDINATOR**, in his or
her official capacity;

**ROBERT FLAHERTY**, in his individual
capacity;

**CHRISTIAN L. TOM**, Director of Digital
Strategy at the White House, in his official
capacity;

**VIVEK MURTHY, M.D.**, Surgeon General
of the United States, in his official capacity,
and in his individual capacity;

**SCOTT GOTTLIEB, M.D.**, former FDA
Commissioner and Member of the Board of
the Directors of Pfizer, Inc.; and

**ALBERT BOURLA, PH.D., D.V.M.**,
Chief Executive Officer of Pfizer, Inc.,

        **Defendants**.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

    Case No. 1:23-cv-03048-JGLC

------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF
ANDREW M. SLAVITT'S MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
*Attorneys for Defendant Andrew M. Slavitt*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 3

ARGUMENT ........................................................................................ 7

I.    This Court Lacks Personal Jurisdiction Over Slavitt. ............................ 7

    A.    Berenson Has Not Adequately Pled Personal Jurisdiction Over Slavitt
        Under New York's Long-Arm Statute.................................................. 8

    B.    Berenson Cannot Establish Personal Jurisdiction Under the Due Process
        Clause............................................................................................. 10

II.   Berenson Fails to STATE A CLAIM ON THE MERITS. ............................ 11

    A.    Berenson Fails to Adequately Plead Causation for Any Claim. ........... 11

    B.    Berenson Fails to State a First Amendment Claim. ............................. 13

        1.    Berenson Cannot Obtain Any Remedy for the Alleged First
            Amendment Violations. ........................................................... 13

        2.    Berenson Fails to State a First Amendment Claim..................... 15

        3.    Slavitt Is Entitled to Qualified Immunity................................. 19

    C.    Berenson Fails to State a Claim Under Section 1985(3). .................... 20

        1.    Berenson Cannot Hold Slavitt Liable for Speech Activity Protected
            by the First Amendment........................................................... 20

        2.    Berenson Fails to Satisfy Multiple Elements of a § 1985(3) Claim. ........ 20

        3.    Slavitt is Entitled to Qualified Immunity on the §1985(3) Claim ........... 23

    D.    Berenson Fails to State a Tortious Interference Claim. ....................... 23

    E.    Section 230 Provides Immunity from Berenson's § 1985(3) and Tortious
        Interference Claims. ......................................................................... 25

CONCLUSION..................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abadi v. City of N.Y.*,
   2022 WL 347632 (S.D.N.Y. Feb. 4, 2022)..........................................................................21

*Admiral Ins. Co. v. Niagara Transformer Corp.*,
   57 F.4th 85 (2d Cir. 2023) .............................................................................................14, 15

*Al-Ahmed v. Twitter, Inc.*,
   553 F. Supp. 3d 118 (S.D.N.Y. 2021).................................................................................10

*Am. Fam. Ass'n, Inc. v. City & Cnty. of S.F.*,
   277 F.3d 1114 (9th Cir. 2002) .............................................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................11, 12, 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................................11

*Bensusan Rest. Corp. v. King*,
   126 F.3d 25 (2d Cir. 1997)...............................................................................................7, 8

*Berenson v. Twitter, Inc.*,
   No. 21-cv-9818 (N.D. Cal. Dec. 20, 2021)............................................................................1

*Beskrone v. Berlin*,
   — F. Supp. 3d —, 2023 WL 2023413 (S.D.N.Y. Feb. 15, 2023) ...........................................9

*Biden v. Knight First Amend. Inst.*,
   141 S. Ct. 1220 (2021)..........................................................................................................18

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
   403 U.S. 388 (1971) ............................................................................................................14

*Boddie v. Schnieder*,
   105 F.3d 857 (2d Cir. 1997)................................................................................................23

*Bonhac World Corp. v. Mellin Works LLC*,
   2023 WL 346950 (S.D.N.Y. Jan. 20, 2023) ..................................................................3, 8, 9

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)........................................................................................................21, 22

*Bristol-Myers Squibb Co. v. Superior Court*,
   582 U.S. 255 (2017)..............................................................................................................10

**TABLE OF AUTHORITIES**
*(Cont'd.)*

Page(s)

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014).................................................................................................10

*Doe v. Del. State Police*,
  939 F. Supp. 2d 313 (S.D.N.Y. 2013)........................................................................10

*Dolan v. Connolly*,
  794 F.3d 290 (2d Cir. 2015)..................................................................................21, 22

*Domen v. Vimeo, Inc.*,
  433 F. Supp. 3d 592 (S.D.N.Y. 2020).........................................................................25

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022)..........................................................................................2, 14

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021)..............................................................................................10

*Gleason v. McBride*,
  869 F.2d 688 (2d Cir. 1989)..................................................................................21, 22

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971)...............................................................................................21, 22

*Gucci Am., Inc. v. Li*,
  768 F.3d 122 (2d Cir. 2014).....................................................................................8, 9

*Hammerhead Enters., Inc. v. Brezenoff*,
  707 F.2d 33 (2d Cir. 1983).........................................................................................15

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  470 P.3d 571 (Cal. 2020)...........................................................................................24

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.'s Servs., Inc.*,
  175 F.3d 848 (10th Cir. 1999) ...................................................................................25

*Kahl v. Bureau of Nat'l Affs., Inc.*,
  856 F.3d 106 (D.C. Cir. 2017)....................................................................................20

*Knight First Amendment Institute v. Trump*,
  928 F.3d 226 (2d Cir. 2019)..................................................................................18, 19

*Lama Holding Co. v. Smith Barney Inc.*,
  668 N.E.2d 1370 (N.Y. 1996)...............................................................................23, 25

*Levin v. United States*,
  568 U.S. 503 (2013)...................................................................................................24

**TABLE OF AUTHORITIES**
*(Cont'd.)*

Page(s)

*M.O.C.H.A. Soc'y, Inc. v. City of Buffalo,*
689 F.3d 263 (2d Cir. 2012)..............................................................................18, 22

*Manhattan Cmty. Access Corp. v. Halleck,*
139 S. Ct. 1921 (2019)................................................................................14, 19, 22

*McCoy v. Interclaim Holdings Ltd.,*
2005 WL 8156768 (E.D.N.Y. Feb. 25, 2006)...............................................................9

*In re Mexican Gov't Bonds Antitrust Litig.,*
412 F. Supp. 3d 380 (S.D.N.Y. 2019).......................................................................11

*Minn. Voters All. v. Mansky,*
138 S. Ct. 1876 (2018).............................................................................................18

*Nat'l Rifle Ass'n of Am. v. Vullo,*
49 F.4th 700 (2d Cir. 2022) ........................................................................13, 15, 16, 19

*Nat'l Union Fire Ins. Co. v. UPS Supply Chain Sols., Inc.,*
74 F.4th 66 (2d Cir. 2023) ..................................................................................9, 10

*O'Handley v. Weber,*
62 F.4th 1145 (9th Cir. 2023) ....................................................................15, 17, 19

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
193 F.3d 781 (3d Cir. 1999)......................................................................................20

