UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEX BERENSON,

                Plaintiff,

    -against-


JOSEPH R. BIDEN, JR., ANDREW M. SLAVITT,
ROBERT  FLAHERTY, VIVEK MURTHY, M.D.,
SCOTT GOTTLIEB, M.D., and ALBERT
BOURLA, PH.D, D.V.M.

                Defendants.

---

Case No. 1:23-cv-03048-JGLC

**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN SUPPORT OF
DR. ALBERT BOURLA AND DR. SCOTT GOTTLIEB'S
<u>MOTION TO DISMISS THE COMPLAINT</u>**


James P. Rouhandeh
Michael Scheinkman
David B. Toscano
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York   10017
212-450-4000

*Attorneys for Dr. Albert Bourla and
Dr. Scott Gottlieb*

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................4

     A.     Dr. Gottlieb and Dr. Bourla .........................................................4

     B.     Twitter's Efforts to Limit Misinformation About COVID-19....................4

     C.     The Alleged Conspiracy Against Berenson, and Twitter's Enforcement Actions Against His Account ................................................5

     D.     Berenson's Lawsuit Against Twitter ............................................7

     E.     The Instant Action and Berenson's Publicity Campaign ...........................8

ARGUMENT............................................................................................................................9

     I.     Berenson Fails to State a § 1985(3) Claim Against Dr. Gottlieb or Dr. Bourla ..........................................................................9

        A.     Berenson Fails to Plead Class-Based Invidiously Discriminatory Animus.................................................................10

           1.     Berenson Fails to Plead a Class Protected by § 1985(3) ...............10

           2.     Berenson Fails to Plead Invidiously Discriminatory Animus........12

        B.     Berenson Fails to Plead Facts Plausibly Showing that Dr. Gottlieb or Dr. Bourla Conspired to Deprive Him of First Amendment Rights..........12

        C.     Berenson Fails to Plead the Necessary Government Action .....................14

           1.     Berenson Fails to Plead That the Government Coerced Twitter to Suspend Him ...................................................15

           2.     Berenson Fails to Plead "Joint Action" Between Twitter and the Government.............................................................16

           3.     Berenson Fails to Plead Twitter Was Exercising a Public Function .........................................................17

II.    Berenson's Tortious Interference Claim Is Not Actionable ..................................17

      A.    Berenson Fails to Allege Any Breach of Contract.....................................18

      B.    Berenson Fails to Plead Dr. Gottlieb or Dr. Bourla Knew of the "Direct" Personal Assurances that Twitter Supposedly Breached ............20

      C.    Berenson Fails to Allege Any Independently Tortious Conduct...............21

      D.    Berenson Fails to Plead That Dr. Gottlieb's or Dr. Bourla's Alleged Conduct Caused Twitter to Suspend His Account...................................22

III.    The First Amendment Bars the Claims Against Dr. Gottlieb and Dr. Bourla .......22

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Abadi v. City of New York*,
2022 WL 347632 (S.D.N.Y. Feb. 4, 2022) ........................................................... 11

*Am. Diamond Exch., Inc. v. Alpert*,
101 Conn. App. 83 (2007) ...................................................................................... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 12

*Berenson v. Twitter, Inc.*,
2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) .............................................. *passim*

*Biro v. Conde Nast*,
622 F. App'x 67 (2d Cir. 2015) .............................................................................. 25

*Blake v. Levy*,
191 Conn. 257 (1983) ............................................................................................ 21

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ............................................................................................... 12

*Brock v. City of New York*,
2022 WL 479256 (S.D.N.Y. Jan. 28, 2022) .......................................................... 11

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) ............................................................................................... 16

*Butler Am., LLC v. Ciocca*,
2020 WL 6781488 (Conn. Super. Ct. Mar. 12, 2020) ........................................... 21

*Celle v. Filipino Rep. Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000) .................................................................................. 24

*Changizi v. HHS*,
602 F. Supp. 3d 1031 (S.D. Ohio 2022) ................................................................ 15

*Children's Health Def. v. Facebook Inc.*,
546 F. Supp. 3d 909 (N.D. Cal. 2021) ................................................................... 17

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018) .................................................................................. 21

*Cox v. Twitter, Inc.*,
2019 WL 2513963 (D.S.C. Feb. 8, 2019), *report and recommendation approved*,
2019 WL 2514732 (D.S.C. Mar. 8, 2019) .............................................................. 19

*Craft v. Musk*,
   2023 WL 2918739 (N.D. Cal. Apr. 12, 2023) ................................................................ 17

*Czech Beer Importers, Inc. v. C. Haven Imports, LLC*,
   2005 WL 1490097 (S.D.N.Y. June 23, 2005) .............................................................. 18

*D'Andrea v. Rafla-Demetrious,*
   146 F.3d 63 (2d Cir. 1998) ........................................................................................ 18

*Daley v. Aetna Life & Cas. Co.*,
   249 Conn. 766 (1999) ................................................................................................ 22

*Daniels v. Alphabet Inc.*,
   2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ............................................................ 19

*Davis v. Avvo, Inc.*,
   345 F. Supp. 3d 534 (S.D.N.Y. 2018) ........................................................................ 25

*Dean v. Warren*,
   12 F.4th 1248 (11th Cir. 2021) .................................................................................. 11

*Delano Vill. Cos. v. Orridge*,
   147 Misc. 2d 302 (Sup. Ct. N.Y. Cty. 1990) .............................................................. 23

*Doe v. Fenchel*,
   837 F. App'x 67 (2d Cir. 2021) .................................................................................. 12

*Dolan v. Connolly*,
   794 F.3d 290 (2d Cir. 2015) ...................................................................................... 10

*Eastlander Grp., LLC v. Severin Hills, LLC*,
   2005 WL 1524945 (Conn. Super. Ct. June 2, 2005) .................................................. 22

*Eli Lilly & Co. v. Gottstein*,
   617 F.3d 186 (2d Cir. 2010) ........................................................................................ 2

*Fabrikant v. French*,
   691 F.3d 193 (2d Cir. 2012) ...................................................................................... 14

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) ................................................................................... 23

*Flamm v. Am. Ass'n of Univ. Women*,
   201 F.3d 144 (2d Cir. 2000) ...................................................................................... 24

*Flynn v. Dixon*,
   2023 WL 3477081 (Conn. Super. Ct. May 9, 2023) .................................................. 22

*Ford v. Northam*,
   2023 WL 2767780 (W.D. Va. Mar. 31, 2023) ............................................................ 11

*Fulani v. McAuliffe*,
2005 WL 2276881 (S.D.N.Y. Sept. 19, 2005) ........................................................................ 11

*Griffin v. Breckenridge*,
403 U.S. 88 (1971) ................................................................................................................ 10

*Hammerhead Enters., Inc. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983) .................................................................................................... 23

*Hart v. Facebook Inc.*,
2022 WL 1427507 (N.D. Cal. May 5, 2022) ................................................................... 15, 16

*Hartline v. Gallo*,
546 F.3d 95 (2d Cir. 2008) .................................................................................................... 14

*Huber v. Biden*,
2022 WL 827248 (N.D. Cal. Mar. 18, 2022) ......................................................................... 17

*Illoominate Media, Inc. v. CAIR Found.*,
2019 WL 13168767 (S.D. Fla. Nov. 19, 2019), *aff'd sub nom.*
*Illoominate Media, Inc. v. CAIR Fla., Inc.* ................................................................... 3, 7, 17

*Illoominate Media, Inc. v. CAIR Fla., Inc.*,
841 F. App'x 132 (11th Cir. 2020) .................................................................................... 3, 19

*Immuno AG. v. Moor-Jankowski*,
77 N.Y.2d 235 (1991) ............................................................................................................ 22

