UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEX BERENSON,

                              Plaintiff,

                    v.

JOSEPH R. BIDEN, JR., *et al.*,

                              Defendants.

No. 23 Civ. 3048 (JGLC)

## MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2678/2822
Fax: (212) 637-2786
E-mail: jeannette.vargas@usdoj.gov
          alyssa.o'gallagher@usdoj.gov

JEANNETTE A. VARGAS
ALYSSA B. O'GALLAGHER
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    I.     Social Media Companies Such as Twitter Have Long Sought to Combat
         Misinformation ............................................................................................. 3

    II.    Allegations in the Complaint .................................................................... 5

LEGAL STANDARD............................................................................................................ 10

ARGUMENT....................................................................................................................... 11

    I.     BERENSON LACKS ARTICLE III STANDING FOR HIS FIRST
         AMENDMENT CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF
         AGAINST THE FEDERAL DEFENDANTS ..................................................... 11

         A.    Berenson Does Not Identify an Injury That Satisfies Article III .............. 11

         B.    Berenson Does Not Allege any Injury that is Traceable to the Conduct of
              the Federal Defendants as Opposed to Twitter, Which Is Not Before This
              Court ...................................................................................................... 14

         C.    Berenson Does Not Allege Injuries that Would Be Redressed by the
              Sweeping Injunctive Relief He Seeks....................................................... 18

    II.    THE SEPARATION OF POWERS DOCTRINE REQUIRES DISMISSAL OF
         THE CLAIMS AGAINST PRESIDENT BIDEN ............................................. 20

    III.   THE COMPLAINT FAILS TO STATE A PLAUSIBLE FIRST AMENDMENT
         CLAIM.................................................................................................... 22

         A.    Allegations Regarding the April 2021 Meeting Do Not Plausibly Establish
              Coercion................................................................................................. 24

         B.    Allegations Regarding Actions Taken by Non-Government Officials
              Cannot Be Imputed to the Government ..................................................... 26

          C.    Allegations Regarding Generalized Public Policy Statements Made by
              Senior Government Officials Regarding COVID-19 Misinformation Do
              Not Suffice to Plausibly Allege Coercion.................................................. 27

    IV.   THE *BIVENS* CLAIMS AGAINST FLAHERTY AND SURGEON GENERAL
         MURTHY SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM 31

i

V.      BERENSON FAILS TO STATE A PLAUSIBLE SECTION 1985(3) CLAIM
        AGAINST FLAHERTY AND SURGEON GENERAL MURTHY.................... 35

        A.      Section 1985(3) Does Not Apply to Federal Officers ............................. 36

        B.      The Complaint Fails to State a Claim Under § 1985(3) ........................... 38

VI.     FLAHERTY AND SURGEON GENERAL MURTHY ARE ENTITLED TO
        QUALIFIED IMMUNITY ................................................................................ 45

VII.    BERENSON'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM
        AGAINST SLAVITT MUST BE DISMISSED ................................................... 48

CONCLUSION.................................................................................................................... 50

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*A Soc'y Without A Name v. Virginia,*
655 F.3d 342 (4th Cir. 2011) ................................................................................................. 38

*Alharbi v. Miller,*
368 F. Supp. 3d 527 (E.D.N.Y. 2019) ........................................................................ 36, 37, 44

*Allen v. Wright,*
468 U.S. 737 (1984) .............................................................................................................. 14

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ................................................................................................................ 30

*Anderson v. Creighton,*
483 U.S. 635 (1987) .............................................................................................................. 46

*Arar v. Ashcroft,*
585 F.3d 559 (2d Cir. 2009) .................................................................................................. 35

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) .............................................................................................................. 20

*Art Metal-U.S.A., Inc. v. United States,*
753 F.2d 1151 (D.C. Cir. 1985) ............................................................................................ 50

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................... 10, 16, 32

*Ass'n of Am. Physicians & Surgeons v. Schiff,*
518 F. Supp. 3d 505 (D.D.C. 2021) ...................................................................................... 17

*Bacon v. Phelps,*
961 F.3d 533 (2d Cir. 2020) ............................................................................................ 45, 47

*Barnes v. Lehman,*
861 F.2d 1383 (5th Cir. 1988) .............................................................................................. 30

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................. 10, 17, 38, 40

*Bennett v. Spear,*
520 U.S. 154 (1997) .............................................................................................................. 14

*Bivens v. Six Unknown Fed. Narcotics Agents*,
   403 U.S. 388 (1971) .................................................................................... 32

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ......................................................................... 23, 30, 31

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ......................................................................... 42, 43, 44

*Britt v. Garcia*,
   457 F.3d 264 (2d Cir. 2006) ...................................................................... 38

*Calcano v. Swarovski N. Am. Ltd.*,
   36 F.4th 68 (2d Cir. 2022) ......................................................................... 16

*California v. Texas*,
   141 S. Ct. 2104 (2021) .............................................................................. 18

*Cantú v. Moody*,
   933 F.3d 414 (5th Cir. 2019) ..................................................................... 37

*Carlson v. Green*,
   446 U.S. 14 (1980) .................................................................................... 32

*Carroll v. Trump*,
   49 F.4th 759 (2d Cir. 2022) ....................................................................... 48

*Celestine v. Mount Vernon Neigh. Health Ctr.*,
   403 F.3d 76 (2d Cir. 2005) ........................................................................ 49

*Changizi v. HHS*,
   602 F. Supp. 3d 1031 (S.D. Ohio 2022) ................................................ 17, 18

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
   333 U.S. 103 (1948) ............................................................................. 21, 35

*Children's Health Def. v. Facebook, Inc.*,
   546 F. Supp. 3d 909 (N.D. Cal. 2021) ........................................................ 29

*Cine SK8, Inc. v. Town of Henrietta*,
   507 F.3d 778 (2d Cir. 2007) ...................................................................... 38

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983) ............................................................................... 11, 12

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................. 12, 14

iv

*Cohen v. United States*,
No. 21 Civ. 10774, 2022 WL 16925984 (S.D.N.Y. Nov. 14, 2022) .................................. 33, 34

*Collins v. United States*,
996 F.3d 102 (2d Cir. 2021)..................................................................................................... 49

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)................................................................................................................. 22

*Cooper v. Clancy*,
No. 19 Civ. 362, 2023 WL 2624334 (N.D.N.Y. Mar. 24, 2023)............................................. 40

*Correctional Services Corp. v. Malesko*,
534 U.S. 61 (2001)................................................................................................................... 34

*Dalton v. Specter*,
511 U.S. 462 (1994)................................................................................................................. 21

*Davis v. Passman*,
442 U.S. 228 (1979)................................................................................................................. 32

*Davis v. Samuels*,
962 F.3d 105 (3d Cir. 2020)..................................................................................................... 37

*DeMartinez v. Lamagno*,
515 U.S. 417 (1995)................................................................................................................. 49

*DeMasi v. Schumer*,
608 F. Supp. 2d 516 (S.D.N.Y. 2009)...................................................................................... 48

*Desiderio v. National Ass'n of Securities Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999)..................................................................................................... 30

*Divino Grp. LLC v. Google LLC*,
No. 19 Civ. 4749, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) .................................................. 29

*Dixon v. United States*,
No. 13 Civ. 2193, 2014 WL 23427 (S.D.N.Y. Jan. 2, 2014).................................................... 50

*Doe v. Google*,
No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ........................................... 17, 29

*Dolan v. Connolly*,
794 F.3d 290 (2d Cir. 2015)............................................................................................... 38, 41

*Doninger v. Niehoff*,
642 F.3d 334 (2d Cir. 2011)..................................................................................................... 46

v

*Dorce v. City of N.Y.*,
  2 F.4th 82 (2d Cir. 2021) ...................................................................................... 12

*Dye v. United States,*
  516 F. Supp. 2d 61 (D.D.C. 2007) ....................................................................... 38

*Egbert v. Boule,*
  142 S. Ct. 1793 (2022) ................................................................................... 33, 34

*Ellison v. Evans*,
  No. 13 Civ. 885, 2013 WL 5863545 (S.D.N.Y. Oct. 31, 2013) ............................ 44

*Flast v. Cohen*,
  392 U.S. 83 (1968) ............................................................................................... 19

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019) ..................................................................................... 4

*Ford v. Northam*,
  No. 22 Civ. 122, 2023 WL 2767780 (W.D. Va. Mar. 31, 2023) ............................ 42

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................... 20, 21, 22

*Frasco v. Mastic Beach Prop. Owners' Ass'n*,
  No. 12 Civ. 2756, 2014 WL 3735870 (E.D.N.Y. July 29, 2014) ............................ 42

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ......................................................................................... 19

*Gleason v. McBride*,
  869 F.2d 688 (2d Cir. 1989) ................................................................................. 41

*Graseck v. Mauceri*,
  582 F.2d 203 (2d Cir. 1978) ................................................................................. 26

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971) ........................................................................................... 37, 43

*Griffin-Nolan v. Providence Wash. Ins. Co.*,
  No. 04 Civ. 1453, 2005 WL 1460424 (N.D.N.Y. June 20, 2005) ........................... 41

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................................................. 20

*Gyadu v. Hartford Ins. Co.*,
  197 F.3d 590 (2d Cir. 1999) ................................................................................. 39

*Hammerhead Enterprises, Inc. v. Brezenoff,*
   707 F.2d 33 (2d Cir. 1983)..................................................................... 23, 25

*Hartline v. Gallo,*
   546 F.3d 95 (2d Cir. 2008)......................................................................... 40

*Hernandez v. Mesa,*
   140 S. Ct. 735 (2020) ................................................................................. 35

*Hobson v. Wilson,*
   737 F.2d 1 (D.C. Cir. 1984)................................................................. 37, 44

*Holland v. JPMorgan Chase Bank, N.A.,*
   No. 19 Civ. 233, 2019 WL 4054834 (S.D.N.Y. Aug. 28, 2019) ............................... 14

*Hu v. City of New York,*
   927 F.3d 81 (2d Cir. 2019)......................................................................... 10

*Huber v. Biden,*
   No. 21 Civ. 6580, 2022 WL 827248 (N.D. Cal. March 18, 2022) ..................................... 19, 29

*Hunter v. Bryant,*
   502 U.S. 224 (1991)................................................................................... 45

*In re Agent Orange Prod. Liab. Litig.,*
   818 F.2d 210 (2d Cir. 1987)......................................................................... 50

*Iqbal v. Hasty,*
   490 F.3d 143 (2d Cir. 2007)......................................................................... 37

*Joffe v. King & Spalding LLP,*
   575 F. Supp. 3d 427 (S.D.N.Y. 2021)............................................................. 42, 44

*Johnson v. Andlinger & Co.,*
   No. 94 Civ. 43, 1998 WL 229913 (D. Conn. Mar. 30, 1998)..................................... 42

*Jones v. Nat'l Commc'n & Surveillance Networks,*
   409 F. Supp. 2d 456 (S.D.N.Y. 2006)............................................................. 36

*K.D. ex rel. Duncan v. White Plains Sch. Dist.,*
   921 F. Supp. 2d 197 (S.D.N.Y. 2013)............................................................. 41, 44

*Kennedy v. Warren,*
   66 F.4th 1199 (9th Cir. 2023) ............................................................... passim

*Knight First Amend. Inst. at Columbia Univ. v. Trump,*
   302 F. Supp. 3d 541 (S.D.N.Y. 2018)............................................................. 1

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993)................................................................................................ 37

*Lebron v. Rumsfeld*,
  670 F.3d 540 (4th Cir. 2012) ................................................................................ 35

*Levin v. United States*,
  568 U.S. 503 (2013)................................................................................................ 50

*Little v. City of New York*,
  487 F. Supp. 2d 426 (S.D.N.Y. 2007).................................................................... 40

*Louisiana Division Sons of Confederate Veterans v. City of Natchitoches*,
  821 F. App'x 317 (5th Cir. 2020) .................................................................... 25, 31

*Luckett v. Bure*,
  290 F.3d 493 (2d Cir. 2002).................................................................................. 10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................... 12, 14, 18, 19

*M.S. v. Brown*,
  902 F.3d 1076 (9th Cir. 2018) ............................................................................... 19

*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000)................................................................................... 10

*Marley v. Ibelli*,
  203 F. Supp. 2d 302 (S.D.N.Y. 2001).................................................................... 50

*Matzell v. Annucci*,
  64 F.4th 425 (2d Cir. 2023) ................................................................................... 46

*McGowan v. United States*,
  825 F.3d 118 (2d Cir. 2016).................................................................................. 46

*McHugh v. Univ. of Vermont*,
  966 F.2d 67 (2d Cir. 1992)..................................................................................... 49

*McMorris v. Carlos Lopez & Assocs., LLC*,
  995 F.3d 295 (2d Cir. 2021)................................................................................... 12

