# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**ALEX BERENSON,**

    **Plaintiff,**

    **v.**

**JOSPEH R. BIDEN, JR., et al.,**

    **Defendants.**

Case No.: 1:23-cv-03048-JGLC

## MEMORANDUM IN OPPOSITION TO THE FEDERAL DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
ENVISAGE LAW
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law

SEAN P. GATES (SBN 186247)
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730
E-mail: sgates@charislex.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

I.    Journalist Alex Berenson uses Twitter to report on and ask questions regarding the public policy response to COVID-19 and ultimately the vaccines. Twitter initially resists third party censorship requests, backing Mr. Berenson's right to report. ..................................................... 3

II.    President Biden takes office and the White House targets constitutionally protected speech about the COVID-19 vaccines. Then the White House targets Alex Berenson's journalism, causing him immediate injury, as the Federal Defendants exert pressure on other social media platforms. ..................................................................................................... 5

III.  Twitter caves to government pressure, and begins the process of deplatforming Alex Berenson. ..................................................................................................... 8

IV.  Mr. Berenson's suspension from Twitter and the threats to his speech
he continues to face.............................................................................................11

LEGAL STANDARD............................................................................................ 12

ARGUMENT ......................................................................................................... 13

I.    Mr. Berenson has Article III standing for his First Amendment claims against the Federal Defendants. ............................................................................................. 13

A.    Mr. Berenson suffered multiple, distinct injuries arising out of the Federal Defendants' pressure campaign on Twitter, ultimately leading to his permanent suspension from the platform. With the Federal Defendants' contacts with social media companies ongoing, Mr. Berenson's injuries are likely to recur............................................................. 13

B.    Mr. Berenson's censorship injuries are fairly traceable to the Federal Defendants' conduct........................................................................................... 19

C.    The harm Mr. Berenson suffered and continues to suffer is redressable.................... 25

II.  Separation of powers does not bar Mr. Berenson's claims against President Biden. ........ 26

III. Mr. Berenson's complaint states a plausible First Amendment claim. ........................... 26

A.    The Federal Defendants coerced Twitter's content moderation decisions generally and specifically with respect to Mr. Berenson.......................................................... 26

B.    The Federal Defendants significantly encouraged Twitter to censor Mr. Berenson... 31

C.    The Federal Defendants violated Mr. Berenson's access to a public forum.............. 32

IV. Mr. Berenson seeks to preserve a *Bivens* claim for appellate review. ............................... 34

V.  Mr. Berenson states a plausible claim for relief under 42 U.S.C. § 1985(3). .................... 34

A.    Section 1985(3) extends to claims against federal officials. ..................................... 34

B.    Mr. Berenson states a claim under Section 1985(3). ................................................. 36

1.     Mr. Berenson's complaint contains allegations supporting the existence of an actionable Section 1985(3) conspiracy. ........................................................... 36

2.     Mr. Berenson adequately alleges invidious, class-based discrimination. ............... 40

VI.  The Federal Defendants are not entitled to qualified immunity. ....................................... 44

**CONCLUSION** .......................................................................................................... **47**

# TABLE OF AUTHORITIES

## Cases

*Alharbi v. Miller*, 368 F. Supp.3d 527, (E.D.N.Y. 2019) ............................................... 36

*American Broadcasting Companies, Inc v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977) .................... 33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................ 12, 13, 38

*Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ................ 24

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ............................................... 17

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ......................................... 34

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ........................................................... 31

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ............................... 42, 43

*Burton v. Wilmington Pkg. Auth*, 365 U.S. 715 (1961) ............................................. 33

*California v. Texas*, 141 S. Ct. 2104 (2021) ..................................................... 20

*Cantú v. Moody*, 933 F.3d 414 (5th Cir. 2019) .................................................... 35

*Carpenters v. Scott*, 463 U.S. 825 (1983) ........................................................ 40

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016) ........................................... 20

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................ 14

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) .................................... 18, 19

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................ 26

*Colon v. Sawyer*, No. 9:03-CV-1018, 2006 WL 721763 (N.D.N.Y. March 20, 2006) .................. 35

*Conklin v. Lovely,* 834 F.2d 543 (6th Cir. 1987) ................................................. 41

*Cooper v. Clancy,*
    No. 9:19-CV-362 (GLS/ML), 2023 WL 2624334 (N.D.N.Y. Mar. 24, 2023) ...................... 39

*Davis v. Samuels*, 962 F.3d 105 (3d Cir. 2020) ............................................... 35, 36

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ................................................ 32

*Democratic Cong. Campaign Comm. v. Kosinski,*
    614 F. Supp. 3d 20 (S.D.N.Y. 2022) .................................................... 14, 15

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019) ...................................... 20

*Deskovic v. City of Peekskill,* 894 F. Supp.2d 443 (S.D.N.Y. 2012) ............................... 44

*Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ..................... 24

*Dolan v. Connolly*, 794 F.3d 290 (2d Cir. 2015) .................................................. 42

*Dorce v. City of New York*, 2 F.4th 82 (2d Cir. 2021) ............................................ 19

*Dry Creek Lodge, Inc. v. US*, 515 F.2d 926 (10th Cir. 1975) ...................................... 35

*Evans v. Herman*, No. 4:22-CV-2508, 2023 WL 4188347 (S.D. Tex. Apr. 24, 2023) ................. 32

*Federer v. Gephardt*, 263 F.3d 754 (8th Cir. 2004) ............................................... 35

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012) ....................................... 14

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022) ..................................... 32

*Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980) ............................................ 35

*Glacken v. Inc. Vill. of Freeport,*
    No. 09 CV 4832 DRH AKT, 2012 WL 894412 (E.D.N.Y. Mar. 15, 2012) .......................... 37

*Gleason v. McBride*, 869 F.2d 688 (2d Cir. 1989) ................................................. 40

*Gorman-Bakos v. Cornell Co-op Ext. of Schenectady Cty.*, 252 F.3d 545 (2d Cir. 2001) ........... 24

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010) .................................. 23

iv

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ............................................................... 35, 36, 40

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................................ 44

*Hart v. Facebook Inc.*,
    No. 22-CV-737-CRB, 2023 WL 3362592 (N.D. Cal. May 9, 2023)..................................... 24

*Hartline v. Gallo*, 546 F.3d 95 (2d Cir. 2008) ....................................................................... 39

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984),..................................................................... 35

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007).......................................................................... 35

*Jews for Jesus v. Jewish Comm. Rel. Council of N.Y., Inc.*,
    968 F.2d 286 (2d Cir. 1992) .............................................................................................. 40

*Johnson-Kirk v. OB GYN Womenservices, P.C.*,
    No. 93-CV-0702E(F), 1995 WL 307589 (W.D.N.Y. May 15, 1995)..................................... 41

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir. 2005) ......................................... 23

*Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141 (S.D.N.Y. 2021) ........................................ 31

*Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983) ...................................................................... 40

*Kennedy v. Warren*, 66 F.4th 1199 (9th Cir. 2023)................................................................ 29

*Khodara Env't, Inc. v. Blakey*, 376 F.3d 187 (3d Cir. 2004)................................................... 20

*Knight First Amendment Institute at Columbia University v. Trump*,
    928 F.3d 226 (2d Cir. 2019).......................................................................................... 16, 32

*Laird v. Tatum*, 408 U.S. 1 (1972).......................................................................................... 17

*Lederman v. Giuliani*,
    No. 98 Civ.2024LMM/JCF, 2007 WL 1623103 (S.D. N.Y. June 5, 2007).................. 41, 42, 47

*Little v. City of New York*, 487 F. Supp.2d 426 (S.D.N.Y. 2007) ............................................ 39

*Ludtke v. Kuhn*, 461 F. Supp. 86 (S.D.N.Y. 1978) ................................................................. 33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................................. 25

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) ....................................... 23

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ...................................................................... 13

*Missouri v. Biden*, 80 F.4th 641 (5th Cir. 2023)…………………………………………..*passim*

*Moriani v. Hunter*, 462 F. Supp. 353 (S.D.N.Y. 1978) .......................................................... 35

*National Rifle Association v. Vullo*, 49 F.4th 700 (2d Cir. 2022)..................................... 28, 30, 46

*Norwood v. Harrison*, 413 U.S. 455 (1973)...................................................................... 26, 33

*O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003) ......................................................................... 44

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ......................................................... 21, 25

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .............................................................................. 14

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) ...................................................... 24, 27, 28, 45

*Pangburn v. Culbertson,* 200 F.3d 65 (2d Cir. 1999) ............................................................. 36

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................................ 44

*Peck v. United States*, 470 F. Supp. 1003 (S.D.N.Y. 1979)................................................... 35

*Pellegrino v. County of Orange*, 313 F. Supp. 2d 303 (S.D.N.Y. 2004) ................................. 24

*Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309 (S.D.N.Y. 2020) ....................................... 33

*Querry v. Messar*, 14 F. Supp. 2d 437 (S.D.N.Y. 1998)........................................................ 26

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982)........................................................................................................ 31

*Rini v. Zwirn*, 886 F. Supp 270 (E.D.N.Y. 1995) ................................................................... 40

v

*Rother v. NYS Dept. of Corr. & Cmty. Supervision*,
    970 F. Supp.2d 78 (N.D.N.Y. 2013) ........................................................ 37, 39
*Rounseville v. Zahl*, 13 F.3d 625 (2d Cir. 1994) ........................................... 36
*Sabir v. Licon-Vitale*,
    No. 20 Civ. 1552, 2022 WL 1291731 (D. Conn. Apr. 29, 2022) ............ 36
*Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004) ............................................ 14
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ......................................... 13, 19
*Swanson v. Griffin*, No. 21-2034, 2022 WL 570079 (10th Cir. Feb. 25, 2022) ........................... 32
*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
    546 F.3d 255 (2d Cir. 2008) ................................................................. 31
*Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999) ..................................... 34, 47
*Trautz v. Weisman*, 819 F. Supp. 282 (S.D.N.Y. 1993) .............................. 40
*Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019) ........ 20
*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ................................... 13
*Virginia Soc. for Hum. Life v. Fed. Election Comn'n*,
    83 F. Supp. 2d 668, 674 (E.D. Va. 2000) ............................................ 16
*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)…………………………………………………………………..25
*Wahad v. F.B.I.*, 813 F. Supp. 224 (S.D.N.Y. 1993) ...................... 35, 36, 39, 47
*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................... 13
*Zieper v. Metzinger,* 474 F.3d 60 (2d Cir. 2007) ...................................... 45
*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ...................................................... 39

## Statutes

42 U.S.C. § 1985(3) ................................................................................... 34

## Other Authorities

Alex Berenson (@AlexBerenson), X (Sept. 13, 11:45 AM) ........................ 15
Amy Maxmen, *A new COVID vaccine is here, but those at greatest risk may not get it as
    outreach drops off*, PBS, Sept. 17, 2023 .......................................... 12, 15
Elon Musk (@ElonMusk), X (Nov. 18, 2022, 1:31 PM) ........................... 16
*Orchestrate*, Merriam-Webster ................................................................ 47
Remarks by President Biden on Fighting the COVID-19 Pandemic, Sept. 9, 2021 ................... 43
Rep. Jim Jordan (@Jim_Jordan), X (July 27, 2023, 12:03 PM) ................... 7

**INTRODUCTION**

On August 28, 2021, Twitter made international news by permanently suspending Alex Berenson. From the start of the COVID-19 pandemic, Mr. Berenson emerged as a reporter who exposed the shortcomings in the public policy response to the virus. With Twitter's express support and approval, Mr. Berenson built an audience, and he used his platform to report and ask questions about business and school closures, mask mandates, and eventually the COVID-19 vaccines.

