**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

**ALEX BERENSON,**

    **Plaintiff,**

    **v.**

**JOSPEH R. BIDEN, JR., et al.,**

    **Defendants.**

Case No.: 1:23-cv-03048-JGLC

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM IN OPPOSITION TO DEFENDANT ANDREW M. SLAVITT'S
MOTION TO DISMISS**

JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
ENVISAGE LAW
2601 Oberlin Rd, Suite 100
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: .919.782.0452
Email: jlawrence@envisage.law

SEAN P. GATES (SBN 186247)*
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730
E-mail: sgates@charislex.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice

# TABLE OF CONTENTS

INTRODUCTION..........................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................... 2

ARGUMENT ................................................................................................................................ 8

    I.     This Court has specific personal jurisdiction over Mr. Slavitt..........................................8

    II.    Mr. Berenson adequately pled Mr. Slavitt caused injury to him.......................................11

    III.   Mr. Berenson states a First Amendment claim...............................................................12

    IV.   Mr. Berenson states a claim against Mr. Slavitt under 42 U.S.C. § 1985(3). ............... 14

        A.     The First Amendment does not bar Mr. Berenson's civil rights claim. ...................... 14

        B.     Mr. Berenson has stated a Section 1985(3) claim against Mr. Slavitt. ...................... 15

        C.     Even if this Court finds the claims against the Federal Defendants are barred by qualified immunity, Mr. Berenson's Section 1985(3) claim should proceed against the private defendants. ............................................................................................................ 15

    V.    Mr. Slavitt tortiously interfered with Mr. Berenson's contract with Twitter..................... 17

        A.     Mr. Slavitt knew about Mr. Berenson's binding contract with Twitter, including the COVID-19 misleading information policy, and that any suspension of Mr. Berenson would be predicated on violations of the company's rules. ...................... 18

        B.     Mr. Slavitt interfered with Mr. Berenson's enforceable contract with Twitter without justification, inducing Twitter to breach by directly causing at least one suspension. ......... 20

    VI.   Section 230 does not shield Mr. Slavitt from liability.................................................... 23

    CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38 (2d Cir. 1986) ............................................................ 12

*B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc.*,
   No. 01CIV.0530MBM, 2005 WL 1138474 (S.D.N.Y. May 12, 2005) .............................. 19, 22

*Berenson v. Twitter, Inc.*,
   No. C 21-09818 WHA, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022)..........................11, 21

*Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017)...........................................11

*Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 970 F.2d 785 (11th Cir. 1992)................................. 17

*Calder v. Jones*, 465 U.S. 783 (1984) ..................................................................................... 10

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 818 N.E.2d 1100 (N.Y. 2004)....................................... 20

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) ....................................... 8

*Ciambriello v. Cnty. of Nassau*, 292 F.3d 307 (2d Cir. 2002) ...................................................... 13

*Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632 (2015).......................................................... 21

*Darnaa, LLC v. Google, Inc.*,
   No. 15-CV-03221-RMW, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016) .............................. 24

*Dennis v. Sparks*, 449 U.S. 24 (1980) ....................................................................................... 16

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ................................................................... 16

*Domen v. Vimeo, Inc.*, 433 Supp. 3d 592 (S.D.N.Y. 2020) .......................................................... 25

*Elmasri v. England*, 111 F. Supp. 2d 212 (E.D.N.Y. 2000)......................................................... 16

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
   946 F.3d 1040 (9th Cir. 2019)............................................................................... 24, 25

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021)...........................10, 11

*Glacken v. Inc. Vill. of Freeport*,
   No. 09 CV 4832 DRH AKT, 2012 WL 894412 (E.D.N.Y. Mar. 15, 2012) .......................... 15

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
   50 N.Y.2d 183, 406 N.E.2d 445 (1980) ............................................................ 18, 19, 20, 22

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*,
   241 F. Supp. 2d 246 (S.D.N.Y. 2002) ...................................................................... 18

*Iconoclast Advisers LLC v. Petro-Suisse Ltd.*,
   17 Misc. 3d 1101(A), 851 N.Y.S.2d 58 (N.Y. Sup. Ct. 2007)........................................... 9

*Jordan's Ladder Legal Placements, LLC v. Major, Lindsey & Afr., LLC*,
   No. 21 CV 7124 (CM), 2022 WL 1500772 (S.D.N.Y. May 12, 2022)................................... 19

*Knight First Amendment Institute at Columbia University v. Trump*,
   928 F.3d 226 (2d Cir. 2019)....................................................................................... 12

*Lama Holding Co. v. Smith Barney Inc.*,
   88 N.Y.2d 413, 668 N.E.2d 1370 (N.Y. 1996) ................................................................ 17, 20

*LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 735 N.E.2d 883 (N.Y. 2000) ............................... 8

*Missouri v. Biden*, 80 F.4th 641 (5th Cir. 2023) ............................................................ 2, 12, 13, 14

*Murphy v. Sr. Investigator Neuberger*,
   No. 94 CIV. 7421 (AGS), 1996 WL 442797 (S.D.N.Y. Aug. 6, 1996)..................................... 15

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
    87 N.Y.2d 614, 664 N.E.2d 492 (N.Y. 1996) ................................................... 20
*Norwood v. Harrison*, 413 U.S. 455 (1973) ............................................................ 13
*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................. 16
*Richardson v. McKnight*, 521 U.S. 399 (1997) ....................................................... 15
*Sass v. MTA Bus Co.*, 10 CV 4079 (MKB), 2012 WL 4511394 (E.D.N.Y. Oct. 1, 2012) ............ 14
*State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322 (S.D.N.Y. 2020) ................. 18, 19
*Storck v. Suffolk County Dep't of Social Services*, 62 F. Supp. 2d 927 (E.D.N.Y. 1999) ............. 16
*United States v. Rowlee*, 899 F.2d 1275 (2d Cir. 1990) .............................................. 14
*Walden v. Fiore*, 571 U.S. 277 (2014) ................................................................... 10
*Zango, Inc. v. Kaspersky Lab, Inc.*,
    No. 07-CV-00807 (JCC), 2007 WL 5189857 (W.D. Wash. Aug. 28, 2007) ......................... 25
*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ................................................................... 16

**Other Authorities**

Dareh Gregorian, *Top Biden coronavirus adviser Andy Slavitt announces last day at White
    House*, NBC News, June 8, 2021 ................................................................ 2, 3
Restatement (Second) of Torts § 766 ..................................................................... 22
Restatement (Second) of Torts § 767 ..................................................................... 23
SoCal in 17, July, 30, 2021 ......................................................................... 3, 13, 15

**Statutes**

47 U.S.C. § 230 ......................................................................................... 23
47 U.S.C. § 230(a)(3) ................................................................................... 25
N.Y. C.P.L.R. § 302(a)(3)(i) ........................................................................... 10
N.Y. C.P.L.R. § 302(a)(3)(ii) ........................................................................... 8

## INTRODUCTION

As he sat in the White House in early 2021, President Biden's Senior COVID-19 advisor Andrew Slavitt faced a dilemma. Mr. Slavitt believed the COVID-19 vaccines saved lives and viewed COVID-19 vaccine critic Alex Berenson as a roadblock to convincing Americans to be vaccinated. Mr. Slavitt could have engaged Mr. Berenson on Twitter, as he had in the past, and tried to answer the questions the journalist was raising about the shots. But from Mr. Slavitt's point of view, Mr. Berenson was not just misguided, the former *New York Times* reporter was "ground zero" for "misinformation," a public health enemy in the way of saving the United States from COVID-19. Unfortunately, as one federal district court judge and the Fifth Circuit Court of Appeals have already concluded, Mr. Slavitt succumbed to the temptation of power, and wielded his authority to coerce Twitter to censor Mr. Berenson's speech.