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.,*
791 P.2d 587 (Cal. 1990) .........................................................................................23

*Penguin Grp. (USA) Inc. v. Am. Buddha,*
609 F.3d 30 (2d Cir. 2010).....................................................................................7, 8

*Peralta v. St. Lukes Roosevelt Hosp.,*
2015 WL 3947641 (S.D.N.Y. June 26, 2015) .........................................................13

*Snyder v. Phelps,*
562 U.S. 443 (2011).................................................................................................20

*United States v. Wardy,*
777 F.2d 101 (2d Cir. 1985).....................................................................................23

*Walden v. Fiore,*
571 U.S. 277 (2014).................................................................................................10

*Webb v. Goord,*
340 F.3d 105 (2d Cir. 2003)......................................................................................23

iv

## TABLE OF AUTHORITIES
### *(Cont'd.)*

**Page(s)**

*Zherka v. Ryan*,
  52 F. Supp. 3d 571 (S.D.N.Y. 2014)......................................................................................14

**STATUTES**

28 U.S.C. § 2679..........................................................................................................................24

42 U.S.C. § 1985.....................................................................................2, 20, 21, 22, 23, 25

47 U.S.C. § 230..............................................................................................................2, 18, 25

**OTHER AUTHORITIES**

Derek Thompson, *The Pandemic's Wrongest Man*, The Atlantic (Apr. 1, 2021) ...........................5

Twitter Blog, *Coronavirus: Staying Safe and Informed on Twitter* (Jan. 29, 2020) .......................3

**RULES**

Fed. R. Evid. 201 ............................................................................................................................3

Defendant Andrew M. Slavitt respectfully submits this memorandum of law in support of his motion to dismiss plaintiff Alex Berenson's complaint.

## PRELIMINARY STATEMENT

Twitter, now known as X, suspended plaintiff Alex Berenson's account in August 2021 for repeatedly violating the company's policy against COVID-19 misinformation. Berenson claims that defendant Andrew M. Slavitt, who served as a senior White House advisor for the COVID-19 response for less than six months between January and June 2021, "caused" Berenson's "deplatforming" by criticizing him to Twitter both during and after Slavitt's brief term of government service. Compl. (Dkt. 3) ¶¶ 191–92, 196; Dkt. 28. But Berenson fails to offer a single non-conclusory allegation that would show Slavitt was somehow responsible for Twitter's decision to suspend his account before later reinstating it.

*Twitter* developed and instituted a five-strikes policy—and issued its first strike to Berenson—before Slavitt or any past or present member of the U.S. government allegedly complained about him. Compl. ¶¶ 81, 85. *Twitter* then issued four subsequent strikes to Berenson in July and August 2021—months *after* Slavitt had left government service. *Id.* ¶¶ 147, 155, 169. Berenson's own allegations make clear that numerous critics across a broad spectrum of interests objected to his Twitter posts regarding COVID-19 vaccines. On the face of the complaint, Twitter decided to take action against Berenson's account—or not (*e.g.*, *id.* ¶ 8)—based on its independent assessment of whether his tweets violated the platform's misinformation policies.

A federal court already decided as much. Berenson made substantively identical allegations in a 2021 lawsuit against Twitter in the Northern District of California, where he asserted that federal officials "enticed and coerced Twitter" to deprive him of his free speech rights. Decl. Ex. 2 ¶ 162, *Berenson v. Twitter, Inc.*, No. 21-cv-9818 (N.D. Cal. Dec. 20, 2021). Although

Berenson now claims that suit was "successful," Compl. ¶ 174, in reality the district court *rejected* his First Amendment claim as "futile" and dismissed with prejudice every claim except those based on unique and "*direct*" alleged promises by Twitter to Berenson, Ex. 3, at 4, 6.  In doing so, the *Twitter* court held that Berenson's allegations were "consistent with Twitter's good faith effort to respond to clearly objectionable content posted by users on its platform."  *Id.* at 3.  Berenson's complaint selectively quotes the *Twitter* decision, Compl. ¶ 212, but ignores the key First Amendment holding that binds him here.  Berenson seeks to re-litigate issues he already lost.

Berenson's claims disregard more than just the adverse ruling in the Northern District of California.  To select only four among the complaint's many fatal defects, first, Slavitt is a California resident, yet Berenson has dragged him into a court 3,000 miles away that lacks personal jurisdiction over him.  Second, the U.S. Supreme Court has "*never*" held that a plaintiff may pursue a damages action against federal officials for an alleged violation of the First Amendment, and has declined at least 12 times to imply a similar cause of action for constitutional violations, *Egbert v. Boule*, 142 S. Ct. 1793, 1800–01 (2022) (emphasis added), but Berenson pursues such a claim anyway, Compl. ¶ 199.  Third, Berenson sues Slavitt for conspiracy to violate Berenson's civil rights under 42 U.S.C. § 1985(3), but Berenson is not a member of any relevant protected class.  Fourth, Berenson challenges speech that § 230 of the Communications Decency Act immunizes from liability.  As discussed below, the list goes on.

Berenson's meritless complaint is a textbook example of a "SLAPP" suit—a strategic lawsuit designed to suppress Slavitt's constitutionally protected speech.  All of the conduct by Slavitt that Berenson challenges as tortious, including his conduct as a federal official, consists of speech or petitioning activity at the heart of the First Amendment.  Berenson complains, for example, that Slavitt criticized him to Twitter, Compl. ¶¶ 109, 156–57; coauthored a letter to

Congress with one of his co-defendants, *id.* ¶ 143; hosted public health experts on his podcast, *id.* ¶¶ 129–30, 149–50; and expressed views with which Berenson disagrees on quintessential matters of public concern, *id.* ¶¶ 53, 58, 93, 126–27, 146.  None of this political speech amounts to an actionable tort or conspiracy.  Berenson may dislike Slavitt's speech and advocacy, but he has no right to suppress it under the guise of tort claims.  The Court should dismiss the complaint against Slavitt for lack of personal jurisdiction under Federal Rule 12(b)(2) or dismiss it with prejudice for failure to state a claim under Federal Rule 12(b)(6).[1]

## BACKGROUND

Slavitt served as a White House senior advisor on the federal COVID-19 response from January to June 2021.  Compl. ¶ 31.  Every action Twitter allegedly took with respect to Berenson's account—and COVID-19 vaccine misinformation more generally—either happened when Slavitt was not working at the White House or is not alleged to have been brought about by Slavitt.

In March and April 2020, Twitter instituted and then updated a policy barring posts that contained false or misleading information about COVID-19.  Compl. ¶¶ 66–67; *see also* Twitter Blog, *Coronavirus: Staying Safe and Informed on Twitter* (Jan. 29, 2020).[2]  The company's bar on misinformation included any "content that goes directly against guidance from authoritative sources of global and local public health information."  Compl. ¶ 66.

Complaints about Berenson's Twitter activity began almost immediately.  In March 2020, the Imperial College of London "took its concerns to Twitter" concerning a series of "extremely

---

[1]  To the extent other defendants make arguments applicable to Slavitt that the Court finds meritorious, Slavitt joins such arguments by reference.