*Iosilevich v. City of New York*,
2022 WL 19272855 (E.D.N.Y. Aug. 10, 2022) ..................................................................... 11

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*,
968 F.2d 286 (2d Cir. 1992) .................................................................................................. 22

*Jones v. Deutsch*,
715 F. Supp. 1237 (S.D.N.Y. 1989) ...................................................................................... 14

*K.D. ex rel. Duncan v. White Plains Sch. Dist.*,
921 F. Supp. 2d 197 (S.D.N.Y. 2013) ................................................................................... 11

*Khan v. Yale Univ.*,
27 F.4th 805 (2d Cir. 2022) ................................................................................................... 18

*Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*,
318 Conn. 847 (2015) ............................................................................................................ 20

*Levine v. N.Y. State Police*,
2022 WL 4465588 (N.D.N.Y. Sept. 26, 2022) ...................................................................... 10

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ..................................................................................................... 12, 17

*Masson v. New Yorker Mag., Inc.*,
  501 U.S. 496 (1991) ...................................................................................... 25

*McEvoy v. Spencer*,
  49 F. Supp. 2d 224 (S.D.N.Y. 1999) ............................................................ 11

*McTerrell v. N.Y.C. Health & Hosps. Corp.*,
  2020 WL 1503194 (S.D.N.Y. Mar. 30, 2020)............................................... 13

*Medtech Prod. Inc. v. Ranir, LLC*,
  596 F. Supp. 2d 778 (S.D.N.Y. 2008) ........................................................... 20

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
  2018 WL 847014 (S.D.N.Y. Jan. 12, 2018),
  *report and recommendation adopted*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)............ 23

*Morton v. Twitter, Inc.*,
  2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) ................................................ 19

*Murphy v. Twitter, Inc.*,
  60 Cal. App. 5th 12 (2021) ............................................................................ 19

*N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*,
  2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) ............................................... 20

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ...................................................................................... 22

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013) .......................................................................... 22

*Owens v. Lead Stories, LLC*,
  2021 WL 3076686 (Del. Super. Ct. July 20, 2021), *aff'd*, 273 A.3d 275 (Del. 2022)............ 23

*O'Handley v. Padilla*, 579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub nom.*
*O'Handley v. Weber,* 62 F.4th 1145 (9th Cir. 2023) .............................................. 14, 16

*O'Handley v. Weber,*
  62 F.4th 1145 (9th Cir. 2023) ........................................................................ 15, 16

*Rangel v. Dorsey*,
  2022 WL 2820107 (N.D. Cal. July 19, 2022) ............................................... 19

*Reid v. City of New York*,
  2022 WL 2967359 (S.D.N.Y. July 27, 2022)................................................. 11

*Rich v. Fox News Network, LLC*,
  939 F.3d 112 (2d Cir. 2019) .......................................................................... 18, 22

*Roundtree v. City of New York*,
  2021 WL 1667193 (S.D.N.Y. Apr. 28, 2021) ............................................... 12

*Sweet v. Google Inc.*,
  2018 WL 1184777 (N.D. Cal. Mar. 7, 2018) ........................................................ 19

*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
  546 F.3d 255 (2d Cir. 2008) ............................................................................. 14

*Taboola, Inc. v. Ezoic Inc.*,
  2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020) ..................................................... 20

*Taboola, Inc. v. Ezoic Inc.*,
  2021 WL 2041639 (S.D.N.Y. May 21, 2021) ...................................................... 21

*United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*,
  463 U.S. 825 (1983) .................................................................................... 12, 13

*Webb v. Goord*,
  340 F.3d 105 (2d Cir. 2003) ............................................................................. 12

*Weiss v. Willow Tree Civic Ass'n*,
  467 F. Supp. 803 (S.D.N.Y. 1979) ....................................................................... 2

*Williams v. Rosenblatt Sec. Inc.*,
  136 F. Supp. 3d 593 (S.D.N.Y. 2015) ................................................................. 12

*Yuksel v. Twitter, Inc.*,
  2022 WL 16748612 (N.D. Cal. Nov. 7, 2022) ..................................................... 19

*Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................................... 22

*In re Zyprexa Injunction*,
  474 F. Supp. 2d 385 (E.D.N.Y. 2007) ................................................................... 2

## STATUTES & RULES

42 U.S.C. § 1985(3) ................................................................................. *passim*

## PRELIMINARY STATEMENT[1]

Like many other COVID-19 vaccine skeptics and critics, plaintiff Alex Berenson had one of his social media accounts suspended for violating the platform's rules. Berenson concedes that the platform (Twitter) made the decision to suspend his account. He disagreed with Twitter's August 2021 decision to suspend him and sued Twitter in December 2021. In July 2022, Berenson settled with Twitter on undisclosed terms, and Twitter lifted its suspension of Berenson.

In this action, Berenson alleges — without any facts — that this suspension was the result of a vast conspiracy, hatched at the White House by the President of the United States and members of his administration, to target specifically Berenson's Twitter account for removal. Berenson gloms onto his alleged conspiracy two private citizens — Dr. Scott Gottlieb, an independent director on the board of Pfizer Inc. ("Pfizer"), and Dr. Albert Bourla, Pfizer's CEO — claiming they conspired to violate his First Amendment rights in violation of 42 U.S.C. § 1985(3) and tortiously interfered with his contractual relationship with Twitter under state law.[2]

Berenson has explained, publicly and repeatedly, why he named private citizens Dr. Gottlieb and Dr. Bourla as defendants in a lawsuit challenging the "*federal government's* censorship agenda." Berenson openly admits that he hopes to obtain discovery from non-party Pfizer about "what Pfizer actually knew" and "what [it was] telling the White House" about vaccines in 2021.[3] This is not Berenson's first misuse of judicial process: he concocted a scheme to serve what the Second Circuit criticized as a "sham" subpoena as an "end run around [a] protective

---

[1] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

[2] Berenson also brings constitutional claims against President Joseph R. Biden, Jr., Dr. Vivek Murthy (the Surgeon General of the United States), Andrew M. Slavitt (the former White House Senior Advisor to the COVID-19 Response Coordinator), and Robert Flaherty (the former White House Director of Digital Strategy). Berenson asserts that Slavitt conspired both during his time at the White House, and after he became a private citizen.

[3] *Tucker Carlson Tonight* (Fox News television broadcast Apr. 12, 2023).

order" in order to publish confidential discovery material produced by another pharmaceutical company.[4]  His present abuse of the legal process should not be countenanced, especially given his past conduct, which the district judge described as "brazen" and "reprehensible."[5]

Because Berenson pleads no facts plausibly showing that Dr. Gottlieb or Dr. Bourla played any role in the purported conspiracy at the heart of his complaint, his claims against them fail at the motion to dismiss stage.  Not only does Berenson fail to allege virtually every required element, but his theories are foreclosed by longstanding binding precedent.  Berenson's § 1985(3) claim is an egregious perversion of the Ku Klux Klan Act, which "may not be construed as a warrant to impose wide-ranging new duties upon private individuals in the interests of abstract equality."[6]

Berenson's proffered class — "Americans who had chosen not to receive a COVID-19 vaccine" — is not cognizable under § 1985(3) because it is not defined by "inherited or immutable" characteristics, as the Supreme Court and Second Circuit require.  No court has accepted § 1985(3) claims based on vaccination status, and judges of this Court have repeatedly held that COVID-19 vaccination status does not warrant treatment as a protected class.  Nor does Berenson allege that he belongs to that "class," another missing requisite for his claim.  And Berenson himself affirmatively negates the necessary "invidiously discriminatory animus" by acknowledging that the government defendants view vaccination against COVID-19 as a "life-saving measure."

Berenson's § 1985(3) claim fails for the independent reason that he does not plead facts plausibly showing the government action necessary to any First Amendment violation — much less showing that Dr. Gottlieb or Dr. Bourla are, as private citizens, liable for any such government

---

[4] *See Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 192 (2d Cir. 2010).