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ................................................................................. 20

*Missouri v. Biden*,
  No. 22 Civ. 1213, 2023 WL 2578260 (W.D. La. Mar. 20, 2023) .......................... 17

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)................................................................................................. 45

*Moody v. Farrell*,
    868 F.3d 348 (5th Cir. 2017) ................................................................................. 27

*Mullenix v. Luna*,
    577 U.S. 7 (2015).................................................................................................... 46

*National Rifle Ass'n of America v. Vullo*,
    49 F.4th 700 (2d Cir. 2022) ............................................................................. passim

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ....................................................................... 20, 21

*Newman v. Google LLC*,
    No. 20 Civ. 4011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ............................ 29

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)................................................................................................ 21

*Nwaokocha v. Sadowski*,
    369 F. Supp. 2d 362 (E.D.N.Y. 2005) .................................................................... 32

*Ochoa v. Bratton*,
    No. 16 Civ. 2852, 2017 WL 5900552 (S.D.N.Y. Nov. 28, 2017) ........................... 44

*O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) .......................................................................... 26, 31

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)................................................................................................ 11

*Packingham v. North Carolina*,
    582 U.S. 98 (2017).................................................................................................. 47

*Peck v. United States*,
    470 F. Supp. 1003 (S.D.N.Y. 1979)........................................................................ 37

*Peery v. Chi. Hous. Auth.*,
    791 F.3d 788 (7th Cir. 2015) ........................................................................... 19, 20

*Porter-McWilliams v. Anderson*,
    No. 07 Civ. 0407, 2007 WL 4276801 (S.D.N.Y. Dec. 3, 2007)............................... 42

*Puglisi v. Underhill Park Taxpayer Ass'n*,
    947 F. Supp. 673 (S.D.N.Y. 1996)........................................................................... 41

*Radwan v. Manuel*,
   55 F.4th 101 (2d Cir. 2022) ................................................................................. 46

*Raines v. Byrd*,
   521 U.S. 811 (1997) ............................................................................................. 11

*Rasul v. Myers*,
   563 F.3d 527 (D.C. Cir. 2009) ............................................................................. 35

*Reichle v. Howards*,
   566 U.S. 658 (2012) ....................................................................................... 33, 45

*Renal Physicians Ass'n v. HHS*,
   489 F.3d 1267 (D.C. Cir. 2007) ........................................................................... 18

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982) ............................................................................................. 31

*Robinson v. Overseas Mil. Sales Corp.*,
   21 F.3d 502 (2d Cir. 1994) ............................................................................ 32, 36

*Romer v. Morgenthau*,
   119 F. Supp. 2d 346 (S.D.N.Y. 2000) ................................................................. 44

*Rother v. NYS Dep't of Corr. & Cmty. Supervision*,
   970 F. Supp. 2d 78 (N.D.N.Y. 2013) ............................................................. 38, 40

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ................................................................................... 14

*Sabir v. Licon-Vitale*,
   No. 20 Civ. 1552, 2022 WL 1291731 (D. Conn. Apr. 29, 2022) ..................... 36, 37

*Spina v. Lu Feng Liu*,
   541 F. Supp. 3d 425 (S.D.N.Y. 2021) ................................................................. 50

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ....................................................................................... 11, 20

*Srubar v. Rudd, Rosenberg, Mitofsky & Hollender*,
   875 F. Supp. 155 (S.D.N.Y. 1994) ....................................................................... 41

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................. 11

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ............................................................................................. 11

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ........................................................................................ 21

*Torcivia v. Suffolk Cnty.*,
  17 F.4th 342 (2d Cir. 2021) ............................................................................................ 46

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .................................................................................................... 11

*Trump v. Twitter Inc.*,
  No. 21 Civ. 8378, 2023 WL 1997921 (N.D. Cal. Feb. 14, 2023) .................................. 13

*Trump v. Twitter, Inc.*,
  602 F. Supp. 3d 1213 (N.D. Cal. May 6, 2022) ............................................................. 29

*United States v. Browder*,
  866 F.3d 504 (2d Cir. 2017) ........................................................................................... 47

*United States v. Eaglin*,
  913 F.3d 88 (2d Cir. 2019) ............................................................................................. 47

*United States v. Elias*,
  579 F. Supp. 3d 374 (E.D.N.Y. 2022) ........................................................................... 42

*United States v. Mitchell*,
  445 U.S. 535 (1980) ........................................................................................................ 49

*United States v. Sherwood*,
  312 U.S. 584 (1941) ........................................................................................................ 49

*United States v. Smith*,
  499 U.S. 160 (1991) ........................................................................................................ 48

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ........................................................................................................ 19

*VDARE Foundation v. City of Colorado Springs*,
  11 F.4th 1151 (10th Cir. 2021) ....................................................................................... 29

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) .............................................................................................. 20, 23, 28

*Webb v. Goord*,
  340 F.3d 105 (2d Cir. 2003) ........................................................................................... 38

*West v. Atkins*,
  487 U.S. 42 (1988) .......................................................................................................... 30

*Williams v. Rosenblatt Sec. Inc.*,
  136 F. Supp. 3d 593 (S.D.N.Y. 2015)............................................................................ 44

*Williams v. United States*,
  947 F.2d 37 (2d Cir. 1991)............................................................................................ 49

*Wolocko v. Town of Ridgefield*,
  No. 98 Civ. 1096, 2000 WL 565447 (D. Conn. Mar. 31, 2000).................................... 42

*X-Men Sec., Inc. v. Pataki*,
  196 F.3d 56 (2d Cir. 1999)............................................................................................ 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)...................................................................................................... 22

*Zherka v. Ryan*,
  52 F. Supp. 3d 571 (S.D.N.Y. 2014).............................................................................. 34

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017).............................................................................................. passim

**Statutes**

28 U.S.C. § 2201............................................................................................................ 21

28 U.S.C. § 2671............................................................................................................ 48

28 U.S.C. § 2675(a) ....................................................................................................... 49

28 U.S.C. § 2679...................................................................................................... 48, 49

28 U.S.C. § 2680............................................................................................................ 50

42 U.S.C. § 1983............................................................................................................ 32

42 U.S.C. § 1985(3) ................................................................................................ passim

**Regulations**

28 C.F.R. § 15.4(a)........................................................................................................ 48

## PRELIMINARY STATEMENT

President Joseph R. Biden, Jr. and Christian L. Tom, Director of the White House Office of Digital Strategy, sued in their official capacities; Robert Flaherty, former Director of Digital Strategy at the White House, sued in his individual capacity; Dr. Vivek Murthy, Surgeon General of the United States, sued in his official and individual capacities; and the United States of America (collectively, the "Federal Defendants"), by their attorney Damian Williams, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Alex Berenson's Complaint as against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

The gravamen of Berenson's Complaint is that general pronouncements by senior federal officials advancing the Biden administration's public policy stance regarding the harms of COVID-19 misinformation and encouraging social media companies to adopt policies to combat such misinformation amounted to a "pressure campaign" that resulted in Berenson's suspension from Twitter in August 2021, when Twitter independently determined that he had racked up five "strikes" or violations of its COVID-19 misinformation policy. The independent actions of a

---

[1] On August 16, 2023, the Government filed a notice of automatic substitution of an official capacity defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, noting that Tom was substituted as the successor for Flaherty with respect to official capacity claims asserted against Flaherty. *See* Dkt. No. 30. The notice also stated that Andrew M. Slavitt, who was sued in his official capacity as Senior Advisor to the COVID-19 Response Coordinator, no longer holds that position and is no longer employed in any capacity by the U.S. Government. *Id.* Furthermore, no successor has been named for Slavitt, and his duties and responsibilities for which he was named as a defendant have not been reassigned. *Id.* Accordingly, there are no official capacity claims pending against Flaherty or Slavitt, and both are sued solely in their individual capacities. *See, e.g., Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 555 n.6 (S.D.N.Y. 2018) ("Because plaintiffs seek only prospective relief and Hicks was sued only in her official capacity, the fact of Hicks's resignation alone warrants summary judgment in her favor. Further, because the President has not yet appointed Hicks's successor, no substitution by operation of Rule 25(d) can occur. Hicks will therefore be dismissed as a defendant, and no one will be substituted in her stead at this time." (citation omitted)), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated on unrelated grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). Additionally, as discussed below, on August 16, 2023, the United States filed a Certification of Scope of Employment with respect to the tort claim asserted against Slavitt, which served to substitute the United States of America as a defendant in this action. *See infra* Argument, Section VII. This Office does not represent Slavitt with respect to the claims asserted against him in his individual capacity.

private social media company in applying its terms of service cannot be attributable to the federal government. But more fundamentally, Berenson cannot hold the Federal Defendants liable for exercising the Government's prerogative, under the Government Speech Doctrine, to speak about matters of public concern. The Second Circuit has made clear that a "healthy representative democracy" requires that government officials be permitted to advocate for their political views and preferred courses of action. *See National Rifle Ass'n of America v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022) (holding that government official did not violate First Amendment by urging businesses to discontinue arrangements with the National Rifle Association). Valid exercises of government speech include an official's communications that seek to "convince" private individuals and entities to disassociate from disfavored speech, so long as in doing so the official does not "intimat[e] that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Id.* (citation and internal quotation marks omitted); *cf. Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023) ("Generating public pressure to motivate others to change their behavior is a core part of public discourse, and 'we are aware of no constitutional right . . . that requires [government officials] to refrain from such speech or advocacy.'" (alterations and citation omitted)). As the Complaint does not allege that any Federal Defendant threatened Twitter with punishment or adverse regulatory action had that platform declined to suspend Berenson's account, it fails to plausibly allege a violation of Berenson's rights under the Free Speech Clause of the First Amendment.

Berenson's Complaint suffers from a number of additional defects independently warranting dismissal. This Court lacks jurisdiction over Berenson's claims for equitable relief. Berenson lacks standing to bring these claims against the Federal Defendants because there is no allegation of present injury or imminent threat of future injury; no concrete allegation that the

2

hypothetical future injury alleged would be fairly traceable to the actions of the Federal Defendants rather than the independent judgment of third-party social media platforms not before this Court; and no concrete allegation that this injury would be redressed by the requested equitable relief. Berenson's claim for equitable relief against President Biden must also be dismissed as contrary to the separation of powers doctrine.

Berenson's claims against Flaherty and the Surgeon General in their individual capacities fare no better. The Supreme Court has made clear that extension of the *Bivens* cause of action is disfavored. And Berenson's claims under 42 U.S.C. § 1985(3) are fatally deficient, as he has neither adequately alleged the existence of a conspiracy, nor has he alleged that the Federal Defendants were motivated by animus towards his membership in a protected class.

Finally, the Court lacks subject-matter jurisdiction over Berenson's claim against Slavitt for tortious interference, to the extent that claim is premised on actions taken in the scope of his federal employment. The Federal Tort Claims Act makes a suit against the United States the exclusive remedy for torts committed by federal employees acting in the scope of employment, but expressly precludes suits for interference with contract.

## BACKGROUND

### I.    Social Media Companies Such as Twitter Have Long Sought to Combat Misinformation

Twitter[2] is a private social media company that allows users and advertisers to post content on its digital communications platform subject to its terms of service and policies. Since the emergence of the first social media companies in the early 2000s, these companies have moderated

---

[2] Twitter has since been rebranded as X, *see* Ryan Mac and Tiffany Hsu, *From Twitter to X: Elon Musk Begins Erasing an Iconic Internet Brand*, N.Y. Times (July 24, 2023), https://www.nytimes.com/2023/07/24/technology/twitter-x-elon-musk.html, but was known as Twitter at all times relevant to the allegations in the Complaint.

content uploaded to their platforms. *See, e.g.*, *Making the Internet Safe for Kids: The Role of ISP's and Social Networking Sites: Hearing Before the Subcomm. on Oversight & Investigations, of the H. Comm. on Energy & Com.*, 109th Cong. 214–16 (2006) (statement of Chris Kelly, Chief Privacy Officer, Facebook.com, Inc.); *see also id.* at 219 (statement of Michael Angus, Executive Vice President & General Counsel, MySpace). Today, Twitter requires users and advertisers to agree to extensive conditions—including conditions related to content moderation—in exchange for authorization to use its services.[3]

For years, social media companies have taken steps to prevent the spread of content on their platforms that they deem to be "misinformation." In response to the onset of the COVID-19 pandemic, companies specifically amended their policies to address misinformation harmful to public health. In March 2020, Twitter began addressing health misinformation about COVID-19 on its platform by introducing policies to "address content that goes directly against guidance from authoritative sources of global and local public health information." Vijaya Gadde & Matt Derella, *An Update on our Continuity Strategy During COVID-19* (Mar. 16, 2020; updated Apr. 1, 2020), https://perma.cc/2UAL-YXSH; *see* Dkt. No. 1 ("Compl.") ¶ 66.[4] Twitter expressed the intention to "enforce" those policies "in close coordination with trusted partners, including public health authorities and governments, and [to] continue to use and consult with information from those sources when reviewing content." Vijaya Gadde & Matt Derella, *An Update on our Continuity Strategy During COVID-19* (Mar. 16, 2020; updated Apr. 1, 2020), https://perma.cc/2UAL-YXSH. Later, Twitter stated that it would "take action" against "statements or assertions that have

---

[3] *See Terms of Service*, Twitter, https://perma.cc/LPC6-GM69 (last visited Nov. 20, 2022) ("We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment.").