Then everything changed. Mr. Berenson's reporting drew the attention and ire of powerful White House officials. In April 2021, those officials, Defendants Rob Flaherty and Andrew Slavitt,[1] asked Twitter a "really tough question": why was the company allowing Mr. Berenson to report on the platform? After all, the officials advised, Mr. Berenson was "ground zero" for COVID-19 misinformation. Under White House pressure, Twitter conducted an additional review of Mr. Berenson's account, declining to suspend him. But the inquiry from the world's most powerful office highlighted to the company the risks it ran by allowing him to speak freely on its platform.

"Very angry" meetings with Twitter followed. Then, after a week that began with Dr. Anthony Fauci publicly criticizing Mr. Berenson on national television, continued with Defendant Surgeon General Murthy releasing a public health advisory about vaccine "misinformation," and ended with President Biden accusing social media companies of "killing people" for platforming constitutionally protected speech about the COVID-19 vaccines, Twitter locked Mr. Berenson out of his account for the first time. By mid-July, Mr. Berenson knew he and Twitter faced heavy government pressure to censor him. But he refused to give in and

---

[1] President Biden, Surgeon General Murthy, Mr. Flaherty, and Mr. Slavitt are referred to here collectively as the "Federal Defendants."

continued to report on the growing evidence that the Covid vaccines no longer prevented infection—as well as criticizing—Mr. Slavitt specifically.

In response, Mr. Slavitt—who had officially resigned from the government in June but by his own admission at the time remained in contact "every day" with the White House and Centers for Disease Control (and continued to have a live White House email address to which he directed "government" email)—privately and relentlessly pressed a senior Twitter government lobbyist to censor Mr. Berenson. Twitter responded by escalating its censorship of Mr. Berenson, giving him two more "strikes" in late July, putting him on the precipice of permanent suspension.

Finally, in late August, Twitter bent to the pressure, and permanently suspended Mr. Berenson's account. As Yoel Roth, Twitter's former Head of Trust and Safety, explained recently, at Twitter "[i]t isn't machine learning models and faceless algorithms behind key content moderation decisions: it's people. And people can be pressured, intimidated, threatened and extorted." Yoel Roth, *Trump Attacked Me. Then Musk Did. It Wasn't an Accident*, N.Y. Times, Sept. 18, 2023, https://www.nytimes.com/2023/09/18/opinion/trump-elon-musk-twitter.html.

Almost a year later, after Mr. Berenson successfully sued Twitter over his ban, and the company admitted it never should have banned him. Now the Federal Defendants who loudly demanded social media companies take action against COVID-19 misinformation contend they had nothing to do with that error, going so far as to suggest Twitter's decision to ban Mr. Berenson "reflect[ed] independent judgments." In reviewing the actions of the White House against Twitter and other social media companies in 2021, a federal district court judge and the United States Court of Appeals for the Fifth Circuit reached a very different conclusion. The Fifth Circuit has enjoined a group of federal officials—including all three of the Federal Defendants in this case—from further violating the First Amendment by coercing Twitter and

other social media companies to suppress protected speech. After closely considering the evidence, the Fifth Circuit found that officials in the White House, as well as the Surgeon General "likely coerced or significantly encouraged social-media platforms to moderate content, rendering those decisions state actions. In doing so, the officials likely violated the First Amendment." *Missouri v. Biden*, 80 F.4th 641, 681 (5th Cir. 2023).[2]

What happened here was even more targeted at free speech and the free press. This Court should allow Mr. Berenson's First Amendment and Section 1985(3) claims to move forward.

## FACTUAL BACKGROUND

I.     **Journalist Alex Berenson uses Twitter to report on and ask questions regarding the public policy response to COVID-19 and ultimately the vaccines. Twitter initially resists third party censorship requests, backing Mr. Berenson's right to report.**

Alex Berenson is an independent journalist and former *New York Times* reporter who previously broke multiple front-page stories about questionable practices in the pharmaceutical industry. (Dkt. 3 ¶¶ 43-44.) In 2020, Mr. Berenson emerged as a vocal critic of the public policy response to COVID-19, questioning the underlying evidentiary basis for business and school closures. (*Id.* ¶¶ 63-64.) Like the Federal Defendants who maintain significant accounts on the platform, (*id.* ¶ 51), Mr. Berenson used Twitter, a self-proclaimed "public square" for journalism and debate, to inform and engage Americans and people around the world on matters of public concern, including COVID-19 and cannabis legalization, (*id.* ¶¶ 5, 49, 60-61).[3] As he reported on COVID-19, Mr. Berenson's following on Twitter increased from around 7,000 followers in

_____

[2] On October 3, 2023, the Fifth Circuit revised its ruling to include the Cybersecurity and Infrastructure Security Agency within the scope of its ruling. *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023). The portions of its opinion that are relevant to Mr. Berenson's claims did not change.
[3] Former Twitter CEO, Jack Dorsey, testified under oath that "we," meaning Twitter, "believe the people use Twitter as they would a public square." (*Id.* ¶ 49.) Elon Musk likewise wrote that he acquired the company "because it is important to the future of civilization to have a common digital town square, where a wide range of beliefs can be debated in a healthy manner, without resorting to violence." (*Id.* ¶ 50.)

January 2020 to more than 229,000 in March 2021. (*Id.* ¶¶ 61, 102.) In 2021 alone, Mr. Berenson's Twitter feed received more than one billion impressions. (*Id.* ¶ 6.)

Early in the COVID-19 pandemic, third parties began objecting to Mr. Berenson's reporting and the platform Twitter was giving him. In late March 2020, after Mr. Berenson's tweet about COVID-19 mortality models by Professor Neil Ferguson of the Imperial College became widely shared, the College asked Twitter to "delete Berenson's tweets or at least flag them for making false claims" because Mr. Berenson's speech was "ultimately putting lives at risk." (*Id.* ¶¶ 63-64.) Despite the College's claim of actual harm, Twitter declined to do so. (*Id.* ¶ 65.) A Twitter executive, who acknowledged Mr. Berenson was raising "nuanced points," personally assured Mr. Berenson that the company was "trying to make sure that factual debate finds a way through the emotion, but we're obviously not successful all the time." (*Id.* ¶¶ 70-71.)

In November 2020, Mr. Berenson welcomed the initial reports emerging from clinical trials for the COVID-19 mRNA vaccines. He pointed to reporting from clinical trials on the Pfizer and BioNTech shot as well as the Moderna vaccine as "legitimately good news" and "good topline vaccine news," respectively. (*Id.* ¶¶ 74-75.) Nevertheless, he raised questions about the details of the clinical trials for the vaccines, and the same Twitter executive assured Mr. Berenson in December 2020 that these questions "should not be an issue at all." (*Id.* ¶ 79.) When Twitter announced its five-strike COVID-19 misleading information policy in March 2021, the executive told Mr. Berenson, "your name has never come up in the discussions around these policies." (*Id.* ¶ 83.)

After another journalist complained about Mr. Berenson's reporting, Twitter did a "deep dive" into his account in March 2021, and concluded "he avoids making demonstrably false or misleading claims about COVID-19 vaccines." (*Id.* ¶¶ 84-85.) The company "took action"

against one of Mr. Berenson's tweets that argued the mRNA shots are "more properly described as a gene therapy," but Twitter gave him no notice this was a "strike" under the COVID-19 misleading information policy, and Mr. Berenson did not lose access to his account or his audience. (*Id.* ¶ 85.) As late as either late April or early May 2021, despite Twitter's increasingly restrictive COVID-19 misinformation policies, Twitter had concluded that "Mr. Berenson had not violated any Twitter policies at that time." (*Id.* ¶ 113.)

**II.     President Biden takes office and the White House targets constitutionally protected speech about the COVID-19 vaccines. Then the White House targets Alex Berenson's journalism, causing him immediate injury, as the Federal Defendants exert pressure on other social media platforms.**

Even before taking office, President Biden referred to the decision to get a COVID-19 shot as one of "life and death," promising to "confront this historical challenge with the full strength of the federal government." (*Id.* ¶ 86.) Consistent with this promise, the Biden Administration began pressing social media companies to remove posts that raised questions about mRNA shots within days of Biden's inauguration. (*Id.* ¶ 7.) Shortly afterwards, the White House asked Twitter to meet. Lauren Culbertson, Twitter's head of government affairs for the United States and Canada, wrote later that "one of the first meeting requests from the Biden White House was about COVID-19 misinformation . . . Biden's staff focused on vaccines and high-profile anti-vaxxer accounts, including Alex Berenson." (*Id.* ¶ 105.) Upon information and belief, the Surgeon General was involved in these meetings. The Fifth Circuit considered "the White House and the Surgeon General's office together" because of "their close cooperation and the ministerial ecosystem." *Missouri*, 80 F.4th at 651.

In April 2021, Andrew Slavitt, the Senior Advisor to the White House's COVID-19 Response Coordinator, and Rob Flaherty, Director of Digital Strategy at the White House, met with representatives of Twitter. During that meeting, Mr. Flaherty and Mr. Slavitt targeted Mr.

Berenson by asking "one really tough question about why Alex Berenson hasn't been kicked off from the platform." (Dkt. 3 ¶ 107.) The Twitter employee who reported on this conversation did not say the White House targeted any other user by name. The employee distinguished the question about Mr. Berenson from other questions, which were "pointed but fair—and mercifully we had answers." (*Id.*) The employee recounted that "they," meaning Mr. Flaherty and Mr. Slavitt, "allege that they've done some data visualization that show [Mr. Berenson]'s . . . ground zero for covid misinformation that radiates outward." (*Id.* ¶ 108.) In a separate internal discussion, a Twitter employee noted Mr. Slavitt "really wanted to know about Alex Berenson" because "he was the epicenter of disinfo that radiated outwards to the persuadable public." (*Id.* ¶ 109.) In this regard, the concern was plausible vaccine skepticism like Mr. Berenson's, not more bizarre claims like those asserting the COVID-19 vaccines contain microchips. (*Id.* ¶ 101.)

To deflect the White House's pressure, Twitter promised it would perform an in-depth review of Mr. Berenson's account, (*id.* ¶ 112)—a prime example of what the Fifth Circuit would refer to in its ruling as government "entanglement in a party's independent decision-making." *Missouri*, 80 F.4th at 671. Mr. Berenson, the journalist whose name a Twitter executive said "has never come up in the discussions around these policies" as late as early March 2021, (*id.* ¶ 83), was now fully on the company's censorship radar. As the Fifth Circuit further explained, "the officials imparted a lasting influence on the platforms' moderation decisions… In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards." *Missouri*, 80 F.4th at 678.

Since filing his complaint, Mr. Berenson has obtained internal e-mails from Twitter further characterizing the April 2021 meeting. One of Twitter's own in-house lawyers wrote that "Berenson was specifically targeted by the White House in a meeting with Twitter; [and] the WH

Covid Response Team considered him 'ground zero' for COVID-19 misinformation." (Ex. A to Declaration of Christopher Caudill in Supp. of Request for Leave to Amend Complaint ("Caudill Decl.").) Twitter's attorney also conceded that documents it provided Mr. Berenson would be used "to argue that Twitter never should have actioned his account and later did so only because of immense pressure from government/liberal media." (*Id.*) The attorney did not deny "immense pressure" from government existed or that it contributed to Mr. Berenson's censorship.