Mr. Slavitt carried this unconstitutional agenda back to private life, where he resolved to take out "garbage" like Mr. Berenson's reporting. Still keeping in close, even daily contact with the White House, Mr. Slavitt secretly went back to the same Twitter executive he had coerced in the White House. Mr. Slavitt succeeded in getting Mr. Berenson to get locked out of his account and ultimately, with help from others, banned.

Mr. Slavitt contends our laws and the First Amendment have nothing to say about this. He goes so far as to say Mr. Berenson is violating his First Amendment rights with this lawsuit. He is wrong. Mr. Berenson has no interest in preventing Mr. Slavitt from speaking. Unlike Mr. Slavitt, Mr. Berenson values open, uncensored, free debate. He seeks to protect his rights to report and inform the public from would-be private and governmental censors. Mr. Slavitt is both, and the guilty party in this action, not the victim.

1

## FACTUAL BACKGROUND

Alex Berenson is an independent journalist and former *New York Times* reporter who previously broke multiple front-page stories about questionable practices in the pharmaceutical industry. (Dkt. 3 ¶¶ 43-44.) Leaning on his training and experience, Mr. Berenson became a prominent critic of the public policy response to COVID-19, reporting and asking questions about school and business closures and then later about the COVID-19 vaccines. (*E.g.*, *id.* ¶¶ 63-64, 77-80.) Mr. Berenson's reporting drew criticisms from third parties. (*Id.* ¶¶ 64, 84.)

One of those critics was Andrew Slavitt, who served as President Biden's "top" COVID-19 advisor. Dareh Gregorian, *Top Biden coronavirus adviser Andy Slavitt announces last day at White House*, NBC News, June 8, 2021, https://www.nbcnews.com/politics/white-house/top-biden-coronavirus-adviser-andy-slavitt-announces-last-day-white-n1269962. Prior to joining the Biden White House, Mr. Slavitt was aware of Mr. Berenson, having publicly tangled with the journalist in May 2020. (*Id.* ¶ 111.)

Clothed with the authority of the "most powerful office in the world," *Missouri v. Biden*, 80 F.4th 641, 662 (5th Cir. 2023), Mr. Slavitt took his concerns about "misinformation" to the social media companies themselves, including Twitter. President Biden's chief COVID-19 advisor had Mr. Berenson in view. Twitter's former head of government affairs for the United States and Canada, Lauren Culbertson, later recounted how one of the Biden White House's "first meeting requests" dealt with "vaccines and high-profile anti-vaxxer accounts, including Alex Berenson." (*Id.* ¶ 105.) During an April 2021 meeting between the White House and Twitter, Mr. Slavitt (along with his colleague Rob Flaherty) asked "one really tough question about why Alex Berenson hasn't been kicked off from the platform." (*Id.* ¶ 107.) During the Twitter meeting, Mr. Slavitt "really wanted to know about Alex Berenson," and "suggested" that the journalist "was the epicenter of disinfo that radiated outwards to the persuadable public." (*Id.*

¶ 109.) As he advocated for Facebook to censor constitutionally protected speech about the COVID-19 shots, (*see* Mr. Berenson's Memorandum in Opposition to the Federal Defendants' Motion to Dismiss (the "Government Opposition"), Factual Background), Mr. Slavitt and others in the Biden White House held "several other calls" with Twitter, which were "very angry in nature," about how the officials "wanted Twitter to do more and to de-platform several accounts." (*Id.* ¶ 115.)

Mr. Slavitt officially left his White House post in June 2021, Gregorian, *supra*, but he remained in close contact with his former colleagues. In a podcast about COVID-19 misinformation and social media published on July 30, 2021, Mr. Slavitt said he was "on the phone with and talking to the White House and the CDC and with States and with other foreign governments you know as often as people need me and **usually that's on a daily basis** when things get to crunch time." SoCal in 17, July, 30, 2021, 5:00 AM PT, [https://spectrumnews1.com/ca/la-west/socal-in-17/2021/07/29/vaccines--lies-and-social-media--andy-slavitt-explains-how-covid-19-myths-spread-like-wildfire](https://spectrumnews1.com/ca/la-west/socal-in-17/2021/07/29/vaccines--lies-and-social-media--andy-slavitt-explains-how-covid-19-myths-spread-like-wildfire) (starting at 14:00 mark). *Id.* (emphasis added). Mr. Slavitt discussed these ongoing contacts openly on his podcast, where he also interviewed Surgeon General Vivek Murthy and White House Press Secretary Jen Psaki. (*Id.* ¶¶ 128, 130.) He also leaked information on Twitter he evidently gleaned from these contacts. *See, e.g.*, Andy Slavitt (@ASlavitt), Twitter (Aug. 18, 2021, 10:40 AM), [https://twitter.com/ASlavitt/status/1428003384778825728](https://twitter.com/ASlavitt/status/1428003384778825728) (announcing that "September 20, boosters will be made available & recommended" to certain people).

Twitter suspended Mr. Berenson's account for the first time in July 2021. (*Id.* ¶ 136.) During the week leading to his suspension, which was punctuated by President Biden's accusation that social media companies were "killing people" for failing to censor speech about

the COVID-19 vaccines, Mr. Slavitt discussed Mr. Berenson publicly. On July 12, 2021, after listening to a soundbite of Mr. Berenson's remarks about COVID-19 vaccine hesitancy at a political conference, (*id.* ¶ 124), Mr. Slavitt referred to a need to "get rid of all this garbage coming out of CPAC," (*id.* ¶ 126). "I know nobody more worthy of being ignored than Alex Berenson," he said. (*Id.* ¶ 127.) Later, on his podcast, Mr. Slavitt said Mr. Berenson was "[s]omeone who frankly I don't intend to dignify by mentioning his name." (*Id.* ¶ 128.)