[2]  Twitter's COVID policies in effect in 2020 and 2021 are posted at https://tinyurl.com/4rzfjbt8. Berenson extensively relies on these policies—and brings a tortious interference claim based on them—and therefore incorporates them by reference into the complaint.  Compl. ¶¶ 66–67, 76, 81, 211–12; *see also Bonhac World Corp. v. Mellin Works LLC*, 2023 WL 346950, at *2 (S.D.N.Y. Jan. 20, 2023).  These policies are also subject to judicial notice.  *See* Fed. R. Evid. 201.

popular and dangerously misleading" tweets Berenson had published about the research of one of

its professors.  Compl. ¶ 64.  The college's director of media relations asked Twitter to "delete" or

"at least flag" the tweets and referred the company to a Financial Times article that explained why

Berenson's claims were "utterly false."  *Id.*  Throughout the rest of 2020, "[t]hird parties continued

to complain about Mr. Berenson's reporting."  *Id.* ¶ 73.

In December 2020, Twitter launched "a new policy regarding misleading COVID-19

vaccine information," announcing that it would start to "remove Tweets which advance harmful

or misleading narratives about COVID-19 vaccinations."  Compl. ¶ 76.  Then, on March 1, 2021,

Twitter "announced a new five-strike policy as part of the company's bar on medical

misinformation," under which "five or more violations" of the company's COVID misinformation

policy could result in "permanent suspension."  *Id.* ¶ 81.  "Meanwhile," according to the complaint,

"third party pressure to censor Mr. Berenson continued."  *Id.* ¶ 84.  As Berenson acknowledged in

an email to Twitter in December 2020:  "Many people are complaining I'm raising questions about

the vaccine."  *Id.* ¶ 78 (brackets and quotations omitted).

Notably, the "third party pressure" on Twitter was coming from private parties—not Slavitt

and not the U.S. government.  *See* Compl. ¶ 84.  Berenson alleges that Twitter had an entire team,

called the Global Escalation Team, or "GET," devoted to handling "complaints about tweets."  *Id.*

In mid-March 2021, a journalist sent an inquiry about Berenson's account that made its way to the

GET.  *Id.*  The "deep dive" Twitter performed as a result of that inquiry revealed that Berenson

cited "at times outdated" studies and that he made a misleading claim that had been "debunked by

the CDC."  *Id.* ¶ 85 (emphasis omitted).  As a result, Twitter decided to "take action on one of

Berenson's tweets that has been consistent with [its] past enforcements of the policy."  *Id.*  This

March 14, 2021 action was Berenson's first "strike."  *See id.*

At that time, public criticism of Berenson was growing.  The Atlantic published an article about Berenson on April 1, 2021, with the headline *The Pandemic's Wrongest Man*.  Compl. ¶ 102. Berenson's complaint quotes a portion of the article reporting that he had 200,000 followers on Twitter and "millions of viewers for his frequent appearances on Fox News" (where not even Berenson alleges that Slavitt or any other defendant attempted to "censor" him).  *Id.*  Berenson omits that the article walked readers "point by point through his wrong positions" and concluded that "Berenson has mischaracterized just about every detail regarding the vaccines to make the dubious case that most people would be better off avoiding them."  Derek Thompson, *The Pandemic's Wrongest Man*, The Atlantic (Apr. 1, 2021).

By "mid-April," after publication of the Atlantic article, Berenson allegedly "had the White House's attention."  Compl. ¶ 105; *see also id.* ¶ 158 (alleging that the "White House started" targeting Berenson's account "in April 2021").[3]  Berenson points to an April 21, 2021 meeting between Slavitt and two of his White House colleagues and several Twitter employees.  *Id.* ¶ 105. The government participants had seen a "data visualization" created by MIT researchers that identified Berenson's account as "ground zero for COVID-19 misinformation that radiates outward."  *Id.* ¶ 108.  One of the three White House officials allegedly asked Twitter "one really tough question about why Alex Berenson hasn't been kicked off from the platform."  *Id.* ¶ 107. Slavitt supposedly suggested that Twitter "was not enforcing its content guidelines with respect to Alex Berenson's tweets."  *Id.* ¶ 113.  At the conclusion of the meeting, Twitter "agreed to examine the account again."  *Id.* ¶¶ 85, 112.

Following its independent review of Berenson's account, Twitter informed the White

---

[3]  The complaint asserts that Berenson had the White House's "attention" "[b]y mid-April, if not before."  Compl. ¶ 105.  But Berenson does not allege any link between the White House and Berenson prior to mid-April 2021.

House's director of digital strategy that it "would not be removing Mr. Berenson."  Compl. ¶¶ 32, 105, 113.  As alleged in the complaint, Slavitt's (and others') alleged "initial pressure campaign *failed*."  *Id.* ¶ 8 (emphasis added).  Twitter communicated its "reluctance to suspend Mr. Berenson" and "told both the [alleged] conspirators and Mr. Berenson himself that he had done nothing wrong."  *Id.*  Throughout the spring of 2021, "Twitter continued to defend Mr. Berenson, and he continued to build his audience."  *Id.* ¶¶ 8, 116.  In May, June, and July 2021, Berenson published tweets "chiding President Biden" and "directly and aggressively criticiz[ing] the CDC," including accusing the CDC of "lying."  *Id.* ¶¶ 118, 120.  According to Berenson, "consistent with its previous defense of Mr. Berenson's right to express his views, Twitter took no action against any of these tweets."  *Id.* ¶ 120.

Berenson did not accumulate his second, third, fourth, and fifth strikes until July and August 2021, several months after Slavitt had left the government.  Compl. ¶¶ 147, 155, 169. Berenson alleges that Slavitt exchanged emails with Twitter employees from his personal Gmail account when he was once again a private citizen.  *See id.* ¶¶ 148–49, 156–57.  On July 28, 2021, between Berenson's third and fourth strike, Slavitt expressed his personal opinion to Twitter that Berenson "knows he's gone" and was "milk[ing] Twitter for audience."  *Id.* ¶¶ 148, 156.  Slavitt's email said nothing about the tweet resulting in Berenson's fourth strike, which made, in part, the widely disputed claim that the vaccine "does nothing to reduce the overall risk of death."  *Id.* ¶ 154.

On July 31, after Berenson's fourth strike, Slavitt stated his view that "if he doesn't go permanently after this, the outcry will be justified."  *Id.* ¶ 157.  The complaint contains no allegation that Twitter took action against Berenson's account *as a result of* Slavitt's emails, as opposed to numerous complaints that other third parties were making about Berenson's tweets.