[5] *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 428 (E.D.N.Y. 2007) (Weinstein, J.).

[6] *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803, 815 (S.D.N.Y. 1979) (quoting *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1248 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366 (1979)).

action.  The facts pleaded by Berenson show that Twitter independently made the decision to suspend Berenson's account, as well as the decision to reinstate it at a later point in time.  Even with the benefit of internal documents from Twitter, Berenson alleges no more than ordinary interactions between individuals inside and outside government who were involved in important aspects of the nation's pandemic response — including that Dr. Gottlieb "was repeatedly a guest on Mr. Slavitt's podcast" after Slavitt left the White House, and that "in remarks at a Pfizer manufacturing facility,"  President Biden "thanked [Dr.] Bourla for 'what you do.'"  Courts around the country have repeatedly and uniformly dismissed First Amendment claims — however disguised — against private persons arising from COVID-19 posts on social media.

Berenson's remaining claim — alleged tortious interference — fares no better.  As one federal court aptly reasoned, the "suggestion that the mere reporting of a Twitter user — however insistent such reporting may be — is sufficient to constitute tortious interference in a business relationship between Twitter and the targeted user is, to put it mildly, nonsensical."[7]  With good reason.  Twitter's Terms of Service allowed it to suspend or terminate Berenson's account for "any or no reason" — undermining any contract or expectancy relating to the continuation of his account.  Berenson also fails to allege that any alleged action by Dr. Gottlieb or Dr. Bourla caused his Twitter suspension.  He admits that Twitter had issued him four (of the maximum five) strikes before *any* contact from Dr. Gottlieb, and that Twitter itself made the decision to issue the fifth strike.

Finally, the First Amendment provides an independent and insurmountable obstacle to Berenson's claims against Dr. Gottlieb and Dr. Bourla, which seek to penalize their speech about

---

[7] *Illoominate Media, Inc. v. CAIR Found.*, 2019 WL 13168767, at *3 (S.D. Fla. Nov. 19, 2019), *aff'd sub. nom Illoominate Media, Inc. v. CAIR Fla., Inc.* 841 F. App'x 132 (11th Cir. 2020).

3

matters of enormous public importance (vaccines) and a self-proclaimed public figure (Berenson).

For these reasons, and the additional reasons set forth below, Dr. Gottlieb and Dr. Bourla respectfully request that the Court dismiss Berenson's claims against them and order such further relief as the Court finds appropriate in light of all of the circumstances.

## BACKGROUND

### A.      Dr. Gottlieb and Dr. Bourla

Dr. Scott Gottlieb is a physician, author, and media commentator who served as FDA commissioner from 2017 to 2019.  ¶¶ 14, 34.[8]  After completing his public service, Dr. Gottlieb took positions as a senior fellow at the American Enterprise Institute, partner at a venture capital firm, and director on the boards of multiple public companies, including as an independent director on the board of Pfizer, a research-based, global biopharmaceutical company headquartered in New York City.  ¶¶ 140–42.  During the pandemic, Dr. Gottlieb used his expertise to inform the public about important issues relating to COVID-19, including the role of vaccines.  ¶¶ 98, 142, 146, 175. He wrote columns for *The Wall Street Journal*, contributed to NBC News and CBS News, and published a book identifying gaps in the global response to COVID-19.  Among his many public health statements, he and 15 current and former public health officials (including Slavitt) issued a bipartisan call in April 2020 for investment in COVID-19 tracking and tracing.  ¶ 143.  Since 2019, Dr. Bourla has served as Pfizer's CEO, under whose leadership Pfizer co-developed the first FDA-approved COVID-19 vaccine.  ¶¶ 35, 145, 149, 153.

### B.      Twitter's Efforts to Limit Misinformation About COVID-19

Twitter (since renamed X) is a social media platform that allows users to post short

---

[8] Citations in the form "¶" or "¶¶" refer to the Complaint, the well-pleaded allegations of which are assumed to be true solely for purposes of this motion to dismiss, notwithstanding that the Complaint's allegations are inaccurate, incomplete, and misleading.

messages called "tweets."  By using Twitter's services, a user agrees to be bound by Twitter's Rules and Terms of Service.  ¶ 212; *see* Ex. A.[9]  Twitter invited and actively solicited third parties to help police its platform by reporting potential violations for Twitter's review and evaluation. Ex. B.  For instance, after Berenson commented on a study by a professor from Imperial College London in March 2020, the institution asked Twitter to "delete Berenson's tweets or at least flag them for making false claims."  ¶¶ 63–64.  After reviewing the tweets, Twitter took no action. ¶ 65.

In December 2020, Twitter published a COVID-19 Misleading Information Policy (the "COVID-19 Policy") barring content "advanc[ing] a claim of fact," that was "demonstrably false or misleading," and "likely to impact public safety or cause serious harm."  ¶ 76; Ex. C at 1.  In March 2021, Twitter updated the COVID-19 Policy to provide that five violations (so-called "strikes") would result in the user's permanent suspension.  ¶ 81; Ex. D at 3.  That month, a journalist reported Berenson's account to Twitter, which conducted a "deep dive" and declined to issue any strikes to Berenson.  ¶¶ 84–85.  By the time it stopped enforcing its COVID-19 Policy in November 2022, Twitter had challenged actions taken by 11.72 million accounts, suspended 11,230 accounts, and removed 97,674 pieces of content globally.  Ex. E at 3.

**C.      The Alleged Conspiracy Against Berenson, and Twitter's Enforcement Actions Against His Account**

From the outset of his presidency, President Biden and senior federal officials including Slavitt, Flaherty and Murthy allegedly touted the benefits of COVID-19 vaccines publicly, and sought to reduce vaccine misinformation, including by communicating with social media companies such as Twitter.  ¶¶ 94–99.  Berenson asserts that at a "secret White House meeting" — which

---

[9] Citations in the form "Ex. _" refer to an exhibit to the accompanying declaration of James P. Rouhandeh.

neither Dr. Gottlieb nor Dr. Bourla is alleged to have attended — "the conspirators . . . led by Andrew Slavitt . . . specifically targeted Mr. Berenson for removal" from Twitter. ¶ 7. On April 21, 2021, Twitter allegedly briefed White House officials about its efforts to counter vaccine misinformation. ¶¶ 105–06. At the meeting, the White House participants allegedly presented data showing Berenson was "ground zero for covid misinformation," and asked why Twitter had not removed his account. ¶¶ 105–14. But, according to the complaint, Twitter stood on its conclusion that Berenson had not violated its policies, based on the previous month's "deep dive." ¶¶ 85, 112–13. Berenson alleges that there were "[m]ore meetings" between Twitter and White House officials, but he does not allege that Dr. Gottlieb or Dr. Bourla attended any such meetings. ¶ 115.

After leaving the White House on June 9, 2021, Slavitt returned to podcasting. In episodes published in July 2021, Slavitt interviewed Dr. Murthy about COVID-19 misinformation, interviewed Dr. Bourla, and interviewed Dr. Gottlieb, who allegedly stated that he had been in "pretty regular" contact with Slavitt and other Biden administration officials in early 2021. ¶¶ 128, 130–32, 144, 149. The same month, the Biden administration publicly addressed COVID-19 misinformation on social media platforms. ¶¶ 129–38. For example, Dr. Murthy recommended that platforms detect "misinformation 'super-spreaders'" and "[i]mpose clear consequences" for violating the platforms' policies. ¶ 129. President Biden criticized social media companies for their failure to police COVID-19 misinformation by saying, "They're killing people." ¶ 135.