[4] Berenson's Complaint relies extensively on, and thereby incorporates by reference, blog posts that set and/or clarify Twitter's terms of service.  These publicly available terms are also subject to judicial notice.  *See Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019).

been confirmed to be false or misleading by subject-matter experts, such as public health authorities." Twitter, *Updating Our Approach to Misleading Information* (May 11, 2020), https://perma.cc/LSM4-3AAA; *see* Compl. ¶ 67. And as vaccines against COVID-19 became available in late 2020, Twitter broadened its policy to provide for the removal of a variety of vaccine-related misinformation, such as "[f]alse claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary." Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine Information* (Dec. 16, 2020), https://perma.cc/8FXZ-EC2K; *see* Compl. ¶¶ 76–77. In March 2021, Twitter introduced a "strike system," which provided that "[r]epeated violations" of its COVID-19 policy would be enforced "on the basis of the number of strikes an account has accrued for violations of the policy," with five or more strikes resulting in "permanent suspension" of the offending account. Twitter, *Updates to Our Work on COVID-19 Vaccine Misinformation* (March 1, 2021), https://blog.twitter.com/en_us/topics/company/2021/updates-to-our-work-on-covid-19-vaccine-misinformation; *see* Compl. ¶ 81.

Even before the end of the COVID-19 public health emergency in May 2023, however, Twitter (under new management) altered its policies to allow COVID-19-related content that might contradict the views of public health authorities. Twitter "is no longer enforcing" its "COVID-19 misleading information policy" as of November 2022. Twitter, *Coronavirus: Staying Safe and Informed on Twitter* (Jan. 12, 2021; updated Nov. 23, 2022), https://blog.twitter.com/en_us/topics/company/2020/covid-19.

## II.    Allegations in the Complaint

Alex Berenson commenced this action on April 12, 2023. *See generally* Compl. The Complaint names six defendants, including President Biden, in his official capacity; Andrew M. Slavitt, the former Senior Advisor to the COVID-19 Response Coordinator, Robert Flaherty, the

former Director of Digital Strategy at the White House, and Surgeon General Vivek Murthy, each purportedly in their official and individual capacities; and Scott Gottlieb, a member of the Board of Directors of Pfizer, Inc. ("Pfizer") and Albert Bourla, the CEO of Pfizer.

Berenson conclusorily contends in his Complaint that the Federal Defendants engaged in a "nearly unprecedented conspiracy to suppress [his] First Amendment rights" by "work[ing] together" with Slavitt, Gottlieb, and Bourla "to pressure Twitter to suspend [his] account and mute his voice as a leading COVID-19 vaccine skeptic." *Id.* ¶ 2. Yet the Complaint contains a dearth of factual allegations supporting this assertion. Instead, the allegations in the Complaint generally outline public policy pronouncements made by various federal officials regarding the need to combat COVID-19 misinformation.

For example, the Complaint alleges that President Biden made the COVID-19 vaccination campaign a priority of his administration, calling it a "wartime effort" in a speech in January 2021. *Id.* ¶ 87. President Biden issued an executive order "to facilitate the gathering, sharing, and publication of COVID-19-related data" in order to "deter the spread of misinformation and disinformation." *Id.* ¶ 94. President Biden allegedly gave another speech at a Pfizer manufacturing plant in February 2021, in which he thanked CEO Bourla for "what you do," and referred to vaccination as a "case of life and death." *Id.* ¶ 88. President Biden also noted that addressing vaccine hesitancy in the African-American population was a "priority." *Id.* ¶ 90. The Complaint further alleges that, in July 2021, President Biden was asked by a reporter, "On COVID-19 misinformation, what's your message to platforms like Facebook?" *Id.* ¶ 135. President Biden allegedly responded, "They're killing people."[5] *Id.* There are no allegations in the Complaint that

---

[5] The Court should take judicial notice of President Biden's statement, made three days later, which clarified that people spreading misinformation about COVID-19 vaccines on Facebook (and not Facebook itself) were killing people. *See* Eugene Scott and Rachel Lerman, *Biden Clarifies Comments about Facebook 'Killing People' with*

6

President Biden ever discussed Berenson's Twitter account or his posts with anyone, either within the Biden administration or at Twitter.

The allegations in the Complaint regarding Surgeon General Murthy are similarly limited. Berenson alleges that Murthy issued an advisory in July 2021 entitled "Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment." *Id.* ¶ 129. Berenson alleges that this advisory encouraged social media companies to prioritize early detection of misinformation superspreaders and repeat offenders and to impose clear consequences for accounts that repeatedly violate platform policies. *Id.* Berenson further alleges that the Surgeon General appeared on a podcast to discuss his advisory, during which he stated that social media companies had a "responsibility" to do something about misinformation, and that "we see significant harm coming from social platforms that don't have strong enough guardrails and measures to reduce the flow of misinformation." *Id.* ¶ 131. The Complaint alleges that the Surgeon General noted during this podcast that "free speech is a bedrock value of our country," and that "we need to protect freedom of speech," "[b]ut that doesn't mean that we need to allow misinformation that we know harms people's health to run rampant." *Id.* ¶ 132. As with President Biden, there are no allegations in the Complaint that the Surgeon General ever discussed Berenson's Twitter account or his posts with anyone, let alone engaged in a pressure campaign to have Berenson's account suspended.

The Complaint also contains allegations regarding statements made by government officials other than the Federal Defendants. For example, the Complaint alleges that, in July 2021, the then-White House Press Secretary affirmed in public comments that senior White House officials had been in contact with social media platforms to propose changes to those platforms

---

*Vaccine Misinformation*, Wash. Post (July 19, 2021), https://www.washingtonpost.com/politics/2021/07/19/biden-facebook-misinformation/.

regarding misinformation, including that they adopt a "robust enforcement strategy," but also stated that decisions about whether particular individuals should remain on the platform were left to the private sector. *Id.* ¶¶ 133–34. The Complaint further alleges that the White House was examining how misinformation related to the liability protections for social media companies in § 230 of the Communications Decency Act ("CDA"), *id.* ¶ 137, with the then-White House Communications Director allegedly publicly commenting that social media companies should "certainly be held accountable," and calling for consideration of "reform" to the CDA, *id.* ¶ 138.[6]

The only allegations regarding communications between federal officials and Twitter concerning Berenson pertain to a meeting between White House officials and Twitter employees in April 2021. *Id.* ¶ 105. Flaherty initiated the meeting, and Slavitt was one of the attendees. *Id.* The purpose of the meeting was to brief White House staff on COVID-19 misinformation circulating on Twitter, the "tangible effects seen from [Twitter's] recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work." *Id.* ¶ 106.

During that meeting, Slavitt is alleged to have asked a "really tough question about why Alex Berenson hadn't been kicked off the platform." *Id.* ¶ 107. Slavitt allegedly suggested that the White House had done some data visualization that indicated that Berenson's account was at the epicenter for "covid disinformation that radiates outward." *Id.* ¶¶ 108–09. The Complaint does not allege that either Flaherty or Slavitt threatened Twitter during this meeting (or at any other time). The Complaint alleges that Twitter employees agreed to reexamine whether Berenson's account complied with Twitter's misinformation policies. *Id.* ¶ 112. Twitter did not take action against

---

[6] The balance of these public comments, which are incorporated by reference into the Complaint, demonstrates the Biden administration's recognition of platform authority to decide for themselves how to limit misinformation and shows that there was no particular § 230 reform on the table at the time.

8

Berenson at that time. The Complaint alleges that, instead, a Twitter employee called Flaherty to inform him that Twitter would not be removing Berenson because he had not violated Twitter's policies. *Id.* ¶ 113.

The Complaint alleges that White House officials continued to have "angry" communications with Twitter regarding vaccine misinformation in the following months, during which unnamed White House staff members expressed that they were "not satisfied with Twitter's enforcement approach[] as they wanted Twitter to do more and to de-platform several accounts." *Id.* ¶ 115. The Complaint does not allege who participated in those communications, nor does it indicate that Berenson's account was discussed during those meetings and calls. *Id.* The Complaint does not concretely allege any further communications regarding Berenson between Twitter and the White House.[7]

Instead, the remaining allegations largely concern actions taken by Slavitt after he left his federal employment, including communications he had with Twitter employees regarding Berenson's account, *id.* ¶¶ 126–30, 148, 156–57, as well as communications between Pfizer employees and Twitter regarding Berenson that took place in August 2021, *id.* ¶¶ 161–69. Berenson's account was allegedly permanently banned on August 28, 2021. *Id.* ¶ 169. In July 2022, however, Berenson's Twitter account was reinstated. *Id.* ¶ 178.

Berenson asserts claims for relief against the Federal Defendants under the First Amendment and 42 U.S.C. § 1985(3). In Count One, Berenson alleges that the Federal Defendants violated his First Amendment rights and "caused [his] deplatforming from Twitter." *Id.* ¶¶ 188–

---

[7] In an apparent reference back to paragraph 115 of the Complaint, Count I of the Claims for Relief conclusorily alleges that "[f]ollowing Twitter's initial refusal to deplatform Mr. Berenson, the White House, including Mr. Flaherty and Mr. Slavitt, [held] 'very angry' phone calls with Twitter urging the platform to censor Mr. Berenson's speech." Compl. ¶ 192(b). But at no point prior to the Claims for Relief does the Complaint allege that Flaherty or Slavitt participated in these alleged phone calls, or that Berenson's account was discussed.

199. In Count Two, Berenson alleges that the Federal Defendants "conspired together to deprive [him] of his First Amendment rights" in violation of 42 U.S.C. § 1985(3) and "caus[ed] him to be deplatformed from Twitter." *Id.* ¶¶ 200–06. In Count Three, Berenson asserts that Slavitt, Gottlieb and Bourla tortiously interfered with the contract between Berenson and Twitter. *Id.* ¶¶ 207–17.

## LEGAL STANDARD

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* at 496–97.

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id*. at 678, 681. In deciding a Rule 12(b)(6) motion, "the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (alteration, citation, and internal quotation marks omitted).

10

**ARGUMENT**

**I.    BERENSON LACKS ARTICLE III STANDING FOR HIS FIRST AMENDMENT CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF AGAINST THE FEDERAL DEFENDANTS**

Berenson lacks standing to pursue his claims for equitable relief against the Federal Defendants. To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements ensure "that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation and internal quotation marks omitted). The "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997). After all, "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Berenson's Complaint fails under all three prongs of the standing analysis.

**A.  Berenson Does Not Identify an Injury That Satisfies Article III**

"An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted). Where, as here, a plaintiff seeks prospective equitable relief, it is not enough to allege a past injury. *See City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Rather, a plaintiff must demonstrate a continuing,

present injury or a "real and immediate threat" of future injury. *Lyons*, 461 U.S. at 102. "[T]hreatened injury must be *certainly impending* to constitute injury in fact, and [ ] allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and internal quotation marks omitted); *accord McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300 (2d Cir. 2021). Allegations that rely on "a highly attenuated chain of possibilities" are insufficient to show the required "certainly impending" threatened injury. *Clapper*, 568 U.S. at 410, 416.