Additional relevant evidence emerged after Mr. Berenson filed this action. The United States House Judiciary Select Subcommittee on the Weaponization of the Federal Government produced documents showing the White House, through Mr. Slavitt, pressured Facebook to censor vaccine-related content in April 2021, around the same time the White House was meeting with Twitter about Mr. Berenson. In an email, when Facebook "countered that removing content like that would represent a significant incursion into traditional boundaries of free expression in the US," Mr. Slavitt was not deterred, arguing the meme at issue "demonstrably inhibits confidence in Covid vaccines amongst those the Biden Administration is trying to reach." Rep. Jim Jordan (@Jim_Jordan), X (July 27, 2023, 12:03 PM), https://twitter.com/Jim_Jordan/status/1684595387284303872. In other words, a social media company explicitly warned Mr. Slavitt the White House might be violating the First Amendment with its censorship demands even as he pushed Twitter for Mr. Berenson's removal.

Meanwhile, with its efforts at Facebook, YouTube, and Google well under way, *Missouri*, 80 F.4th at 651, the White House held "several other calls" that were "very angry in nature" with Twitter about the company's refusal to deplatform users. (Dkt. 3 ¶ 115.) Mr. Berenson continued to report on the Twitter platform, criticizing President Biden while accusing the CDC of "l[ying] when it said myocarditis wasn't a risk." (*Id.* ¶¶ 118-120.) Twitter was now caught between

unrelenting government pressure and Mr. Berenson's commitment to reporting. What came next was predictable.

### III. Twitter caves to government pressure, and begins the process of deplatforming Alex Berenson.

The Federal Defendants' "frustrations reached a boiling point in July of 2021." *Missouri*, 80 F.4th at 654. The Fifth Circuit describes in detail how the Federal Defendants mounted a full-scale pressure campaign against the social media companies. *Id.* at 654-655. At a White House press briefing, Dr. Murthy called "social-media-based misinformation an 'urgent public health threat[]'" *Id.* at 654. Dr. Murthy "contemporaneously issued a public advisory 'calling out social media platforms' and saying they have a role to play to improve [ ] health outcomes.'" *Id.* (alterations in original). "The next day, President Biden said that the platforms were 'killing people' by not acting on misinformation," and "a few days later, a White House official said they were 'reviewing' the legal liability of platforms—noting 'the president speak[s] very aggressively about' that—because 'they should be held accountable.'" *Id.* (alterations in original).

"The platforms responded with total compliance." *Id.* Twitter's handling of Mr. Berenson was no exception. On July 16, hours after President Biden's "killing people" remark, Twitter locked Mr. Berenson out of his account for the first time, cutting him off from his audience. (Dkt. 3 ¶ 136.) Though this was purportedly Mr. Berenson's second "strike" under Twitter's five-strike COVID-19 misleading information policy, the company had not informed him of the previous action against his account. (*Id.*)

At least one powerful federal official specifically and publicly criticized Mr. Berenson during this critical period. On Sunday, July 11, Dr. Anthony Fauci, President Biden's Chief Medical Advisor, called Mr. Berenson's comments about the federal government's failure to

persuade Americans to take a COVID-19 vaccine "horrifying," and described Mr. Berenson as "someone saying that it's a good thing for people not to try and save their lives." (*Id.* ¶ 124.) At deposition in *Missouri v Biden*, Dr. Fauci did not deny further discussing Mr. Berenson, but testified that such discussions "may have occurred, I don't recall." (*Id.* ¶ 125.) Similarly, in his verified interrogatory responses in the *Missouri* litigation, Mr. Flaherty recalled receiving a phone call from Twitter "probably a week or two" after the April 2021 meeting with Twitter about Mr. Berenson, which Mr. Flaherty said "is the last time that [he] recalls discussing Mr. Berenson with employees from Twitter." (Dkt. 3-1 at 57.) As with Dr. Fauci, Mr. Flaherty's statement is short of a denial that further conversations with Twitter about Mr. Berenson took place.

The day after Dr. Fauci's nationally televised criticism of Mr. Berenson, Mr. Slavitt took his colleague's remarks a step further. On July 12, Mr. Slavitt referred to a desire to "get rid of all this garbage coming out of CPAC," a reference to Mr. Berenson's remarks which had raised Dr. Fauci's ire. (Dkt. ¶ 126.) Mr. Slavitt was purportedly out of the federal government by that time, though he remained in close contact with his former colleagues, whom he hosted on his podcast. (*Id.* ¶¶ 126, 130.) (If given leave to amend, Mr. Berenson can plead that in an interview published on July 29, 2021, Mr. Slavitt said he spoke to White House and Centers for Disease Control officials every day. SoCal in 17, July, 30, 2021, 5:00 AM PT, https://spectrumnews1.com/ca/la-west/socal-in-17/2021/07/29/vaccines--lies-and-social-media--andy-slavitt-explains-how-covid-19-myths-spread-like-wildfire (starting at 14:00 mark).)

Mr. Berenson received his third and fourth strikes, which caused his second and third Twitter suspensions, on July 27 and July 30. (*Id.* ¶¶ 147, 155.) Mr. Slavitt contacted Twitter on July 28, arguing Mr. Berenson "knows he's gone," that he was "milk[ing] Twitter for audience."

(*Id.* ¶ 148.) Todd O'Boyle, the same Twitter employee present at the April 2021 meeting, contacted Mr. Slavitt on July 30, sending him a link to Mr. Berenson's fourth strike, advising that "[f]urther violations of the rules will result in permanent suspension." (*Id.* ¶ 156.)

Since filing this lawsuit, Mr. Berenson obtained evidence which contextualizes Mr. O'Boyle's status report. An unredacted copy of Mr. Slavitt's July 28 e-mail and Mr. O'Boyle's July 30 response is shown below.

---

**From:** "Todd O'Boyle" <toboyle@twitter.com>
**Subject: Re: Screenshot 2021-07-28 at 12.37.29 PM**
**Date:** July 30, 2021 at 12:09:30 PM PDT
**To:** Andy Slavitt <andy.slavitt@gmail.com>

https://twitter.com/AlexBerenson/status/1420839456228118535

He's on a 7 day suspension. Further violations of the rules will result in permanent suspension.

On Wed, Jul 28, 2021 at 3:40 PM Andy Slavitt <andy.slavitt@gmail.com> wrote:
> It turns out that without Twitter sub stack doesn't work. He knows he's gone. Now it's time to milk Twitter for audience but he can't seem to resist. Yikes
>
>
> Andy Slavitt
>
> For Government Email, Please Send to Andrew.M.Slavitt@who.eop.Gov

---

Thus at least as late as July 28, 2021, though he had purportedly been out of the federal government since mid-June, Mr. Slavitt still included his White House e-mail address in his personal e-mail signature line, an indication of his ongoing relationship with his colleagues. Twitter's in-house counsel later wrote "one of our employees [(Todd O'Boyle)] shared information about the account they probably should not have, informing the external party that Berenson was on his last strike and would be suspended if he violated again." (Ex. A to Caudill Decl.) The attorney did not indicate the company's employees had divulged such information to external parties in the past. Regardless, Mr. O'Boyle broke protocol to provide this update to Mr. Slavitt.

With the Federal Defendants' targeted, sustained pressure campaign having pushed Mr. Berenson's account to the brink of permanent suspension, Pfizer Board member and former FDA

Commissioner Dr. Scott Gottlieb lobbied for a fifth strike, using Dr. Fauci's name to do so. Dr. Gottlieb turned to Mr. O'Boyle, who had been present at the April 2021 White House meeting and was Mr. Slavitt's contact at Twitter both before and after Mr. Slavitt left the government, to push Twitter to censor Mr. Berenson. (Dkt. 3 ¶¶ 161-69.) Dr. Gottlieb "flagged the Tweet that led to Berenson's suspension," (Ex. A to Caudill Decl.), which criticized COVID-19 vaccine mandates. On August 28, 2021, Twitter issued a fifth, ban-inducing strike against Mr. Berenson. (Dkt. 3 ¶ 169.)

The ban happened even though there was significant internal debate within the company about its validity. In one internal e-mail, Twitter's in-house counsel acknowledged the existence of "debate and disagreement within T&S [(Trust and Safety)] and leadership, regarding enforcement decisions on Berenson's account." (Ex. A to Caudill Decl.) In a separate e-mail the lawyer characterized those "internal deliberations" as "more sensitive and potentially harmful to our overall enforcement efforts." (Ex. B to Caudill Decl.) The same lawyer rated Twitter's chances of winning Mr. Berenson's suit against the company at "less than 50%." (*Id.*)

Less than two weeks after Twitter banned Mr. Berenson, President Biden announced vaccine mandates that compelled tens of millions of American adults to choose between their livelihoods and their right to determine whether they should receive mRNA shots. (Dkt. 3 ¶ 180.) Mr. Berenson was a key voice for many of these Americans who, like Mr. Berenson, had decided not to take any of the COVID-19 vaccines, but he was excluded from this critical debate.

## IV. Mr. Berenson's suspension from Twitter and the threats to his speech he continues to face.

The effect of the suspension on Mr. Berenson was immediate, concrete, and negative. Overnight, he lost access to his more than 300,000 Twitter followers, the primary outlet for his reporting. (*Id.* ¶ 176.) He lost the chance to engage with government and public health officials

on Twitter and to promote his longer form journalism on Substack. (*Id.*) Mr. Berenson's content was not just suppressed; rather he was completely excluded from the world's largest, most important digital public forum. (*Id.* ¶ 180.) Twitter since acknowledged this should have never happened. Prior to Elon Musk acquiring the company in 2021, Twitter publicly stated Mr. Berenson's "tweets should not have led to his suspension." (*Id.* ¶ 20.)

Mr. Berenson is back on the platform, where he continues to report on COVID-19 and the vaccines, but his voice remains under threat. The federal government's "back-and-forth with the platforms continues to this day." *Missouri*, 80 F.4th at 655. Meanwhile, the federal government is even now trying to convince Americans to take another round of COVID-19 booster shots. Amy Maxmen, *A new COVID vaccine is here, but those at greatest risk may not get it as outreach drops off*, PBS, Sept. 17, 2023, https://www.pbs.org/newshour/health/a-new-covid-vaccine-is-here-but-those-at-greatest-risk-may-not-get-it-as-outreach-drops-off. Mr. Berenson's COVID-19 vaccine skepticism is a barrier to these efforts.

Even under new Twitter ownership, and as the "back-and-forth" goes on, Mr. Berenson's account has experienced shadow banning and suppression. If given leave to amend, Mr. Berenson can plead that his followers have reported that his content is not showing up in their Twitter feeds. Mr. Berenson can also plead that Twitter users have not been able to find his account when entering "Alex Berenson" as a search into Twitter.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* This is not a "'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.*

## ARGUMENT[4]

### I.     Mr. Berenson has Article III standing for his First Amendment claims against the Federal Defendants.

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'" *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007). To meet this threshold standing requirement, "a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021). Relevant here, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The allegations in Mr. Berenson's complaint establish standing.

### A.     Mr. Berenson suffered multiple, distinct injuries arising out of the Federal Defendants' pressure campaign on Twitter, ultimately leading to his permanent suspension from the platform. With the Federal Defendants' contacts with social media companies ongoing, Mr. Berenson's injuries are likely to recur.

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). A "concrete" injury is one that is "real, and not abstract." *Id.* (internal quotation marks omitted).

---

[4] The Federal Defendants devote a section of their brief to explaining how Mr. Slavitt's conduct while employed by the federal government falls outside the scope of the Federal Tort Claims Act. (Dkt. 45 at 61-63.) Mr. Berenson does not challenge that contention.

Past injury "does not in itself" confer standing for prospective injunctive relief, "if unaccompanied by continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). Rather, a plaintiff "must show a likelihood that he will be injured in the future." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (internal quotation marks and alterations omitted). In this regard, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). "Evidence of past injury becomes even more probative, and the threat of future injury less speculative, 'when actual repeated incidents are documented.'" *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 39 (S.D.N.Y. 2022) (quoting *Floyd v. City of New York*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012)). "[O]ther circuits have held that standing for injunctive relief may be established through evidence of repeated past harms that resulted from a system or policy that remains in effect." *Id.* (collecting cases).