Mr. Slavitt did everything but ignore Mr. Berenson, though. Mr. Slavitt contacted Twitter about Mr. Berenson at least three separate times in July 2021 as part of his ongoing effort to deplatform the journalist. Mr. Slavitt knew Twitter's rules well by that point. During his April 2021 White House meeting with Twitter, Mr. Flaherty provided verified discovery responses saying that "Mr. Slavitt express[ed] his view Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and that employees from Twitter disagreed with that view." (*Id.* ¶ 112.) By that time, the operative guidelines were Twitter's five-strike COVID-19 misleading information policy. (*Id.* ¶ 81.) Mr. Slavitt also stated on a July 2021 podcast he knew COVID-19 vaccine critics "come as close as possible to that line without getting booted off." SoCal in 17, *supra*.

With this knowledge, Mr. Slavitt did not use Twitter's ordinary reporting mechanism to flag Mr. Berenson's tweets for the company. Instead, Mr. Slavitt turned to the same Twitter executive present during the April 2021 White House meeting: upon information and belief, Todd O'Boyle, a senior member of Twitter's government affairs team. As shown below, on July 27, Mr. Slavitt took a screenshot of a tweet and sent a message to Mr. O'Boyle.



(Exs. C and D to Caudill Decl. in Supp. of Request for Leave to Amend ("Caudill Decl.").)

Indicative of their longstanding relationship with one another, Mr. Slavitt's message to Twitter contained three words: "Begging for it." Mr. Slavitt included no explanation regarding how the tweet violated any company rules. He did not have to—after Mr. Slavitt's e-mail, Twitter issued a third strike against Mr. Berenson, suspending his account. (*Id.* ¶ 147.) Mr. Slavitt did not argue Twitter could suspend Mr. Berenson for "any or no reason."

The following day, July 28, Mr. Slavitt pressed Twitter again. As shown below, the day after Mr. Berenson's third, suspension-inducing strike, Mr. Slavitt accused the journalist of "milk[ing] Twitter for audience" because "without Twitter sub stack doesn't work."

Consistent with his ongoing contacts with the White House and the CDC, Mr. Slavitt's Gmail signature line included his White House e-mail address.

On July 29, Mr. Berenson publicly criticized Mr. Slavitt on Twitter for advocating that Americans be required to take the COVID-19 vaccine or submit to intrusive testing "several

times/week," and cast doubt on Mr. Slavitt's credibility regarding COVID-19 while tagging his @aslavitt account. Alex Berenson (@AlexBerenson), Twitter (July 29, 2021, 10:05 PM), https://twitter.com/AlexBerenson/status/1420928576258445312. The very next day, on July 30, Mr. O'Boyle sent Mr. Slavitt an e-mail with a link to Mr. Berenson's fourth strike, a tweet summarizing clinical trial results from the Pfizer COVID-19 vaccine. "Further violations of the rules will result in permanent suspension," Mr. O'Boyle advised. A Twitter attorney later wrote that "one of our employees [(Todd O'Boyle)] shared information about the account they probably should not have, informing the external party that Berenson was on his last strike and would be suspended if he violated again." (Ex. A to Caudill Decl.) At the same time, Mr. O'Boyle did not cite the "any or no reason" language in Twitter's Terms of Service or otherwise inform Mr. Slavitt that the company's relationship with Mr. Berenson was "at will." Mr. Berenson's fate on the platform was tied to "[f]urther violations of the rules."

Mr. Slavitt contacted Mr. O'Boyle again on July 31. Mr. Berenson had tweeted three German words, "impfung macht frei," meaning "vaccines make free," a criticism of those arguing to restrain individiual freedom based on vaccination status. As shown below, Mr. Slavitt wrote that "if [Mr. Berenson doesn't go permanently after this, the outcry will be justified." (*Id.* ¶ 157.) Again, Mr. Slavitt did not explain how the tweet violated any Twitter rule, but he did attach a screenshot of a text message exchange with an unidentified third person who sent Mr. Slavitt a Wikipedia article, and the statement "[t]hats the entrance to Achwitz," meaning Auschwitz. The e-mail and attachment are shown below.




Twitter did not issue a strike against this tweet, but the company kept monitoring his account.

Mr. Berenson returned to Twitter on August 6. By this time there was ongoing "debate and disagreement within T&S [(Trust and Safety)] and leadership, regarding enforcement decisions on Berenson's account." (Ex. A to Caudill Decl.) Pfizer board member Dr. Scott Gottlieb had been in "pretty regular contact" with Mr. Slavitt and other Biden Administration officials in the winter and spring of 2021, and Mr. Slavitt even hosted Dr. Gottlieb on his podcast on July 7. (*Id.* ¶ 144.) On August 24, Dr. Gottlieb contacted Twitter about Mr. Berenson. Like his co-conspirator Mr. Slavitt, the Pfizer board member did not turn to the reporting mechanisms regular users might have relied on to object to Mr. Berenson's content. Dr. Gottlieb turned to Mr. Slavitt's contact, Mr. O'Boyle, to complain about one of Mr. Berenson's Substack articles about Dr. Fauci. The article criticized Dr. Fauci for his "arrogance" and called for "open debate" of potential vaccine risk but contained no threats of violence of any kind against him. Nonetheless, Dr. Gottlieb claimed that it was somehow dangerous to Dr. Fauci. "This is why Tony needs a security detail," Dr. Gottlieb said. (*Id.* ¶ 162.) On August 28, after Dr. Gottlieb "flagged the Tweet that led to Berenson's suspension," (Ex. A to Caudill Decl.), the company permanently banned Mr. Berenson's account. Mr. Slavitt immediately broadcast his approval of Twitter's censorship to his Twitter followers. (*Id.* ¶ 170.)

After Mr. Berenson sued Twitter over his permanent ban, the parties reached a resolution. Twitter reinstated Mr. Berenson's account and the company publicly acknowledged that Mr. Berenson's "tweets should not have led to his suspension," admitting that the strikes issued against his account, including the third strike Mr. Slavitt flagged, were issued in error and in violation of the company's own policy. (*Id.* ¶ 20.)

Following Mr. Berenson's reinstatement, and after he published evidence that the White House pushed Twitter to deplatform him, *The Atlantic* contacted Mr. Slavitt for comment. By that time, Mr. Slavitt had publicly and repeatedly criticized Mr. Berenson by name on the Peacock network and his podcast. He had promptly announced to his Twitter followers when Twitter suspended Mr. Berenson's account. Mr. Slavitt targeted Mr. Berenson while serving in the White House, and then in July 2021 also privately contacted Twitter at least three separate times to complain about Mr. Berenson's speech.

Nevertheless, Mr. Slavitt told *The Atlantic*, "I think his name was in a magazine article," but "I don't remember anything else about him." (*Id.* ¶ 174.)

## ARGUMENT

### I.    This Court has specific personal jurisdiction over Mr. Slavitt.

"To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the Court must engage in a two-step analysis." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). The first step involves determining whether the long-arm statute of the forum state, in this case New York, applies, and second "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Id.*

For the first step, N.Y. C.P.L.R. § 302(a)(3)(ii) provides for jurisdiction over non-resident defendants for torts that impact New York residents. As the New York Court of Appeals explained:

> The conferral of jurisdiction under this provision rests on five elements: First, that defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.

*LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214, 735 N.E.2d 883, 886 (N.Y. 2000).

8

The first and second elements are not in dispute. Mr. Slavitt challenges the third element, arguing the "first effect" of Mr. Berenson's injury was felt in California, not New York. (Dkt. 39 at 15-16.)[1] "In a tortious interference with contract claim, the first effects are felt where the contract was to be performed by plaintiff, who was prevented from performing and reaping the benefits thereof." *Iconoclast Advisers LLC v. Petro-Suisse Ltd.*, 17 Misc. 3d 1101(A), 851 N.Y.S.2d 58 (N.Y. Sup. Ct. 2007). Here, Mr. Slavitt's acts caused New York-based Mr. Berenson to be blocked from tweeting, i.e., performing, from his residence in this forum.

Mr. Slavitt argues that Twitter issued its deplatforming decision in California. (Dkt. 39 at 16.) However, the Twitter employee who issued the fifth strike under pressure from Mr. O'Boyle, Tiffany Lowe, is a New York City resident who worked at the time of Mr. Berenson's deplatforming in Twitter's New York City office. By Mr. Slavitt's own argument, the "situs of the injury" or "original event" thus occurred in New York, not California, further supporting a finding of personal jurisdiction in New York. (*See* Ex. A to Caudill Decl. in Opp. to Mt. to Dismiss for Lack of Personal Jurisdiction ("2d Caudill Decl.") (showing correspondence between Ms. Lowe and Twitter's Todd O'Boyle regarding Mr. Berenson's fifth strike); Ex. B to 2d Caudill Decl. (showing Ms. Lowe's LinkedIn profile and connections to New York).)

Regarding the fourth element, Mr. Berenson's New York location was not a secret. At all relevant times, including when Mr. Slavitt was communicating with Mr. Berenson on Twitter in May 2020, Mr. Berenson listed his New York location on his Twitter profile. (Ex. C to 2d Caudill Decl.) Mr. Slavitt could have submitted a declaration contending he was unaware of Mr. Berenson's location, but he did not. Given how closely Mr. Slavitt monitored Mr. Berenson's Twitter account, it is nearly impossible to imagine he was unaware of Mr. Berenson's location.

---

[1] Mr. Berenson does not challenge Mr. Slavitt's contention that general personal jurisdiction does not exist here.

Finally, regarding the fifth element, interstate commerce, Mr. Berenson alleged Mr. Slavitt markets his book on Twitter and broadcasts his revenue-generating podcast on the Internet. (Dkt. 3 ¶ 31; *id.* ¶ 114 (linking to podcast transcript acknowledging sponsors).)

Relevant here, under N.Y. C.P.L.R. § 302(a)(3)(i), Mr. Slavitt also regularly does and solicits business, visits, and derives revenues in New York. (*See* Ex. D to 2d Caudill Decl. (showing Mr. Slavitt's location in New York City at least five separate times in 2022); Ex. E to 2d Caudill Decl. (showing Mr. Slavitt taking over as Chief Executive Officer of Cityblock Health); Ex. F to 2d Caudill Decl. (showing Cityblock's Brooklyn, New York headquarters); Ex. G to 2d Caudill Decl. (showing Mr. Slavitt's New York-based fund raising $350 million in 2022). These contacts provide a separate basis for long-arm jurisdiction over Mr. Slavitt.

The second personal jurisdiction question is whether Mr. Slavitt's contacts with New York are sufficient under the Due Process Clause. Under *Calder v. Jones*, 465 U.S. 783 (1984), personal jurisdiction is appropriate where the "effects" of out-of-state conduct are absorbed in the forum. *Id.* at 789. Like the plaintiff in *Calder*, Mr. Berenson absorbed the harm at issue in this case, his Twitter ban, in New York. It is reasonable, particularly in view of Mr. Slavitt's other contacts with New York, to require him to defend this case in this forum.[2]

Mr. Slavitt argues his contacts with New York lack a sufficient connection to this lawsuit. (Dkt. 39 at 16.) But the Supreme Court clarified in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021), that "some relationships will support jurisdiction without a causal showing" and it has never required "proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Id.* at 1026. The Supreme Court also explained that the non-

---

[2] Mr. Slavitt also cites *Walden v. Fiore*, 571 U.S. 277 (2014). (Dkt. 39 at 16-17.) But the "relevant conduct occurred entirely in Georgia." *Walden*, 571 U.S. at 291. The defendant also lacked any "physical presence" in the forum, which is not the case here. *Id.* at 285.

resident plaintiffs in *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017), "were

engaged in forum-shopping." *Ford Motor Co.*, 141 S Ct. at 1031. That is not so here.

## II.      Mr. Berenson adequately pled Mr. Slavitt caused injury to him.

Mr. Slavitt asserts Mr. Berenson's pleading does not demonstrate causation. (Dkt. 39 at

17-19). Mr. Berenson addresses these causation arguments in the Government Opposition. As

Mr. Berenson explains in section I.B of the Argument in the Government Opposition, Mr.

Slavitt's targeting of his constitutionally protected speech in April 2021 immediately moved the

journalist onto Twitter's censorship radar. The fact that Mr. Berenson's suspension happened

later, after further efforts by Mr. Slavitt, does not negate the immediate harm he caused.

Mr. Slavitt downplays the impact of his July 2021 outreach to Twitter. (Dkt. 39 at 18.) As

noted above, and if provided leave to amend, Mr. Berenson can demonstrate that Mr. Slavitt

flagged and reported a tweet by Mr. Berenson to Todd O'Boyle, a Twitter executive who was Mr.

Slavitt's contact while Mr. Slavitt served in the White House. The third strike not only moved

Mr. Berenson closer to a permanent suspension, it caused Twitter to lock Mr. Berenson out of his

account. Mr. Slavitt notes that Mr. Berenson has received partial discovery from Twitter,

discovery that supports Mr. Berenson's pleading about Mr. Slavitt's conduct. But he is flatly

incorrect that Mr. Berenson has received all relevant records from Twitter related to his

suspension or the government and private pressure that caused it. Among other things, Twitter

has not yet provided Mr. Berenson with the "problematic documents" regarding Twitter's

"internal deliberations and discussions" about Mr. Berenson's account, which would be

"potentially harmful to our overall enforcement efforts." (Ex. B to Caudill Decl.)