For example, Berenson alleges that, when Slavitt "wrote to Twitter" to complain about a

tweet preceding Berenson's fifth strike, "Mr. Slavitt did not explain how or why anything Mr. Berenson said broke any of Twitter's rules or policies, including the company's COVID-19 misleading information policy." *Id.* ¶ 157.  Berenson notably omits any description of the tweet Slavitt was referencing when he opined to Twitter that the "outcry" over Berenson's account was "justified."  Compl. ¶ 157.  The dates alleged in the complaint indicate that it was "Impung macht frei" ("Vaccinations set you free"), Berenson's invocation of "arbeit macht frei" ("work sets you free"), the inscription over the gate to Auschwitz.  Slavitt was far from alone in objecting to Berenson's tweet.  *See* Ex. 1.  The Auschwitz Memorial Twitter account described the tweet as "painful to the memory of Auschwitz and its victims."  *Id*.  Other commenters reported the post to @TwitterSafety, asking:  "Why . . . hasn't @Twitter removed this monster yet?"  *Id.*

Twitter, however, ultimately took no action against Berenson for the Auschwitz tweet about which Slavitt and many others complained.  Ex. 2 ¶¶ 137, 139, 140, 144 (identifying tweets that prompted Berenson's strikes).  Although Berenson already possesses documents from Twitter and the government that have been produced in other litigation and posted as part of the "Twitter files," Compl. ¶¶ 4, 183, he does not allege that *any* of Slavitt's communications with Twitter caused the company to issue any strikes against his account.  To the contrary, Berenson alleges that a full month passed between Slavitt's alleged email exchanges with Twitter on July 28 and 31, 2021 and Berenson's permanent suspension from Twitter on August 28.  *Id.* ¶¶ 156–58, 169.

## ARGUMENT

## I.    THIS COURT LACKS PERSONAL JURISDICTION OVER SLAVITT.

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  "In diversity or federal question cases the court must look first to the long-arm statute of the forum state, in this instance, New York."  *Bensusan Rest. Corp. v. King*, 126 F.3d

25, 27 (2d Cir. 1997) (affirming dismissal for lack of personal jurisdiction).  Under New York's

long-arm statute, "a court in New York can exercise personal jurisdiction over a non-resident

defendant based either on general jurisdiction, under CPLR § 301, or specific jurisdiction, under

CPLR § 302."  *Bonhac*, 2023 WL 346950, at *3.  "If the exercise of jurisdiction is appropriate

under that statute, the court then must decide whether such exercise comports with the requisites

of due process."  *Bensusan*, 126 F.3d at 27.  Berenson has failed to make the required "prima facie

showing" of personal jurisdiction here.  *Penguin Grp.*, 609 F.3d at 34–35.

### A.      Berenson Has Not Adequately Pled Personal Jurisdiction Over Slavitt Under New York's Long-Arm Statute.

***General Jurisdiction***.  "Pursuant to N.Y. C.P.L.R. § 301 . . . , a defendant is subject to

personal jurisdiction if she is domiciled in New York, served with process in New York, or

continuously and systematically does business in New York."  *Bonhac*, 2023 WL 346950, at *3;

*see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (recognizing that the Due

Process Clause limits the availability of "doing business" jurisdiction under New York's long-arm

statute only to cases where the defendant is "essentially at home" in New York).  Berenson cannot

satisfy any of these factors.  He acknowledges Slavitt is domiciled in California, not in New York.

Compl. ¶ 31.  He did not personally serve Slavitt with the complaint in New York.  *See* Dkts. 14,

23.  And Berenson has not alleged that Slavitt engaged in such continuous and systematic business

in New York as to render him "essentially at home" there.  *Gucci*, 768 F.3d at 135.

Berenson's attempts to tie Slavitt to New York thus are wholly inadequate.  Berenson

alleges that Slavitt "worked as the general partner of a private equity fund based in New York,"

published a book with a New York-based publisher, and "traveled" to New York for occasional

speaking engagements.  Compl. ¶ 37.  Neither the work Slavitt allegedly performed as a general

partner, nor his sporadic other business in New York, make this the "exceptional case," *Gucci*, 768

F.3d at 135, where general jurisdiction is proper outside Slavitt's home state of California.  *See McCoy v. Interclaim Holdings Ltd.*, 2005 WL 8156768, at *4–5 (E.D.N.Y. Feb. 25, 2006) (holding that court lacked general jurisdiction over former New York resident who remained a partner at a New York law firm); *see also Beskrone v. Berlin*, — F. Supp. 3d —, 2023 WL 2023413, at *9 (S.D.N.Y. Feb. 15, 2023) (recognizing that business activity performed as an agent of an employer does not subject a defendant to general jurisdiction in New York in his individual capacity).

*Specific Jurisdiction*.  The only applicable subsection of New York's long-arm statute that could create specific jurisdiction is Civil Practice Law § 302(a)(3), which confers jurisdiction over a non-domiciliary under specific conditions.[4]  Section 302(a)(3) "is more stringent than any constitutional requirement."  *Nat'l Union Fire Ins. Co. v. UPS Supply Chain Sols., Inc.*, 74 F.4th 66, 72 (2d Cir. 2023) (quotations omitted); *see generally id.* ("Though many state statutes extend personal jurisdiction to the full extent permitted by the Constitution—thereby merging the statutory and constitutional inquiries—New York's long-arm statute does not reach so far.").

One condition for Berenson to establish personal jurisdiction under § 302(a)(3) is that "the act caused injury to a person or property within the state."  *Nat'l Union*, 74 F.4th at 72.  For purposes of § 302(a)(3), "the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff."  *Id.*  "The original event occurs where the *first effect* of the tort that ultimately produced the final economic injury is

---

[4] Berenson cannot establish personal jurisdiction under New York Civil Practice Law § 302(a)(1) because to do so he would have to allege that Slavitt "transacted business within the state" and "the claim asserted . . . arise[s] from that business activity."  *Bonhac*, 2023 WL 346950, at *3.  He makes no such allegations.  And § 302(a)(2) does not apply because it "provides that personal jurisdiction may apply where a defendant commits tort[i]ous conduct while physically present in New York."  *Id.* at *4.  Finally, § 302(a)(4) does not apply because Berenson does not allege that Slavitt owns, uses, or possesses real property in New York, let alone that such property is linked in any way to Berenson's claims.

located." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 327 (S.D.N.Y. 2013) (emphasis added).

Here, Berenson does not allege that the "first effect of the tort"—that is, his "deplatforming from Twitter," Compl. ¶ 196—happened in New York.  The more plausible conclusion is that Twitter issued such a decision in California, where it is based.  *Id.* ¶ 211.  Berenson also fails to satisfy other elements of § 302(a)(3), including that Slavitt "should reasonably have expected" his communications with Twitter "to have consequences in the state" or that Slavitt "derives substantial revenue from interstate or international commerce."  *Nat'l Union*, 74 F.4th at 72.

### B.    Berenson Cannot Establish Personal Jurisdiction Under the Due Process Clause.

Even if Berenson "could somehow shoehorn this case" into New York's long-arm statute, "exercising jurisdiction . . . would run afoul of due process."  *Al-Ahmed v. Twitter, Inc.*, 553 F. Supp. 3d 118, 130 (S.D.N.Y. 2021).  Under the Due Process Clause, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile."  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  Berenson resides in California, not New York.  Compl. ¶ 31.