On July 28, 2021, Dr. Bourla and Pfizer's general counsel allegedly attended a White House meeting with unspecified attendees, the agenda for which — upon "information and belief" — included "COVID-19 booster shots and vaccine skepticism." ¶ 152. Dr. Bourla previously had appeared alongside President Biden at a February 2021 event at a Pfizer manufacturing facility. ¶ 88. Berenson does not allege that either meeting included any discussion about him.

In July and August 2021, Twitter issued four strikes against Berenson, who had apparently received his first strike earlier that year.  ¶ 85.  Twitter issued the second strike on July 16 for a tweet by Berenson arguing that "[t]he vaccines are failing."  ¶ 147.  Twitter issued the third strike on July 27, and the fourth strike on July 30 for a tweet arguing that Pfizer's COVID-19 vaccine "does nothing to reduce the overall risk of death."  ¶¶ 147, 154–55.

On August 24, 2021, Dr. Gottlieb allegedly emailed Todd O'Boyle, a public policy executive at Twitter, forwarding a link to a Substack post by Berenson criticizing Dr. Anthony Fauci, with the cover message: "This is what[']s promoted on Twitter.  This is why Tony [Fauci] needs a security detail."  ¶¶ 161–62.  Dr. Gottlieb did not mention penalizing Berenson's account.  In response, Twitter arranged a call between Dr. Gottlieb and unidentified Twitter employees.  ¶ 164.

On August 28, 2021, Berenson tweeted: "It doesn't stop infection.  Or transmission.  Don't think of it as a vaccine.  Think of it - at best - as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS.  And we want to mandate it?  Insanity."  ¶ 167.  Dr. Gottlieb forwarded the tweet to O'Boyle without comment.  *Id*.  O'Boyle referred it to Twitter's Strategic Response Team, which labeled it as misleading, issued Berenson his fifth strike, and suspended his account.  ¶¶ 168–69.  The next day, Berenson notified his Substack followers that he had created a new Twitter account under a pseudonym.[10]  Dr. Gottlieb forwarded this post to O'Boyle, writing: "seems he switched accounts on you."  ¶ 171.

### D.    Berenson's Lawsuit Against Twitter

On December 20, 2021, Berenson sued Twitter in the United States District Court for the Northern District of California.  *See* Ex. F.  He asserted, among other claims, that Twitter's

---

[10] Alex Berenson, *Hello Twitter*!, Unreported Truths (Aug. 29, 2022), , https://alexberenson.substack.com/p/hello-twitter.

permanent suspension of his account had breached a contract and violated his First Amendment rights. Ex. F ¶¶ 157–64, 198–208. Berenson's contract claim focused on his alleged interactions with a Twitter vice president named Brandon Borrman. Concerned about Twitter's new COVID-19 policy, Berenson in December 2020 contacted Borrman, who allegedly told him that "[t]he points you're raising should not be an issue at all," because the "policy is designed to allow debate and discussion," but not "conspiracy theories." Ex. F ¶¶ 102–03. Months later, after another Twitter policy change, Borrman allegedly told Berenson that "your name has never come up in the discussions around these policies" and "[i]f it does I will try to ensure you're given a heads up before an action is taken." Ex. F ¶ 110.

On Twitter's Rule 12(b)(6) motion, the court held that Berenson had stated claims only for breach of contract and promissory estoppel. *Berenson v. Twitter, Inc.*, 2022 WL 1289049, at *2–3 (N.D. Cal. Apr. 29, 2022). Based on Borrman's alleged statements, the court concluded that Berenson "plausibly avers that Twitter's conduct here modified its contract with plaintiff and then breached that contract by failing to abide by its own five-strike policy and its specific commitments set forth through its vice president." *Id.* at *2. On June 30, 2022, the parties settled. Twitter reinstated Berenson's account and publicly stated: "Upon further review, Twitter acknowledges Berenson's Tweets should not have led to his account's suspension at that time." ¶ 178.

The court rejected Berenson's claim under the First Amendment, "which only prohibits government abridgement of speech." *Berenson*, 2022 WL 1289049, at *3. It held that Twitter's suspension of Berenson was not "state action," including because "general cajoling from various federal officials regarding misinformation on social media platforms do[es] not plausibly assert Twitter conspired or was otherwise a willful participant in government action." *Id.*

**E.      The Instant Action and Berenson's Publicity Campaign**

Berenson brought this lawsuit as the centerpiece of an ongoing publicity, merchandising,

8

and fundraising campaign that commenced months before this suit was filed.[11]  The same day he filed the complaint, Berenson tweeted links to fundraising sites to "support my lawsuit against @POTUS @AlbertBourla."[12]  That night, Berenson appeared on *Tucker Carlson Tonight*, revealing that he was using this litigation as a back door to obtain information from Pfizer about the development of its COVID-19 vaccines.  In that interview, Berenson said that "[t]his lawsuit is probably the only lawsuit that can . . . get all of us to have some idea of what Pfizer actually knew about the failure of the vaccines in 2021 and what they were telling the White House."[13]  He admitted that his primary goal was to "survive the motion to dismiss" to obtain "discovery that nobody else is going to be able to get."[14]  Berenson touted this lawsuit on Twitter as "a unique chance at winning discovery with Pfizer."[15]  As recently as August 9, 2023, Berenson promoted it as "the only – and I mean ONLY – civil lawsuit with a chance to force @Pfizer to reveal what it knew, or at least what it told the government in 2021."[16]

## ARGUMENT

### I.    Berenson Fails to State a § 1985(3) Claim Against Dr. Gottlieb or Dr. Bourla

---

[11] Alex Berenson, *Looks Even Better Than I Hoped*, Unreported Truths (Oct. 21, 2022), https://alexberenson.substack.com/p/looks-even-better-than-i-hoped (showing picture of coffee mug with "Fauci & Gottlieb & Slavitt & Bourla); Alex Berenson, *Fauci & Gottlieb & Slavitt & Bourla*, Unreported Truths (Oct. 17, 2022), https://alexberenson.substack.com/p/fauci-and-gottlieb-and-slavitt-and ("I'm printing a limited number of t-shirts and coffee mugs which I may auction off to support the coming lawsuit.").

[12] @AlexBerenson, *Twitter* (Apr. 12, 2023 3:31 PM), https://twitter.com/AlexBerenson/status/1646234541160267794.

[13] *Tucker Carlson Tonight* (Fox News television broadcast Apr. 12, 2023).

[14] *Tucker Carlson Tonight* (Fox News television broadcast Apr. 12, 2023); *see also* Fox Business, *My Lawsuit Might Be the Only Way Into Pfizer: Alex Berenson*, www.foxbusiness.com/video/6324887365112 (Apr. 12, 2023) ("[I]f I can get past the motion to dismiss, I can get Pfizer to tell me what they were talking to senior officials in the White House about — not just about me, but about these vaccines."); @AlexBerenson, *Twitter* (Nov. 22, 2022 8:02 PM), https://twitter.com/AlexBerenson/status/1595221187377991681 ("[S]oon enough we should get to depose Tony [Fauci] for ourselves along with @ScottGottliebMD and @ASlavitt and even @AlbertBourla (inshallah!) . . .").

[15] @AlexBerenson, *Twitter* (Apr. 12, 2023 3:35 PM), https://twitter.com/AlexBerenson/status/1646235665242243072.

[16] @AlexBerenson, *Twitter* (Aug. 9, 2023 10:52 AM), https://twitter.com/AlexBerenson/status/1689288476686942208.

To state a § 1985(3) claim, a plaintiff must plead: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) resulting injury to a person or his property or deprivation of any right or privilege of a citizen of the United States. *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).[17]  Berenson contends that Dr. Gottlieb, Dr. Bourla, and the government defendants conspired to suspend his Twitter account in violation of his First Amendment rights.  ¶¶ 204–05.  As shown below, his § 1985(3) claim fails to plead the essential elements of (1) invidiously discriminatory animus toward any "class" protected by the statute, (2) a cognizable conspiracy involving Dr. Gottlieb or Dr. Bourla, or (3) the government action necessary to a deprivation of First Amendment rights.