Berenson does not sufficiently allege Article III injuries-in-fact to support the prospective equitable relief he seeks. He alleges only that he suffered Twitter content moderation *in the past*, *see, e.g.*, Compl. ¶ 2 (alleging that the defendants "worked together to pressure Twitter to suspend [his] account and mute his voice" "[t]hrough 2021"), but "'[p]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy' with respect to potential future similar wrongs," *Dorce v. City of N.Y.*, 2 F.4th 82, 95–96 (2d Cir. 2021) (quoting *Lyons*, 461 U.S. at 103), *remanded*, 2022 WL 2286381 (S.D.N.Y. June 24, 2022). Berenson alleges no present, continuing injury; indeed, the most recent alleged instance of content moderation (Berenson's suspension, or deplatforming, from Twitter) occurred nearly two years ago, Compl. ¶ 169, and Twitter has since reinstated Berenson's account, *id.* ¶ 178. And he offers no plausible, nonconclusory allegations of certainly impending future injury sufficient to support the prospective equitable relief sought. *See Clapper*, 568 U.S. at 415; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (noting that the concept of imminent injury "has been stretched beyond the breaking point where, as here, the plaintiff alleges only an injury at some indefinite future time"). The Complaint offers no allegations whatsoever regarding any impending harm to Berenson other than the following conclusory statements:

12

> [U]nless and until Defendants are enjoined, Mr. Berenson's rights remain under threat. President Biden and his Administration continue to view COVID-19 vaccination as a life-saving measure, and thus the federal government might continue or start anew its efforts to silence Mr. Berenson, who has since returned to Twitter.
>
> . . .
>
> Since his return to Twitter, Mr. Berenson has continued to write about the COVID-19 vaccines and the public policy choices and failures of the last three years. He now has almost 500,000 followers on Twitter. He remains at risk from future government censorship efforts. . . . Defendants targeted Mr. Berenson once before, and there is no reason to think they will not do so again.
>
> …
>
> The violations described above may and are likely to recur unless the government Defendants are enjoined.

Compl. ¶¶ 182, 186, 198. These allegations fall far short of demonstrating the real and immediate threat of future injury necessary to allege standing for prospective equitable relief, especially given the fact that the injury Berenson alleges in his Complaint—his "deplatforming from Twitter," *id.* ¶ 196—allegedly resulted from application of Twitter's COVID-19 misleading information policy, including the strike system, *id.* ¶ 169, and Twitter has since stated unequivocally that it will no longer enforce that policy. *Cf. Trump v. Twitter Inc.*, No. 21 Civ. 8378, 2023 WL 1997921, at \*2 (N.D. Cal. Feb. 14, 2023) (concluding that plaintiff's action brought against Twitter for allegedly deplatforming her in response to pressure from members of Congress was moot because, after she filed the action, Twitter restored her account and stopped enforcing its COVID-19 misleading information policy); *Stafford v. Int'l Bus. Machines Corp.*, __ F.4th __, No. 22-1240, 2023 WL 5183546, at \*3 (2d Cir. Aug. 14, 2023) ("Mootness is 'standing set in a time frame.'" (citation omitted)).

13

**B. Berenson Does Not Allege any Injury that is Traceable to the Conduct of the Federal Defendants as Opposed to Twitter, Which Is Not Before This Court**

Even assuming Berenson has adequately alleged an injury based on some content moderation decisions that Twitter has made or may make in the future, he does not sufficiently allege that those decisions were (or will be) attributable to the Federal Defendants rather than Twitter's "independent action." *See Bennett v. Spear*, 520 U.S. 154, 169 (1997).

To satisfy Article III's causation requirement, Berenson must demonstrate a "causal nexus" between each "defendant's conduct and the injury." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (citation and internal quotation marks omitted); *Holland v. JPMorgan Chase Bank, N.A.*, No. 19 Civ. 233, 2019 WL 4054834, at *6 (S.D.N.Y. Aug. 28, 2019) ("A plaintiff proceeding against multiple defendants must establish standing as to each defendant and each claim."). Where, as here, "the plaintiff[s] [are] not [themselves] the object of [a] government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). "In that circumstance, causation and redressability ordinarily hinge on the . . . unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or predict." *Id.* Put otherwise, the Supreme Court has adhered to its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414.

Berenson's alleged injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party," *Lujan*, 504 U.S. at 560 (alterations and citation omitted), but he makes little effort to connect specific actions taken by President Biden, Flaherty, or Murthy to distinct actions taken by Twitter that injured Berenson

14

in concretely described ways. As to President Biden, the Complaint alleges only that he said that social media companies, including Twitter, were "killing people" by allowing users to publish COVID-19 vaccine skepticism, Compl. ¶¶ 16, 135; used Twitter to promote getting vaccinated, *id.* ¶¶ 55–57; made statements about the "wartime effort" and life-and-death consequences of vaccinating the American public, *id.* ¶¶ 87–88; made comments about addressing vaccine hesitancy, *id.* ¶ 90; and issued an executive order intended to help deter the spread of misinformation and disinformation, *id.* ¶ 94. As to Flaherty, the Complaint alleges only that he attended one meeting with Slavitt and Twitter employees about COVID-19 misinformation at which Berenson's name was raised, *see id.* ¶¶ 105, 192(a), and conclusorily alleges that Flaherty participated in subsequent "phone calls with Twitter urging the platform to censor Mr. Berenson's speech," without identifying when these calls took place, who exactly participated in them, or what specifically was discussed during them, *id.* ¶ 192(b). As to Murthy, the Complaint alleges only that he gave an interview about misinformation on social media sites before he became Surgeon General, *id.* ¶ 95; published an advisory addressing health misinformation generally, *id.* ¶ 129; and appeared once on Slavitt's podcast (after Slavitt left the federal government) to discuss misinformation on social media sites generally, *id.* ¶¶ 130–31.[8]

The Complaint is thus completely devoid of factual allegations linking Murthy's alleged actions to Twitter's decisions to issue strikes to, and ultimately suspend, Berenson's Twitter account. And there is no plausible, *non-speculative* allegation that Twitter is or was responding to President Biden's or Flaherty's alleged actions rather than enforcing its own content-moderation policies. Indeed, Berenson purports to infer a causal link between President Biden's statement that Twitter was "killing people" and Berenson's deplatforming from the mere timing of Twitter's

---

[8] The Complaint also makes repeated reference to the "Biden Administration," but the "Biden Administration" is not a defendant in this action; only allegations involving the Federal Defendants are relevant to the standing inquiry.

decision to issue a strike to Berenson. Compl. ¶¶ 16, 135–36. But social media companies host billions of users' content on their platforms and make innumerable decisions about what content to moderate on their platforms every day. That one such decision taken by Twitter occurred close in time to a statement made by President Biden does not plausibly suggest that the decision is causally linked to President Biden's public statement about social media companies generally, especially in light of the fact that over a month elapsed between when President Biden allegedly made that statement and when Berenson was deplatformed from Twitter.

Berenson's allegations also undermine any causal link between the one meeting Flaherty attended with Twitter employees and Berenson's deplatforming. According to Berenson's allegations, Flaherty did not even bring Berenson up at this meeting, and when Berenson was brought up by another attendee, Twitter indicated that it would not be removing Berenson because he had not violated any of its policies. *Id.* ¶ 113. Moreover, nearly three months elapsed between this meeting and when Berenson's account was first locked, *see id.* ¶ 136, and over four months elapsed between this meeting and when Berenson was deplatformed from Twitter, *see id.* ¶ 169. Berenson's speculation is insufficient under the plausibility standard articulated under *Twombly* and *Iqbal* to attribute Twitter's decisions to the Federal Defendants. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) ("Although we generally accept the truth of a plaintiff's allegations at the motion to dismiss stage, the plaintiff still 'bears the burden of alleging facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" (alteration in original) (citation omitted)). It is just as likely (if not more likely) that Twitter's decisions reflect independent judgments based on its own policies and subjective business interests. *See Iqbal*, 556 U.S. at 680 (explaining that, in *Twombly*, "parallel conduct was consistent with an unlawful agreement, [but] the Court nevertheless concluded that it did not plausibly suggest an illicit accord

16

because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

Berenson is not the first social media user to advance the coercion-based theory of causation raised in the Complaint. To the contrary, numerous recent First Amendment cases, advancing a similar theory of causation, have been filed in district courts across the country and subsequently dismissed for failure to satisfy Article III's causation requirement. *See, e.g*, *Changizi v. HHS*, 602 F. Supp. 3d 1031, 1046–49 (S.D. Ohio 2022); *Hart v. Facebook Inc.* ("*Hart I*"), No. 22 Civ. 737, 2022 WL 1427507, at *9–10 (N.D. Cal. May 5, 2022); *Hart v. Facebook Inc.*("*Hart II*"), No. 22 Civ. 737, 2023 WL 3362592, at *2–4 (N.D. Cal. May 9, 2023) (denying leave to amend complaint dismissed in *Hart I* because new allegations did not show that the government was responsible for the conduct of social media companies); *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 515–16 (D.D.C. 2021) ("*AAPS I*"), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*"); *cf. Doe v. Google*, No. 21-16934, 2022 WL 17077497, at *2–3 (9th Cir. Nov. 18, 2022) (similar rationale albeit under Rule 12(b)(6)). *But see Missouri v. Biden*, No. 22 Civ. 1213, 2023 WL 2578260 (W.D. La. Mar. 20, 2023).

There is nothing materially distinct about this case that should compel a different conclusion. Indeed, Berenson here faces the same obstacles that resulted in dismissal of the overwhelming majority of those actions. As noted above, he ignores the "obvious alternative explanation[s]" for Twitter's decisions to combat misinformation on its platform. *Twombly*, 550 U.S. at 567. It might well have concluded that content moderation was "necessary to save itself from losing other sources of revenue, such as advertisers (or other users) who do not want to be associated with a company that passively allows 'misinformation' to spread," or perhaps it "simply chose to prioritize tackling the spread of perceived COVID-19 mistruths over its profitability."

17

*Changizi*, 602 F. Supp. 3d at 1050 n.5. The undeniable "widespread societal concerns about online misinformation" offer a "far [more] plausible" explanation for Twitter's content moderation decisions than any alleged pressure from the Federal Defendants. *AAPS II*, 23 F.4th at 1034–35.

Accordingly, Berenson fails to plausibly allege the requisite causal link to establish Article III standing. The Court should join the several courts to have considered this issue and dismiss the claims for equitable relief against the Federal Defendants for failure to allege causation.

### C. Berenson Does Not Allege Injuries that Would Be Redressed by the Sweeping Injunctive Relief He Seeks

Berenson also fails to sufficiently allege that the expansive injunction he seeks would likely redress his alleged injuries. *Lujan*, 504 U.S. at 561. "Whether an injury is redressable depends on the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 141 S. Ct. 2104, 2215 (2021); *cf. Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) (concluding redressability was lacking where "the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces").

Berenson seeks a sweeping injunction prohibiting the Federal Defendants "from further violating [his] First Amendment rights to free speech, right to petition the government, and freedom of the press" by causing his deplatforming from Twitter. Compl., Prayer for Relief ¶ B. Such an injunction would not redress any alleged injury here because, ultimately, whether to take action against any "misinformation" on Twitter turns on "unfettered choices made by independent actors not before the court[], and whose exercise of broad and legitimate discretion the court[] cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (citation omitted). No injunction against the Federal Defendants could require Twitter—which is not before this Court— to rescind or modify its policies on misinformation. Thus, no matter the relief entered here, Berenson would still be bound by private terms of service and policies constraining Twitter use,

18

including as to misinformation. *See, e.g.*, *Huber v. Biden*, No. 21 Civ. 6580, 2022 WL 827248, at *5 (N.D. Cal. March 18, 2022), *aff'd*, No. 22-15443, 2022 WL 17818543 (9th Cir. Dec. 20, 2022). The Court "cannot presume" to "control" Twitter misinformation policies or the application of those policies to particular content posted by users (including Berenson) bound by platform terms of service. *Lujan*, 504 U.S. at 562. Nor is it "likely, as opposed to merely speculative," that an injunction against the Federal Defendants would cause Twitter independently to decide to rescind or modify its misinformation policies.[9] *Id.* at 561.

Berenson's proposed injunction would also take the Court far beyond the limits of Article III. It would require for its enforcement that this Court effectively become a permanent monitor of government speech at the highest levels. "[I]n the context of Article III standing," however, "federal courts must respect their 'proper—and properly limited—role . . . in a democratic society.'" *M.S. v. Brown*, 902 F.3d 1076, 1087 (9th Cir. 2018) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("The importance of [Article III standing] should not be underestimated as a means of 'defin[ing] the role assigned to the judiciary in a tripartite allocation of power.'" (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968))). To fully redress Berenson's purported harms, the Court would have to enjoin government officials not only from engaging with Twitter directly, but also from engaging in a wide range of government speech, including making press statements and issuing advisories related to misinformation. "Government officials and agencies spend a great deal of time urging private persons and firms and other institutions to change their behavior." *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 790 (7th Cir. 2015). Berenson's proposed injunction invites the Court to impermissibly entangle itself with and impede

---

[9] As a factual matter, Twitter *did* independently decide to stop enforcing its COVID-19 misleading information policy as of November 2022. *See supra* p. 5.

the performance of critical Executive Branch functions that regularly require Executive Branch officials to engage in government speech. *Id.*; *see also, e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015) ("[W]hen the government speaks it is entitled to promote a program, to espouse a policy, or to take a position [because o]therwise, government would not work."). If "the law of Article III standing" is to "serve[] to prevent the judicial process from being used to usurp the powers of the political branches," then it must preclude the Court from issuing the broad injunctive relief sought. *Spokeo*, 578 U.S. at 338.