Mr. Berenson's injuries are repeated, prolonged, and continuing. On July 16, 2021—less than three months after the meeting between Twitter, Mr. Flaherty, and Mr. Slavitt at which the White House first targeted him, and just hours after President Biden accused social media platforms of "killing people" by not sufficiently policing so-called COVID-19 misinformation—Twitter locked Mr. Berenson out of his account for the first time. (Dkt. 3 ¶¶ 135, 142.) As the Biden Administration's pressure campaign continued, Twitter issued two additional strikes against Mr. Berenson's account on July 27 and July 30, respectively. (*Id.* ¶¶ 147, 155.) Each of these three strikes caused temporary suspensions that cost Mr. Berenson access to his Twitter audience and the opportunity to engage with Biden Administration officials, including President Biden. (*Id.* ¶ 175.)

After these discrete, repeated injuries, prolonged and total censorship followed on August 28, 2021, as Twitter permanently suspended Mr. Berenson's account. (*Id.* ¶ 169.) Mr. Berenson instantly lost access to his more than 300,000 Twitter followers, the primary outlet for his journalism. Mr. Berenson's archive of reporting became unavailable to his followers and the public. (*Id.* ¶ 176.) And he lost the opportunity to engage with public officials on Twitter. (*Id.*) In all, Mr. Berenson's Twitter banishment lasted 312 days, or more than ten months. Only after Mr. Berenson sued the company did Twitter reinstate his account on July 6, 2022. (*Id.* ¶ 178.)

Mr. Berenson's speech remains at risk. The federal government, including the White House, has not stopped pressing social media companies about disfavored speech, including speech about COVID-19 vaccines. As the federal government ramps up efforts to convince Americans to take more COVID-19 booster shots (Maxmen, *supra*),Mr. Berenson's reporting remains an impediment. On September 13, Mr. Berenson took aim at the rationale for boosters, posting that the CDC's "OWN data" establishes that "1 million mRNA Covid shots for teens will prevent 0-1 Covid deaths and CAUSE 100,000-200,000 severe side effects." Alex Berenson (@AlexBerenson), X (Sept. 13, 11:45 AM), https://twitter.com/AlexBerenson/status/1701985570426122636. This tweet, which has now received almost 6 million views, directly conflicts with the federal government's views on the COVID-19 vaccines. There is no reason to conclude that, during the White House and the Surgeon General's ongoing "back-and-forth with the platforms," they will not target Mr. Berenson's speech again. From the federal government's perspective, nothing has changed. The "system or policy" that induced the White House's direct, documented efforts "remains in effect." *Kosinski*, 614 F. Supp. 3d at 39. As the Fifth Circuit noted, "the record [in that case]

shows, and counsel confirmed at oral argument, that the officials' challenged conduct has not stopped." *Missouri*, 80 F.4th at 684.

Even if the Federal Defendants abandoned their contacts with the social media platforms entirely, which they have not, injury would still exist. In *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019), the Second Circuit agreed the individual plaintiffs in that case had standing to sue even though, "[a]fter the District Court granted declaratory relief, the defendants unblocked" plaintiffs from the @realdonaldtrump Twitter account. *Id.* at 223 n.3. The Federal Defendants have provided no such relief in this case, continuing interactions with social media companies similar in kind to those that led to Mr. Berenson's suspensions. But even if those interactions did cease for a time, as one district court put it, "[s]uch non-binding decisions offer little comfort to those" like Mr. Berenson "who wish to speak freely in the public square." *Virginia Soc. for Hum. Life v. Fed. Election Comn'n*, 83 F. Supp. 2d 668, 674 (E.D. Va. 2000), *aff'd in part, vacated in part sub nom. Virginia Soc'y for Hum. Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379 (4th Cir. 2001).

While the Federal Defendants continue to press social media platforms like Twitter, the company's new owner, industrialist Elon Musk, is in the Federal Trade Commission's regulatory crosshairs. (Dkt. 3 ¶ 184.) These adverse contacts incentivize Twitter's new ownership to offer concessions on disfavored speech like Mr. Berenson's to remain in the federal government's good graces. Instead of outright, total censorship, those concessions could include suppressing Mr. Berenson's speech. As Mr. Musk explained in November 2022, the company's policy is "freedom of speech, but not freedom of reach." Elon Musk (@ElonMusk), X (Nov. 18, 2022, 1:31 PM), https://twitter.com/elonmusk/status/1593673339826212864. Unless the Federal Defendants are enjoined, they are free to continue these efforts, giving Twitter incentive to nudge

Mr. Berenson's speech over the wrong side of this "lawful but awful," censorable line. In this way, Mr. Berenson is in the same situation as the publishers in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), who brought a First Amendment challenge to a Rhode Island State Commission's regulation of book distributors for obscenity, and whose standing to sue, the Supreme Court concluded, could not be "successfully questioned." *Id.* at 64 n.6.[5]

Mr. Berenson's injury is not just likely to recur—it is ongoing. If provided leave to amend, Mr. Berenson can plead that his Twitter account has been throttled and shadow banned before and after the company reinstated him to the platform. These ongoing issues span both Twitter's prior and new ownership and are against the backdrop of the ongoing "back-and-forth" between the federal government and the social media platforms, including Twitter.

The Federal Defendants deny Mr. Berenson suffered injuries-in-fact. They argue Mr. Berenson's injuries are "in the past" and that he failed to allege "plausible and nonconclusory allegations of certainly impending future injury." (Dkt. 45 at 25.) The Federal Defendants raised similar arguments in *Missouri v. Biden*. In that case, several individual plaintiffs, including Twitter users, alleged their content was removed, censored, and artificially suppressed. 80 F.4th at 658. The Federal Defendants argued these were "past injuries" and that the same harm was not likely to "reoccur in the future." *Id.* at 659.

The Fifth Circuit rejected these arguments. Regarding ongoing harm, the court pointed to the "chilling of the Individual Plaintiffs' exercise of their First Amendment rights [which] is, itself, a constitutionally sufficient injury." *Id.* (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). In

---

[5] In *Bantam Books*, the Supreme Court also pointed to "pragmatic considerations" supporting standing, because the "distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights" while "[t]he publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing." 372 U.S. at 64 n.6. The same considerations apply here to Mr. Berenson.

its survey of those plaintiffs' allegations, the Fifth Circuit noted various censorship injuries, *see id.* at 658-59, but White House officials did not specifically target those plaintiffs like they did Mr. Berenson. (Dkt. 3 ¶¶ 105-16.) Given this history, the risk of recurrence is even greater for Mr. Berenson than the *Missouri v. Biden* plaintiffs.

In denying that Mr. Berenson's risk of future harm is cognizable, the Federal Defendants cite *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), for the proposition that future injury "must be certainly impending" for standing purposes. (Dkt. 45 at 25.) *Amnesty International* involved a constitutional challenge to the Foreign Intelligence Surveillance Act of 1978. *Id.* at 401. The plaintiffs in that case "assert[ed] that they can establish injury in fact because there is an objectively reasonable likelihood that their communications will be acquired under [the statute] at some point in the future." *Id.* The Supreme Court rejected that theory of injury, dismissing it as resting on a "highly attenuated chain of possibilities" which included five discrete links, some of which included built-in protections against the anticipated harm. *Id.* at 410.[6]

*Amnesty International* is distinguishable. Most importantly, the plaintiffs in that case "fail[ed] to offer any evidence that their communications have been monitored under [the statute], a failure that substantially undermine[d] their standing theory." *Id.* at 411. Here, by contrast, Mr. Berenson has offered evidence the Federal Defendants specifically targeted him. (Dkt. 3 ¶¶ 105-16.) At the same time, the *Amnesty International* Court recognized that the "certainly impending" standard is flexible, noting that "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about,"

---

[6] Among other things, the Court noted that for the alleged injury to happen "the Article III judges who serve on the Foreign Intelligence Surveillance Court [would have to] conclude that the Government's proposed surveillance procedures satisfy [the statute's] many safeguards and are consistent with the Fourth Amendment." *Id.*

and that "we have found standing based on a substantial risk that the harm will occur." *Id.* at 414 n.5 (internal quotation marks omitted). Mr. Berenson's complaint details just such a risk.

The Federal Defendants' reliance on the Second Circuit's decision in *Dorce v. City of New York*, 2 F.4th 82 (2d Cir. 2021), is also misplaced. That case involved a challenge to a New York City property tax disclosure program. *Id.* at 88. The court found plaintiffs, former property owners, lacked standing because they did "not allege any facts to show that they own, plan to purchase, or have been deterred from purchasing any additional property that is likely to be subject to the program." *Id.* at 95. Mr. Berenson remains on Twitter and potentially subject to censorship on account of the government's unchanged policy priorities and ongoing contacts with Twitter. (Dkt. 3 ¶ 186.)

Finally, the Federal Defendants contend Mr. Berenson cannot forecast future injury because "Twitter has since stated unequivocally that it will no longer enforce" the company's COVID-19 misleading information policy. (Dkt. 45 at 26.) The Fifth Circuit rejected this argument about Twitter because the company "continues to enforce a robust general misinformation policy." *Missouri*, 80 F.4th at 659; *see also id.* at 660 n.3 (describing Twitter's "crisis misinformation policy" which "would presumably apply to COVID-related misinformation if COVID-19 were again classified as a Public Health Emergency").

### B.     Mr. Berenson's censorship injuries are fairly traceable to the Federal Defendants' conduct.

The second requirement for Article III standing is that the complained-of injury is "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "A plaintiff is not required to show that a statute is the sole or the but-for cause of an injury. An injury can be 'fairly traceable' even when future contingencies of one kind or another might disrupt or derail a project." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d

Cir. 2019); *see also Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) ("Article III standing demands a causal relationship, but neither the Supreme Court nor our Court has ever held that but-for causation is always needed."). "The fact that the defendant's conduct may be only an indirect cause is not necessarily fatal to standing." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (internal quotation marks and alterations omitted). In this regard, "[a] defendant's conduct that injures a plaintiff but does so only after intervening conduct by another person, may suffice for Article III standing." *Id.*

When third parties are involved in the traceability analysis, a "plaintiff must show at the least that third parties will likely react in predictable ways." *California v. Texas*, 141 S. Ct. 2104 (2021) (internal quotation marks omitted). The Supreme Court found such predictable reactions in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019). In that case, several States challenged inclusion of "a question about citizenship on the 2020 census questionnaire." *Id.* at 2561. The plaintiffs' theory of standing was that "a citizenship question will depress the response rate and lead to an inaccurate population," causing injuries including "loss of federal funds." *Id.* at 2565. The theory was based on "evidence at trial [which] established that noncitizen households have historically responded to the census at lower rates than other groups," and that "the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* at 2566. The Supreme Court found this theory "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.*

Mr. Berenson's traceability theory is less speculative than the one the Supreme Court endorsed in *Department of Commerce*. Mr. Flaherty and Mr. Slavitt's April 21, 2021 meeting with Twitter produced immediate—not just "predictable"—effects causing Twitter to review Mr.

Berenson's account and marking him as a target of particular interest to the government. (*Id.* ¶ 112.)

Though Mr. Berenson's account survived the government's first, private attack, as government censorship efforts surged in the summer of 2021, Twitter responded by temporarily and then permanently suspending him, As the Fifth Circuit concluded in *Missouri v. Biden*, these censorship decisions "were likely attributable at least in part to the platforms' reluctance to risk the adverse legal or regulatory consequences that could result from a refusal to adhere to the government's directives." 80 F.4th . The Ninth Circuit reached a similar conclusion in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), determining for standing purposes "[i]t is possible to draw a causal line from" from the state agency's "flagging" of one of the plaintiff's posts to his eventual "suspension from the platform, even if it is one with several twists and turns." *Id.* at 1161-62. The same is true here, on more compelling underlying facts.