Finally, Mr. Slavitt cites the decision in *Berenson v. Twitter, Inc.*, No. C 21-09818 WHA,

2022 WL 1289049 (N.D. Cal. Apr. 29, 2022), and asserts that "the doctrine of collateral

estoppel" precludes Mr. Berenson's claims. (Dkt. 39 at 19.) Mr. Slavitt does not explain how or

11

why that is the case. For collateral estoppel to apply, the following four facts must be true: "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986). The court in *Berenson v. Twitter* did not decide anything about Mr. Slavitt's conduct. Mr. Slavitt is not named in the complaint and Mr. Berenson did not allege anything about Mr. Slavitt in that case. Collateral estoppel is inapplicable for at least this reason.

### III.    Mr. Berenson states a First Amendment claim.

Mr. Berenson again incorporates the Federal Defendants Opposition. Sections I, III, and VI of Argument in the Government Opposition address the standing and merits issues arising under the First Amendment and qualified immunity, respectively. Regarding the First Amendment, Mr. Slavitt raises three arguments not already directly addressed in that briefing.

*First*, Mr. Slavitt argues Mr. Berenson has no remedy for the violations at issue. (Dkt. 39 at 19-21.) To the contrary, as Mr. Berenson argues at length in Section I of his Argument against the Federal Defendants' motion to dismiss, the injuries he suffered are likely to reoccur. Further, the Fifth Circuit named Mr. Slavitt and his former office in its injunction, which extends to certain federal government employees, and barring them "directly or indirectly" from "coerc[ing] or significantly encourag[ing]" various forms of social media censorship. *Missouri*, 840 F.4th at 667-68. The injunction would cover any post-government employment censorship collaborations between Mr. Slavitt and the covered government officials, including Surgeon General Murthy.

*Second*, Mr. Slavitt denies the applicability of *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019). (Dkt. 39 at 24-25.) Mr. Slavitt misconstrues Mr. Berenson's theory. Mr. Berenson is not arguing Twitter is a "government-

controlled" public forum or even that Mr. Slavitt's @aslavitt Twitter account is. Mr. Berenson is arguing that Mr. Slavitt and the Federal Defendants used Twitter as a public forum and then engaged in viewpoint discrimination akin to coercing a facility hosting a press conference to expel a journalist asking undesirable questions. Once Mr. Slavitt and others enter such a public forum, government officials cannot use state power to achieve indirectly, through coercing a private party, what they could not do directly, namely expelling a journalist whose views they do not approve of. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

*Third*, Mr. Slavitt denies he is a state actor for purposes of his post-government activities, calling the allegation "preposterous." (Dkt. 39 at 25.) The Second Circuit recognizes that a private person can become a state actor when they are a "willful participant in joint activity with the State or its agents." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (internal quotation marks omitted). "Conclusory allegations" are not enough—"the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Id.* Mr. Berenson alleges Mr. Slavitt maintained ongoing contacts with his White House colleagues. (Dkt. 3 ¶¶ 126, 130). If provided leave to amend, Mr. Berenson can also allege that Mr. Slavitt was talking to the White House on a "daily basis" regarding the very subject that gave rise to his deplatforming from Twitter: COVID-19 misinformation. SoCal in 17, *supra*. All this occurred in close temporal proximity to the federal government's generalized push on social media to combat misinformation in July 2021, what the Fifth Circuit described as a "boiling point." *Missouri*, 80 F.4th at 654. Courts in the Second Circuit have recognized that a close temporal connection in and of itself has evidentiary value, noting that "temporal proximity" can alone be "sufficient to establish a causal connection at the

13

prima facie stage." *Sass v. MTA Bus Co.*, 10 CV 4079 (MKB), 2012 WL 4511394, at *5
(E.D.N.Y. Oct. 1, 2012).

Further, Mr. Slavitt's July outreach to Twitter occurred while, by Mr. Slavitt's own
admission, his government contacts continued and resulted in Mr. Berenson's third strike—an
action Twitter later admitted was wrong. (Dkt. 3 ¶ 20.) There are enough factual allegations here
to plausibly draw the conclusion that Mr. Slavitt worked with the White House to accomplish
these ends.

**IV.    Mr. Berenson states a claim against Mr. Slavitt under 42 U.S.C. § 1985(3).**

    **A.    The First Amendment does not bar Mr. Berenson's civil rights claim.**

Mr. Slavitt argues he cannot be held liable for conspiracy to violate Mr. Berenson's First
Amendment rights because of—the First Amendment. (Dkt. 39 at 26.) Mr. Slavitt casts his
campaign against Mr. Berenson as "political speech protected by the First Amendment," which
reflects his "general worldview that COVID vaccines are beneficial and misinformation poses a
threat to public health," and is "core First Amendment-protected activity." (*Id.*)

As the Second Circuit has explained in the criminal law context, "speech is not protected
by the First Amendment when it is the very vehicle of the crime itself." *United States v. Rowlee*,
899 F.2d 1275, 1278 (2d Cir. 1990). Mr. Slavitt did not just state his "general world view" or
engage with Mr. Berenson publicly about the COVID-19 vaccines. Instead, Mr. Slavitt used the
"most powerful office in the world," *Missouri*, 80 F.4th at 662, to mark Mr. Berenson for
censorship. (Mr. Berenson explained how those actions violated the First Amendment in the
Government Opposition.) Then, after leaving the White House, Mr. Slavitt used his prior Twitter
contact to directly induce Mr. Berenson's censorship on Twitter. The First Amendment does not
protect his behavior. Mr. Slavitt is entitled to his views, and he is entitled to express them in

noncoercive, otherwise legal ways, but he is not entitled to channel state power to violate Mr. Berenson's rights.

**B.      Mr. Berenson has stated a Section 1985(3) claim against Mr. Slavitt.**

Mr. Berenson already detailed why he has stated a prima facie claim under Section 1985(3) in Section V of the Government Opposition. He reiterates those arguments since Mr. Slavitt's rationale for dismissal largely overlaps with the Federal Defendants'.

Mr. Slavitt argues Mr. Berenson did not adequately allege conspiracy, focusing on allegations of his contacts with Drs. Scott Gottlieb and Albert Bourla. (Dkt. 39 at 29.) What Mr. Berenson has alleged is "a factual backdrop that explains both the motivation and occasion for such a conspiracy," which is enough to state a plausible conspiracy claim. *Glacken v. Inc. Vill. of Freeport*, No. 09 CV 4832 DRH AKT, 2012 WL 894412, at *9 (E.D.N.Y. Mar. 15, 2012). Regardless, Mr. Slavitt ignores Mr. Berenson's allegations regarding Mr. Slavitt's ongoing contacts with the government, even on a "daily basis," which provide enough factual content to plausibly allege conspiracy here. (Dkt. 3 ¶¶ 126, 130); *see also* SoCal in 17, *supra*.