For a court to exercise specific jurisdiction consistent with due process, Slavitt's "suit-related conduct" must have a "meaningful connection" to New York.  *Al-Ahmed*, 553 F. Supp. 3d at 130.  In other words, the defendant must not only undertake "some act by which it purposefully avails itself of the privilege of conducting activities within the forum," but the plaintiff's claims must also "*arise out of or relate to* the defendant's contacts with the forum."  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021) (emphasis added).  "What is needed . . . is a connection between the forum and the specific claims at issue."  *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 265 (2017).  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on 'random, fortuitous, or attenuated' contacts he makes by interacting with persons affiliated with the State."  *Walden v.*

*Fiore*, 571 U.S. 277, 286 (2014).  Here, however, none of the conduct that underlies Berenson's claims bears even a remote relationship to New York.

## II.    BERENSON FAILS TO STATE A CLAIM ON THE MERITS.

If the Court agrees with Slavitt that Berenson fails to state a claim, then it should conserve judicial and party resources by exercising its discretion to dismiss under Federal Rule 12(b)(6) rather than for lack of personal jurisdiction under Rule 12(b)(2).  *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 387 n.12 (S.D.N.Y. 2019) (The Federal Rules permit the Court to bypass the personal jurisdiction inquiry "by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction.").  That result is warranted here because the complaint fails at the most basic level to allege plausible claims.

To survive a motion to dismiss under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the Court must take the plaintiff's well-pleaded allegations as true for purposes of the motion, that principle does not apply to "a legal conclusion couched as a factual allegation." *Id.*  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### A.    Berenson Fails to Adequately Plead Causation for Any Claim.

Under Rule 12(b)(6), a core failing of each of Berenson's three claims against Slavitt is that Berenson fails to adequately allege that Slavitt caused Berenson's alleged injury—his suspension from Twitter.  Berenson alleges that Slavitt made "pointed inquiries to and veiled threats" during an April 2021 meeting between White House officials and Twitter employees. Compl. ¶ 192(a), (b).  Even accepting that characterization at face value, as Berenson concedes, Slavitt's alleged entreaties to Twitter "failed." *Id.* ¶ 8.  The company "took no action against"

Berenson in response to the April 2021 meeting—and did not do so for another *three months*, when it issued strikes two, three, and four in July 2021. *Id.* ¶¶ 8, 147, 155, 169. Nor has Berenson shown that Twitter took any adverse action against him in response to undated "angry" phone calls between unnamed White House officials and Twitter in which Berenson does not even allege that Slavitt participated. *Id.* ¶ 115 (emphasis omitted). To the contrary, Berenson alleges that "[m]any people" were "complaining" to Twitter about his online activity. *Id.* ¶ 78 (quotations omitted).

As for Slavitt's personal emails to Twitter after Slavitt left government service, the text of the emails contradict Berenson's characterization of them as "demand[s]" to remove Berenson from Twitter. Compl. ¶¶ 156–57. Slavitt simply expressed his personal opinion that Berenson "knows he's gone" and that "the outcry will be justified" if Berenson's Holocaust tweet did not result in his permanent suspension. *Id.* In any event, Berenson offers no substantive allegation that Twitter removed Berenson from the platform because of Slavitt's emails. Nor can Berenson attribute his failure to adequately allege causation to a lack of discovery—Berenson *already obtained discovery* in his lawsuit against Twitter, gained access to documents produced in Missouri and Louisiana's suit against the company, and has access to information that Twitter has made publicly available in the "Twitter files." *Id.* ¶¶ 4, 183. His conclusory claims that any of Slavitt's actions "caused Mr. Berenson's deplatforming from Twitter," *id.* ¶¶ 196, 205, 216, are insufficient to state a claim, particularly in light of the numerous other third-party complaints directed at Berenson's Twitter account. *See Iqbal*, 556 U.S. at 678.

Indeed, Berenson's claims already have been rejected by a federal court. As in this case, Berenson alleged in his suit against Twitter that the government coerced Twitter into censoring him. *Compare*, *e.g.*, Ex. 2 ¶ 162 ("Upon information and belief, the federal government enticed and coerced Twitter to deprive Mr. Berenson of his right to speak and petition the federal

government on the platform."), *with* Compl. ¶ 180 ("While debate raged about the mandates, Mr. Berenson was excluded from the world's largest, most important digital public forum, consigned there by a censorious, unconstitutional public-private partnership."); *see also* Ex. 2 ¶¶ 4–6, 12, 118, 122–29.  But the Northern District of California held that Berenson's similar allegations in the Twitter case were "consistent with Twitter's *good faith* effort to respond to clearly objectionable content posted by users on its platform."  Ex. 3, at 3 (emphasis added).

Because a court already decided that Berenson's allegation that government officials somehow forced Twitter into removing him from the platform was meritless, the doctrine of collateral estoppel precludes Berenson from relitigating the same causation question against Slavitt here.  *See Peralta v. St. Lukes Roosevelt Hosp.*, 2015 WL 3947641, at *4 (S.D.N.Y. June 26, 2015) ("Issues of res judicata and collateral estoppel may be decided on a motion to dismiss.").

### B.    Berenson Fails to State a First Amendment Claim.

Berenson's First Amendment claim fails on multiple independent grounds.  At the outset, the First Amendment does not provide a cause of action for money damages against current or former federal officials, nor can Berenson obtain forward-looking injunctive relief against Slavitt because he is no longer a government employee.  Even if some remedy were available to Berenson, which there is not, he has failed to show that Slavitt violated his First Amendment rights by allegedly "cajoling" Twitter to enforce its misinformation policies against Berenson.  Ex. 3, at 5. To state a First Amendment claim, Berenson must plausibly allege that Slavitt *coerced* Twitter into suspending his account by threatening an exercise of government power.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 717 (2d Cir. 2022).  He fails to do so here.

### 1.    Berenson Cannot Obtain Any Remedy for the Alleged First Amendment Violations.

This Court should dismiss the First Amendment claim because it can grant Berenson no

possible relief against Slavitt for the alleged violation of his rights—including damages, an injunction, or declaratory relief.

As explained by the U.S. Attorney, whose arguments Slavitt joins here, the First Amendment does not create a private right of action for money damages (*i.e.*, a "*Bivens*" claim). *See generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The U.S. Supreme Court has declined at least 12 times over the past 40 years to imply a cause of action for alleged constitutional violations, and the Court reiterated just last year that it has "*never* held that *Bivens* extends to First Amendment claims." *Egbert*, 142 S. Ct. at 1800–01, 1807 (emphasis added); *see also Zherka v. Ryan*, 52 F. Supp. 3d 571, 579 (S.D.N.Y. 2014) (noting that the Second Circuit has never recognized a *Bivens* remedy for First Amendment violations). To the extent Berenson bases his claim on Slavitt's alleged "retaliatory" targeting of Berenson because he tagged Slavitt's Twitter account "in a thread critical of Mr. Slavitt[]," Compl. ¶ 111, *Egbert* unequivocally held that "there is no *Bivens* action for First Amendment retaliation," 142 S. Ct. at 1807.