### A.    Berenson Fails to Plead Class-Based Invidiously Discriminatory Animus

Berenson's § 1985(3) claim should be dismissed because he fails to plead facts plausibly showing that the defendants' actions were motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."  *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  Berenson has pleaded neither a cognizable class nor any invidiously discriminatory motivation.

### 1.    Berenson Fails to Plead a Class Protected by § 1985(3)

The class that Berenson posits — "Americans who had chosen not to receive a COVID-19 vaccine" (¶ 202) — is not cognizable under binding Second Circuit law.  "[T]he term class unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors."  *Dolan*, 794 F.3d at 296.  The Second Circuit has rejected putative classes that "do not possess the type of inherited or immutable characteristics

---

[17] Section 1985(3) provides: "If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."  42 U.S.C. § 1985(3).

sufficient to satisfy the class-based animus requirement." *Id*. Thus, courts in this Circuit have rejected proffered § 1985(3) "classes" defined by reference to individuals' choices. *See*, *e.g.*, *id.* ("jailhouse lawyers and members of an [inmate liaison committee]"); *Levine v. N.Y. State Police*, 2022 WL 4465588, at *9 n.10 (N.D.N.Y. Sept. 26, 2022) (formerly incarcerated individuals); *Reid v. City of New York*, 2022 WL 2967359, at *21 (S.D.N.Y. July 27, 2022) (pre-trial detainees); *Fulani v. McAuliffe*, 2005 WL 2276881, at *6 (S.D.N.Y. Sept. 19, 2005) (independent voters); *McEvoy v. Spencer*, 49 F. Supp. 2d 224, 227 (S.D.N.Y. 1999) (whistleblowers).

The choice not to receive a COVID-19 vaccine is neither inherent nor immutable, and membership in the "class" is in constant flux. Accordingly, the only court to have addressed the issue has held that a class based on a person's vaccination status is not protected by § 1985(3). *Ford v. Northam*, 2023 WL 2767780, at *9 (W.D. Va. Mar. 31, 2023). And unlike race or national origin — which are among the protected classes that merit strict scrutiny — "the distinction . . . between vaccinated and non-vaccinated persons has an amply rational basis," and vaccination status is not a "constitutionally protected characteristic." *Abadi v. City of New York*, 2022 WL 347632, at *8 (S.D.N.Y. Feb. 4, 2022); *accord Brock v. City of New York*, 2022 WL 479256, at *6 (S.D.N.Y. Jan. 28, 2022); *Iosilevich v. City of New York*, 2022 WL 19272855, at *4 n.14 (E.D.N.Y. Aug. 10, 2022). In an attempt to evade this requirement, Berenson alleges that his proffered class "includes a disproportionate number of African-Americans, political conservatives, and evangelical Christians." ¶ 202. But such alleged "disparate impact" discrimination is not cognizable under § 1985(3). *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 n.4 (1993); *Dean v. Warren*, 12 F.4th 1248, 1256 (11th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).

Moreover, Berenson does not allege that he is a member of the posited class, as is required

under § 1985(3).  *See K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013).  He alleges he "ha[s] taken vaccines" and does not allege he is unvaccinated against COVID-19.  ¶ 74.  In any event, Berenson does not contend that he suffered his alleged harm (suspension from Twitter) because he was unvaccinated.  These pleading failures provide independent grounds to dismiss his § 1985(3) claims against Dr. Gottlieb and Dr. Bourla.

### 2.    *Berenson Fails to Plead Invidiously Discriminatory Animus*

Berenson's complaint not only fails to plead invidiously discriminatory animus, it negates it.  Berenson acknowledges that the government defendants "view COVID-19 vaccination as a life-saving measure" and want to increase vaccination rates, demonstrating a lack of animus. ¶ 182.  Despite no specific allegations that Dr. Gottlieb and Dr. Bourla were motivated by anything other than saving lives, Berenson asserts, without any plausible factual basis, that their motivations were "financial."  ¶ 22; *see* ¶ 163 ("Mr. Berenson's reporting was dangerous to Pfizer's multi-billion-dollar product.").  Even if Berenson could support that assertion, financial motivation is not a cognizable theory of invidiously discriminatory animus under § 1985.  *See United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 838 (1983).  Courts routinely dismiss § 1985 claims premised on financial, as opposed to discriminatory, motivations for engaging in an alleged conspiracy.  *See*, *e.g.*, *Doe v. Fenchel*, 837 F. App'x 67, 68–69 (2d Cir. 2021); *Roundtree v. City of New York*, 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021); *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 610 (S.D.N.Y. 2015).

### B.    **Berenson Fails to Plead Facts Plausibly Showing that Dr. Gottlieb or Dr. Bourla Conspired to Deprive Him of First Amendment Rights**

Berenson falls far short of alleging an actionable conspiracy involving Dr. Gottlieb or Dr. Bourla, including because he fails to plead facts plausibly showing "a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v.*

*Goord*, 340 F.3d 105, 110 (2d Cir. 2003).  Further, because the First Amendment "prohibits only *governmental* abridgment of speech," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (emphasis in original), Berenson must plead that Dr. Gottlieb and Dr. Bourla, as private citizens, conspired with a *then-current* government official.  *Scott*, 463 U.S. at 830.[18]

Here, even after obtaining internal Twitter documents and discovery from government officials,[19] Berenson pleads no facts plausibly showing that Dr. Gottlieb or Dr. Bourla entered into any agreement with any *then-current* government official (or anyone else) to violate Berenson's free speech rights.  *See McTerrell v. N.Y.C. Health & Hosps. Corp.*, 2020 WL 1503194, at *5 (S.D.N.Y. Mar. 30, 2020).  The sparse, incomplete facts alleged do not show that Dr. Gottlieb or Dr. Bourla ever discussed Berenson's Twitter account with any other defendant, much less agreed on a plan *for the government* to cause Twitter to suspend it.  Berenson does not allege that Dr. Gottlieb or Dr. Bourla attended the "secret White House meeting in April 2021" at which the alleged conspiracy "target[ing] Berenson for removal" from Twitter supposedly was formed.  ¶ 7.

Berenson's phrase "conspiracy theory nonsense" perfectly describes his attempt to plead a § 1985(3) claim with vague, conclusory and otherwise non-probative allegations.  ¶ 78.  Berenson alleges that Dr. Gottlieb "was repeatedly a guest on Mr. Slavitt's podcast," publicly "lauded" Slavitt's White House appointment, and "remained in 'pretty regular' contact with Mr. Slavitt and other Biden Administration officials throughout the winter and spring of 2021."  ¶¶ 14, 143, 144.  The conspiracy allegations against Dr. Bourla are even weaker.  Berenson alleges only that Dr. Bourla received thanks from President Biden during an event at a Pfizer manufacturing facility, sat for an

---

[18] Dr. Gottlieb was not a government official at any relevant time, and is not a "[G]overnment Defendant[]."  ¶ 191.

[19] Berenson relies on documents obtained from his settlement with Twitter, ¶¶ 4, 174, 178, the publicly released Twitter Files, ¶¶ 183–85, and discovery made public in a lawsuit against government officials, ¶¶ 4, 26, 125; Dkt. No. 3-1.

interview on Slavitt's podcast, and attended a White House meeting about (on "information and belief") "COVID-19 booster shots and vaccine skepticism." ¶¶ 14, 88, 149, 152.