## II.    THE SEPARATION OF POWERS DOCTRINE REQUIRES DISMISSAL OF THE CLAIMS AGAINST PRESIDENT BIDEN

Berenson's First Amendment claim against President Biden should be dismissed for an additional reason: the requested injunctive and declaratory relief is unavailable against him. By history and tradition, injunctive relief has long been unavailable against the President under Supreme Court precedent concerning the separation of powers. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Here, there is no tradition of equitable relief against the President. Instead, more than a century and a half ago, the Supreme Court concluded that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by" it. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498, 501 (1866). In other words, as "to the President, courts do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

*Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion), underscored that point. The *Franklin* plurality observed that *Mississippi v. Johnson* "left open the question

20

whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* at 802. But it repeated that "in general," it lacked jurisdiction to issue an injunction against the President "in the performance of his official duties"—calling this relief so "extraordinary" that it should "raise[] judicial eyebrows." *Id.* at 802–03 (citation omitted); *see also id.* at 826 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear that no court has authority to direct the President to take an official act."). The Supreme Court has thus repeatedly refused to second-guess the legality of the President's discretionary decisions. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 474–75 (1994); *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948).

The separation of powers principles that prevent the federal courts from enjoining the President's official acts also prevent them from entering declaratory relief against the President:[10]

> Permitting declaratory or injunctive relief against the President personally would not only distract him from his constitutional responsibility to "take Care that the Laws be faithfully executed," but, as more and more disgruntled plaintiffs add his name to their complaints, would produce needless head-on confrontations between district judges and the Chief Executive.

*Franklin*, 505 U.S. at 828 (Scalia, J., concurring) (quoting U.S. Const., Art. II, § 3); *accord* *Newdow*, 603 F.3d at 1012–13 ("[C]ourts . . . have never submitted the President to declaratory relief" because "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." (citing, *inter alia*, *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996))).[11]

---

[10] Even assuming, *arguendo*, that the Constitution allows declaratory relief against the President, Congress must speak clearly before it subjects the President to suit for declaratory relief. In *Franklin* and *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Supreme Court applied a clear-statement requirement before the President could be subjected to certain relief. But the Declaratory Judgment Act contains no express statement that it extends to the President. *See* 28 U.S.C. § 2201.

[11] The Second Circuit affirmed a declaratory judgment against the President in *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v.*

21

The general rule of *Mississippi* and *Franklin* applies to the present case. Berenson does not seek to enjoin or declare unlawful President Biden's ministerial acts—acts where nothing is left to discretion. Instead, Berenson's requested relief necessarily concerns a broad category of actions that includes official actions and that would extend beyond purely ministerial duties. *See, e.g.*, Compl., Prayer for Relief ¶ B. The Constitution's separation of powers allows the Executive to make decisions about his interactions with social media companies without judicial interference. And of course, if necessary, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part); *see, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–89 (1952). Thus, the Court should dismiss Berenson's claim against President Biden for equitable relief.

## III.    THE COMPLAINT FAILS TO STATE A PLAUSIBLE FIRST AMENDMENT CLAIM

Berenson's First Amendment claims against the Federal Defendants should be dismissed for failure to state a claim. There are two forms of speech "implicated" in First Amendment cases such as this one, which premise a claim of censorship on policy statements made by public officials. *Vullo*, 49 F.4th at 714. The first type belongs to "private individuals and entities" who allege that their First Amendment rights have been infringed. *Id.* The second type belongs to the government officials themselves. *Id.* The Government Speech Doctrine preserves the authority of government officials to advocate for a "preferred course of action." *Id.* As the Supreme Court

---

*Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021). The Supreme Court subsequently vacated that judgment, so that decision is not binding on this Court. But even if it were binding on this Court, *Knight* would not have precedential value on this issue (and should not have any persuasive value, either) because the availability of declaratory relief against the President was neither raised by the parties before the Second Circuit nor addressed in the Circuit's opinion. *See id.* at 233–34 n.3 (mentioning declaratory relief only to recite the steps taken by the district court and to observe that this did not render the case moot); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citation omitted)).

observed, through use of a particularly pertinent example, the Government must have the "freedom to select the messages it wishes to convey," otherwise "[h]ow could [it] effectively develop programs designed to encourage and provide vaccinations . . . ?" *Walker*, 576 U.S. at 207–08 (citation and internal quotation marks omitted). So, "when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position." *Id.* at 208.

To accommodate the Government Speech Doctrine with an individual's Free Speech Clause rights, the Second Circuit has held that "in determining whether a particular request to suppress speech is constitutional, what matters is the distinction between attempts to convince and attempts to coerce." *Vullo*, 49 F.4th at 715; *cf. Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (The Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the" Government). "Although government officials are free to advocate for (or against) certain viewpoints, they may not encourage suppression of protected speech in a manner that 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'" *Vullo*, 49 F.4th at 715 (quoting *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983)). In "distinguishing between attempts to convince and attempts to coerce," the Second Circuit considers four factors: "(1) word choice and tone," "(2) the existence of regulatory authority," "(3) whether the speech was perceived as a threat," and, "perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* Applying that four-factor test here leads to the conclusion that, as a matter of law, Berenson's allegations fail to state a violation of the First Amendment.

23

Berenson's Complaint contains no plausible allegation that federal officials coerced Twitter to suspend him from its platform. To the contrary, the Complaint's sole allegations concerning any contacts between federal officials acting in their official capacities and Twitter employees regarding Berenson only serve to prove the *lack* of coercion, as Twitter allegedly responded to the White House's inquiry by informing them that Berenson had not violated its policies and that they would therefore not be removing his account. Compl. ¶ 113. Faced with the dearth of allegations of any further communications from the White House regarding Berenson, Berenson is forced to rely on allegations that federal officials' general public statements encouraging social media companies to take action to halt the spread of COVID-19 misinformation on their platforms amounted to censorship that coerced Twitter into suspending his specific account. Yet federal officials' own expression of their views on an important public health priority—made without any reference to Berenson or his Twitter account, let alone a threat of consequences against Twitter should they fail to suspend his account—is consistent with the Government Speech Doctrine, and does not constitute coercion.

### A. Allegations Regarding the April 2021 Meeting Do Not Plausibly Establish Coercion

Although the Complaint conclusorily asserts that there was a "pressure campaign" brought by the federal government targeting Berenson, Compl. ¶¶ 8, 129, 137, 147, the Complaint in fact alleges only a single instance in which federal officials discussed Berenson's account with Twitter employees—at an April 2021 meeting between Twitter employees and White House officials regarding COVID-19 misinformation. Under the four-factor *Vullo* test, the federal officials' alleged actions in this single instance fall far short of being "coercive," and certainly do not amount to a "pressure campaign."

24

According to the Complaint, rather than compelling Twitter to take specific action against Berenson's account, at the April 2021 meeting, Slavitt merely asked a "tough question about why Alex Berenson hasn't been kicked off from the platform." *Id.* ¶ 107. Asking a "question" is very different than issuing a directive, an instruction, an ultimatum, or a requirement. *See Kennedy*, 66 F.4th at 1208 (where communication was framed as request rather than command, the first factor of *Vullo* test weighed against finding of coercion). Nor is there any allegation that any of the officials attending that meeting had the regulatory authority to require Twitter to suspend Berenson's account or to take any adverse regulatory action against Twitter. *See id.* at 1210 ("Although the lack of direct authority is 'not necessarily dispositive,' it is 'certainly relevant' for determining whether a message is an act of persuasion or a threat of adverse consequences." (citation omitted)). And the Complaint is completely devoid of any allegation that Twitter—which did *not* take action against Berenson following the April 2021 meeting, *see* Compl. ¶ 113— perceived this tough question as a threat, *see Vullo*, 49 F.4th at 715. With respect to the "most important" factor of the *Vullo* test, whether there were references to adverse consequences, there is no allegation that at this meeting any threats were issued regarding penalties, fines, or legal consequences flowing from a failure to remove Berenson from Twitter. *See Louisiana Division Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 319 (5th Cir. 2020) ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses."); *Hammerhead*, 707 F.2d at 39 (holding that, to state a First Amendment claim for government censorship, governmental speech must "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request").

25

Thus, Twitter, as a private entity, was free to respond to this inquiry as it deemed appropriate. And it is clear from the Complaint itself that White House officials did not dictate to Twitter what action it must take. The Complaint alleges that in response to this inquiry, Twitter employees reviewed Berenson's Twitter activity, determined independently that he had ***not*** violated Twitter's misinformation policies, and informed the White House that it would not be taking any action against Berenson's account. Compl. ¶ 113. Berenson's own allegations therefore demonstrate that this interaction was *not* coercive. *See Graseck v. Mauceri*, 582 F.2d 203, 210 (2d Cir. 1978) (holding that state judges did not coerce Legal Aid Society to dismiss attorney, such as to convert the termination decision into state action, where judges made complaints regarding the attorney, but Legal Aid Society decided not to terminate his employment at that time and instead only fired him some months later after additional incidents occurred); *cf. O'Handley v. Weber*, 62 F.4th 1145, 1158–59 (9th Cir. 2023) ("[A]ny decision that Twitter took in response [to a request to remove a post] was the result of its own independent judgment in enforcing its Civic Integrity Policy. . . . Twitter was free to agree with the [request]—or not.").

### B. Allegations Regarding Actions Taken by Non-Government Officials Cannot Be Imputed to the Government

There are no allegations that any federal government official had further contact with Twitter regarding Berenson's account in the months that followed the April 2021 meeting. *See Kennedy*, 66 F.4th at 1207 (in finding that Senator Warren's letter to Amazon complaining about distribution of a book containing COVID-19 misinformation was not coercive, the court noted that an "interaction will tend to be more threatening if the official refuses to take 'no' for an answer and pesters the recipient until it succumbs"). Berenson instead alleges that, in the months that preceded Twitter's suspension of Berenson's account in August 2021, various private sector individuals encouraged Twitter to take action against his account. Compl. ¶¶ 140–169. But the

26

actions of, *inter alia*, the CEO and a board member of a private pharmaceutical company are irrelevant in determining if the federal government censored Berenson's speech in violation of the First Amendment. And any actions taken by Slavitt after he left his position in the White House and was acting as a private citizen cannot be attributed to the federal government.

This is particularly true as the Complaint contains no factual averments to suggest that these individuals were state actors. Although the Complaint characterizes these individuals as members of a "conspiracy" to suppress Berenson's speech, the Complaint itself is devoid of any allegations that i) any official in the federal government asked, solicited, or encouraged Slavitt, Bourla, or Gottlieb to take any action with respect to Berenson; ii) any federal official even discussed Berenson with Bourla or Gottlieb at any time; or iii) any federal official discussed Berenson with Slavitt after he left his position in the White House. *See, e.g.*, *Moody v. Farrell*, 868 F.3d 348, 352–54 (5th Cir. 2017) (actions of private individuals or entities cannot be considered state action under "joint action" test without a finding that the private party and government officials formed a "preconceived plan" to achieve the "specific conduct of which the plaintiff complains"). Accordingly, any allegations concerning Bourla or Gottlieb, or Slavitt following his departure from the White House, cannot be considered in determining the sufficiency of the First Amendment allegations against the Government.

### C. Allegations Regarding Generalized Public Policy Statements Made by Senior Government Officials Regarding COVID-19 Misinformation Do Not Suffice to Plausibly Allege Coercion

The remainder of Berenson's allegations regarding a purported "pressure campaign" are limited to public remarks made by Biden administration officials encouraging social media companies to adopt policies to address misinformation on their platforms. Such government speech advancing a public policy position is consistent with the First Amendment, however, and does not rise to the level of unlawful coercion. *See X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir.

27

1999) (concluding that government officials did not violate First Amendment where "the complaint alleges that the legislators exerted 'pressure' on the decisionmakers, [but] there is no allegation that such 'pressure' took the form of anything other than speech. . . . [They] are not alleged to have threatened the decisionmakers in any way or to have engaged in coercive or intimidating conduct.").

For example, with respect to President Biden, Berenson points to three public speeches. *See* Compl. ¶¶ 87–88, 135. Berenson also alleges that the then-White House Press Secretary affirmed in public comments that senior White House officials had been in contact with social media platforms to propose that they adopt a "robust enforcement strategy" regarding misinformation but also stated that decisions about whether particular individuals should remain on the platform were left to the private sector. *Id.* ¶¶ 133–34. And Berenson's only allegations with respect to the Surgeon General concern his July 2021 advisory on COVID-19 misinformation and a podcast he participated in discussing the advisory. *Id.* ¶¶ 129, 131.