In denying traceability, the Federal Defendants first attack the sufficiency of Mr. Berenson's allegations regarding President Biden, Mr. Flaherty, and Surgeon General Murthy. (Dkt. 45 at 28.) This attack minimizes and misstates the factual allegations against these Defendants. Regarding President Biden, Mr. Berenson points to an e-mail from Mr. Flaherty to YouTube executives the day after the White House's meeting with Twitter in which Mr. Flaherty informed YouTube his concerns about content causing "vaccine hesitancy" presents "a concern that is shared at *the highest (and I mean the highest levels* of the [White House]," at least implying President Biden's knowledge and approval of the other Federal Defendants' censorship efforts. (*Id.* ¶ 99.) Meanwhile, Mr. Flaherty is not just alleged to have "attended one meeting" with Twitter, (Dkt. 45 at 28), but "several other calls" which were "very angry in nature," (Dkt. 3

¶ 115).[7] And Dr. Murthy not only "address[ed] and "discuss[ed]" so-called "misinformation" in a "general" way, the Surgeon General specifically called for social media companies to "[i]mpose clear consequences for accounts that repeatedly violate platform policies" and to "dramatically increase . . . how aggressive we're being" about social media misinformation. (*Id.* ¶ 131.)

The Federal Defendants deny any causal relationship between their conduct and Mr. Berenson's injuries. Twitter's decisions, the Federal Defendants contend, were "just as likely (if not more likely) . . . [to] reflect independent business judgments based on its own policies and subjective business interests." (Dkt. 45 at 30.) But the Federal Defendants' independent judgment argument faces a threshold problem. After he sued the company, Twitter publicly admitted that Mr. Berenson did not violate its COVID-19 misleading information policy, announcing that "Mr. Berenson's Tweets should not have had led to his suspension at that time." (Dkt. 3 ¶ 178.)[8] In an internal e-mail, Twitter's in-house counsel conceded documents it provided Mr. Berenson would be used "to argue that Twitter never should have actioned his account and later did so only because of immense pressure from government/liberal media." (Ex. A to Caudill Decl.) The attorney did not deny "immense pressure" from government existed or that it contributed to Mr. Berenson's censorship. Earlier on, the same attorney advised that Twitter's "chances of success at the trial level are less than 50%, though we may have slightly more success on appeal." (Ex. B to Caudil Decl.) In other words, Twitter's attorney acknowledged the company was unlikely to prove it had "reasonably/accurately appl[ied] our own COVID-19 misinformation policy." (*Id.*) This is consistent with Twitter's government-induced re-evaluation

---

[7] The Federal Defendants emphasize Mr. Berenson's failure to provide pre-discovery details regarding "when these calls took place, who exactly participated in them, or what specifically was discussed during them." (Dkt. 45 at 28.) But they cite no authority requiring such details at the Rule 12 stage of this litigation. (*See id.*)

[8] By using the plural "Tweets," the company went on the record that all five of the strikes against Mr. Berenson's account were invalid.

of Mr. Berenson's account after the April 2021 meeting. Nothing about Twitter's decision to suspend and deplatform Mr. Berenson was "independent," as the Federal Defendants now maintain.

The Federal Defendants also point to the gap in time between the April 2021 meeting and Mr. Berenson's subsequent suspensions and ultimate deplatforming to dismiss any causal connection. (Dkt. 45 at 29.) This argument is misguided for at least three reasons. First, it ignores the immediate, documented harm Mr. Flaherty and Mr. Slavitt's April 2021 meeting with Twitter caused Mr. Berenson, subjecting his reporting to additional, government-induced company scrutiny. That was injury in and of itself caused by the Federal Defendants with "a strong temporal connection" to the conduct at issue. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 180 (2d Cir. 2005). Mr. Berenson, a journalist whose "name ha[d] never come up in the discussions around these policies," (*id.* ¶ 83), became the subject of debate at the highest levels of Twitter. Second, there were other, subsequent meetings between the White House and Twitter which "were very angry in nature" about COVID-19 misinformation. (*Id.* ¶ 115.) Third, and related, to the extent temporal correlation is "probative" for traceability purposes, *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 213 (4th Cir. 2020), Mr. Berenson's suspensions all occurred after the meeting, with his first suspension less than four hours after President Biden accused Twitter and other social media platforms of "killing people" by allowing so-called COVID-19 vaccine misinformation on their platforms. (*Id.* ¶ 136.)

Mr. Berenson's injuries are well within timing the Second Circuit has accepted in other cases. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 111 (2d Cir. 2010) (there is no bright line test for determining the outer limits of a temporal relationship that is "too attenuated to establish causation," noting that five months is not too long); *Gorman-Bakos v. Cornell Co-op*

*Ext. of Schenectady Cty.*, 252 F.3d 545 (2d Cir. 2001) (denying summary judgment to defendant in retaliation claim under Section 1983 where a series of adverse events occurring two to four months after plaintiff publicly complained a program). And in 2004, a Southern District of New York court found that "'strong temporal correlation,' standing alone, is sufficient to sustain an inference" of injury. *Pellegrino v. County of Orange*, 313 F. Supp. 2d 303, 316-17 (S.D.N.Y. 2004). Similarly, the Second Circuit ruled in 2003 that the "close proximity" of a public official's complaint about a billboard containing an anti-gay message and the resulting "public outcry" were evidence that the complaint had led the billboard company to remove it, violating the free speech rights of the plaintiffs that had purchased it. *Okwedy v. Molinari*, 333 F.3d 339, 334 (per curiam) (2d Cir. 2003).

The cases the Federal Defendants rely on are all distinguishable. None of the litigants in those cases, including the plaintiffs in *Missouri v. Biden*, proffered evidence they were specifically targeted by the White House as Mr. Berenson has. *See Missouri*, 80 F.4th at 658-59 (alleging various censorship harms but no specific targeting while ultimately concluding plaintiffs satisfied Article III standing requirements); *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1031 (D.C. Cir. 2022) (alleging that a single Member of Congress sent letters to various social media platforms, but not that the plaintiff association had been specifically targeted); *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *2 (9th Cir. Nov. 18, 2022) (alleging various public statements by legislators and legal actions, but no direct targeting); *Hart v. Facebook Inc.*, No. 22-CV-737-CRB, 2023 WL 3362592, at *3 (N.D. Cal. May 9, 2023) (noting "the lone mention" of plaintiff in amended complaint was Defendant Dr. Gottlieb "complain[ing] about [plaintiff]'s posts to a Twitter lobbyist"). Mr. Berenson's

complaint contains allegations about *both* the generalized government pressure on the social media platforms as well specific targeting of his speech.

### C. The harm Mr. Berenson suffered and continues to suffer is redressable.

The final requirement for Article III standing is redressability. An injury is redressable if there is "a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Mr. Berenson is a current Twitter user. (Dkt. 3 ¶ 186.) He is at risk from future, government-induced censorship. (*Id.*) Like the plaintiffs in *Missouri v. Biden*, he is asking to "restrain the officials from unlawfully interfering with the social-media companies' independent application of their content-moderation policies." 80 F.4th at 662. Also like the plaintiff in *O'Handley*, because Twitter reinstated Mr. Berenson's account, "he has standing to seek injunctive relief." 62 F.4th at 1145.

The Federal Defendants assert that no injunction "could require Twitter . . . to rescind or modify its policies on misinformation." (Dkt. 45 at 31.) That is beside the point. As the Fifth Circuit observed in *Missouri v. Biden*, the issue for purposes of the redress Mr. Berenson seeks is not Twitter's "independent *application*" of its rules, but rather "*government-coerced* application of those policies." 80 F.4th at 662 (emphasis in original). Like the plaintiffs in that case, Mr. Berenson "seek[s] to redress the latter injury, not the former." *Id.*

The Federal Defendants also complain about the scope of Mr. Berenson's request for injunctive relief. (Dkt. 45 at 32-33.) That objection is premature. This litigation is at the Rule 12 stage. The Federal Defendants cite no authority for the proposition that Mr. Berenson is required to provide a specific, detailed proposed injunction at the end of his complaint. Further, Mr. Berenson's request for injunctive relief is not overbroad, since he asks this Court to enjoin the

Federal Defendants and others "from further violating Mr. Berenson's First Amendment rights." (Dkt. 3 at 69.) The request is predicated on stopping future First Amendment violations, not flatly restraining Federal Defendants from "engaging with Twitter directly" or "engaging in a wide range of government speech." (Dkt. 45 at 32.) In modifying the district court's injunction in *Missouri v. Biden*, the Fifth Circuit struck such a balance by barring the Federal Defendants from "coerc[ing] or significantly encourag[ing] social-media companies" from engaging in censorship. 80 F.4th at 687-88. The same outcome can and should occur here.

## II. Separation of powers does not bar Mr. Berenson's claims against President Biden.

Mr. Berenson does not dispute the Federal Defendants' position that injunctive relief against President Biden is unavailable here. (Dkt. 45 at 33.) However, declaratory relief against President Biden is available. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the Supreme Court indicated plaintiff's injury would be redressed "by a declaratory judgment that the cancellations [under the Line Item Veto Act] are invalid." *Id.* at 433 n.22; *see also Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 2578260, at *38 (W.D. La. Mar. 20, 2023) (declining to dismiss the claims for declaratory relief against President Biden at this time).

## III. Mr. Berenson's complaint states a plausible First Amendment claim.

### A. The Federal Defendants coerced Twitter's content moderation decisions generally and specifically with respect to Mr. Berenson.

The Supreme Court has observed that "it is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (cleaned up); *see also Querry v. Messar*, 14 F. Supp. 2d 437, 452 (S.D.N.Y. 1998) (citing *Norwood*). In *Okwedy v Molinari*, a case with significant parallels to this one because it also involved an executive-branch official demanding a company stifle controversial speech it had contracted to carry, the Second Circuit

ruled, "[a] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decision making authority over the plaintiff, or *in some less-direct form*." 333 F.3d at 344. (emphasis added).

The Federal Defendants exercised coercive power to immediately nudge Twitter to monitor and ultimately censor Mr. Berenson. During an April 21, 2021 meeting, Mr. Flaherty and Mr. Slavitt pressed Twitter regarding "why Alex Berenson hasn't been kicked off the platform." (Dkt. 3 ¶ 107.) These two White House officials also told Twitter that Mr. Berenson is "ground zero for COVID-19 misinformation that radiates outward," (*id.* ¶ 108), meaning his reporting was not a concern limited to Twitter, but the entire social media ecosystem. Mr. Slavitt and Mr. Flaherty were already engaged with (and, in Facebook's case, had proven successful in) actually changing content moderation practices. The detailed allegations Mr. Berenson has offered go well beyond the skeletal pleading the Supreme Court narrowly rejected in *Iqbal*.

The tactics in this case were at least as coercive as what the Second Circuit found actionable under the First Amendment in *Okwedy*. In that case, the plaintiff posted messages on billboards in Staten Island condemning homosexuality. 333 F.3d. at 341. The "Borough President of Staten Island" contacted the billboard company, calling the billboard "unnecessarily confrontational and offensive" and stating "that [its] message conveys an atmosphere of intolerance which is not welcome in our Borough" before noting the company "owns billboards on Staten Island and derives substantial economic benefits from them." *Id.* at 341-42. The company backed out of its contract with plaintiff. *Id.* at 342. The district court dismissed the plaintiff's claim, relying on the fact that the defendant Borough president "did not have direct

regulatory or decision making authority over" the billboard company. *Id.* at 343. The Second Circuit reversed the district court, because "a jury could find that [the defendant's] letter contained an implicit threat of retaliation." *Id.* at 344. The Second Circuit instructed that the district court "should have viewed the language of [the defendant's] letter in the light most favorable to plaintiffs." *Id.* at 344.