**C.      Even if this Court finds the claims against the Federal Defendants are barred by qualified immunity, Mr. Berenson's Section 1985(3) claim should proceed against the private defendants.**

Mr. Slavitt contends he is entitled to qualified immunity, (Dkt. 39 at 23), but that defense only applies to his work as a government employee. *See, e.g.*, *Richardson v. McKnight*, 521 U.S. 399 (1997) (holding that employees of privately managed prison operated pursuant to state contract were not entitled to qualified immunity in Section 1983 action); *Murphy v. Sr. Investigator Neuberger*, No. 94 CIV. 7421 (AGS), 1996 WL 442797, at *11 (S.D.N.Y. Aug. 6, 1996) ("Qualified immunity only applies in suits against officials in their personal capacity."). Even if this Court were to grant the Federal Defendants their qualified immunity defense, the Section 1985(3) case should still proceed against Mr. Slavitt.

15

In *Dennis v. Sparks*, 449 U.S. 24 (1980), the Supreme Court considered the interplay between absolute immunity and private actors. In that case, which involved a Section 1983 claim, a state court judge had allegedly issued an injunction against the plaintiff "as the result of a conspiracy between the judge and the other defendants." *Id.* at 26. The district court granted absolute immunity to the judge and dismissed the case against "the remaining defendants [since they] could not be said to have conspired under color of state law within the meaning of §1983." *Id.* But the Supreme Court repudiated that rationale, noting that "[i]mmunity does not change the character of the judge's action or that of his co-conspirators," allowing the claims against the private parties to go forward. *Id.*

The same logic holds here. The standards for qualified immunity under Section 1985(3) and Section 1983 are the same. *Compare Ziglar v. Abbasi*, 582 U.S. 120, 150-52 (2017) (discussing immunity in Section 1985(3) context), *with District of Columbia v. Wesby*, 583 U.S. 48, 62-64 (2018) (discussing immunity in Section 1983 context). Courts consider whether a constitutional right was violated and whether that right was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Even if this Court determines Mr. Berenson's rights were not "clearly established," the immunity such a finding would confer would not "change the character of the actions" at issue here. *Dennis*, 449 U.S. at 28. District courts in the Second Circuit have followed this rule, declining to dismiss civil rights claims against private plaintiffs based on findings of immunity for public officials. *See*, *e.g.*, *Elmasri v. England*, 111 F. Supp. 2d 212, 218 (E.D.N.Y. 2000) ("Liability for participating in a Section 1983 conspiracy may be imposed on private individuals *even if the state actor is immune from liability*.") (emphasis added); *Storck v. Suffolk County Dep't of Social Services*, 62 F. Supp. 2d 927, 940 (E.D.N.Y. 1999) (same). "Private individuals who associate themselves with a public official to

16

encroach on another's constitutional rights must bear the risk of trial." *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 970 F.2d 785, 796 (11th Cir. 1992).[3] So should Mr. Slavitt.

## V.    Mr. Slavitt tortiously interfered with Mr. Berenson's contract with Twitter.

In New York, "[t]ortious interference with contract requires [(1)] the existence of a valid contract between the plaintiff and a third party, [(2)] defendant's knowledge of that contract, [(3)] defendant's intentional procurement of the third-party's breach of the contract without justification, [(4)] actual breach of the contract, [(5)] and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (N.Y. 1996).

The first and fifth elements of tortious interference are not in dispute. Like all Twitter users, including Mr. Slavitt, (Dkt. 3 ¶ 51), Mr. Berenson agreed to Twitter's User Agreement, which the company called a "binding contract." (Dkt. 43-3 at 4). The company also conceded this in litigation against Mr. Berenson. (Dkt. 43-7 at 40:11-13 ("Twitter admits that its Terms and the Rules incorporated therein, including the COVID-19 misleading information policy, constitute a binding contract between [Mr. Berenson] and Twitter.").) Mr. Berenson incurred damages because he lost access to his audience of hundreds of thousands of readers and potential subscribers to his Substack account. Mr. Slavitt himself acknowledged the value of Mr. Berenson's readership when he accused the journalist of "milk[ing] Twitter for audience" because "without Twitter sub stack doesn't work," a reference to the following Mr. Berenson was building for his reporting on that alternate platform. (Dkt. 3 ¶ 156.) This is in addition to the opportunity Mr. Berenson lost to promote his book on the COVID-19 pandemic. (*Id.* ¶ 176.)

The remaining elements are knowledge, intentional procurement without justification, and actual breach for which Mr. Slavitt says Mr. Berenson's fails to state a claim.

---

[3] In *Ziglar v. Abbasi*, which was decided in 2017, the Supreme Court abrogated *Burrell*'s holding that qualified immunity is unavailable to Section 1985(3), but this language remains good law in the Eleventh Circuit.

A.     **Mr. Slavitt knew about Mr. Berenson's binding contract with Twitter, including the COVID-19 misleading information policy, and that any suspension of Mr. Berenson would be predicated on violations of the company's rules.**

For tortious interference with contract to exist, a defendant's knowledge of the contract at issue "need not have been perfect or precise." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 279 (S.D.N.Y. 2002). Specifically, knowledge of the "legal particulars of the contract" is not required. *Id.*; *see also State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) ("[U]nder New York law, a [defendant] must have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required."). As the New York Court of Appeals has explained, this rule makes sense because, "as a practical matter [a defendant] will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract (as distinguished, perhaps, from its economic or operational aspects)." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193, 406 N.E.2d 445, 450 (1980).

Here, Mr. Slavitt knew about Twitter's contract with Mr. Berenson, and even the "particulars" of it. As a fellow Twitter user, Mr. Slavitt agreed to the same User Agreement. (Dkt. 3 ¶ 51.) Mr. Slavitt also knew about the company's COVID-19 misleading information policy. According to his former White House colleague Rob Flaherty, Mr. Slavitt told Twitter during the April 2021 meeting with the company that the company "was not enforcing its content guidelines with respect to Alex Berenson's tweets." (*Id.* ¶ 113.) The relevant "content guidelines" at that time was Twitter's COVID-19 misleading information policy, which the company previously issued in March 2021. At the meeting, Twitter confirmed it was applying its rules to Mr. Berenson, and later that the journalist had not violated them. (*Id.*) Mr. Slavitt also publicly stated COVID-19 vaccine critics like Mr. Berenson knew how to "come as close as possible to that line without getting booted off." SoCal in 17, *supra*. Mr. Slavitt used this knowledge to flag content

to Twitter to push Mr. Berenson over wrong side of the line, directly inducing Mr. Berenson's

third strike. Mr. O'Boyle, Mr. Slavitt's Twitter contact from the White House, even gave

President Biden's former top COVID-19 advisor special knowledge that Mr. Berenson was on

his fourth strike, and that "[f]urther violations of the rules will result in permanent suspension."