Nor may this Court enjoin Slavitt from hypothetical future incursions on Berenson's speech rights. The First Amendment "prohibits only *governmental* abridgment of speech," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019), and Slavitt ceased being a government official years ago, Compl. ¶¶ 31, 126. All that remains is Berenson's plea for a declaration that Slavitt "violated the First Amendment." *Id.* at 69. But declaratory judgments allow a party who has been "threatened" with a lawsuit or other coercive action to initiate suit and obtain "an authoritative determination" of his rights rather than wait to be sued as a defendant. *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023). They do not empower federal courts to issue what Berenson appears to be seeking—an "abstract"

pronouncement that Slavitt violated Berenson's rights when he served in the White House more than two years in the past.  *Id.* at 91.  Berenson has failed to plead a viable theory of relief.

### 2. Berenson Fails to State a First Amendment Claim.

Even if this Court could grant a remedy, Berenson has failed to plead that Slavitt infringed his First Amendment rights.  As a "government official," Slavitt enjoyed his own First Amendment rights "to speak, to take and express views, and to try to persuade."  *Nat'l Rifle Ass'n*, 49 F.4th at 714, 720.  Berenson's allegations, taken as true, show only that Slavitt permissibly exercised his right to "advocate" for his "preferred course of action," *id.* at 715—that Twitter follow its own policies and its stated public intent to stem the tide of vaccine misinformation that Slavitt believed to be "a life-and-death issue," Compl. ¶ 22.

### a. Berenson Has Not Plausibly Alleged that Slavitt Coerced Twitter Into Taking Any Adverse Action Against Him.

Berenson asserts that Slavitt's "pointed" suggestion to Twitter that his tweets violated Twitter's standards amounts to impermissible censorship.  Compl. ¶ 192(a).  But public officials do not violate the First Amendment by urging third parties like Twitter to remove harmful speech unless their "attempts to convince" escalate into "attempts to coerce."  *Nat'l Rifle Ass'n*, 49 F.4th at 715.  Public officials cross that line only if they imply that "some form of punishment or adverse regulatory action will follow the failure to accede to the official's request" to purge disfavored content.  *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983).  "This line holds even when government officials ask an intermediary not to carry content they find disagreeable."  *O'Handley v. Weber*, 62 F.4th 1145, 1163 (9th Cir. 2023).

The Second Circuit's opinion in *National Rifle Association* illustrates the distinction between permissible pressure and impermissible coercion.  There, following the Parkland mass shooting, the superintendent of New York's Department of Financial Services issued guidance

letters urging regulated insurers to "discontinue[] their arrangements with the NRA," a message she also pressed in private meetings with at least one large insurance company.  49 F.4th at 708–09, 717.  Reversing the denial of a motion to dismiss, the Second Circuit rejected the NRA's First Amendment challenge because the superintendent was "entitled to advocate for her political views" and did not threaten to flex the state's "regulatory authority" if insurers did not comply. *Id.* at 715, 717.  Absent "implied threats to employ coercive state power to stifle protected speech," a public official does not violate the First Amendment by using the stature of her office to persuade others to dissociate from the plaintiff.  *Id.* at 714–15; *see also Am. Fam. Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002) (holding that city council resolution that "urged television stations not to air" plaintiff's message did not violate First Amendment because it involved "no sanction or threat of sanction").

Berenson's allegations do not come close to showing impermissible coercion.  His claim turns on the April 2021 meeting at which Slavitt and two White House colleagues allegedly discussed certain "high-profile anti-vaxxer accounts" with Twitter employees.  Compl. ¶ 105.  The White House trio "really wanted to know about Alex Berenson" because they had seen a study showing his account was an "epicenter" of vaccine misinformation.  *Id.* ¶ 109.  Slavitt simply "express[ed] his view Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets."  *Id.* ¶ 113.  Another unidentified White House participant asked "one really tough question about why Alex Berenson hadn't been kicked off the platform."  *Id.* ¶ 107.  But Berenson does not allege that Slavitt or his colleagues at any point threatened action of any kind if Twitter allowed Berenson to remain.  *Id.* ¶¶ 105–14.

The facts alleged here closely track the facts of *O'Handley*, in which the Ninth Circuit affirmed the dismissal of a complaint under Rule 12(b)(6) on the basis that state officials do not

violate the First Amendment by flagging posts for Twitter that arguably violate the company's content-moderation policies.  62 F.4th at 1163.  The plaintiff in that case alleged that the California secretary of state "requested that Twitter remove" one of his posts for spreading election misinformation.  *Id.* at 1154, 1157–58.  The Ninth Circuit rejected the plaintiff's charge of state coercion because Twitter remained "free to ignore" the state's request and "decided how to respond" to its recommendations "independently."  *Id.* at 1158, 1163.  That Twitter "valued outside actors' input" did not suggest that the company was bound to follow it.  *Id.* at 1163.

So too here.  Far from compelling Twitter officials to suspend Berenson's account, Slavitt's alleged "pointed inquiries" did not bring about any action by Twitter.  Compl. ¶ 192(a).  As Berenson concedes, Twitter conducted an independent audit of Berenson's tweets after the April 2021 meeting and informed the White House that it "would not be removing Mr. Berenson" because he "had not violated Twitter policies at that time."  *Id.* ¶ 113.  As a result, Slavitt's supposed "pressure campaign *failed*."  *Id.* ¶ 8 (emphasis added).

Berenson quotes Lauren Culbertson, Twitter's head of government affairs, as saying that "we were asked to join several other calls" with White House officials after the April 2021 meeting that became "very angry in nature."  Compl. ¶ 115 (emphasis omitted).  But these supposedly "angry" calls do not come close to showing impermissible coercion by Slavitt.  Culbertson did not identify Slavitt as a participant in these calls, did not specify when they took place, and did not suggest that they included any threat of adverse regulatory action against Twitter.  *Id.*  Culbertson did not even indicate that the "angry" calls were *about Berenson*.  *Id.*  In any event, Berenson fails to allege that Twitter took *any* action against him (or anyone else) as a result of these calls.

Berenson also asserts that other members of the Biden Administration explored whether they could hold "social media platforms . . . legally liable for misinformation," notwithstanding

17

the protections afforded by § 230 of the Communications Decency Act.  Compl. ¶¶ 137–38.  Once again, such an allegation fails to show impermissible coercion by Slavitt.  Berenson does not allege that Slavitt contributed in any way to the government's legal analysis of Twitter's potential liability under § 230, which would have fallen well outside his expertise in public health.  Moreover, the complaint cites news reports dating these alleged government efforts to July 2021, after Slavitt had already left the government.  *Id.*  And, again, Berenson does not allege that Twitter was aware of, let alone acted in response to, this purported government initiative.

### b. Berenson Has Not Plausibly Alleged that Either Twitter or Slavitt's Twitter Account Is a Public Forum.

Berenson attempts to plead a First Amendment claim under the alternative theory that Twitter constitutes a public forum where public officials like Slavitt are barred from engaging in viewpoint discrimination.  Compl. ¶¶ 193–94.  But Berenson fails to plausibly allege that Twitter, a private company, has the essential attribute of a public forum—that it is "government-controlled."  *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).  In fact, the Northern District of California resolved this precise question against Berenson in his suit against Twitter, holding that "general cajoling" from "various federal officials" did not transform Twitter's content-moderation decisions into "state action" constrained by the First Amendment.  Ex. 3, at 5.  Berenson is precluded from repeating the same failed "public forum" theory here.  *See M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 284 (2d Cir. 2012).