The most Berenson alleges is that, in the midst of a global pandemic, the former FDA Commissioner (Dr. Gottlieb) "became prominent in the debate over ways to contain its threat" and communicated about vaccines with government officials in "both the Trump and Biden Administrations;" and that the CEO of the company that co-developed the first COVID-19 vaccine (Dr. Bourla) spoke publicly and with government officials about the vaccine. ¶¶ 14, 142–44, 149. These meetings "might demonstrate a meeting of the minds to promptly address" vaccine-related issues, but do not show "a meeting of the minds to violate constitutional rights, let alone [Berenson's] constitutional rights." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1184 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).[20]

### C.     Berenson Fails to Plead the Necessary Government Action

Berenson does not state a § 1985(3) claim for the independent reason that he has not adequately alleged that *the government* infringed his First Amendment rights — let alone that any such infringement can be attributed to Dr. Gottlieb or Dr. Bourla. To show state action, Berenson must plead facts showing that Twitter's suspension of his account is "fairly attributable" to the government. *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012). Specifically, Berenson must plead that: (1) the government coerced Twitter to suspend him; (2) his suspension constituted "joint action" by the government and Twitter; or (3) the government delegated a public function to Twitter pursuant to which he was suspended. *See Sybalski v. Indep. Grp. Home Living Program,*

---

[20] Berenson's theory that Dr. Bourla and Dr. Gottlieb are co-conspirators fails on the facts and the law. "[O]fficers, agents and employees of a single corporate entity are legally incapable of conspiring together" under § 1985. *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008). Dr. Bourla and Dr. Gottlieb both served as Pfizer directors, and Berenson alleges they shared "pecuniary motives" "to silence" Berenson's criticisms of Pfizer's vaccine. ¶¶ 141, 215.

*Inc.*, 546 F.3d 255, 257 (2d Cir. 2008); *Jones v. Deutsch*, 715 F. Supp. 1237, 1248 (S.D.N.Y. 1989) (applying substantively similar tests to § 1985(3) claim).  Berenson fails all three tests.

### 1.    *Berenson Fails to Plead That the Government Coerced Twitter to Suspend Him*

Berenson's § 1983(5) claim flies in the face of the overwhelming authority rejecting First Amendment claims alleging government coercion of social media companies to suspend users — including in Berenson's suit against Twitter.  The Ninth Circuit recently held that a state government did not coerce Twitter by using a portal to "fla[g] for Twitter's review posts that potentially violated the company's content-moderation policy," reasoning that the state merely "suppl[ied] Twitter with information," which Twitter could "decid[e] how to utilize."  *O'Handley*, 62 F.4th at 1160; *see also Hart v. Facebook Inc.*, 2022 WL 1427507, at *8 (N.D. Cal. May 5, 2022) ("Hart has not alleged any connection between any (threat of) agency investigation . . . and Twitter's decisions."); *Changizi v. HHS*, 602 F. Supp. 3d 1031, 1053 (S.D. Ohio 2022) (holding that Surgeon General's public comments could not be construed as "threats" against Twitter).

Berenson's allegations confirm that the decision to suspend his account was Twitter's alone.  He concedes that Twitter repeatedly rejected third-parties' requests to flag or delete his tweets, including a March 2020 request from a university, a March 2021 request from a journalist, and an April 2021 request from White House officials.  ¶¶ 64–65, 84, 112–13.  Indeed, Berenson asserts that defendants' "initial pressure campaign failed" because of "Twitter's reluctance to suspend [him]" and "Twitter['s] [finding] that [he] had not violated the platform's rules about COVID-19." ¶ 8.  Twitter's independence continued through its ultimate decision to suspend Berenson's account, which was the considered result of Twitter's internal deliberations — as shown by facts pleaded based on discovery in Berenson's lawsuit against Twitter.  ¶¶ 4, 174, 178.  Specifically, a member of Twitter's "Strategic Response Team" analyzed a tweet by Berenson under the supervision of a senior manager, assigned the tweet a strike (Berenson's fifth), and reported to

the senior manager that Berenson's account had been suspended for violating Twitter's COVID-19 policy. ¶ 168. Berenson editorializes that the senior manager's follow-up questions constituted "insist[ence]" and "press[ure]." *Id.* But even if it were proper to credit Berenson's labels, they describe *only* internal decision-making at Twitter, and do not negate the independence of Twitter's decision from defendants. Conspicuously absent from the internal Twitter communications quoted by Berenson is any hint of coercion by Dr. Gottlieb, Dr. Bourla, or any other defendant.

In addition, Twitter publicly took responsibility for its suspension of Berenson, telling "media outlets [that Berenson] had committed 'repeated violations of our COVID-19 misinformation rules.'" ¶ 19; *see Hart*, 2022 WL 1427507, at *6 ("On their own, Facebook and Twitter's contemporaneous statements plausibly explain Hart's injury."). And when Twitter settled Berenson's lawsuit against it in 2022, it did not attempt to shift the blame to third parties, but instead "acknowledge[d]" that Twitter should not have suspended his account at that time. ¶ 178. [21]

### 2. Berenson Fails to Plead "Joint Action" Between Twitter and the Government

Joint action occurs *only* when the government "has so far insinuated itself into a position of interdependence with [a private actor] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). Berenson has failed to allege facts showing that the government acted jointly with Twitter in suspending him. Because "consultation and information sharing" between the government and Twitter is not "joint action," courts have rejected claims premised on that theory, *O'Handley*, 62 F.4th at 1160; *Hart*, 2022 WL 1427507, at *7, including when Twitter allegedly provided election officials with "priority pathway . . . to flag concerns" about tweets. *O'Handley*, 579 F. Supp. 3d at 1172, 1183.

---

[21] Likewise, Twitter pleaded in its answer in *Berenson v. Twitter* that Berenson's August 28, 2021 tweet "constituted a strike under Twitter's COVID-19 misleading information policy." Ex. G ¶ 144.

16

Nor did Twitter's and the government's overlapping interests in combatting vaccine misinformation transform Twitter's decision to suspend Berenson into state action. *See*, *e.g.*, *Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 928 (N.D. Cal. 2021) ("[G]eneral statements by the CDC and Zuckerberg about 'working together' to reduce the spread of health or vaccine misinformation, or to promote universal vaccination do not show that the government was a 'joint participant in the challenged activity.'"); *Huber v. Biden*, 2022 WL 827248, at *7 (N.D. Cal. Mar. 18, 2022), *aff'd*, 2022 WL 17818543 (9th Cir. Dec. 20, 2022) ("[S]tatements about working together with the government to prevent the spread of misinformation do not equate to working in concert to violate constitutional rights."). "Joint action" is affirmatively negated by all the facts showing that Twitter alone made the decision to suspend Berenson. *See supra* Point I.C.1.

### 3.    *Berenson Fails to Plead Twitter Was Exercising a Public Function*

The Supreme Court has held that "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." *Halleck*, 139 S. Ct. at 1930. Likewise, lower courts uniformly have concluded that Twitter's content decisions are not a "public function." *See*, *e.g.*, *Craft v. Musk*, 2023 WL 2918739, at *2 (N.D. Cal. Apr. 12, 2023); *Berenson*, 2022 WL 1289049, at *3.

## II.    Berenson's Tortious Interference Claim Is Not Actionable

Reporting tweets to Twitter is not a basis for tort liability. The "suggestion that the mere reporting of a Twitter user — however insistent such reporting may be — is sufficient to constitute tortious interference in a business relationship between Twitter and the targeted user is, to put it mildly, nonsensical." *Illoominate*, 2019 WL 13168767, at *3. Twitter informs users that potentially violative content can be reported, and that Twitter consults with third parties in enforcing its policies. Ex. A at 3; Ex. D at 2. Berenson's tortious interference claim fails at every step.