Berenson's attempt to infer misconduct from such generalized political policy statements contradicts "the government speech doctrine," under which "public officials are generally free to favor certain views over others when they speak." *Vullo*, 49 F.4th at 715 (citing *Walker*, 576 U.S. at 207–08). Under the Government Speech Doctrine, the Federal Defendants legitimately chose to exercise their discretion to urge social media companies to do more to contain misinformation generally. *Id.* That type of standard government speech does not, and cannot, amount to the type of "coercion" necessary to convert private conduct into state action.

The allegation in the Complaint that the then-White House Communications Director commented that social media companies should "certainly be held accountable," and called for consideration of "reform" to § 230 of the CDA, Compl. ¶ 138, does not alter this analysis. To begin

28

with, it is unclear how the alleged comments about amending § 230 could be viewed as "threats" given that no Federal Defendant could unilaterally take such legislative action. And, again, the Complaint is completely devoid of any allegations suggesting that Twitter perceived these alleged comments as a threat. *See Vullo*, 49 F.4th at 715. Moreover, "referencing potential legal liability does not morph an effort to persuade into an attempt to coerce." *Kennedy*, 66 F.4th at 1209; *see also VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1165 (10th Cir. 2021) (finding no coercion where there was "no threat to prosecute, nor intimation of intent to proscribe the distribution of" specific speech). Furthermore, Berenson does not allege that any government official said that they would refrain from pursuing those remedies if social media companies intensified their content moderation measures with respect to Berenson.

A recent decision of the Ninth Circuit in a case brought against Google, among others, is instructive on this point. *See Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *2–3 (9th Cir. Nov. 18, 2022). There, the plaintiffs alleged that "events involving federal officials regarding YouTube, Google, or general social media platform moderation policies" in 2019 and 2020, including House Speaker comments about § 230 and a House resolution mentioning social media company conduct, transformed YouTube's content moderation decisions into state action under the compulsion or joint action tests. *Id.* Yet those events, the Ninth Circuit reasoned, "lack[ed] force of law, rendering them incapable of coercing YouTube to do much of anything," and thus were insufficient to plausibly allege state action. *Id.* at *2.[12]

---

[12] *See also Divino Grp. LLC v. Google LLC*, No. 19 Civ. 4749, 2021 WL 51715, at *6 (N.D. Cal. Jan. 6, 2021); *accord Trump v. Twitter, Inc.*, 602 F. Supp. 3d 1213, 1223–24 (N.D. Cal. May 6, 2022), *appeal filed*, No. 22-15961 (9th Cir. June 28, 2022); *Huber*, 2022 WL 827248, at *9–10; *Children's Health Def. v. Facebook, Inc.*, 546 F. Supp. 3d 909, 931–32 (N.D. Cal. 2021), *appeal filed sub nom. Children's Health Def. v. Meta Platforms, Inc.*, No. 21-16210 (9th Cir. July 21, 2021); *Newman v. Google LLC*, No. 20 Civ. 4011, 2021 WL 2633423, at *9–10 (N.D. Cal. June 25, 2021).

The Complaint's reliance upon statements advancing positions of public policy fails for an additional reason: Berenson is unable to draw the requisite connection between advocating for the adoption and enforcement of policies governing misinformation generally and Twitter's specific decision to suspend his account. It is not enough to show that the Government recommended a general policy under which the private party retained discretion over whether to take the particular action at issue. *See West v. Atkins*, 487 U.S. 42, 52 n.10 (1988) (noting that a "private party's challenged decisions could satisfy the state-action requirement if they were made on the basis of some rule of decision for which the State is responsible," but private party "decisions . . . based on independent professional judgments" would not constitute state action); *cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ("Action taken by private entities with the mere approval or acquiescence of the State is not state action."). Rather, "*Blum* requires a nexus between the state and the *specific* conduct of which plaintiff complains," *Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999), which here is the suspension of Berenson's Twitter account.

Berenson does not allege that any of these public speeches even mentioned Berenson or his Twitter activity, let alone "dictat[ed] the challenged action" (*e.g.*, by directing Twitter to take any specific content moderation action against him). *Barnes v. Lehman*, 861 F.2d 1383, 1387 (5th Cir. 1988); *see also Blum*, 457 U.S. at 1010. Nor does the Complaint allege that any federal official instructed Twitter to follow a "rule of decision" that would have required it to take action against content posted by Berenson, such as requiring Twitter to define misinformation in a particular manner that would obligate the company to take specific types of action against specific content posted by Berenson. *West*, 487 U.S. at 52 n.10. Instead, it is clear that the content moderation

30

decisions made by social media companies ultimately "rested with" those companies. *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020).

Twitter is thus analogous to the physicians in *Blum*, who made certain medical necessity decisions that caused the State to adjust the patient's Medicaid benefits. 457 U.S. at 1006–07. Because those determinations regarding medical necessity "ultimately turn[ed] on medical judgments made by private parties according to professional *standards that are not established by the State*," *id.* at 1008 (emphasis added), the Court held that those decisions could not be attributed to the State, *id.* at 1009; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) (concluding that state action was lacking in *Blum* even though "[b]oth state and federal regulations *encouraged* the nursing homes to transfer patients to less expensive facilities when appropriate" (emphasis added)). Just as the private parties in *Blum* exercised their own judgment, social media companies exercise independent judgment to determine whether to moderate any content on their platforms deemed to be "misinformation." Accordingly, the actions of Twitter cannot fairly be attributed to the Federal Defendants under the "compulsion test." *Cf. O'Handley*, 62 F.4th at 1158–59.

In sum, Berenson fails to plausibly allege that federal officials exercised coercive power over any content-moderation measures that Twitter may have taken with respect to him. Accordingly, the First Amendment claims for declaratory and injunctive relief should be dismissed.

IV.    **THE *BIVENS* CLAIMS AGAINST FLAHERTY AND SURGEON GENERAL MURTHY SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM**

The Complaint can be read to assert *Bivens* claims against Flaherty and Surgeon General Murthy for violations of Berenson's First Amendment rights.[13] *See* Compl. ¶ 199 (claiming

---

[13] The Complaint can also be read to assert a *Bivens* claim against President Biden. *See* Compl. ¶¶ 188–99. However, the Complaint names President Biden as a defendant in his official capacity only, *see* Compl. ¶ 30, and

"damages" for violation of Berenson's First Amendment rights). As discussed above, the Complaint does not adequately allege violations of the First Amendment by any of the Federal Defendants. But the allegations with respect to Flaherty and Murthy are particularly threadbare. The only allegation with respect to Flaherty is that he attended the April 2021 meeting in which Slavitt asked the "tough question" regarding Berenson. And there are absolutely no allegations linking Murthy to any requests to deplatform Berenson.

But even if the Complaint could be read to allege First Amendment violations by Flaherty and Murthy, a First Amendment *Bivens* claim not viable under recent Supreme Court precedent. *Bivens* is the "federal analog to suits brought against state officials under" 42 U.S.C. § 1983. *Iqbal*, 556 U.S. at 675. The theory is that the Constitution itself contains "an implied damages remedy" against federal actors for constitutional violations. *See Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017). Since the 1970s, however, the Supreme Court has recognized *Bivens* claims in only three contexts: (1) unreasonable search and seizure under the Fourth Amendment, *see Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971); (2) sex-based employment discrimination under the Fifth Amendment's Due Process Clause, *see Davis v. Passman*, 442 U.S. 228 (1979); and (3) deliberate indifference to a convicted prisoner's life-threatening medical needs under the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980). *See Komatsu v. United States*, No. 21 Civ. 1838, 2023 WL 317326, at *5 (S.D.N.Y. Jan. 19, 2023). The Supreme Court has since "emphasized that recognizing a cause of action under *Bivens* is a disfavored judicial activity" and has "declined 11

_____

thus any *Bivens* claim asserted again him is barred by sovereign immunity, *see Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against . . . federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."); *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 372 (E.D.N.Y. 2005) ("All *Bivens* claims brought against the defendants in their official capacities must be dismissed since sovereign immunity is not waived under *Bivens*.")

times to imply a similar cause of action for other alleged constitutional violations." *Egbert v. Boule*, 142 S. Ct. 1793, 1799, 1803 (2022) (citation and internal quotation marks omitted).

To decide whether a *Bivens* claim may proceed, courts must apply a "two-step test, which first asks '[i]f the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court,' meaning that it presents a new context, . . . and then asks if there are 'special factors counselling hesitation in the absence of affirmative action by Congress,' in which case a court should decline to extend *Bivens*." *Cohen v. United States*, No. 21 Civ. 10774, 2022 WL 16925984, at *5 (S.D.N.Y. Nov. 14, 2022) (citation omitted). In *Egbert*, the Supreme Court endorsed an "even narrower" test, stating that "[w]hile our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* (quoting *Egbert*, 142 S. Ct. at 1803). Post-*Egbert*, there is a clear default answer to this question: "in *most every case*," "the answer is 'Congress'" is better equipped. *Egbert*, 142 S. Ct. at 1803 (emphasis added); *see Cohen*, 2022 WL 16925984, at *6 (observing that *Egbert* "all but held that *no* case would ever be able to satisfy [the Supreme Court's] analytic framework"). Berenson's claims do not survive under the Supreme Court's rigorous two-step test for implying a constitutional damages remedy.

First, Berenson's First Amendment claims indisputably arise in a new context. As discussed above, *Bivens*, *Davis*, and *Carlson* "represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself," *Abbasi*, 582 U.S. at 131, and in none of those cases did the Supreme Court recognize a remedy for a First Amendment *Bivens* claim. Indeed, as the Supreme Court has often reiterated, it has *never* recognized a First Amendment *Bivens* claim in *any* context. *See, e.g., Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012); *see also Egbert*, 142 S. Ct. at 1807. Likewise, the Second Circuit has never "recognized a

*Bivens* action sounding in the First Amendment." *Zherka v. Ryan*, 52 F. Supp. 3d 571, 579 (S.D.N.Y. 2014). For this reason alone, Berenson's First Amendment claims necessarily present a new context. *See Egbert*, 142 S. Ct. at 1807 ("Because a new context arises when there is a new 'constitutional right at issue,' the Court of Appeals correctly held that Boule's First Amendment claim presents a new *Bivens* context." (citation omitted)).

Second, several special factors counsel against implying a *Bivens* remedy here. The availability of injunctive relief against unconstitutional conduct—which Berenson is seeking in this very action—"is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1804 ("If there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action."); *accord Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *Abbasi*, 582 U.S. at 144–45, 148; *see also Cohen*, 2022 WL 16925984, at *9 (concluding that the availability of injunctive relief was an alternative remedial structure that counseled against implying *Bivens* remedy).

Moreover, Berenson's *Bivens* claims "call[] into question" the Biden administration's entire alleged policy of encouraging social media platforms to take more robust steps to combat misinformation, but a "*Bivens* action is not a proper vehicle for altering an entity's policy." *Abbasi*, 582 U.S. at 140 (citation and internal quotation marks omitted). *Bivens* actions against high-level executive officials such as this one, which "call into question the formulation and implementation of a general policy," are disfavored because such actions may "require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged," and the burden of that litigation and discovery could prevent the high-level executive officials "from devoting the time and effort required for the proper discharge of their

34

duties." *Id.* at 141. Indeed, "[a]llowing a damages suit in this context . . . would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch," *id.*, raising separation-of-power concerns.

Finally, because Berenson's *Bivens* claims call into question the Biden administration's entire alleged policy of encouraging social media platforms to take more robust steps to combat misinformation, they necessarily implicate national security and foreign policy. As courts have long recognized, national security and foreign policy are the prerogatives of Congress and the President. *Abbasi*, 582 U.S. at 142–43; *see also, e.g.*, *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (Matters of foreign affairs "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative."). Accordingly, numerous courts, including the Supreme Court, have consistently concluded that special factors counsel against implying a *Bivens* remedy where, as here, doing so would impinge on foreign policy and interfere with national security. *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 744–47 (2020); *Lebron v. Rumsfeld*, 670 F.3d 540, 551 (4th Cir. 2012); *Arar v. Ashcroft*, 585 F.3d 559, 573–74 (2d Cir. 2009); *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009). Were every individual whose content was moderated by social media companies permitted to sue high-level executive officials for money damages in their individual capacities, the United States' efforts to combat misinformation would undoubtedly be hindered, to the detriment of its foreign policy and national security objectives.

## V.    BERENSON FAILS TO STATE A PLAUSIBLE SECTION 1985(3) CLAIM AGAINST FLAHERTY AND SURGEON GENERAL MURTHY

Berenson also alleges that Flaherty and Murthy conspired with the other defendants to

deprive him of his constitutional rights in violation of 42 U.S.C. § 1985(3).[14] These claims should be dismissed for two independent reasons: (1) § 1985(3) does not apply to federal officers; and (2) the Complaint fails to state a claim under § 1985(3).