The Federal Defendants' course of conduct did not involve just one letter as in *Okwedy* or even one meeting. Representing the "the most powerful office in the world," the Federal Defendants engaged in what the Fifth Circuit described as a campaign "of escalating threats" and "unrelenting pressure." *Missouri*, 80 F.4th at 662. Faced with such efforts, that court noted, the "social-media platforms," including Twitter, "did, and would continue to bend to the government's will." *Id.* And that is what happened here, as Twitter censored and deplatformed Mr. Berenson despite internal debate at the highest levels of the company.

The Second Circuit's decision in *National Rifle Association v. Vullo*, 49 F.4th 700 (2d Cir. 2022), does not require a different result. In that case, the NRA sued a New York state official who "urged . . . banks and insurance companies to 'join' other companies that had discontinued their associations with the NRA." *Id.* at 706. The NRA's First Amendment claim turned on whether the official's conduct was an effort to convince or an attempt to coerce. *Id.* at 715. The court applied a four-factor test focusing on the official's "(1) word choice and tone," "(2) the existence of regulatory authority," "(3) whether the speech was perceived as a threat," and "perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* Applying this framework, the Second Circuit held the NRA failed to state a First Amendment claim, finding that the official's messages and public statements were "written in an even-handed, nonthreatening tone and employed words intended to persuade rather than intimidate." *Id.* at 717.

In *Missouri v. Biden*, the Fifth Circuit indicated that "coercion may be readily apparent here," based on the Federal Defendants' "persistent and angry" as well as "urgent, uncompromising demands to moderate conduct." 80 F.4th at 673. Even so, the court applied the *Vullo* test to conclude the Federal Defendants' conduct was coercive under that framework, as well. *Missouri*, 80 F.4th at 674-77. Tracking *Vullo*, the Fifth Circuit first considered the Federal Defendants' demeanor, distinguishing their private and public comments, noting their use of "foreboding, inflammatory, and hyper-critical phraseology." *Id.* at 673. Regarding regulatory power, and distinguishing the situation from the Ninth Circuit's decision in *Kennedy v. Warren*, 66 F.4th 1199 (9th Cir. 2023), the Fifth Circuit noted the White House "directs an army of federal agencies that create, modify, and enforce federal regulations," *Missouri*, 80 F.4th at 675, which is also why the Federal Defendants' contention that they could not take unilateral action to amend section 230 of the Communications Decency Act is unavailing, (Dkt. 45 at 42). The court noted the platforms' changed moderation practices, particularly "that platforms were influenced by the officials' demands." *Id.* at 674. Finally, the Fifth Circuit noted the Federal Defendants' direct and indirect threats of adverse consequences, including calls for "regulatory changes and increased enforcement" actions. *Id.* at 676.

Mr. Berenson's case individualizes the "unrelenting pressure" campaign the Fifth Circuit has already found likely to violate the First Amendment. As noted above, the individual plaintiffs suffered censorship injuries like Mr. Berenson, but none of them alleged they were specifically targeted by the White House, as Mr. Berenson has. (Dkt. 3 ¶ 106-15.) Nor did any of those plaintiffs allege or provide direct evidence the White House considered them "ground zero" for COVID-19 "misinformation." (*Id.* ¶ 108.) Given this designation, the various individual censorship requests the Fifth Circuit chronicled at length all relate back to Mr. Berenson, whom

the Federal Defendants regarded as the focal point for the perceived "misinformation" they desired to quell. By their own statements in the April 2021 meeting with Twitter, they viewed Mr. Berenson as "ground zero" for COVID-19 "misinformation" generally, not just on Twitter, but across the entire social media landscape. The rationale for the relief the Fifth Circuit provided to the individual plaintiffs in *Missouri v. Biden* applies even more forcefully to Mr. Berenson.

The Federal Defendants deny the April 2021 meeting was coercive. They distinguish the "really tough question" the Federal Defendants asked about Mr. Berenson from "issuing a directive, an instruction, an ultimatum, or a requirement." (Dkt. 45 at 38.) But *Vullo* says the Federal Defendants' statements "must" be viewed "in context." 49 F.4th at 718. Mr. Berenson's complaint contains ample context. The question the White House posed to Twitter in April 2021 was not to satisfy academic curiosity, but to push Twitter to censor the man the Federal Defendants specifically targeted and considered "ground zero" for preventing many Americans from taking what the Federal Defendants considered to be a life-saving vaccine. (Dkt. 3 ¶ 88-89.)

The Federal Defendants also contend that Mr. Slavitt's actions are not attributable to the federal government. (Dkt. 45 at 39-40.) That is unclear. As shown above, Mr. Slavitt included his White House e-mail address in his July 2021 correspondence with Twitter, in which he urged the company to deplatform Mr. Berenson. That same month, Mr. Slavitt hosted Dr. Murthy on his podcast during the critical week when Dr. Fauci criticized Mr. Berenson, the Surgeon General released his misinformation advisory, and President Biden said social media companies were "killing people." (Dkt. 3 ¶ 130.) Mr. Slavitt also cultivated close contacts with Defendants Drs. Gottlieb and Bourla, the former being in "pretty regular" contact with Mr. Slavitt while he served in the White House, (*id.* ¶ 144), and the latter being a guest on Mr. Slavitt's podcast, (*id.* ¶ 149).

Further, if given leave to amend, plaintiff can plead that in an interview on July 30, 2021, Mr. Slavitt emphasized his close ongoing connections with the White House, saying that "I am on the phone with and talking to the White House and the CDC… as often as people need me, and usually that's on a daily basis when things get, get to crunch time." SoCal in 17, *supra*. Given Mr. Slavitt's demonstrated history of sustained animus toward Mr. Berenson, and his view that Mr. Berenson is "ground zero" for COVID-19 misinformation, it would be remarkable if Mr. Slavitt's had not continued to work with his White House and government colleagues to silence speech he called "a legitimate killer." (Dkt. 3 ¶ 130.)

    **B.**     **The Federal Defendants significantly encouraged Twitter to censor Mr. Berenson.**

The actions of a private entity "are attributable to the state . . . when the state provides 'significant encouragement' to the entity." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008). State action does not exist where "decisions ultimately turn on . . . judgments made by private parties according to professional standards that are not established by the State." *Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982). "The 'ultimate issue' in this analysis is whether the private entity's actions are 'fairly attributable' to the state." *Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141, 153 (S.D.N.Y. 2021) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)).

The Fifth Circuit found the Federal Defendants' actions satisfied the significant encouragement test. The court found it "apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions," and that the Federal Defendants' contacts "imparted a lasting influence on the platforms' moderation decisions without the need for any further input." *Missouri*, 80 F.4th at

678. As in Mr. Berenson's case, the Federal Defendants "ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards." *Id.*

## C. The Federal Defendants violated Mr. Berenson's access to a public forum.

The Second Circuit has recognized that social media can be a public forum. *Knight*, 928 F.3d at 237. In *Knight*, the Second Circuit determined that former President Donald J. Trump's @realdonaldtrump Twitter account was a public forum on account of it being "repeatedly used . . . as an official vehicle for governance." *Id.* Though the Supreme Court ultimately dismissed the case as moot because President Trump left office, the Second Circuit determined that his use of Twitter's block feature for certain users, "blocking them from viewing, retweeting, replying to, and liking his tweets," violated the First Amendment. *Id.* at 238. This was so even though the plaintiffs could "engage in various 'workarounds' such as creating new accounts, logging out to view the President's tweets, and using Twitter's search functions to find tweets about the President posted by other users with which they can engage." *Id.* To the extent *Knight* stands as only persuasive authority,[9] multiple other federal circuit courts of appeal have concluded that the First Amendment bars public officials from blocking users on social media. *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1177, 1184 (9th Cir. 2022) (holding government official violated the First Amendment by blocking user); *Swanson v. Griffin*, No. 21-2034, 2022 WL 570079, at *3 (10th Cir. Feb. 25, 2022) (same); *Davison v. Randall*, 912 F.3d 666, 688 (4th Cir. 2019) (same).

In this case, the Federal Defendants all utilize Twitter. (Dkt. 3 ¶ 51.) At various times, Mr. Berenson engaged with the accounts. (*Id.* ¶¶ 103-04, 118-19.) Unlike what President Trump did,

---

[9] District courts continue to cite *Knight*. *See, e.g.*, *Evans v. Herman*, No. 4:22-CV-2508, 2023 WL 4188347, at *3 (S.D. Tex. Apr. 24, 2023), *report and recommendation adopted*, No. 4:22-CV-02508, 2023 WL 4188466 (S.D. Tex. June 26, 2023).

the Federal Defendants did not just issue an individualized block against Mr. Berenson's account; rather, they worked to get him banned entirely. There were no "workarounds" for Mr. Berenson either, as there were for the aggrieved users in *Knight*, only complete censorship. What the Federal Defendants did here would be akin to coercing a press conference venue to dismiss a reporter because the government disliked his questions, instead of taking a direct approach by revoking press credentials. *Cf. Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 321 (S.D.N.Y. 2020) (describing revocation of CNN reporter Jim Acosta's credentials by the Trump White House). Again, the government cannot achieve indirectly through coercing a private party, what it could not do directly. *Norwood*, 413 U.S. at 465.

Further, the Second Circuit has previously found that privately owned spaces can become public fora that must be open to all journalists once some are invited. In *American Broadcasting Companies, Inc v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977), the Second Circuit ruled that a political candidate could not invite some reporters but not others to his privately owned campaign headquarters. As the court explained: "Once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media . . . once the press is invited . . . there is a dedication of those premises to public communications use." *Id.*

One year later, a Southern District court found that the New York Yankees and Bowie Kuhn, the commissioner of baseball, could not bar a female reporter from locker rooms at Yankee Stadium. The court found that Kuhn's effort to segregate the locker room was "state action," even though Major League Baseball and the Yankees are private entities. *Ludtke v. Kuhn*, 461 F. Supp. 86 (S.D.N.Y. 1978). Further, the court in *Kutch* noted the Supreme Court's explanation in *Burton v. Wilmington Pkg. Auth*, 365 U.S. 715 (1961) that "only by sifting facts

and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." It is that sifting of facts Mr. Berenson seeks here.

**IV.  Mr. Berenson seeks to preserve a *Bivens* claim for appellate review.**

Mr. Berenson does not dispute that the remedy in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), has not been extended to the First Amendment violations at issue here, for which he also seeks declaratory and injunctive relief. Mr. Berenson preserves the *Bivens* issue for appellate review.

**V.  Mr. Berenson states a plausible claim for relief under 42 U.S.C. § 1985(3).**

"To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The Federal Defendants argue that Mr. Berenson's Section 1985(3) claim against Mr. Flaherty and Surgeon General Murthy should be dismissed for two reasons: first, because Section 1985(3) does not apply to federal officers; and second, because Mr. Berenson has not adequately alleged conspiracy and failed to allege membership in a protected class. These arguments lack merit.

**A.  Section 1985(3) extends to claims against federal officials.**

The Federal Defendants first invite this Court to adopt a minority view which the Second Circuit has directly called into question and that courts in this district have already declined to apply by finding that Section 1985(3) does not cover claims against federal officers. This argument should be squarely rejected.