      Mr. Slavitt's knowledge of the contract at issue here is comparable to, if not greater, than

what courts found sufficient in other tortious interference cases. *See Visbal*, 431 F. Supp. 3d at

349 (holding knowledge allegations sufficient because accused party "had some knowledge of

the terms" even though "it lacked detailed knowledge about that agreement"); *B. Lewis Prods.,*

*Inc. v. Maya Angelou, Hallmark Cards, Inc.*, No. 01CIV.0530MBM, 2005 WL 1138474, at *13

(S.D.N.Y. May 12, 2005) ("*BLP*") (holding there was "at least a jury issue as to whether"

defendant had sufficient knowledge of contract, even though it was "unaware of the terms" but

"did have formal written notice that a contract" between the plaintiff and a third party existed);

*Guard-Life Corp.*, 50 N.Y.2d at 194-95, 406 N.E.2d 445 (allowing tortious interference claim to

go to trial where defendant knew that "the contract 'will last until the end of June this year'").

Mr. Slavitt even had knowledge of Twitter's enforcement of its contract with Mr. Berenson.

Further, this a Rule 12 motion, and Mr. Berenson "does not need to *prove* anything at this stage

in the litigation; instead, [he] need only *allege* that" Mr. Slavitt knew of the contract. *Jordan's*

*Ladder Legal Placements, LLC v. Major, Lindsey & Afr., LLC*, No. 21 CV 7124 (CM), 2022 WL

1500772, at *7 (S.D.N.Y. May 12, 2022) (emphasis in original). Mr. Berenson did that here.

      Mr. Slavitt argues the complaint contains no allegation he knew about the "private

assurances" Mr. Berenson gave Twitter. (Dkt. 39 at 31.) The extent to which Mr. Slavitt knew of

the assurances is an open question.[4] Regardless, Mr. Slavitt's argument is beside the point. Mr.

---

[4] If given leave to amend, Mr. Berenson can allege that he posted about the personal assurances he received from a
Twitter executive. Alex Berenson (@AlexBerenson), Twitter (May 12, 2020, 10:07 PM),

Slavitt knew about the COVID-19 misleading information policy and, most importantly, he knew the company was applying it to Mr. Berenson. Mr. Slavitt also understood the company was not treating Mr. Berenson as an "at will" user whom the company could toss from its platform at any time for "any or no reason." Consistent with that knowledge, Mr. Slavitt closely monitored Mr. Berenson's account to find a predicate tweet he could send to his familiar contact at Twitter to bring about what he long desired: shutting down Mr. Berenson's Twitter account.

**B.    Mr. Slavitt interfered with Mr. Berenson's enforceable contract with Twitter without justification, inducing Twitter to breach by directly causing at least one suspension.**

For there to be a claim for tortious interference with contract, a defendant must "intentionally procure[] . . . the third-party's breach of contract without justification." *Lama Holding*, 88 N.Y.2d at 424, 668 N.E.2d at 1375. "[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621, 664 N.E.2d 492 (N.Y. 1996); *see also Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189–90, 818 N.E.2d 1100 (N.Y. 2004) (quoting, discussing, and approving this language from *NBT*). Distinct from tortious interference with an existing contract is tortious interference "with prospective contract rights," which includes interference with "voidable contracts and contracts terminable at will." *Guard-Life*, 50 N.Y.2d at 192, 406 N.E.2d at 449. The latter category requires showing "more culpable conduct on the part of the defendant." *NBT*, 87 N.Y. 2d at 621.

---

https://twitter.com/AlexBerenson/status/1260391244204818434 (relating his conversation with Twitter executive and his assurances regarding debate on the platform). Mr. Berenson even posted his December 2020 correspondence with the executive to Twitter. Alex Berenson (@AlexBerenson), Twitter (Dec. 17, 2020, 5:15 PM), https://twitter.com/AlexBerenson/status/1339695810204880900. Given the attention Mr. Slavitt was paying to Mr. Berenson, it is plausible Mr. Slavitt was aware of these tweets.

As a threshold matter, Mr. Berenson's contract with Twitter was not voidable or at-will. In *Berenson v. Twitter*, No. C 21-09818 WHA, 2022 WL 12890491 (N.D. Cal. Apr. 29, 2022), the district court construed the very contract at issue. Noting that "Twitter's terms of service stated at all relevant times that it could suspend user accounts for 'any or no reason'," *id.* at *1, the court nonetheless found "that Twitter's conduct here modified its contract with plaintiff and then breached that contract by failing to abide by its own five-strike policy and its specific commitments set forth through its vice president," *id.* at *2. In other words, the court found that Twitter could not terminate its contract with Mr. Berenson at any time for any or no reason—the company had to follow its own policy, a policy Mr. Slavitt not only knew of in general, but knew Twitter was actively applying to Mr. Berenson's speech.

Mr. Slavitt's contrary position, that the "contract gives Twitter complete discretion to 'suspend or terminate a user's account for 'any or no reason'," (Dkt. 39 at 30), is in direct conflict with the district court's conclusion. Mr. Slavitt accepts the district court's opinion where he thinks it helps his case, arguing Mr. Berenson is "precluded from relitigating" his First Amendment claim. (Dkt. 39 at 28.) Even so, the status of the Twitter contract is not Mr. Berenson's "legal conclusion" as Mr. Slavitt argues—*it was the district court's* conclusion in *Berenson v. Twitter*. 2022 WL 12890491, at *2. That Mr. Slavitt believes Judge William H. Alsup incorrectly ruled on the contract issue does not support his defense because, as the Supreme Court has noted, "[w]hile the invalidity of a contract is a defense to tortious interference, belief in validity is irrelevant." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 646 (2015) (citing Restatement (Second) Torts § 766 cmt. i (1979)). Or, as *BLP* says, quoting the same source the Supreme Court cited, "an individual is subject to liability for tortious interference even if he or she believes that the agreement is *not legally binding or has a different legal effect from what it*

*is judicially held to have.*" *BLP*, 2005 WL 1138474, at *13 n.11 (emphasis added). Tellingly, Twitter's own attorney surmised the "legal effect" of the contract with Mr. Berenson to mean the company's chances of prevailing in its lawsuit were "less than 50%." (Ex. B to Caudill Decl.)

Mr. Berenson need not show "more culpable conduct" here—only that Mr. Slavitt acted "without justification"—which New York courts generally define as economic justification—or "improperly." *Guard-Life*, 50 N.Y.2d at 189, 406 N.E.2d at 448. *Guard-Life* cited and relied on the *Restatement (Second) of Torts*. *Id.* The *Restatement* notes "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of contract," and even "a simple request or persuasion exerting only moral pressure" or a "statement unaccompanied by any specific request but having the same effect as if the request were specifically made" is enough. Restatement (Second) of Torts § 766, cmt. k (1979).

Mr. Slavitt's conduct here meets this threshold. He made three specific requests that Twitter censor Mr. Berenson—not just that the company censor individual tweets, but that it shut down Mr. Berenson's entire account. He did so in secret, outside the company's normal reporting channels. He also did so while failing to offer any rationale as to how Mr. Berenson violated any of the company's policies.