Nor has Berenson plausibly alleged that Slavitt's individual Twitter account qualifies as a public forum.  Berenson relies on *Knight First Amendment Institute v. Trump*, 928 F.3d 226 (2d Cir. 2019), which he describes as "the closest immediate precedent," Compl. ¶ 25.  Berenson notably omits that the Supreme Court vacated the *Knight* judgment as moot.  *See Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1220–21 (2021).  Even assuming the Second Circuit's opinion

remains good law, its holding that former President Trump's Twitter account qualified as a public forum does not help Berenson here.  Slavitt's personal Twitter account, unlike Trump's, has none of "the trappings of an official, state-run account," nor has Berenson alleged that Slavitt opened the comments section "for indiscriminate use by the general public."  *Knight*, 928 F.3d at 231, 237.  Berenson, in short, fails to show that the public forum doctrine has any application to this case.

### c.     Slavitt's Activity After He Left the Government Cannot Form the Basis of a First Amendment Claim.

Because the First Amendment constrains only the conduct of government actors, *Halleck*, 139 S. Ct. at 1928, Berenson cannot state a First Amendment claim based on Slavitt's alleged communications with Twitter as a private citizen, *e.g.*, Compl. ¶¶ 148, 156–57.  Although Berenson makes the conclusory (and preposterous) allegation that Slavitt functioned as a "state actor" at "all relevant times," *id.* ¶ 190, he does not plead one fact from which this Court could conclude that this is "one of the exceptional cases" in which a private party is so entangled with the government that he should be "treated as a state actor for constitutional purposes," *O'Handley*, 62 F.4th at 1155–56.  To the contrary, Berenson's own allegations show that Slavitt resumed his podcast, began promoting a book, and joined a "private equity fund" after he left the White House in June 2021.  Compl. ¶¶ 37, 149–50.  Although Berenson alleges that Slavitt "remained in close contact" with former White House colleagues after his government service, *id.* ¶¶ 126, 128, that does not come close to showing he exercised the levers of federal power.

### 3.     Slavitt Is Entitled to Qualified Immunity.

Even if Berenson could state a First Amendment claim at all, which he cannot, Slavitt is entitled to qualified immunity because he did not violate any "clearly established" First Amendment right by engaging in noncoercive speech concerning Berenson's Twitter account, for the reasons given by the U.S. Attorney, whose arguments Slavitt joins here.  *See Nat'l Rifle Ass'n*,

49 F.4th at 719–20 (finding qualified immunity on similar facts).

### C.   Berenson Fails to State a Claim Under Section 1985(3).

#### 1.   Berenson Cannot Hold Slavitt Liable for Speech Activity Protected by the First Amendment.

This Court should dismiss Berenson's claim for conspiracy to violate his civil rights under the Ku Klux Klan Act, 42 U.S.C. § 1985(3), because each and every one of Slavitt's alleged conspiratorial acts consists of political speech protected by the First Amendment.  A plaintiff cannot hold a defendant liable in tort for truthful speech or opinion speech on matters of public concern.  *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011).  "Imposition of civil liability, such as the award of money damages, is treated no less stringently than direct regulation on speech." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 792 (3d Cir. 1999).

Here, however, Berenson seeks to impose money damages on Slavitt for exercising his own speech rights as both a White House official and a private citizen.  *See* Compl. ¶¶ 126–27, 129–30, 143, 149–50; pp. 15–19, *supra*.  As Berenson acknowledges, the great majority of this public-facing speech *was not even about him* and simply expressed Slavitt's general worldview that COVID vaccines are beneficial and misinformation poses a threat to public health.  *Id.* ¶ 15. None of this core First Amendment-protected activity can support a § 1985(3) claim.  *See Snyder*, 562 U.S. at 451.  This Court should dispatch with this meritless claim at the pleading stage to avoid any further chill on Slavitt's own free speech rights.  *See Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.) (directing district courts "to expeditiously weed out unmeritorious" suits that threaten First Amendment rights).

#### 2.   Berenson Fails to Satisfy Multiple Elements of a § 1985(3) Claim.

Apart from the claim's First Amendment defects, Berenson has failed to plead multiple essential elements of a § 1985(3) claim.  Section 1985(3) penalizes conspiracies "for the purpose

of depriving . . . any person or class of persons of the equal protection of the laws." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).  A § 1985(3) claim will lie only if the plaintiff establishes that the conspiracy is driven by "class-based, invidiously discriminatory animus," *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), and that he is a member of the protected class, *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir. 1989).  Plaintiff must also show the conspiracy "deprived" him of a "right or privilege of a citizen of the United States." *Dolan*, 794 F.3d at 296.

*Protected Class*.  Berenson argues that Slavitt targeted him because he speaks for "an identifiable class of Americans who had chosen not to receive a COVID-19 vaccine."  Compl. ¶ 202.  But § 1985(3) requires a class defined by "inherited or immutable characteristics." *Dolan*, 794 F.3d at 296.  A loosely defined group of individuals united "in political and philosophical opposition" to the defendant's policy position, such as a class opposed to COVID vaccines, does "not constitute a cognizable class under section 1985." *Gleason*, 869 F.2d at 695; *see also Abadi v. City of N.Y.*, 2022 WL 347632, at *7 (S.D.N.Y. Feb. 4, 2022) (holding that vaccination status does not give rise to a protected class for equal protection purposes).  That class, moreover, is irrelevant to the § 1985(3) claim:  Berenson does not allege that Slavitt targeted his speech because he "had chosen not to receive a COVID-19 vaccine," Compl. ¶ 202, but because he was spreading COVID misinformation on Twitter, *id.* ¶ 109.

That Berenson's proposed class supposedly consists of "disproportionate" numbers of "African-Americans, political conservatives, and evangelical Christians," Compl. ¶ 202, does not rescue his § 1985(3) claim.  Berenson does not allege that he is a member of any such group.  *See Gleason*, 869 F.2d at 694.  And allegations of disparate impact are not actionable under § 1985(3).  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271–72 (1993) (requiring proof that conspirators "selected or reaffirmed a particular course of action at least in part 'because of,' not

21

merely 'in spite of,' its adverse effects upon an identifiable group").

***Invidious Discrimination***.   Berenson likewise fails to plead that Slavitt's actions were driven by "invidiously discriminatory animus." *Griffin*, 403 U.S. at 102.  His complaint contains no allegation, as it must, that Slavitt discriminated against him because of his "membership in or affiliation with a particular class." *Gleason*, 869 F.2d at 695.  The "personal malice" that Slavitt supposedly harbored against Berenson because Berenson tweaked him on Twitter for "lick[ing]" Governor Cuomo's "shiny boots" does not suffice for § 1985(3). *Id.*; Compl. ¶¶ 103, 111.