17

"The elements [of] tortious interference with contract under either New York or Connecticut law are similar." *Czech Beer Importers, Inc. v. C. Haven Imports, LLC*, 2005 WL 1490097, at *4 (S.D.N.Y. June 23, 2005).[22]   To state a claim under New York law, Berenson must plead "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019).   Under Connecticut law, Berenson must plead "(1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Khan v. Yale Univ.*, 27 F.4th 805, 817 (2d Cir. 2022).

## A.    Berenson Fails to Allege Any Breach of Contract

Berenson has failed to plausibly plead a breach of contract, which is fatal to his tortious interference claim under New York law.  *Rich*, 939 F.3d at 126–27; *see also D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66 (2d Cir. 1998) ("Because there was no breach of contract . . . , [the] tortious interference with contractual relations claim must fail.").

In upholding the contract claim in *Berenson v. Twitter*, the court rested on the alleged "specific and *direct* assurances" to Berenson about the COVID-19 Policy.  *Berenson*, 2022 WL 1289049, at *2.  That approach was necessary because, as Berenson concedes, Twitter's Terms of Service allowed it to suspend or terminate his account for "any or no reason."  ¶ 212.  Given this broad discretion, courts universally have rejected claims that Twitter's account suspensions

---

[22] Dr. Gottlieb lives in Connecticut, but the Court need not undertake a choice-of-law analysis because the tortious interference claim is barred, and fails to state a claim, under both New York law and Connecticut law.

breached its Terms of Service.  *See*, *e.g.*, *Illoominate Media, Inc. v. CAIR Fla., Inc.* 841 F. App'x 132, 137 (11th Cir. 2020).; *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *5 (N.D. Cal. Nov. 7, 2022); *Rangel v. Dorsey*, 2022 WL 2820107, at *3 (N.D. Cal. July 19, 2022); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 35 (2021); *Cox v. Twitter, Inc.*, 2019 WL 2513963, at *4 (D.S.C. Feb. 8, 2019), *report and recommendation approved*, 2019 WL 2514732 (D.S.C. Mar. 8, 2019).

Likewise, Twitter's COVID-19 Policy contained no enforceable promises, much less promises that superseded the Terms of Service.  For this reason, courts have rejected contract claims based on Twitter's alleged violation of policies outside its Terms of Service.  *See Morton v. Twitter, Inc.*, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021) (content moderation policies); *Murphy*, 60 Cal. App. at 38–39 ("promises" in Twitter's rules, enforcement guidelines, and safety page).  Similarly, social media platforms' policy statements *do not* limit the broad discretion granted in the terms of service.  *See*, *e.g.*, *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *8 (N.D. Cal. Mar. 31, 2021); *Sweet v. Google Inc.*, 2018 WL 1184777, at *9–10 (N.D. Cal. Mar. 7, 2018). Berenson cannot "reasonably rely on alleged promises that Twitter would not . . . take 'account-level' action when the terms of service stated at all relevant times that Twitter . . . could suspend or terminate an account 'for any or no reason.'"  *Murphy*, 60 Cal. App. 5th at 38–39.

In any event, the court that upheld Berenson's contract claim against Twitter erred in holding that alleged statements by a Twitter executive changed this result.  The court referred to "specific and *direct* assurances to [Berenson] regarding his posts pursuant to [the five-strikes] policy." *Berenson*, 2022 WL 1289049, at *2.  But the "assurances" were not definitive promises and, in any event, no alleged facts plausibly show that they were breached.  The executive merely told Berenson he would "*try* to ensure you're given a heads up before an action is taken, *but I am not*

19

*always made aware of them before they're executed*."[23] ¶ 83. Even if the executive "never advised [Berenson] that he was in any trouble," *Berenson*, 2022 WL 1289049, at *1, there is no allegation that he did not "try" to do so, or even that he was aware of the impending account suspension.

## B.    Berenson Fails to Plead Dr. Gottlieb or Dr. Bourla Knew of the "Direct" Personal Assurances that Twitter Supposedly Breached

A tortious interference claim also requires that the defendant have "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached." *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020); *see also Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 864 (2015) (requiring defendants' knowledge of contractual relationship). Here, even if Borrman's "direct" personal assurances to Berenson gave rise to a contractual obligation, Berenson pleads no facts showing that Dr. Gottlieb or Dr. Bourla had any knowledge of them. Indeed, Berenson does not even plead facts showing that either Dr. Gottlieb or Dr. Bourla had knowledge of the details of Twitter's COVID-19 Policy.

Berenson does not meet his pleading burden with the conclusory allegation that Dr. Gottlieb was "aware of that contract, including Twitter's COVID-19 misleading information policy." ¶ 213. Indeed, Berenson fails to allege facts showing that Dr. Gottlieb knew of the private personal exchanges between Borrman and Berenson. *See N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333, at *4 (S.D.N.Y. Apr. 12, 2013) (requiring knowledge of specific provision that allegedly was breached); *Butler Am., LLC v. Ciocca*, 2020 WL 6781488, at *3 (Conn. Super. Ct. Mar. 12, 2020) (same). As such, the only plausible inference is that Dr. Gottlieb would understand that Berenson's "contract" with Twitter was freely terminable at Twitter's discretion,

---

[23] Even if these statements created a contract, it was superseded by Twitter's August 19, 2021 updated Terms of Service providing that "the most current version of the Terms . . . will govern our relationship," by "continuing to access or use [Twitter] after those revisions become effective, [users] agree to be bound by the revised Terms," and "[n]o advice or information, whether oral or written, obtained from the Twitter Entities or through the Services, will create any warranty or representation not expressly made herein."

just like Twitter's "contracts" with Dr. Gottlieb, Dr. Bourla, and other hundreds of millions of users. This is fatal to Berenson's tortious interference claim. *See Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 796–97 (S.D.N.Y. 2008) (dismissing tortious interference claim based on "wholly conclusory allegation that [defendant] knew of the contracts at issue").

As to Dr. Bourla, Berenson merely alleges that "[u]pon information and belief . . . Dr. Bourla was . . . aware of Mr. Berenson's contract with Twitter." ¶ 213. But to plead knowledge of the relevant terms of a contract, Berenson cannot rest on "conclusory assertion[s] of knowledge" or allegations on "information and belief." *Taboola, Inc. v. Ezoic Inc.*, 2021 WL 2041639 at *9 (S.D.N.Y. May 21, 2021). Nor can Berenson "merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).

### C.    Berenson Fails to Allege Any Independently Tortious Conduct

Under Connecticut law, "not every act that disturbs a contract or business expectancy is actionable." *Blake v. Levy*, 191 Conn. 257, 260 (1983). Instead, Berenson "must plead and prove at least some improper motive or improper means." *Am. Diamond Exch., Inc. v. Alpert*, 101 Conn. App. 83, 90 (2007). Berenson has pleaded neither.

First, Berenson fails to plead facts showing that Dr. Gottlieb contacted Twitter for any tortious reason. Berenson asserts that Dr. Gottlieb "falsely charg[ed]" that his content was "damaging, harming people, and causing or inducing threats of violence," ¶ 214, but does not plead facts showing that Dr. Gottlieb had an improper motive. Similarly, Berenson criticizes Dr. Gottlieb for not explaining why Berenson's content caused threats to Dr. Fauci, and for "not explain[ing]" how Berenson violated Twitter's rules. ¶¶ 163, 175. But it is Berenson who bears — and has not met — his burden of pleading an improper motive. Further, Berenson's assertion that Dr. Gottlieb acted to censor criticism of Pfizer's COVID-19 vaccine is belied by the documents

21

he obtained from Twitter and cited in his complaint, which show that Dr. Gottlieb never mentioned the COVID-19 vaccine in his communications with Twitter about Berenson's account.