### A. Section 1985(3) Does Not Apply to Federal Officers

As an initial matter, Berenson's § 1985(3) claims should be dismissed because that statute does not apply to federal officers. Under 42 U.S.C. § 1985(3), "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

Neither the Supreme Court nor the Second Circuit have held that "Section 1985(3) applies to conspiracy claims against federal officials," *Sabir v. Licon-Vitale*, No. 20 Civ. 1552, 2022 WL 1291731, at *13 (D. Conn. Apr. 29, 2022) (noting the absence of a "clear pronouncement from the Supreme Court or Second Circuit that Section 1985(3) applies to conspiracy claims against federal officials"), and district courts in this Circuit "are split on this issue," *compare Alharbi v. Miller*, 368 F. Supp. 3d 527, 567–68 (E.D.N.Y. 2019) (concluding that "§ 1985(3) is inapplicable to federal officers acting under color of federal law"), *aff'd in part, dismissed in part*, 829 F. App'x

---

[14] Berenson also purports to assert a claim against President Biden under § 1985(3). *See* Compl. ¶¶ 200–06 (asserting a § 1985(3) claim against "[a]ll [d]efendants"). However, the Complaint names President Biden as a defendant in his official capacity only, *see* Compl. ¶ 30, and thus any § 1985(3) claim asserted again him is barred by sovereign immunity, *see Robinson*, 21 F.3d at 510 ("Because an action against . . . federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."); *Jones v. Nat'l Commc'n & Surveillance Networks*, 409 F. Supp. 2d 456, 466 (S.D.N.Y. 2006), *aff'd*, 266 F. App'x 31 (2d Cir. 2008) ("The U.S. government has not waived its sovereign immunity for claims under Sections 1981 to 1986 of Title 42.").

570 (2d Cir. 2020), *with Peck v. United States*, 470 F. Supp. 1003, 1011 (S.D.N.Y. 1979) (concluding that "federal officers are suable under [§] 1985(3)").[15]

While the text of § 1985(3) neither explicitly includes nor excludes federal officers from its ambit, as a district court in this Circuit recently concluded, it would be "inconsistent with the purpose of [§ 1985(3)] to apply it to federal officers acting under color of federal law." *Alharbi*, 368 F. Supp. 3d at 567. This is so because "[t]he civil-conspiracy prohibition contained in § 1985(3) was enacted as a significant part of the [Civil Rights Act] passed in the aftermath of the Civil War," *Abbasi*, 582 U.S. at 150, and "at that time, federal officials and the federal government were championing civil rights," *Sabir*, 2022 WL 1291731, at *13. Thus, "proponents of the Civil Rights Act did not envision that it would apply against the federal government, because through the Civil Rights Act the federal government"—which was "the protector[] and enforcer[] of those rights granted under the post-Civil War Amendments"—"was vindicating citizens' civil rights against discriminatory state (or arguably private) action." *Alharbi*, 368 F. Supp. 3d at 567. Against this backdrop, the Court should resist the invitation to extend § 1985(3)'s reach "far beyond that which was intended by the proponents of the Civil Rights Act," and conclude that that statute does not apply to federal officers. *Id.* at 567–68 ("[T]his Court finds that § 1985(3) is inapplicable to federal officers acting under color of federal law, consistent with the clear purpose behind the Civil

---

[15] The Supreme Court has concluded that § 1985(3) reaches private conspiracies, *see Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971), and has assumed without deciding that § 1985(3) applies to federal officers, *see Abbasi*, 582 U.S. at 149–50 (assuming that § 1985(3) claims against federal officers were well pleaded but concluding that they were entitled to qualified immunity with respect to those claims). The Second Circuit has noted that the "development of case law" since the Supreme Court's decision in *Griffin* "eroded any basis for interpreting" the Second Circuit's prior case law "to render section 1985(3) inapplicable to federal officials," but it, too, has not issued a "definitive ruling . . . on the application of section 1985(3) to federal officials." *Iqbal v. Hasty*, 490 F.3d 143, 176–77 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Cantú v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (noting that Fifth Circuit "precedent holds § 1985(3) does not apply to federal officers" but declining to decide whether it remains binding on the Fifth Circuit because Cantú failed to state a § 1985(3) claim). *But see Davis v. Samuels*, 962 F.3d 105, 115 (3d Cir. 2020) (concluding that § 1985(3) can redress conspiracies to violate constitutional rights involving those acting under color of federal law); *Hobson v. Wilson*, 737 F.2d 1, 19–20 (D.C. Cir. 1984) (concluding same), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

Rights Act."); *see also Dye v. United States,* 516 F. Supp. 2d 61, 71 (D.D.C. 2007) (concluding that § 1985(3) does not "authorize suits challenging actions taken under color of federal law").

## B. The Complaint Fails to State a Claim Under § 1985(3)

Even if the Court concludes that § 1985(3) applies to federal officers, it should still dismiss Berenson's § 1985(3) claims against Flaherty and Murthy for failure to state a claim. "A conspiracy claim under Section 1985(3) requires a plaintiff to allege: '1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n. 4 (2d Cir. 2006)). In addition, the "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (citation omitted).

### i.    Berenson Has Not Adequately Alleged a Conspiracy

Berenson's § 1985(3) claims fail with respect to Flaherty and Murthy because he has not plausibly alleged the existence of a conspiracy. To adequately allege a conspiracy, a "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). In doing so, a plaintiff must "plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy'" because "[w]ithout more, parallel conduct does not suggest conspiracy." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Twombly,* 550 U.S. at 556–57); *accord Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 103 (N.D.N.Y. 2013) ("Even detailed allegations of parallel

conduct do not suffice without some factual basis for inferring the existence of an agreement.”). A “complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.” *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999).

Here, the Complaint does not provide plausible grounds to infer that either Flaherty or Murthy entered into an agreement with the other defendants—or with anyone else—to deprive Berenson of his First Amendment rights. With respect to Flaherty, the Complaint specifically alleges only that he attended one meeting with Slavitt and Twitter employees about COVID-19 misinformation at which Berenson’s name was raised, *see* Compl. ¶¶ 105, 192(a), and summarily alleges that Flaherty participated in subsequent “phone calls with Twitter urging the platform to censor Mr. Berenson’s speech,” without identifying when these calls took place, who exactly participated in them, or what specifically was discussed during them, *id.* ¶ 192(b). With respect to Murthy, the Complaint alleges only that he gave an interview about misinformation on social media sites, *id.* ¶ 95, published an advisory addressing health misinformation generally, *id.* ¶ 129, and appeared once on Slavitt’s podcast (after Slavitt left the federal government) to discuss misinformation on social media sites generally, *id.* ¶¶ 130–31. These sparse allegations fall far short of providing a “factual basis supporting a meeting of the minds” between Flaherty, Murthy, and any other defendants to deprive Berenson of his First Amendment rights. Indeed, the Complaint is completely devoid of any allegation that Murthy ever discussed Berenson with anyone or took any action directed against him. And it only specifically alleges that Flaherty attended *one* meeting with Twitter employees at which Slavitt brought up Berenson’s name. *Id.* ¶ 113. Although the Complaint alleges that “more meetings” and “calls” between the White House and Twitter followed, during which White House officials “wanted Twitter to do more and to de-

39

platform several accounts," *id.* ¶ 115, the Complaint does not provide any detail regarding who participated in these meetings and calls, when they occurred, or which accounts were discussed. In particular, the Complaint does not concretely allege that Berenson's account was specifically discussed during these subsequent meetings and calls.

At most, the Complaint's allegations with respect to Flaherty and Murthy amount to little more than "parallel conduct" directed at misinformation on social media sites, coupled with "a bare assertion of conspiracy," *Twombly,* 550 U.S. at 556–57, and, as such, are insufficient to allege their participation in a conspiracy, *see, e.g.*, *Rother*, 970 F. Supp. 2d at 103 ("Plaintiff has, at most, alleged somewhat parallel action in that each of the Defendants allegedly discriminated against her in some way. Plaintiff's conspiracy claim is therefore dismissed."). Accordingly, the Court should dismiss Berenson's § 1985(3) claims against them. *See Cooper v. Clancy*, No. 19 Civ. 362, 2023 WL 2624334, at *6 (N.D.N.Y. Mar. 24, 2023) (dismissing one of many defendants from action due to a lack of "facts from which a jury could infer that [he] entered into an agreement to violate [the plaintiff's] rights").

The Complaint's conspiracy claims also fail under the intracorporate conspiracy doctrine. Federal officials, each acting within the scope of their employment, are "legally incapable of conspiring together," because they are all part of a single entity, the United States. *See Little v. City of New York*, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007); *see also Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008); *cf. Ziglar*, 582 U.S. at 155 ("These considerations suggest that officials employed by the same governmental department do not conspire when they speak to one another and work together in their official capacities."). Again, there is no allegation that Flaherty or Murthy ever came to an agreement with a non-federal employee to work together to suppress Berenson's speech.

40

ii.    Berenson Has Not Alleged Membership in a Protected Class

Berenson's § 1985(3) claims also fail because he has not alleged membership in a class protected under that statute. As an initial matter, Berenson does not allege that he is a member of *any* class, let alone a class protected under § 1985(3). Indeed, he alleges only that he is "*speaking on behalf of* an identifiable class of Americans who had chosen not to receive a COVID-19 vaccine," which he alleges includes "a disproportionate number of African-Americans, political conservatives, and evangelical Christians." Compl. ¶ 202 (emphasis added). Thus, the Court should dismiss Berenson's § 1985(3) claim for failing to allege that he is a member of a group protected under that statute. *See Gleason v. McBride*, 869 F.2d 688, 694–95 (2d Cir. 1989) (affirming dismissal of § 1985(3) claim because plaintiff did not "allege that he was a member of a protected class"); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013) ("In order to plead a cognizable civil rights conspiracy claim under § 1985(3), a plaintiff is also required to allege that she was a member of a protected class."); *Srubar v. Rudd, Rosenberg, Mitofsky & Hollender*, 875 F. Supp. 155, 162 (S.D.N.Y. 1994) (same), *aff'd*, 71 F.3d 406 (2d Cir. 1995).[16]

But even if Berenson had alleged that he is a member of, rather than a spokesperson for, the class of Americans who chose not to receive a COVID-19 vaccine, his claim would still fail because that class is not protected under § 1985(3). Berenson's putative class of Americans who chose not to receive a COVID-19 vaccine "plainly do[es] not possess the type of inherited or immutable characteristics sufficient to satisfy the class-based animus requirement." *Dolan*, 794

---

[16] Some courts have also analyzed a plaintiff's failure to allege membership in a protected class through the lens of standing, concluding that a plaintiff who is not a member of the class protected by § 1985(3) lacks standing to bring a claim under that statute. *See Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 692 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997). *But see Griffin-Nolan v. Providence Wash. Ins. Co.*, No. 04 Civ. 1453, 2005 WL 1460424, at *9 (N.D.N.Y. June 20, 2005) (concluding that a non-minority person who alleged that he was injured by a conspiracy that aimed to deprive minority persons of the equal protection of the law had standing to assert a § 1985(3) claim).

F.3d at 296; *see also Ford v. Northam*, No. 22 Civ. 122, 2023 WL 2767780, at \*9 (W.D. Va. Mar. 31, 2023) (concluding that "[a] person's vaccination status, which is based on his choice as to whether to accept a vaccine, however 'coerced,' is not a 'discrete, insular, and immutable characteristic[ ] comparable to those characterizing classes such as race, national origin, and sex'" and dismissing § 1985(3) claim); *cf. Joffe v. King & Spalding LLP*, 575 F. Supp. 3d 427, 434 (S.D.N.Y. 2021) (concluding, in overruling an objection to the exclusion of unvaccinated potential jurors that "unvaccinated individuals are not a distinctive group identifiable 'on the basis of some immutable characteristic'"); *United States v. Elias*, 579 F. Supp. 3d 374, 381 (E.D.N.Y. 2022) ("[T]he basis for excluding potential jurors here is an attribute that is within the individual's control, that is, their vaccination status, rather than some immutable characteristic such as race, gender, or ethnic background." (citation and internal quotation marks omitted)).