The Second Circuit has specifically noted "that the development of case law since *Gregoire*[10] has eroded any basis for interpreting that decision to render Section 1985(3) inapplicable to federal officials." *Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir. 2007), *rev'd on other grounds sub nom. by Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Since the late 1970s, courts in this district, have reached the same result. *See Wahad v. F.B.I.*, 813 F. Supp. 224, 232 (S.D.N.Y. 1993) (concluding that the "[t]he scope of § 1985(3) shall not be narrowed by allowing federal agents to escape liability under it"); *Peck v. United States*, 470 F. Supp. 1003, 1011 (S.D.N.Y. 1979) (holding claims against federal officers are actionable under Section 1985(3)); *Moriani v. Hunter*, 462 F. Supp. 353, 355-56 (S.D.N.Y. 1978) ("I can not see how the Second Circuit's rule that [§] 1985(3) does not apply to federal officer survives *Griffin v. Breckenridge*, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971). . . . Unless there is a rationale, unknown to the past cases, for holding that federal officers are not persons' under s 1985(3), there is no longer any reason to exclude from coverage federal officers acting under color of federal law."); *see also Colon v. Sawyer*, No. 9:03-CV-1018, 2006 WL 721763 (N.D.N.Y. March 20, 2006) (holding that "federal officials and employees may be liable" under Section 1985(3)). This is also consistent with the views of at least six other federal circuit courts of appeal.[11]

---

[10] *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949). is a pre-*Griffin* case that some courts had used to support their holdings that Section 1985(3) claims did not apply to federal officers. *Iqbal v. Hasty*, 490 F.3d at 176.

[11] *Davis v. Samuels*, 962 F.3d 105, 115 (3d Cir. 2020) (describing "a significant consensus among our sister Courts of Appeal is that *Griffin* has rendered untenable the argument that § 1985(3) is inapplicable to those acting under the color of federal law"); *Cantú v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (noting that Fifth Circuit precedent holds that § 1985(3) does not apply to federal officers, but explaining that prior precedent, "may not have aged well" in light of its failure to "grapple with Supreme Court precedent" and noting more recent decisions where the Supreme Court assumed that § 1985(3) applies to federal officers); *Federer v. Gephardt*, 263 F.3d 754, 758 (8th Cir. 2004) (noting that "[u]nlike 42 U.S.C. § 1983 . . . the scope of §1985(3) is considerably broader and can reach conspiracies composed of federal officers or federal employees"); *Hobson v. Wilson*, 737 F.2d 1, 19 (D.C. Cir. 1984), *cert denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), *overruled in part on other grounds*, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) (holding federal defendants can be sued under Section 1985(3)); *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980) (allowing plaintiff leave to plead Section 1985(3) claim against United States marshals); *Dry Creek Lodge, Inc. v. US*, 515 F.2d 926, 931 (10th Cir. 1975) (allowing Section 1985(3) claim to proceed against federal defendants).

The Federal Defendants rely on *Alharbi v. Miller*, 368 F. Supp.3d 527, (E.D.N.Y. 2019), and an unpublished, nonbinding opinion from the District Court of Connecticut, *Sabir v. Licon-Vitale*, No. 20 Civ. 1552, 2022 WL 1291731 (D. Conn. Apr. 29, 2022), which found federal officials to be outside the scope of Section 1985(3). As noted above though, this is a minority, non-consensus position, and for good reason. The contrary, majority position follows from the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), as the Third Circuit recently explained:

> In *Griffin*, the Supreme Court held that § 1985(3) can reach purely private conspiracies because the statute's failure to require the "deprivation to come from the State . . . . can be viewed as an important indication of congressional intent to speak in § 1985(3) of all deprivations of 'equal protection of the laws' and 'equal privileges and immunities under the laws,' *whatever their source*."

*Davis*, 962 F.3d at 114 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971)) (emphasis in *Davis*). The same rationale holds here.

### B. Mr. Berenson states a claim under Section 1985(3).

#### 1. Mr. Berenson's complaint contains allegations supporting the existence of an actionable Section 1985(3) conspiracy.

A Section 1985(3) conspiracy is actionable if "one or more persons engaged therein, do or cause to be done, any act in furtherance of the object of the conspiracy." *Wahad v. F.B.I.*, 813 F. Supp. 224, 231 (S.D.N.Y. 1993) (internal quotations omitted). Proof of an explicit agreement is not required but "can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *Id.* (internal quotations omitted). The Second Circuit has "recognized that . . . 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)).

Mr. Berenson's complaint contains voluminous allegations detailing the conspiracy that deprived him of his Twitter audience. Regarding conspiracy claims, when a "complaint does more than merely allege in vague terms that an agreement and 'alliance' was formed; [and] it undergirds these allegations with a factual backdrop that explains both the motivation and occasion for such a conspiracy," that is enough to state a plausible conspiracy claim. *Glacken v. Inc. Vill. of Freeport*, No. 09 CV 4832 DRH AKT, 2012 WL 894412, at *9 (E.D.N.Y. Mar. 15, 2012). Mr. Berenson's complaint contains a voluminous "factual backdrop" describing in detail the motivations of the Federal Defendants, their targeting his speech, and their contacts with Twitter and with one another—all culminating in his permanent Twitter suspension. Mr. Berenson also places Dr. Murthy and the two other private conspirators, Drs. Gottlieb and Bourla, on Mr. Slavitt's show during July 2021, the same month Twitter suspended him for the first time. (Dkt. 3 ¶¶ 130, 144, 149.) And Mr. Berenson shows that the federal and private conspirators—including Dr. Gottlieb—repeatedly directed their complaints about him to the same Twitter executive, Todd O'Boyle. Mr. O'Boyle's appearance in Dr. Gottlieb's emails is particularly striking, since as a senior Twitter public policy lobbyist Mr. O'Boyle was not one of Pfizer's usual contacts at the company. Mr. Berenson's allegations exceed the plausibility standard and contain sufficient underlying facts "to raise a reasonable expectation that discovery will reveal evidence of the [alleged misconduct.]" *Rother v. NYS Dept. of Corr. & Cmty. Supervision*, 970 F. Supp.2d 78, 103 (N.D.N.Y. 2013).

The Federal Defendants attack the sufficiency of Mr. Berenson's conspiracy pleading. (Dkt. 45 at 52.) They complain that Mr. Berenson's complaint does not detail "when" certain calls between the Federal Defendants and Twitter "took place," the participants, and the contents of the discussion. (*Id.*) They also charge Mr. Berenson with failing to allege that Dr. "Murthy

ever discussed Berenson with anyone or took action against him." (*Id.*) Regardless, as the Federal Defendants concede, Mr. Berenson did allege the time, place, and agenda for the initial, critical meeting between Twitter and White House officials Mr. Flaherty and Mr. Slavitt—the meeting at which the conspirators took their first explicit action. Further, as noted above, the Fifth Circuit found Dr. Murthy deeply involved with the White House. *Missouri*, 80 F.4th at 651. Given this connection, it defies "common sense," *Iqbal*, 556 U.S. at 664, to conclude Dr. Murthy never heard of Mr. Berenson, who White House officials believed was "ground zero for covid misinformation," (*id.* ¶ 108), or never mentioned Mr. Berenson to Twitter even as Dr. Murthy raced to stop the spread of COVID-19 misinformation.

Mr. Berenson's complaint goes far beyond establishing "parallel conduct" directed at Twitter, as the Federal Defendants maintain. (Dkt. 45 at 53.) There is no "obvious alternative explanation" for what happened in this case as there was in *Twombly*. *Id.* at 567. What happened here is not, as the Supreme Court later said of *Twombly*, "more likely explained by lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680. Twitter defended Mr. Berenson's right to speak on its platform until, after the Federal Defendants' multi-faceted, targeted campaign, the company permanently suspended his account. Further, Twitter has since conceded that Mr. Berenson's suspension was in error. (*Id.* ¶ 20.) Unlike the plaintiffs in *Twombly*, Mr. Berenson has direct evidence of this—he is not only relying on circumstantial proof, though he has pled that, too. It would have been akin to the *Twombly* plaintiffs providing direct evidence of the defendant companies intending to enter agreement to restrain trade with each other— something that would have been enough to survive a Rule 12(b)(6) challenge in that case.

The cases the Federal Defendants rely on for their *Twombly*/*Iqbal* challenge to Mr. Berenson's complaint are distinguishable. The plaintiff in *Rother v. NYS Dep't of Corr. & Cmty.*

*Supervision*, 970 F. Supp. 2d 78 (N.D.N.Y. 2013), an employment discrimination case, "at most, alleged somewhat parallel action in that each of the Defendants allegedly discriminated against her in some way." *Id.* at 103. By contrast, Mr. Berenson alleges collaboration and coordination. The court in *Cooper v. Clancy*, No. 9:19-CV-362 (GLS/ML), 2023 WL 2624334 (N.D.N.Y. Mar. 24, 2023), dismissed a defendant because the plaintiff did "not provide any examples" of the defendant's involvement, but otherwise let the Section 1985(3) case proceed. *Id.* at *6. Mr. Berenson has included numerous examples, which will be further informed by discovery.

The intracorporate conspiracy doctrine does not save the Federal Defendants from this claim, either. (Dkt. 45 at 53.) The "single corporate entity" doctrine "does not apply to federal agencies as it does business entities,: because "[i]f federal agencies were viewed as business entities, § 1985(3) would be ineffective to deal with potential conspiracies within the government." *Wahad v. F.B.I.*, 813 F. Supp 224, 232 (S.D.N.Y. 1993) (denying summary judgment relating to Section 1985(3) conspiracy between defendant and other federal agents). The Supreme Court has not decided the issue of whether the intracorporate conspiracy doctrine applies to federal officials for Section 1985(3) claims, although it has indicated "that conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under § 1985(3)." *Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017). But this statement has no application here because Mr. Flaherty and Dr. Murthy work in different departments, the former at the White House and the latter at the Department of Health and Human Services. For the same reason, the other cases cited by the Federal Defendants are equally inapplicable. *See Hartline v. Gallo*, 546 F.3d 95 (2d Cir. 2008) (involving suit against police officers in the same department); *Little v. City of New York*, 487 F. Supp.2d 426 (S.D.N.Y. 2007) (same).

### 2. Mr. Berenson adequately alleges invidious, class-based discrimination.

To state a Section 1985(3) claim, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102. The *Griffin* Court imposed that to avoid creating a "general federal tort law." *Id.* at 101-02. In *Carpenters v. Scott*, 463 U.S. 825 (1983), in the context of another purely private conspiracy, the Supreme Court reaffirmed *Griffin's* race-based or class-based animus requirement. *Carpenters*, 463 U.S. at 834. Regarding the more amorphous "class-based" prong, the Court left open the idea that class-based could encompass "political views or activities," but held that "*economic* views, status, or activities" did not qualify. *See id.*

The Second Circuit has extended Section 1985(3)'s "class-based" requirements beyond race to other protected categories such as political affiliation. *See Keating v. Carey*, 706 F.2d 377, 388 (2d Cir. 1983) (holding that "allegations that the defendants conspired against [plaintiff] because he was a Republican satisfies the *Griffin* requirement under § 1985(3) of class-based animus"); *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir. 1989) (declining to overturn *Keating* but finding that plaintiff had only alleged individual discrimination); *Rini v. Zwirn*, 886 F. Supp 270 (E.D.N.Y. 1995) (applying *Keating* and holding that allegations that defendants were motivated by plaintiffs' membership in the Republican Party satisfied the protected class requirement under Section 1985(3)). The Second Circuit has also extended the statute's protection to religion (another mutable category) and disability. *Jews for Jesus v. Jewish Comm. Rel. Council of N.Y., Inc.*, 968 F.2d 286 (2d Cir. 1992) (affirming that "class-based animus" includes religion and holding that issues of whether the group Jews for Jesus was a bona fide religious group was an issue of fact for trial); *Trautz v. Weisman*, 819 F. Supp. 282, 294 (S.D.N.Y. 1993) (holding disabled individuals may be a class protected by Section 1985(3)).