If anything, Mr. Slavitt's conduct meets the more demanding "wrongful means" standard that applies to tortious intereference with prospective economic advantage. Again, the nature of Mr. Berenson's contract with Twitter does not require this showing, but he could make it even if it did. To recount, Mr. Slavitt did not use Twitter's ordinary reporting channels when he informed on Mr. Berenson's speech. He reached out to Todd O'Boyle, the same Twitter executive involved in meetings with the White House who was also likely present for the "very angry" meetings between the copmany and the White House. In the unlikely event Mr. O'Boyle forgot about these

interactions, Mr. Slavitt included his White House e-mail address in his e-mail signature. At the

very least, a jury could conclude that Mr. Slavitt, who continued to talk openly about his

ongoing, even "daily" conversations with the White House, might continue to "enlist the powers

of government" on his side to "prejudice the public interest in public administration" against

Twitter. Restatement (Second) of Torts § 767, cmt. c (1979). After all, as Mr. Slavitt told Mr.

O'Boyle, "the outcry would be justified."

    Mr. Slavitt also argues Mr. Berenson did not allege "that any of Slavitt's e-mails to

Twitter as a private citizen Twitter to issue a strike against him." (Dkt. 39 at 30.) This perceived

defect can be addressed by Mr. Berenson if provided leave to amend. As noted above, Mr. Slavitt

flagged Mr. Berenson's third strike, causing his temporary suspension from the platform.

Discovery is likely to show even more communications between Mr. Slavitt and Twitter.

**VI.    Section 230 does not shield Mr. Slavitt from liability.**

    Mr. Slavitt raises section 230 of the Communications Decency Act, 47 U.S.C. § 230, as a

bar to Mr. Berenson's claims. (Dkt. 39 at 31.) This defense fails for four reasons. First, section

230(c)(2) covers "user[s] of an interactive computer service." While it is true Mr. Slavitt is a

Twitter user, his contacts with Twitter were outside the scope of his usership. As noted above, he

did not flag Mr. Berenson's post as a user, but rather contacted Twitter directly over e-mail.

    The second reason this defense lacks merit is that section 230(c)(2) shields actions "to

restrict access to or availability of material." Mr. Slavitt's advocacy went beyond "restricting"

access to Mr. Berenson's speech—Mr. Slavitt wanted Mr. Berenson banned entirely. Mr. Slavitt

wrote that Mr. Berenson "knows he's gone" and later that "if he doesn't go permanently after

this, the outcry will be justified." (Dkt. 3 ¶¶ 156-57.) Mr. Slavitt publicly approved not the

restriction of some of Mr. Berenson's reporting, but his permanent suspension. (*Id.* ¶ 170.)

Third, for this defense to apply, Mr. Slavitt's actions had to be "taken in good faith." 47 U.S.C. § 230(c)(2). As one district court explained, for good faith to exist, at a minimum "the provider" (or the user in this case) "must actually believe that the material is objectionable for the reasons it gives." *Darnaa, LLC v. Google, Inc.*, No. 15-CV-03221-RMW, 2016 WL 6540452, at *8 (N.D. Cal. Nov. 2, 2016) (internal quotation marks). Again, despite knowing Twitter's COVID-19 rules were in force and being applied to Mr. Berenson's reporting, Mr. Slavitt gave no explanation to Twitter as to how any of the posts he complained about violated Twitter's rules. And the fact Mr. Slavitt continued to contact the same Twitter employee involved in his White House coercion campaign further shows bad faith. Despite all this, and inconsistent with his litigation-induced claims of "good faith," Mr. Slavitt denied "remember[ing] anything else about" Mr. Berenson beyond that "his name was in a magazine article." (Dkt. 3 ¶ 174.)

Fourth, section 230(c)(2) protection extends to "the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Courts have criticized an expansive reading of "otherwise objectionable," with the Ninth Circuit acknowledging the rationale for decisions "recognizing limitations in the scope of the immunity to be persuasive." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1050 (9th Cir. 2019). In *Enigma Software*, the court rejected an interpretation that would "give providers unbridled discretion to block online content." *Id.* at 1051. There, the court allowed a claim to move past a motion to dismiss even though the defendant claimed the plaintiff's products "use deceptive tactics" because there was "anticompetitive animus." *Id.* at 1052 (internal quotation marks omitted). There is ample reason to conclude animus exists here and even that it has anti-competitive undertones.[5]

---

[5] Mr. Slavitt used Twitter to sell his book on the COVID-19 pandemic. (Dkt. 3 ¶ 31.) Because of his deplatforming, Mr. Berenson lost the opportunity to use Twitter to sell his competing book and long-form journalism. (*Id.* ¶ 217)

Mr. Slavitt cites *Domen v. Vimeo, Inc.*, 433 Supp. 3d 592 (S.D.N.Y. 2020), to advance an expansive reading of "otherwise objectionable." (Dkt. 39 at 31.) The court in *Domen* quoted a district court decision in *Zango, Inc. v. Kaspersky Lab, Inc.*, No. 07-CV-00807 (JCC), 2007 WL 5189857, at *4 (W.D. Wash. Aug. 28, 2007), but the *Enigma Software* court made clear that the Ninth Circuit's affirmance of *Zango* did *not* provide that "the immunity was limitless," *Enigma Software*, 946 F.3d at 1045, nor did the Ninth Circuit even consider construction of "otherwise objectionable" in *Zango*, *id.* at 1049. *Domen* must be read in view of *Enigma Software*.[6]

The implications of Mr. Slavitt's broad reading of section 230 are troubling. Under his interpretation, so long as there is a "good faith" subjective objection to content, powerful third parties are free to take almost any action to force social media platforms to censor other users while retaining complete immunity from liability. But this unprecedented expansion of section 230 would undermine the very "diversity of political discourse" Congress enacted section 230 to protect. 47 U.S.C. § 230(a)(3).

## CONCLUSION

For the foregoing reasons, Mr. Berenson respectfully prays that this Court denies Mr. Slavitt's motion to dismiss or otherwise provides Mr. Berenson leave to amend his complaint. In the alternative, with respect to Mr. Slavitt's motion to dismiss for lack of personal jurisdiction, Mr. Berenson respectfully moves this Court for jurisdictional discovery regarding Mr. Slavitt's contacts with New York, including his ownership, use, or possession of any real property, and his knowledge of Mr. Berenson's physical location during the relevant period.

---

[6] The Second Circuit affirmed the district court's dismissal of the claims in *Domen*, but not on section 230 grounds. *Domen v. Vimeo, Inc.*, No. 20-616-CV, 2021 WL 4352312, at *1 n1 (2d Cir. Sept. 24, 2021), *cert. denied*, 142 S. Ct. 1371 (2022) ("We do not reach the district court's conclusions regarding Section 230(c).").

Respectfully submitted, this 4th day of October, 2023.

By: */s/ James R. Lawrence, III*
JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
Envisage Law
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law
          ajbiller@envisage.law


SEAN P. GATES (SBN 186247)*
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730
E-mail: sgates@charislex.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice

26