Nor does the animus that Slavitt supposedly bore towards Berenson's claimed reporting. Compl. ¶ 203.  In *Bray*, 506 U.S. at 270, the Supreme Court held that animus toward abortion did not give rise to a § 1985(3) claim because there are "common and respectable reasons for opposing it."  Here, too, Slavitt's opposition toward vaccine misinformation that he believes imperils public health does not qualify as the sort of "invidious" animus required to state a claim under § 1985(3). *See* Compl. ¶ 182 (alleging that the Biden Administration views vaccines as "a life-saving measure").   Even Berenson does not question the appropriateness of limiting vaccine misinformation. *See id.* ¶ 70 (Berenson responded to Twitter "acknowledging Twitter's legitimate interest in reducing the visibility of" certain claims about COVID-19).

***Deprivation of a Right or Privilege***.  Berenson's § 1985(3) claim also fails because he has not identified any constitutionally protected right that Slavitt supposedly denied him. *See Dolan*, 794 F.3d at 296.  Berenson has no First Amendment right to engage in speech on Twitter, a private social media platform. *See Halleck*, 139 S. Ct. at 1928.  To the contrary, Berenson *lost* his claim that Twitter violated his First Amendment rights when it ejected him from the platform, Ex. 3, at 5, and he is precluded from relitigating that same issue here, *see M.O.C.H.A. Soc'y*, 689 F.3d 263.

***Conspiracy***.  Last, Berenson has not sufficiently alleged a conspiracy, which requires "an

agreement, express or tacit, to achieve [an] *unlawful end*." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (emphasis added).  Berenson offers only "conclusory, vague, or general allegations" that Slavitt formed any "agreement" with his alleged co-conspirators concerning Berenson's Twitter account.  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997).  He charges that Slavitt and Scott Gottlieb "coauthored a letter to Congress" and "appeared on interviews together in 2020 and 2021," and that Slavitt hosted Albert Bourla on his podcast around the time Berenson received several strikes.  Compl. ¶¶ 143, 149.  But none of this protected speech even concerned Berenson, and the mere fact that these defendants shared common views about vaccines and made public appearances together does not support an inference that they agreed to seek his removal from Twitter.  Even if Berenson had somehow shown such an "agreement," he cannot establish that agreement was "unlawful" because neither Slavitt nor any other defendant violated his First Amendment rights.  *See United States v. Wardy*, 777 F.2d 101, 107 (2d Cir. 1985).

### 3.    Slavitt is Entitled to Qualified Immunity on the §1985(3) Claim.

Even if Berenson has plausibly alleged all elements of a § 1985(3) claim, Slavitt is entitled to qualified immunity for the reasons explained by the U.S. Attorney.

### D.    Berenson Fails to State a Tortious Interference Claim.

To state a claim for tortious interference with contract under both New York and California law, Berenson must plausibly allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589–90 (Cal. 1990); *see also Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996) (requiring, unlike California, breach of contract rather than breach or disruption).  In New York, the defendant must procure the breach "without justification." *Lama*

*Holding*, 668 N.E.2d at 1375.   Similarly, when the contract is an at-will contract, California requires the defendant to have "engaged in an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 580 (Cal. 2020).   The Court should dismiss Berenson's tortious claim because he has failed to show Slavitt induced any breach of his contract, much less that he did so wrongfully or without justification.

At the outset, Berenson cannot recover damages in tort stemming from Slavitt's conduct as a federal officer.   The Federal Tort Claims Act shields individual employees from personal liability for alleged torts committed in the scope of their employment and permits suits only against the United States.   *See Levin v. United States*, 568 U.S. 503, 509 (2013) (citing 28 U.S.C. § 2679(b)(1)).   The U.S. Attorney has certified that Slavitt "was acting within the scope of his federal employment" to the extent the tortious interference claim is "premised on actions he took during the time period he served as Senior Advisor."   Dkt. 28.   Accordingly, Berenson's tortious interference claim must rise or fall based on Slavitt's conduct as a private citizen.

The tortious interference claim fails because Berenson has not plausibly alleged that Slavitt interfered with his contract with Twitter.   That contract gives Twitter complete discretion to "suspend or terminate" a user's account for "any or no reason."   Compl. ¶ 212.   Berenson asserts that Twitter "modified" that contract when it instituted the "five-strike" policy, *id.*, but that is a legal conclusion the Court need not accept as true at the pleading stage, *Iqbal*, 556 U.S. at 678. Even assuming the "five-strike" policy did modify the contract, Berenson fails to plausibly allege that any of Slavitt's emails to Twitter as a private citizen caused Twitter to issue a strike against him or otherwise interfered with his alleged contract.   Compl. ¶¶ 156–57; pp. 11–13, *supra*.   And even if Berenson *had* managed to tie any strike to Slavitt's emails, his tortious interference claim still fails because he cannot establish that such communications were wrongful or unjustified.   To

the contrary, Slavitt's expression of opinion that "the outcry will be justified" if Berenson did not receive a strike for his widely condemned Holocaust tweet, *id.* ¶ 157, enjoyed the full protection of the First Amendment and cannot give rise to a tortious interference claim. *See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.'s Servs., Inc.*, 175 F.3d 848, 857–58 (10th Cir. 1999).

Berenson also alleges that Twitter gave him private assurances that his speech did not violate Twitter's policies. Compl. ¶¶ 68–72 78–79, 83. To the extent Berenson claims that Slavitt induced a breach of his oral contract with Twitter, that claim fails because Berenson has not alleged that Slavitt had "knowledge" of any such private agreement. *Lama Holding*, 668 N.E.2d at 1375.

### E.   Section 230 Provides Immunity from Berenson's § 1985(3) and Tortious Interference Claims.

The Communications Decency Act immunizes a "provider *or user* of an interactive computer service" from civil liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider *or user* considers to be . . . objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A) (emphases added). Berenson alleges that Slavitt is a Twitter user, Compl. ¶¶ 51, 58, and his allegations make clear that Slavitt had a good-faith belief that Berenson's tweets represented dangerous and objectionable COVID-19 misinformation, *id.* ¶¶ 58, 89, 109, 130, 143. As such, Slavitt is immune as a matter of law from liability for Berenson's statutory and common law claims arising from his alleged efforts to encourage Twitter to "crack down on COVID-19 skepticism." *Id.* ¶ 105; *see also Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 603–04 (S.D.N.Y. 2020) (recognizing that § 230(c)(2) "does not require that the material actually be objectionable; rather, it affords protection for blocking material that the provider or user considers to be objectionable").

### CONCLUSION

This Court should dismiss the claims against Slavitt with prejudice.

Dated:  August 21, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000


By:/s/ *Theodore J. Boutrous Jr.*
      Theodore J. Boutrous Jr.

Theodore J. Boutrous Jr.
Michael H. Dore (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  (213) 229-7000
TBoutrous@gibsondunn.com
MDore@gibsondunn.com

Katherine Moran Meeks (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, DC  20036
Telephone:  (202) 955-8258
KMeeks@gibsondunn.com

*Attorneys for Defendant Andrew M. Slavitt*