Second, Berenson does not allege that Dr. Gottlieb wrongly accused him of violating Twitter's rules. To succeed on a tortious interference claim, the plaintiff must establish that the adverse action was unjustified. *See Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 808 (1999). Berenson fails to allege that his tweets did *not* violate the Terms of Service or the COVID-19 Policy. He pleads no facts showing that Dr. Gottlieb did *not* believe in good faith that Berenson was violating those rules, so it was not tortious for Dr. Gottlieb to report the tweets to Twitter.

### D. Berenson Fails to Plead That Dr. Gottlieb's or Dr. Bourla's Alleged Conduct Caused Twitter to Suspend His Account

Berenson's tortious interference claim should be dismissed for the independent reason that he fails to allege that either Dr. Gottlieb or Dr. Bourla caused the purported breach. Under New York and Connecticut law, a plaintiff must allege that the defendant's conduct caused the complained of breach. *See Rich*, 939 F.3d at 127; *Eastlander Grp., LLC v. Severin Hills, LLC*, 2005 WL 1524945, at *2 (Conn. Super. Ct. June 2, 2005). As shown above, the facts pleaded by Berenson show that Twitter independently decided to suspend his account. *See supra* Point I.C.1.

### III. The First Amendment Bars the Claims Against Dr. Gottlieb and Dr. Bourla

Berenson violates the First Amendment in attempting to impose civil liability on Dr. Gottlieb and Dr. Bourla for speaking about matters of public concern and about an alleged public figure. "[T]he Supreme Court has long made clear that the First Amendment's protections extend to private suits for money damages based on the content of speech," *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 442 (S.D.N.Y. 2014), including to limit the scope of tort liability under state law.

22

*See*, *e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964).[24]  A claim seeking to impose tort liability on defendants *because of* their speech is subject to First Amendment scrutiny.  *See Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*, 968 F.2d 286, 295 (2d Cir. 1992).

In an analogous case, the Second Circuit held that a defendant's First Amendment rights were a complete defense to § 1983 claims asserting free speech violations.  The court reasoned:

> "Having boldly entered the flames of public discussion the First Amendment specifically is designed to kindle, [the plaintiffs] now seek our rescue from the sparks of controversy they ignited.  In the absence of any evidence that [the defendant] attempted to do more than express his view concerning the distasteful nature of [the plaintiffs' speech], we decline to come to their assistance."

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 35 (2d Cir. 1983).  Here, Dr. Gottlieb was, as alleged, exercising his "right to expound his belief" that Berenson was tweeting misinformation that "should not be circulated."  *Id.* at 40.  "Ironically," by seeking to limit that right, Berenson "undermine[s] the very [free speech] principle [he] champion[s]."  *Id.*

A plaintiff seeking to impose civil liability on speech "cannot evade First Amendment protections for speech by dressing up its slander and defamation claims as other torts."  *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 847014, at *9 (S.D.N.Y. Jan. 12, 2018), *report and recommendation adopted*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018); *see Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("The First Amendment considerations that apply to defamation therefore apply also to [the plaintiffs'] coun[t] for . . . tortious interference.").  As one court held in an action involving misinformation on social media, "[a] tortious interference claim cannot survive if the claim is premised solely on statements that are protected by the First Amendment because the exercise of constitutionally protected speech cannot be an 'improper' or

---

[24] Similarly, the free speech guarantees of the New York and Connecticut constitutions limit state tort law.  *See*, *e.g.*, *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 248 (1991); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013); *Flynn v. Dixon*, 2023 WL 3477081, at *5 (Conn. Super. Ct. May 9, 2023).

'wrongful' action." *Owens v. Lead Stories, LLC*, 2021 WL 3076686, at *17 (Del. Super. Ct. July 20, 2021), *aff'd*, 273 A.3d 275 (Del. 2022); *see also*, *e.g.*, *Delano Vill. Cos. v. Orridge*, 147 Misc. 2d 302, 310 (Sup. Ct. N.Y. Cty. 1990) (constitutionally protected speech cannot, as a matter of law, be "unlawful" means to tortiously interfere). All of Dr. Gottlieb's statements are precluded from liability as statements of opinion, statements lacking falsity, or both.

First, the First Amendment requires that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law," and "liability may not be based on statements that cannot reasonably be interpreted as stating actual facts about an individual." *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000); *see also Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) ("Unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions.").

This standard precludes liability for Dr. Gottlieb's challenged statements of opinion. Berenson alleges, for example, that Dr. Gottlieb acted tortiously by sending Twitter a link to a post by Berenson and opining: "*This* is why Tony [Fauci] needs a security detail." ¶ 162; *see* ¶ 214. Because Dr. Gottlieb disclosed the facts on which his opinion was based — Berenson's linked post[25] — a reasonable reader would understand that Dr. Gottlieb's statement was his subjective view of that post, which "cannot reasonably be interpreted as stating actual facts about" Berenson. *Flamm*, 201 F.3d at 150; *see Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 541 (S.D.N.Y. 2018) (holding that "the defendant's evaluation" is opinion protected under First Amendment and New York Constitution). Nor can forwarding a tweet by Berenson without comment reasonably be interpreted as advancing a factual claim. ¶ 167.

---

[25] Berenson's post concluded with the statement: "Unless [Dr. Fauci] changes - or is forced to change - his attitude - we may have a hard time finding the answers we need." Alex Berenson, *Quite Frankly*, Unreported Truths (Aug. 24, 2021), https://alexberenson.substack.com/p/quite-frankly.

24

Second, to the extent Dr. Gottlieb's statements could be interpreted as "stating actual facts" about Berenson, these statements also fall within the First Amendment's robust protections. Berenson argues that Dr. Gottlieb "falsely charg[ed] that Mr. Berenson's reporting was damaging, harming people, and causing or inducing threats of violence." ¶ 214; *see also* ¶ 192(d), (f) (asserting statements were "fals[e]"); ¶ 215 (asserting complaints were not "legitimate"). Yet the complaint alleges that Berenson is a public figure and Dr. Gottlieb was speaking on matters of public concern. *Biro v. Conde Nast*, 622 F. App'x 67, 69 (2d Cir. 2015). Berenson describes himself as a "leading COVID-19 vaccine skeptic" with "a big Megaphone" who voluntarily and prominently injected himself into the public debate over vaccination. ¶¶ 2, 102. Berenson also acknowledges that Dr. Gottlieb's challenged speech related to matters of public concern. ¶ 28. Thus, Berenson must plead facts showing Dr. Gottlieb spoke with "actual malice," which requires "deliberate or reckless falsification." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991).

Berenson fails to plead facts plausibly showing falsity, let alone actual malice. He asserts that, in a phone call, Dr. Gottlieb "urged Twitter to censor Mr. Berenson," but fails to identify any statement of fact that Dr. Gottlieb made on that call. ¶¶ 164–65, 192(e). He also asserts that Dr. Gottlieb "falsely reported" a tweet by Berenson as violating the COVID-19 Policy — but, in fact, Dr. Gottlieb merely quoted Berenson's tweet verbatim, without commentary. ¶¶ 167, 192(f). And Berenson alleges that Dr. Gottlieb accurately reported to Twitter that Berenson started posting under another account after being suspended. ¶¶ 171, 192(g).

## CONCLUSION

For the reasons set forth above, Dr. Bourla and Dr. Gottlieb respectfully request that the Court dismiss the Complaint as to them. Further, because Berenson pleaded his claims based on discovery in his lawsuit against Twitter, the claims should be dismissed with prejudice, together with such other and further relief as the Court deems proper.

25

Dated:  August 21, 2023
       New York, New York

Respectfully submitted,

**DAVIS POLK & WARDWELL LLP**


By: */s/ James P. Rouhandeh*
James P. Rouhandeh
Michael Scheinkman
David B. Toscano
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Dr. Albert Bourla and
Dr. Scott Gottlieb*

26