Instead, Berenson's purported class of those who chose *not to* receive the COVID-19 vaccine is no different from the class of women who chose *to* seek abortions that was rejected by the Supreme Court in *Bray v. Alexandria Women's Health Clinic*. *See* 506 U.S. 263, 269 (1993) ("'Women seeking abortion' is not a qualifying class."). Indeed, both Berenson's and *Bray*'s putative classes are little more than "group[s] of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors"—not to receive vaccines in Berenson's case, and to seek abortions in *Bray*'s—and as the Supreme Court admonished in *Bray*, the term "class" "unquestionably connotes something more than" that. *Id.*; *see, e.g.*, *Frasco v. Mastic Beach Prop. Owners' Ass'n*, No. 12 Civ. 2756, 2014 WL 3735870, at \*5 (E.D.N.Y. July 29, 2014); *Wolocko v. Town of Ridgefield*, No. 98 Civ. 1096, 2000 WL 565447, at \*7 (D. Conn. Mar. 31, 2000), *aff'd*, 5 F. App'x 78 (2d Cir. 2001); *Porter-McWilliams v. Anderson*, No. 07 Civ. 0407, 2007 WL 4276801, at \*8 (S.D.N.Y. Dec. 3, 2007); *Johnson v. Andlinger & Co.*, No. 94 Civ. 43, 1998 WL 229913, at

42

*2 (D. Conn. Mar. 30, 1998). To hold otherwise would allow "innumerable tort plaintiffs" to "assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with," and would thereby "convert the statute into the 'general federal tort law' it was the very purpose of the animus requirement to avoid." *Bray*, 506 U.S. at 269 (quoting *Griffin*, 403 U.S. at 102).

Any suggestion that the alleged class-based discrimination is directed not at those who chose not to receive the COVID-19 vaccine but rather at "African-Americans, political conservatives, and evangelical Christians," Compl. ¶ 202, fares no better. The animus requirement demands that the alleged discrimination be directed at individuals *by reason of* their protected status. *Bray*, 506 U.S. at 270. Even accepting as true Berenson's allegation that a "disproportionate number of African-Americans, political conservatives, and evangelical Christians" chose not to get vaccinated (and assuming that all of these classes are protected under § 1985(3)), the Complaint is completely devoid of allegations that any alleged discrimination was directed at these classes *by reason of* their race, political preference, or religion rather than by reason of their choice not to receive the COVID-19 vaccine. Moreover, one cannot reasonably infer from opposition to the choice not to receive the COVID-19 vaccine a race, political preference, or religion-based intent. "Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Id.* at 270 (explaining, for example, that "[a] tax on wearing yarmulkes is a tax on Jews"). But the choice not to receive the COVID-19 vaccine is not one of them. Indeed, it "cannot be denied that there are common and respectable reasons for opposing" the choice not to receive the COVID-19 vaccine, and thus opposition to that choice cannot "reasonably be presumed" to reflect a race, political

43

preference, or religion-based intent. *Id.* at 270; *see, e.g.*, *Joffe*, 575 F. Supp. 3d at 430 ("Vaccines are highly effective at protecting individuals from infection, hospitalization, and death from COVID-19."). And any suggestion that "a class-based animus can be determined solely by effect"—here on "African-Americans, political conservatives, and evangelical Christians"—also fails. *Bray*, 506 U.S. at 270. As the Supreme Court held in *Bray*, "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 271–72 (some internal quotation marks omitted). Thus, even if Berenson had alleged a "class-specific . . . impact," such allegations would not satisfy the statute's requirement of a discriminatory *purpose*. *Id.* at 272 & n.4.

Finally, Berenson's 1985(3) claim fails in the "absen[ce of] an underlying federal constitutional violation." *Ellison v. Evans*, No. 13 Civ. 885, 2013 WL 5863545, at *4 (S.D.N.Y. Oct. 31, 2013), *aff'd sub nom. Fuller v. Evans*, 586 F. App'x 825 (2d Cir. 2014). Indeed, "deprivation of a constitutional right is a required object of a conspiracy under [§] 1985(3)," *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 610 (S.D.N.Y. 2015), and thus a complaint "must adequately allege a violation of the right or rights that defendants are alleged to have conspired to violate," *K.D.*, 921 F. Supp. 2d at 209. As articulated above, *see supra* p. 22–31, Berenson has failed to plead any underlying violation of his First Amendment rights. For this reason alone, he has not adequately alleged a violation of § 1985(3). *See, e.g.*, *Alharbi*, 368 F. Supp. 3d at 568 (dismissing § 1985(3) claim for failure to plead an underlying violation of a constitutional right); *Ochoa v. Bratton*, No. 16 Civ. 2852, 2017 WL 5900552, at *9 (S.D.N.Y. Nov. 28, 2017) (same); *cf. Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363–64 (S.D.N.Y. 2000)

44

("Romer's failure to sufficiently allege violation of cognizable constitutional rights makes conspiracy to violate those rights a legal impossibility.").

## VI.     FLAHERTY AND SURGEON GENERAL MURTHY ARE ENTITLED TO QUALIFIED IMMUNITY

The Court should also dismiss the claims asserted against Flaherty and Surgeon General Murthy in their individual capacities, both under *Bivens* and under § 1985(3), for the additional reason that they are entitled to qualified immunity for their alleged actions.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir. 2020) (quoting *Reichle*, 566 U.S. at 664). The qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). Furthermore, qualified immunity is an "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227 (citing cases).

The same qualified immunity test applies in both the *Bivens* context and under § 1985(3). *Ziglar*, 582 U.S. at 150–52. The qualified immunity analysis requires courts to ask two questions: "first, whether the plaintiff [adequately alleged] that his [statutory or] constitutional rights were violated, and second, whether the right at issue was 'clearly established' at the time of the alleged violation." *Bacon*, 961 F.3d at 542 (citation omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis to address first in light of the circumstances in the particular case at hand." *Id.* (alterations, citation, and internal quotation

marks omitted).

A right is "clearly established" if its contours are "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court has instructed that the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). In determining if a right is clearly established, courts look to "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022) (quoting *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). While a Second Circuit or Supreme Court case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

For the reasons articulated above, Berenson has failed to plausibly allege that Flaherty or Murthy violated his First Amendment rights or § 1985(3). On that basis alone, Flaherty and Murthy are entitled to qualified immunity. But in any event, the right that Berenson alleges was violated by Flaherty and Murthy was not clearly established at the time of the alleged violations. Defined at the appropriate level of specificity, *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021), the right at issue is the right of an individual to post on a private social media platform without government officials attempting to persuade the company to adopt more robust misinformation policies that may lead to the removal of his posts or the suspension of his account, or without government officials requesting that the account be suspended for violating those

46

misinformation policies. *Vullo*, 49 F.4th at 719 (While it was clearly established that "the First Amendment prohibits implied threats to employ coercive state power to stifle protected speech," the right must be defined in "a more particularized, and hence more relevant, sense[;]" the caselaw did "not clearly establish that Vullo's statements in this case were unconstitutionally threatening or coercive." (citation omitted)). No precedent from the Second Circuit or the Supreme Court would put a reasonable official in Flaherty's and Murthy's positions on notice that they could not take the actions that Berenson contends violated his rights. *See Bacon*, 961 F.3d at 545.

The Second Circuit has recognized a "First Amendment right to be able to email, blog, and discuss the issues of the day on the Internet," *United States v. Eaglin*, 913 F.3d 88, 96 (2d Cir. 2019), and the Supreme Court has held that the government may not "foreclose access to social media altogether," *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) (holding unconstitutional a North Carolina criminal statute that made it a felony for sex offenders to access certain social media websites). But the actions allegedly taken by Flaherty and Murthy did not amount to government foreclosure of Berenson's access to social media, and neither the Second Circuit nor the Supreme Court has confirmed the existence of a right to be free from government communications with social media companies about misinformation or government statements about misinformation on social medial generally. *Cf. United States v. Browder*, 866 F.3d 504, 511 (2d Cir. 2017) (distinguishing the internet *ban* at issue in *Packingham* from the internet or computer *monitoring* at issue in *Browder*). To the contrary, cases subsequent to the events at issue in this case have only served to affirm that Berenson's First Amendment rights were not violated. *See Vullo*, 49 F.4th at 717; *Kennedy*, 66 F.4th at 1207–11. Thus, reasonable government officials in Flaherty's and Murthy's positions would not have understood that it would violate Berenson's rights to discuss his social media posts with social media companies or to discuss misinformation

47

on social media more generally, and they are thus entitled to qualified immunity.

## VII.   BERENSON'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM AGAINST SLAVITT MUST BE DISMISSED

Berenson cannot maintain a tortious interference with contract claim based upon actions Slavitt took within the scope of his federal employment. Under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (the "FTCA"), "federal employees enjoy absolute immunity from tort claims arising out of acts undertaken in the course of their official duties," *DeMasi v. Schumer*, 608 F. Supp. 2d 516, 520 (S.D.N.Y. 2009). The exclusive remedy for any claim sounding in tort is against the United States. 28 U.S.C. § 2679(b)(1); *see also Carroll v. Trump*, 49 F.4th 759, 765 (2d Cir. 2022). Federal employees enjoy immunity from suit for torts even where the FTCA itself would preclude a plaintiff from recovering against the United States. *See United States v. Smith*, 499 U.S. 160, 166–67 (1991).

Berenson has brought a tortious interference with contract claim against Slavitt. Compl. ¶¶ 207–217. This claim is premised, in part, on actions taken by Slavitt in the course of his federal employment. *Id.* ¶¶ 148, 150, 156–57.  The FTCA provides that "upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States . . . , and the United States shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(1). Pursuant to § 2679(d)(1), the United States Attorney for the Southern District of New York, as the Attorney General's delegate, *see* 28 C.F.R. § 15.4(a), certified that Slavitt was acting within the scope of his federal employment with respect to any allegations in the Complaint pertaining to Slavitt's tenure as Senior Advisor. *See* Dkt. No. 28. This certification provides the "basis for the substitution of the United States as a defendant and for the resultant immunization

48

of the federal employee." *McHugh v. Univ. of Vermont*, 966 F.2d 67, 72 (2d Cir. 1992); *see also DeMartinez v. Lamagno*, 515 U.S. 417, 420 (1995) ("Upon certification, the employee is dismissed from the action and the United States is substituted as defendant."). Berenson's claim for tortious interference against Slavitt arising from any actions Slavitt allegedly took during the course of his federal employment should therefore be dismissed, as the United States has been substituted as the only proper defendant.

Once the United States is substituted for Slavitt, the action proceeds in the same manner as any FTCA action brought against the United States, is "subject to the limitations and exceptions applicable to those actions." 28 U.S.C. § 2679(d)(4). It is well settled that the "United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citation omitted). Accordingly, if the United States has not waived its sovereign immunity, or if the conditions under which the United States has agreed to waive that immunity have not been met, federal subject matter jurisdiction does not exist over the plaintiff's claims. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941); *Williams v. United States*, 947 F.2d 37, 39 (2d Cir. 1991). In the instant case, two conditions on the FTCA's waiver of sovereign immunity require dismissal of Berenson's tortious interference claim against the United States for lack of subject matter jurisdiction.

First, the "FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot be waived." *Celestine v. Mount Vernon Neigh. Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005); *see also Collins v. United States*, 996 F.3d 102, 109 (2d Cir. 2021); 28 U.S.C. § 2675(a). "The burden is on the plaintiff to both plead and prove compliance with the statutory requirements," and "[i]n the

49

absence of such compliance, a district court has no subject matter jurisdiction over the plaintiff's claim." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987); *see also Spina v. Lu Feng Liu*, 541 F. Supp. 3d 425, 433 (S.D.N.Y. 2021). Here, the Complaint does not allege that Berenson exhausted his administrative remedies prior to commencing this action. Thus, Berenson did not plead compliance with the statutory requirements of the FTCA.

Second, the intentional tort exception to the FTCA preserves the United States' immunity from suit for tortious interference with contract causes of action. The waiver of sovereign immunity contained in the FTCA is subject to a list of enumerated exceptions contained in 28 U.S.C. § 2680(a)–(n). *See Levin v. United States*, 568 U.S. 503, 507 (2013). The so-called intentional tort exception deprives federal courts of jurisdiction over any "claim arising out of . . . interference with contract rights." 28 U.S.C. § 2680(h). Berenson's claim for tortious interference with contract is precluded under § 2680(h), as a claim involving interference with contract rights. Indeed, such a cause of action "fall[s] squarely within the express language of the statute." *Marley v. Ibelli*, 203 F. Supp. 2d 302, 311 (S.D.N.Y. 2001), *aff'd*, 52 F. App'x 564 (2d Cir. 2002); *see also Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 (D.C. Cir. 1985); *Dixon v. United States*, No. 13 Civ. 2193, 2014 WL 23427, at *5 (S.D.N.Y. Jan. 2, 2014).

Berenson's tortious interference claim against the United States therefore should be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should grant the Federal Defendants' Motion to Dismiss Berenson's claims against them for lack of subject-matter jurisdiction and failure to state a claim.

50

Dated: August 21, 2023
New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the Federal Defendants

By:    /s/ *Alyssa B. O'Gallagher*
JEANNETTE A. VARGAS
ALYSSA B. O'GALLAGHER
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2678/2822
Fax: (212) 637-2786
E-mail: jeannette.vargas@usdoj.gov
       alyssa.o'gallagher@usdoj.gov