The case of *Lederman v. Giuliani*, No. 98 Civ.2024LMM/JCF, 2007 WL 1623103 (S.D. N.Y. June 5, 2007), illustrates the flexibility of the Section 1985(3) class requirement. In *Lederman*, the plaintiff was arrested in connection with his activities with an organization called A.R.T.I.S.T., "a group comprised of street artists who advocate for greater rights and privileges under the First Amendment for street artists." *Id.* at *1. The Court denied defendants' motion for summary judgment finding that "[w]hether or not A.R.T.I.S.T. qualifies as a political affiliation of satisfying the second element of a 1985(3) claim, where 'class-based' animus is a requirement according to *Griffin* is an issue of material fact" for the jury who could see it as "merely 'a group of individuals who share a desire,'" or who "could perceive it as a political group with an agenda disapproved of by Defendants." *Id.* at *5; *see also Conklin v. Lovely,* 834 F.2d 543, 549 (6th Cir. 1987) (holding that a plaintiff's "political views" provided a sufficient basis for class-based discrimination); *Johnson-Kirk v. OB GYN Womenservices, P.C., No. 93-CV-0702E(F)*, 1995 WL 307589, at *7 (W.D.N.Y. May 15, 1995) (indicating that the court would consider motion for leave to amend where plaintiff, an anti-abortion protestor, was arrested and brought claims against private and government defendants but had failed to allege class-based animus).

Given leave to amend, Mr. Berenson can allege that he has not taken any of the COVID-19 vaccines.[12] As detailed in his complaint, the Federal Defendants targeted Mr. Berenson's speech about the COVID-19 vaccines as he was speaking on behalf of the unvaccinated, a group recognized to include "a disproportionate number of African-Americans, political conservatives, and evangelical Christians." (Dkt. 3 ¶ 202.) With respect to at least the political identity of those unvaccinated against COVID-19, Mr. Berenson is entitled to have a trier of fact determine whether the class he has identified is merely a group of individuals who share a "desire" or

---

[12] Such an amendment would resolve the Federal Defendants' objection that Mr. "Berenson does not allege he is a member of *any* class." (Dkt. 45 at 54.)

whether it could be perceived as a "political group with an agenda disapproved of by Defendants." *Lederman*, 2007 WL 1623103, at *5.

The Federal Defendants argue that *Dolan v. Connolly*, 794 F.3d 290 (2d Cir. 2015), requires "inherited or immutable characteristic[s]" for the proposed class. *Id.* at 296; (Dkt. 45 at 54). But that language relates to the Court's rejection of the plaintiff's contention that Section 1985(3) "encompasses classes of jailhouse lawyers and members of an [inmate liaison committee]." *Dolan*, 794 F.3d at 294. In the preceding paragraph, the Court affirms *Keating*'s holding that political affiliation is covered. *See id.* Because political affiliation is not an immutable trait, the Federal Defendants' immutable characteristics standard does not apply to the class-based analysis under Second Circuit precedent.

The Federal Defendants next analogize Mr. Berenson's "purported class of those who chose *not to* receive the COVID-19 vaccine" to the "class of women who chose *to* seek abortions" which the Supreme Court rejected in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). (Dkt. 45 at 55.) That comparison fails for a threshold reason. The Supreme Court rejected "women seeking an abortion" as "a qualifying class" because "[t]he record in this case does not indicate the petitioner's demonstrations are motivated by a purpose . . . directed specifically at women as a class." *Bray*, 506 U.S. at 269. Mr. Berenson's class theory is different. Unlike the defendants in *Bray* who plainly did not target all women, the Federal Defendants targeted Mr. Berenson's unvaccinated class on account of their vaccination status. President Biden led the way in this regard, calling on unvaccinated Americans to "[d]o the right thing" by taking one of the shots, (*id.* ¶ 56), because otherwise "you will face an extremely difficult winter for your family and community," (*id.* ¶ 57). In a September 9, 2021 speech announcing his vaccine mandate later struck down by the Supreme Court, President Biden called COVID-19 a

"pandemic of the unvaccinated." Remarks by President Biden on Fighting the COVID-19 Pandemic, Sept. 9, 2021, [https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/](https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/). President Biden blamed "elected officials" who were not "encouraging people to get vaccinated and mask up," and who were instead "ordering mobile morgues for the unvaccinated dying from COVID in their communities." *Id.* In this "totally unacceptable" state of affairs, "[t]he unvaccinated overcrowd our hospitals," blocking access for people with other life-threatening conditions such as cancer. *Id.*

*Bray* also did not present a political class question. President Biden himself referred to so-called "pandemic politics" which "are making people sick, causing unvaccinated people to die." *Id.* This is in addition to Mr. Slavitt's observations on the political connections to vaccination status, including when he served in the White House. Mr. Slavitt asserted that refusal to take one of the COVID-19 vaccines is not "necessarily a political thing," but rather that "it may be political." (Dkt. 3 ¶ 91.) Later, in July 2021, Mr. Slavitt said "an element of the conservative wing or the right wing has decided that they want this," meaning resistance to COVID-19 vaccines, "to be their platform." (*Id.* ¶ 92.) He also referred to a need to "get rid of all this garbage coming out of CPAC," a direct reference to Mr. Berenson's remarks at that political conference. (*Id.* ¶ 126.)

The Federal Defendants' reliance on *Bray* is misplaced for another reason. That case involved a purely private conspiracy. *Bray*, 506 U.S. at 278. The conspiracy at issue in this case spans the White House, another federal department, and private actors. What gives rise to Mr. Berenson's Section 1985(3) claim is not the machinations of purely private actors, but a "public-private partnership aimed at censoring critics of the federal government and the COVID-19

vaccines." (Dkt. 3 ¶ 179.) The *Bray* Court's concern about transforming Section 1985(3) into a "general federal tort law" is cabined here because of the nature of the allegations and the federal government's involvement in the censorship at issue.

The Federal Defendants' final argument that Mr. Berenson failed to state a constitutional violation is addressed above. (Dkt. 45 at 57.)

## VI.    The Federal Defendants are not entitled to qualified immunity.

Qualified immunity protects public officials "from liability from civil damages[13] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Deskovic v. City of Peekskill,* 894 F. Supp.2d 443, 451 (S.D.N.Y. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Reasonableness is "judged against the backdrop of law at the time of conduct." *Deskovic*, 894 F. Supp.2d at 451. Even at the summary judgment stage, objective reasonableness requires a showing that no reasonable jury when "viewing the evidence in the light most favorable to the [p]lainitff could conclude that defendant's actions were objectively unreasonable in light of clearly established law." *Id.* (quoting *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003)). If the law was clearly established, the immunity defense "ordinarily should fail, since a reasonably competent official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The issue here is whether it was clearly established that the Federal Defendants' conduct— consisting of implied coercive threats of adverse governmental action against a third party to stifle someone else's speech—violated the First Amendment.

---

[13] Qualified immunity is a shield against civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 803 (1982). Should the court dismiss any claims based on qualified immunity, Mr. Berenson's remaining claims for injunctive relief would remain. *See Vincent v. Yelich*, 718 F.3d 157, 176 (2d Cir. 2013).

As discussed above, the Fifth Circuit's decision in *Missouri v. Biden* demonstrates that the conduct alleged by Mr. Berenson was constitutionally impermissible. Even before that decision, however, precedent in the Second Circuit would have compelled the same conclusion. O*kwedy v. Molinari*, a 2003 Second Circuit decision discussed above, established that a public official's implicit threat of retaliation against a third-party disseminator of another's message is sufficient to state a First Amendment claim. 333 F.3d at 342-44.

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007), also put the Federal Defendants on notice that coercive conduct of this type would violate the First Amendment. In *Zieper*, the court found that a genuine issue of material fact existed as to whether the defendants in that case, an FBI agent and Assistant United States Attorney, engaged in sufficiently threatening conduct to violate the plaintiff's free speech rights. The conduct at issue was the FBI agent's statement to the plaintiff's attorney that FBI agents were on their way to plaintiff's house after the attorney conveyed that plaintiff would not take down a video that the agent had asked to be removed from the internet. *Id.* at 66. While the court found that the general proposition that "the First Amendment prohibits 'implied threats to employ coercive state power to stifle protected speech'" was well established, it found that defendants were entitled to qualified immunity because the Second Circuit's pre-existing law would "not have made apparent to a reasonable officer that defendants' actions crossed the line" between convincing and coercing. In doing so, however, the Second Circuit warned, "as a result of our holding that a reasonable juror could conclude that defendants' actions violated the First Amendment, officials who are in a similar situation will be on notice that they make sure the totality of their actions do not convey a threat even when their words do not." *Id.* at 70-71.

Here, the totality of the facts and circumstances of the White House threats, including the actions taken by Mr. Flaherty and Dr. Murthy, is at least as coercive as the conduct at issue in *Zieper*. Even at the Rule 12 stage of this litigation, it is known Twitter suspended Mr. Berenson in violation of the company's own COVID-19 misleading information policy amidst disagreement at the highest levels of the company and that the suspension occurred after the White House's April 2021 meeting targeting him. Evidence from the House Weaponization Committee shows Facebook changed its moderation practices to placate the White House. The same inference can and should be drawn here.

What is more, the White House, including former COVID-19 advisor Mr. Slavitt, hid what they did, indicating these officials knew what they were doing violated the First Amendment. Despite targeting Mr. Berenson in April 2021 while serving at the White House, repeatedly discussing him in the press, and publicly celebrating his suspension from Twitter, Mr. Slavitt told *The Atlantic* in August 2022, "I think his name was in a magazine article," and that "I don't remember anything else about him." (Dkt. 3 ¶ 174.) Press Secretary Jen Psaki denied the White House asked to deplatform specific users, claiming "who should be on the platform is orchestrated and determined by private-sector companies." (*Id.* ¶ 134.) While using the term "orchestrated," which means "to arrange or combine so as to achieve desired or maximum effect," *Orchestrate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/orchestrate (last visited Sept. 28, 2023), Ms. Psaki left out the fact that the White House had targeted specific accounts, including Mr. Berenson's. This lack of transparency undermines the basis to conclude the Federal Defendants were acting "reasonably and in good faith in endeavoring to meet the duties and responsibilities of [their] office[s]." *Vullo*, 49 F.4th at 707.

In light of the Second Circuit's admonition in *Zieper* in 2007 and other Second Circuit precedent, it is clear that a reasonably competent public official would know that their actions had crossed from persuasion to coercion, thus negating the defense of qualified immunity. In any event, it would be inappropriate to dismiss Mr. Berenson's claims at this stage of the litigation, before discovery, when a reasonable jury could conclude that the actions taken by the Federal Defendants were coercive and thus violated the First Amendment. *See*, *e.g.*, *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (holding "summary judgment on qualified immunity is not appropriate when facts are in dispute that are material to a determination of reasonableness"); *Wahad*, 813 F. Supp. at 230 (denying on summary judgment qualified immunity defense when the law in the area was established at the time of defendant's alleged acts); *Lederman*, 2007 WL 1623103 at *3 (denying summary judgment on qualified immunity defense where there was an issue of fact about whether the use of force was unreasonable).

## CONCLUSION

For the foregoing reasons, Mr. Berenson respectfully prays that this Court denies the Federal Defendants' motion to dismiss or otherwise provides leave to amend his complaint.

Respectfully submitted, this 4th day of October, 2023.

By: */s/ James R. Lawrence, III*
JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No.
ENVISAGE LAW
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: .919.782.0452
Email: jlawrence@envisage.law

SEAN P. GATES (SBN 186247)
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730
E-mail: sgates@charislex.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com