**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALEX BERENSON,** | |
| **Plaintiff,** | |
| **v.** | Case No.: 1:23-cv-03048-JGLC |
| **JOSPEH R. BIDEN, JR., et al.,** | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS DR. ALBERT BOURLA AND
DR. SCOTT GOTTLIEB'S MOTION TO DISMISS**

JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117
ENVISAGE LAW
2601 Oberlin Rd, Suite 100
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law

SEAN P. GATES (SBN 186247)*
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730
E-mail: sgates@charislex.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

I.    Alex Berenson and his reporting on COVID-19 and the vaccines on Twitter. ................. 2

II.    Pfizer's COVID-19 vaccine receives regulatory authorization as company board member and former FDA Commissioner Dr. Scott Gottlieb promotes the shots while remaining in contact with White House officials. ........................................................................ 3

III.    As the efficacy of the vaccines wanes, the federal government's push to censor skepticism of the COVID-19 shots online reaches a boiling point. ............................... 4

IV.    Dr. Gottlieb utilizes Mr. Slavitt's White House contact to push Mr. Berenson off the Twitter platform. ............................................................................................... 6

ARGUMENT ...................................................................................................... 10

I.    Mr. Berenson states a claim under 42 U.S.C. § 1985(3) against Dr. Gottlieb and Dr. Bourla. ........................................................................................................... 10

    A.    Mr. Berenson pled a cognizable class under Section 1985(3). .................................... 11

    B.    Mr. Berenson established sufficient discriminatory animus for his Section 1985(3) claim to proceed against Dr. Gottlieb and Dr. Bourla. ........................................... 12

    C.    Mr. Berenson's pleading of a Section 1985(3) conspiracy is adequate. ..................... 14

    D.    Mr. Berenson pleads necessary government action. ................................................ 16

II.    Mr. Berenson's tortious interference claim is actionable. ................................... 17

    A.    Mr. Berenson adequately alleges breach of his contract with Twitter. ..................... 18

    B.    Mr. Berenson plausibly alleges that Dr. Gottlieb knew the journalist was on his fourth strike under Twitter's COVID-19 misleading information policy, which the company was actively applying to Mr. Berenson. ....................................................................... 19

    C.    Dr. Gottlieb interfered with Mr. Berenson's tortiously interfered with Mr. Berenson's Twitter contract. ........................................................................................... 21

    D.    Mr. Berenson's allegations are sufficient to demonstrate causation. ....................... 23

III.    The First Amendment does not insulate Dr. Bourla and Dr. Gottlieb from liability. ...... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abadi v. City of New York*,
No. 21 CIV 8071 (PAE), 2022 WL 347632 (S.D.N.Y. Feb. 4, 2022) ..................................... 12

*American Diamond Exchange, Inc. v. Alpert*,
101 Conn. 83, 920 A.2d 357 (Conn. Ct. App. 2007) ................................................................ 22

*Appleton v. Bd. of Educ. of Town of Stonington*,
254 Conn. 205, 212–13, 757 A.2d 1059, 1063 (Conn. 2000)................................................... 18

*Berenson v. Twitter, Inc.*,
No. C 21-09818 WHA, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) ................................... 18

*Brock v. City of New York*,
No. 121CV11094ATSDA, 2022 WL 479256, at *5-6 (S.D.N.Y. Jan. 28, 2022)..................... 12

*Buschi v. Kirven*,
775 F.2d 1240 (4th Cir. 1985) .................................................................................................. 12

*Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 734 A.2d 112 (Conn. 1999).............................. 22

*Dolan v. Connolly*, 794 F.3d 290 (2d Cir. 2015)..............................................................................11

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ................................................................. 25

*Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005)............................................................. 15

*Ford v. Northam*, No. 7:22-CV-00122, 2023 WL 2767780 (W.D. Va. Mar. 31, 2023).................11

*Fulani v. McAuliffe*, No. 04 CIV. 6973(LAP), 2005 WL 2276881 (S.D.N.Y. Sept. 19, 2005)......11

*Glacken v. Inc. Vill. of Freeport*,
No. 09 CV 4832 DRH AKT, 2012 WL 894412 (E.D.N.Y. Mar. 15, 2012) ............................ 15

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
50 N.Y.2d 183, 193, 406 N.E.2d 445, 450 (N.Y. 1980).......................................................... 20

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ...................................... 24

*Haughey v. Cnty. of Putnam*,
No. 18-CV-2861 (KMK), 2020 WL 1503513 (S.D.N.Y. Mar. 29, 2020) .............................. 15

*Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984)....................................................................... 12

*Illoominate Media, Inc. v. CAIR Found.*,
No. 19-CIV-81179-RAR, 2019 WL 13168767 (S.D. Fla. Nov. 19, 2019)............................... 23

*Iosilevich v. City of New York*,
No. 21 CV 4717 (RPK)(LB), 2022 WL 19272855 (E.D.N.Y. Aug. 10, 2022) ....................... 12

*Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983) ............................................................................ 13

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (N.Y. 1996)................................................. 18, 21

*Lederman v. Giuliani*,
No. 98 Civ.2024LMM/JCF, 2007 WL 1623103 (S.D. N.Y. June 5, 2007), ...............................11

*Levine v. New York State Police*,
No. 121CV503GLSDJS, 2022 WL 4465588 (N.D.N.Y. Sept. 26, 2022)...................................11

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
No. 17CV07568PGGKHP, 2018 WL 847014 (S.D.N.Y. Jan. 12, 2018) ................................. 25

*Missouri v. Biden*, 80 F.4th 641 (5th Cir. 2023)............................................................. 5, 9, 16, 17

iii

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
  87 N.Y.2d 614, 621, 664 N.E.2d 492 (N.Y. 1996) ................................................................ 21
*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ........................................................ 17
*Reid v. City of New York*,
  No. 20 CIV. 9243 (KPF), 2022 WL 2967359, at (S.D.N.Y. July 27, 2022) .......................... 11
*State St. Glob. Advisors Tr. Co. v. Visbal*,
  431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) .................................................................... 20
*Taboola, Inc. v. Ezoic Inc.*,
  No. 17CIV9909PAEKNF, 2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020) .............................. 20
*Waste Conversion Techs., Inc. v. Midstate Recovery, LLC*,
  No. AANCV044000948, 2008 WL 5481231, at *6 (Conn. Super. Ct. Dec. 3, 2008) ............. 20
*Waste Conversion Techs., Inc. v. Midstate Recovery, LLC*,
  No. AANCV044000948, 2008 WL 5481231, at *6. ......................................................... 21

## Other Authorities

Andy Slavitt, EXCLUSIVE: Pfizer CEO Albert Bourla on the Delta Variant, Boosters and Masks
  Indoors (Part 1), July 28, 2021, ................................................................................... 13
Restatement (Second) of Torts § 766 ................................................................... 20, 22
Yoel Roth, *Getting the Facts Straight: Some Observations on the Fifth Circuit Ruling in Missouri
  v. Biden*, Knight First Amend. Inst. at Colum. Univ., Sept. 27, 2023. .................................. 9

## Statutes

42 U.S.C. § 1985(3) .................................................................................... 11-16
Conn. Gen. Stat. § 35-28(d) .................................................................................. 23

**INTRODUCTION**

On August 28, 2021, Twitter permanently suspended Alex Berenson's account, which at the time was among the most widely watched platforms worldwide for reporting that raised serious, fact-based questions about the efficacy and safety of the mRNA COVID-19 vaccines. The suspension followed an unconstitutional conspiracy to pressure Twitter that had begun in the White House at least four months earlier and escalated through the summer of 2021.

But the conspiracy extended past the federal government. Its final act was led by Dr. Scott Gottlieb. Dr. Gottlieb served as the Commissioner of the Food and Drug Administration before taking his expertise as a pharmaceutical regulator to the drugmaker Pfizer to serve as a senior member of the company's board. Even after joining Pfizer in 2019, Dr. Gottlieb retained close relationships with the Trump and then the Biden White House.

In the summer of 2021, Mr. Berenson drew on Pfizer's own clinical trial data and many other sources to raise questions about the mRNA Covid vaccines. For Pfizer, keeping public confidence in the vaccines high was a business imperative. Pfizer's BNT162b2 COVID-19 shot was by far the company's best-selling product in 2021. And, in August 2021, so Dr. Gottlieb acted to protect it from Mr. Berenson's questions. He approached Todd O'Boyle—the *same* Twitter executive whom the White House had approached about Mr. Berenson—to raise spurious concerns that Mr. Berenson's reporting might somehow be dangerous to Dr. Anthony Fauci. In turn, Mr. O'Boyle personally walked Dr. Gottlieb's complaints to the company's supposedly independent content moderation team and insisted that the team act—to ban Mr. Berenson—in violation of Twitter's internal operating procedures.

Now Mr. Berenson has sued the conspirators, including Dr. Gottlieb and his fellow board member Dr. Albert Bourla. As chairman of Pfizer, Dr. Bourla had more to lose if Twitter allowed Mr. Berenson's investigative reporting to continue than almost anyone else. Astonishingly, Drs.

1

Gottlieb and Bourla have responded by claiming that in trying to hold them accountable for their censorship, Mr. Berenson is violating *their* First Amendment rights. This defense is hypocrisy in the purest form, a civil version of the apocryphal story of the boy who killed his parents and then pleaded for mercy as an orphan. This Court should reject this defense and allow Mr. Berenson's claim to proceed.

## FACTUAL BACKGROUND

I.    **Alex Berenson and his reporting on COVID-19 and the vaccines on Twitter.**

Alex Berenson is an independent journalist and former *New York Times* reporter who previously broke multiple front-page stories about questionable practices in the pharmaceutical industry. (Dkt. 3 ¶¶ 43-44.) Mr. Berenson's critical coverage included pharmaceutical and vaccine manufacturer Pfizer, Inc., reporting on the company's marketing, corporate whistleblowers, and changes in Pfizer's management team. (*Id.* ¶ 45.) As such, Pfizer was aware of Mr. Berenson before the COVID-19 pandemic. (*Id.* ¶ 46.) Members of Pfizer's government affairs team subscribe to Mr. Berenson's *Unreported Truths* Substack (*Id.* ¶ 159.)

Using his training and experience, Mr. Berenson became a prominent critic of the public policy response to COVID-19, reporting and asking questions about school and business closures and then later about the COVID-19 vaccines. (*E.g., id.* ¶¶ 63-64, 77-80.) Mr. Berenson used Twitter as his primary outlet, and his following on the platform increased from around 7,000 followers in January 2020 to more than 229,000 in March 2021. (*Id.* ¶¶ 61, 102.) In 2021 alone, Mr. Berenson's Twitter feed received more than one billion impressions. (*Id.* ¶ 6.)

Regarding the COVID-19 vaccines, in November 2020, Mr. Berenson welcomed reporting from clinical trials on the Pfizer and BioNTech shot as well as the Moderna vaccine as "legitimately good news" and "good topline vaccine news," respectively. (*Id.* ¶¶ 74-75.) Nevertheless, he raised questions about the vaccines, and a Twitter executive who had previously

told Mr. Berenson of the company was committed to debate COVID-19 assured Mr. Berenson in

December 2020 the points he was raising about the vaccines "should not be an issue at all." (*Id.*

¶ 79.) Mr. Berenson posted the December 2020 correspondence, lauding Twitter's commitment

to free speech. Alex Berenson (@AlexBerenson), Twitter (Dec. 17, 2020, 5:15 PM),

https://twitter.com/AlexBerenson/status/1339695810204880900. When Twitter announced its

five-strike COVID-19 misleading information policy in March 2021, the executive told Mr.

Berenson "your name has never come up in the discussions around these policies." (*Id.* ¶ 83.)

     Twitter's handling of third-party complaints about Mr. Berenson was consistent with

these specific assurances. As early as March 2020, one prominent third party, the Imperial

College London, complained about Mr. Berenson's speech "putting lives at risk," but Twitter

refused to censor the journalist. (*Id.* ¶¶ 65-66.) As late as March 2021, Twitter internally

concluded that Mr. Berenson "avoids making demonstrably false or misleading claims about

COVID-19 vaccines." (*Id.* ¶¶ 84.) Though Twitter contemporaneously issued a "strike" against

Mr. Berenson's account for stating his opinion that the technology for the mRNA shots is "more

properly described as a gene therapy," the company gave him no notice of the action and did not

lock him out of his account. (*Id.* ¶ 85.)

## II. Pfizer's COVID-19 vaccine receives regulatory authorization as company board member and former FDA Commissioner Dr. Scott Gottlieb promotes the shots while remaining in contact with White House officials.

     Pfizer, along with its corporate partner BioNTech, makes and sells the Comirnaty (or

BNT162b2) mRNA vaccine, which first received the FDA's authorization for use in ages 16 and

over on December 2020. (*Id.* ¶ 145.) Pfizer claimed that the vaccine was 95% effective at

reducing infections from SARS-Co-V-2, more commonly known as COVID-19. (*Id.*) Comirnaty

quickly became Pfizer's top-selling product, garnering sales of more $36.8 billion, the highest

annual sales of any drug or vaccine ever. (*Id.*) Indeed, through 2022, Pfizer made more than $70 billion selling COVID-19 vaccines. (*Id.* ¶ 2.)

Dr. Scott Gottlieb served as Commissioner of the Food and Drug Administration from 2017 to 2019. (*Id.* ¶ 34.) After stepping down from his post at the FDA, Dr. Gottlieb joined Pfizer's board on June 27, 2019, serving on the company's executive committee alongside Pfizer Chief Executive Officer Dr. Albert Bourla. (*Id.* ¶ 141.) During the early days of the COVID-19 pandemic, Dr. Gottlieb became a frequent guest on talk shows and CNBC where he is a contributor. (*Id.* ¶ 142.) Dr. Gottlieb was a vocal advocate for COVID-19 shots, calling for action to "get as many shots in arms as possible, right away." (*Id.* ¶ 146.)

Dr. Gottlieb lauded his co-Defendant and co-author Mr. Slavitt's appointment to the White House as a Senior Advisor on COVID-19, focusing on Mr. Slavitt's ability to "improv[e] vaccine and opportunity." (*Id.* ¶ 143.) During an edition of his podcast in which Dr. Gottlieb was his featured guest, Mr. Slavitt confirmed Dr. Gottlieb was in "pretty regular" contact with him and the White House throughout winter and spring 2021. (*Id.* ¶ 144.)

## III.    As the efficacy of the vaccines wanes, the federal government's push to censor skepticism of the COVID-19 shots online reaches a boiling point.

The vaccines themselves seemed to be working during the spring of 2021. (*Id.* ¶ 121.) However, in July 2021, the vaccines abruptly began to show signs of failure. (*Id.* ¶ 122.) Coronavirus infections soared in Israel, the first country to mass vaccinate its adult population. (*Id.*) While cases had dropped in Israel to near zero in the spring, between June 15 and July 15, the numbers soared 75-fold. (*Id.* ¶¶ 121-22.) Deaths and hospitalizations also rose, causing health officials to contemplate boosters and the Biden Administration to consider vaccine mandates, a move which the administration knew would be both legally controversial and anger many Americans. (*Id.* ¶ 13.)

In April 2021, the White House, through Dr. Gottlieb's contact Mr. Slavitt, previously targeted Mr. Berenson's speech about the COVID-19 vaccines, calling the journalist "ground zero for covid misinformation." (*Id.* ¶ 108.)[1] Later, in July 2021, the situation reached what the Fifth Circuit called "a boiling point," *Missouri v. Biden*, 80 F.4th 641, 654 (5th Cir. 2023), punctuated by Mr. Berenson getting locked out of his Twitter account for the first time only hours after President Biden said social media companies were "killing people" for not censoring speech about the vaccines. (Dkt. 3 ¶¶ 135-36.)

As detailed in the Slavitt Opposition, Dr. Gottlieb's contact Mr. Slavitt went to Twitter at least three times to advocate for Mr. Berenson to be censored on July 27, July 28, and July 31. Mr. Slavitt's July 27 contact induced Mr. Berenson's third strike, and a temporary suspension from the platform. On July 24 or July 25, just days before his contact with Twitter, Mr. Slavitt interviewed Dr. Bourla. (*Id.* ¶ 149.) Later, on July 28, around the same time as Mr. Berenson's third strike, Dr. Bourla held a meeting at the White House, presumably about COVID-19 vaccine matters. (*Id.* ¶ 152.) Of note, Dr. Bourla was accompanied to the White House not by a senior Pfizer scientist or medical officer, but the company's general counsel. (*Id.*) Given the concerns the White House raised about COVID-19 misinformation throughout that month, it is reasonable to infer that the issue was discussed during Dr. Bourla's July 28 meeting. For his part, in November 2021, echoing President Biden's claim social medial companies were "killing people" by platforming voices like Mr. Berenson's, Dr. Bourla accused COVID-19 vaccine skeptics of being "criminals because they have cost literally millions of lives." (*Id.* ¶ 151.)

---

[1] In the Factual Background Sections of his Memorandum in Opposition to the Federal Defendants' Motion to Dismiss (the "Government Opposition"), Mr. Berenson details the actions the Federal Defendants took to target his speech and relationship with Twitter, beginning with a White House meeting in April 2021 and culminating in the journalist's ban from the platform. Similarly, in the Factual Background to his Memorandum in Opposition to Andrew M. Slavitt's Motion to Dismiss (the "Slavitt Opposition"), Mr. Berenson details actions Mr. Slavitt took to interfere with his relationship after Mr. Slavitt left the White House. Mr. Berenson incorporates this background information from the Government Opposition and Slavitt Opposition here.

**IV.    Dr. Gottlieb utilizes Mr. Slavitt's White House contact to push Mr. Berenson off the Twitter platform.**

On July 28, the same day as Dr. Bourla's meeting at the White House, Pfizer released a "preprint" update to its pivotal clinical trial results for its COVID-19 vaccine. (*Id.* ¶ Mr. Berenson's previous strikes did not come for tweets specifically addressing Pfizer. His fourth strike did. On July 29, Mr. Berenson tweeted the following regarding the preprint:

> The pivotal clinical trial for the @pfizer #COVID-19 vaccine shows it does nothing to reduce the overall risk of death. ZERO.
>
> 15 patients who received the vaccine died; 14 who received placebo died.
>
> The end.
>
> The trial blind is broken now. This is all the data we will ever have.

(*Id.* ¶ 154.) The tweet received more than 2,000 retweets and more than 2.3 million views. (*Id.*) Although the tweet was factually accurate, and neither false or misleading, on July 30, Twitter gave Mr. Berenson his fourth COVID-19-related strike for the tweet about the preprint, which resulted in a one-week suspension and final warning before a permanent suspension. (*Id.* ¶ 155.) Twitter's Todd O'Boyle, Mr. Slavitt's contact from the White House, informed Mr. Slavitt of the strike and that "[f]urther violations of the rules will result in permanent suspension." (*Id.* ¶ 157.)

Mr. Berenson returned to Twitter on August 6, but the company did not sanction his account for the next three weeks. (*Id.* ¶ 160.) Then Dr. Gottlieb stepped in. On August 24, Dr. Gottlieb contacted Mr. O'Boyle to complain about one of Mr. Berenson's Substack articles criticizing Dr. Anthony Fauci. (*Id.* ¶¶ 161-62.) "This is whats [sic] promoted on Twitter," Dr. Gottlieb complained. "This is why Tony needs a security detail." (*Id.* ¶ 162.) Mr. Berenson did not threaten anyone in the article, but Twitter decided to schedule a call with Dr. Gottlieb regardless. (*Id.* ¶ 163.) Three days later, on August 27, Dr. Gottlieb and Twitter held a call with Dr. Gottlieb. (*Id.* ¶ 164.) The discussion turned to Mr. Berenson quickly, and an internal Slack

channel from the call contains a reference to "Berenson 4th COVID-19 strike as of 7/27" approximately eleven minutes into the discussion. (*Id.* ¶ 165.) There is no record that Dr. Gottlieb explained how Mr. Berenson violated any Twitter rule during that discussion. (*Id.*)

On Saturday, August 28, with discussion of COVID-19 vaccine mandates ongoing, Mr. Berenson tweeted the following about the shots:

> It doesn't stop infection. Or transmission.
>
> Don't think of it as a vaccine.
>
> Think of it—at best—as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS.
>
> And we want to mandate it? Insanity.  *Id.*

(*Id.* ¶ 167.) Dr. Gottlieb became aware of the tweet. Upon information and belief, he did not use the company's built-in reporting mechanisms to raise concerns about the content. (*See* Dkt. 43-2 (providing a copy of Twitter's reporting policy as of August 13, 2021). Instead, as shown below, Dr. Gottlieb e-mailed the tweet to, upon information and belief, Twitter's Todd O'Boyle.



> Message
>
> | From: | Scott Gottlieb, MD [scott.gottlieb@gmail.com] |
> | Sent: | 8/28/2021 7:31:32 PM |
> | To: | ▓▓▓▓▓▓▓@twitter.com] |
> | Subject: | It doesn't stop infection. Or transmission. Don't think of it as a vaccine. Think of it - at best - as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS. And we want to mandate it? Insanity. |
>
> AlexBerenson (@Alex Berenson) Tweeted: It doesn't stop infection. Or transmission.
>
> Don't think of it as a vaccine.
>
> Think of it - at best - as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS.
>
> And we want to mandate it?
> Insanity. https://twitter.com/alexberenson/status/1431669119208787974?s=27
> --
> Scott Gottlieb, MD
> Scott.Gottlieb@gmail.com

(*Id.*) This tweet, which was not false or misleading, was Mr. Berenson's fifth, ban-inducing strike. (*Id.* ¶ 169.) Twitter's in-house counsel later confirmed Dr. Gottlieb's "e-mail flagged the Tweet that led to Berenson's suspension." (Ex. A to Caudill Decl. in Support of Request for

Leave to Amend ("Caudill Decl.") Asked about his efforts to censor Mr. Berenson, Dr. Gottlieb reiterated the purported concerns in his August 24 e-mail to Twitter about "threats" to the safety of others. (Dkt. 3 ¶ 175.) Like the Substack article Dr. Gottlieb sent to Twitter on August 24, nothing in Mr. Berenson's fifth strike threatened anyone.

Mr. O'Boyle, a member of Twitter's government relations team, took an active role in bringing about Mr. Berenson's suspension. Mr. O'Boyle forwarded Dr. Gottlieb's concerns and he demanded he receive an explanation if the moderators decided not to issue a strike." (*Id.* ¶ 168.) When a member of Twitter's "Strategic Response Team" labeled the tweet as misleading, Mr. O'Boyle pressed further, insisting the tweet be given a strike, writing, "was it strike eligible?" (*Id.*) When the employee did not respond immediately, Mr. O'Boyle pressed again: "Is this not the fifth strike under the policy?"

After Mr. Berenson briefly activated an alternative Twitter account, Dr. Gottlieb informed Mr. O'Boyle, as shown below.



(*Id.* ¶ 171.) Mr. O'Boyle rapidly forwarded the complaint to Twitter's moderation team. (*Id.* ¶ 172.) When the moderation team did not immediately respond, Mr. O'Boyle brought in a Twitter lawyer to ensure Mr. Berenson's alternative account was censored. (*Id.*)

After Mr. Berenson sued the company over his deplatforming, Twitter conceded that his "tweets"—including the ban-inducing strike Dr. Gottlieb flagged—"should not have led to his suspension." (*Id.* ¶ 20.) In other words, Mr. Berenson did nothing wrong. Twitter violated its own

its own substantive COVID-19 misleading information policy when it found to the contrary and banned Mr. Berenson from the platform.

Mr. Berenson's ban also violated Twitter's internal operating procedures. Yoel Roth, who previously served as Twitter's Head of Trust and Safety (the division responsible for Twitter's "content moderation" policies) at the time of Mr. Berenson's suspension, recently wrote, "At Twitter, we maintained a strict separation between teams responsible for lobbying and government relations and the teams responsible for direct content moderation activities." Yoel Roth, *Getting the Facts Straight: Some Observations on the Fifth Circuit Ruling in Missouri v. Biden*, Knight First Amend. Inst. at Colum. Univ., Sept. 27, 2023,

https://knightcolumbia.org/blog/getting-the-facts-straight-some-observations-on-the-fifth-circuit-ruling-in-missouri-v-biden-1. "While members of Twitter's public policy and legal teams are shown receiving a wide range of reports, their actions in every case are to funnel those reports into operational processes that result in independent review and evaluation." *Id.* But in Mr. Berenson's case, Mr. O'Boyle did not merely report the ban-inducing strike, he contacted and pushed the moderation team to deliver a result: Mr. Berenson's deplatforming from Twitter. This is not the "strict separation" between these functions Mr. Roth claims the company observed.

What explains Twitter's conduct? The company faced what the Fifth Circuit called "unrelenting pressure" from the White House and the federal government to censor speech about COVID-19 and the vaccines. *Missouri*, 80 F.4th at 662. Dr. Gottlieb's efforts ratcheted the pressure up further. Not only was Dr. Gottlieb a former FDA Commissioner with significant contacts in the Biden Administration, he was a sitting board member of a company that spent millions of dollars on Twitter advertising. (Dkt. 3 ¶ 166.) Even if the issue never came up explicitly in discussion between Dr. Gottlieb and Mr. O'Boyle and others at Twitter, the social

media company would have understood if it did not comply with Dr. Gottlieb's requests to censor speech then Pfizer might pull back advertising spending. (*Id.*) For a company like Twitter operating on razor thin margins, that threat was significant. (*Id.*) After Elon Musk acquired Twitter and reinstated banned accounts, Pfizer did pull its advertising on the platform. (*Id.*)

Ultimately, Twitter gave Dr. Gottlieb, his Pfizer colleague Dr. Bourla, and the other co-conspirators what they desired, cutting Mr. Berenson off the world's foremost public digital public square all while the White House rolled out a controversial and unprecedented mandate to require two-thirds of working Americans to take one of the COVID-19 vaccines. (*Id.* ¶ 180.).

Finally, in their factual background section, Dr. Gottlieb and Dr. Bourla accuse Mr. Berenson of "abus[ing] the legal process," claiming the journalist brought the case against them to get discovery from Pfizer. (Dkt. 41 at 10.) As an initial matter, Mr. Berenson's conduct at the *New York Times* 17 years ago is not at issue in this litigation. In attacking Mr. Berenson's character, Drs. Gottlieb and Bourla are trying to smear and intimidate him into silence – just as they did in August 2021. Suffice it to say, Mr. Berenson will honor any protective order this Court enters in this case, as he has in his settlement with Twitter.

## ARGUMENT

### I.    Mr. Berenson states a claim under 42 U.S.C. § 1985(3) against Dr. Gottlieb and Dr. Bourla.

Many of Dr. Gottlieb and Dr. Bourla's arguments in support of their motion to dismiss Mr. Berenson's Section 1985(3) claim are duplicative of the Federal Defendants' arguments. As such, Mr. Berenson incorporates and adopts the arguments in Section V of the Argument in the Government Opposition, while addressing the additional points and authorities Dr. Gottlieb and Dr. Bourla raise in their briefing.

A.    Mr. Berenson pled a cognizable class under Section 1985(3).

Dr. Gottlieb and Dr. Bourla contend that "courts in this Circuit have rejected proffered § 1985(3) 'classes' defined by reference to individuals' choices." (Dkt. 41 at 19.) But *Dolan v. Connolly*, 794 F.3d 290 (2d Cir. 2015), on which they rely, (Dkt. 41 at 18), recognizes that political affiliation represents a cognizable class, *Dolan*, 794 F.3d at 294. Political preferences change. For some people, unvaccinated status has political implication or at least "may be political." (Dkt. 3 ¶ 91.) Like the class of street artists in *Lederman v. Giuliani*, No. 98 Civ.2024LMM/JCF, 2007 WL 1623103 (S.D. N.Y. June 5, 2007), a group at least arguably "defined by reference to individual choices," there is a jury question as to whether Mr. Berenson's proposed class "merely 'a group of individuals who share a desire,'" or who "could perceive it as a political group with an agenda disapproved of by Defendants." *Id.* at *5. Those political overtones did not exist in *Dolan* itself or in *Levine v. New York State Police*, No. 121CV503GLSDJS, 2022 WL 4465588 (N.D.N.Y. Sept. 26, 2022), and *Reid v. City of New York*, No. 20 CIV. 9243 (KPF), 2022 WL 2967359, at (S.D.N.Y. July 27, 2022), the other prison-related cases Dr. Gottlieb and Dr. Bourla cite, or for the "whistleblowers" class in *McEvoy v. Spence*, 49 F. Supp. 2d 224 (S.D.N.Y. 1999). The court in *Fulani v. McAuliffe*, No. 04 CIV. 6973(LAP), 2005 WL 2276881 (S.D.N.Y. Sept. 19, 2005), the one political case Dr. Gottlieb and Dr. Bourla cite, (Dkt. 41 at 19), did "reject[] political affiliation" as a Section 1985(3) class, *Fulani*, 2005 WL 2276881, at *6. However, *Fulani* was decided before *Dolan*, which approvingly cited "political affiliation" as one of the classes "Section 1985(3) covers beyond race." *Dolan*, 794 F.3d at 296.

Dr. Gottlieb and Dr. Bourla's other authorities are inapposite. The district court in *Ford v. Northam*, No. 7:22-CV-00122, 2023 WL 2767780 (W.D. Va. Mar. 31, 2023), rejected "vaccination status" as a Section 1985(3) class, but was applying Fourth Circuit precedent

11

limiting the statute's scope to classes sharing "discrete, insular, and immutable" qualities. *Id.* at *9 (quoting *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985)). The other in-circuit cases Dr. Gottlieb and Dr. Bourla cite considered whether vaccination status is a suspect class for Equal Protection Clause purposes. *Abadi v. City of New York*, No. 21 CIV. 8071 (PAE), 2022 WL 347632, at *7-8 (S.D.N.Y. Feb. 4, 2022) (considering the question under the Equal Protection Clause); *Brock v. City of New York*, No. 121CV11094ATSDA, 2022 WL 479256, at *5-6 (S.D.N.Y. Jan. 28, 2022) (same); *Iosilevich v. City of New York*, No. 21 CV 4717 (RPK)(LB), 2022 WL 19272855, at *4 n.14 (E.D.N.Y. Aug. 10, 2022) (same). By contrast, Mr. Berenson's statutory, class-based claim is based on the Second Circuit's conclusion that Section 1985(3) extends "beyond" inherent or immutable categories like race, *Dolan*, 794 F.3d at 296, and thus has a wider berth than the Equal Protection Clause.

Finally, as Mr. Berenson explained in the Government Opposition, provided leave to amend, he can plead that he is not vaccinated against COVID-19, resolving Dr. Gottlieb and Dr. Bourla's objection that Mr. Berenson "does not allege" he is part of the class. (Dkt. 41 at 19).

**B.    Mr. Berenson established sufficient discriminatory animus for his Section 1985(3) claim to proceed against Dr. Gottlieb and Dr. Bourla.**

Dr. Gottlieb and Dr. Bourla argue Mr. Berenson's allegations regarding their motivations are insufficient to state a claim under Section 1985(3). (Dkt. 41 at 20.) They maintain Mr. Berenson's allegations establish their conduct was motivated by a desire to save lives and possible financial motivations. (*Id.*) According to Dr. Gottlieb and Dr. Bourla, then, Mr. Berenson must plead their actions against him were based on his vaccination status.

But Section 1985(3) conspirators do not have to "possess the same motives." *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984) (internal quotation marks omitted). Conspirators might even have "commingled motives," *id.* at 51, but that does not defeat application of the statute. If

it did, Section 1985(3) defendants could evade the statute by conjuring any number of other motives to explain their conduct. As Mr. Berenson details elsewhere, at least some of the conspirators did act with class-based animus. (*See* Government Opposition, Argument, § V.B.2; Slavitt Opposition, § IV.B.) That is enough here. This construction is consistent with the breadth of Section 1985(3) claims the Second Circuit has allowed to move forward. The plaintiff in *Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983), sued more than a dozen officials asserting discrimination based on his political affiliations. Those defendants undoubtedly had mixed motives, but the plaintiff's Section 1985(3) case moved ahead anyway.

Even so, Dr. Gottlieb and Dr. Bourla's class-based animus can be reasonably inferred from their public statements, which imply if not outright state those who refuse the COVID-19 shots are putting lives at risk. During his interview with Mr. Slavitt in July 2021, Dr. Bourla agreed with Mr. Slavitt's assertion that "you could take the best vaccine, but if you shove yourself into a room for a month with 50 unvaccinated people," then "all you're doing is challenging the vaccine to perform." Andy Slavitt, EXCLUSIVE: Pfizer CEO Albert Bourla on the Delta Variant, Boosters and Masks Indoors (Part 1), July 28, 2021, https://lemonadamedia.com/podcast/exclusive-pfizer-ceo-albert-bourla-on-the-delta-variant-boosters-and-masks-indoors-part-1/ (cited at Dkt. 3 ¶ 149). In Dr. Bourla's view then, unvaccinated people were a direct threat to the efficacy of the COVID-19 vaccine itself, necessarily putting lives at risk. Later on, Dr. Bourla called those like Mr. Berenson spreading "misinformation" about his company's COVID-19 shots "criminals because they have cost millions of lives" (Dkt. 3 ¶ 151.) He also placed blame directly on unvaccinated people for their role in blocking the world from getting "back to normal," saying that "[t]he only thing that

stands between the new way of life and the current way of life is, frankly, hesitancy to vaccinations." Berkley Lovelace Jr., *Pfizer CEO*

*says people who spread misinformation on Covid vaccines are 'criminals'*, CNBC, Nov. 9, 2021, https://www.cnbc.com/2021/11/09/covid-vaccines-pfizer-ceo-says-people-who-spread-misinformation-on-shots-are-criminals.html (cited Dkt. 3 ¶ 151.) In Dr. Bourla's view, the unvaccinated were risking their own lives and the lives of others, while preventing a return to post-pandemic normalcy. All this is sufficient to establish animus against the proposed class.

**C.     Mr. Berenson's pleading of a Section 1985(3) conspiracy is adequate.**

Like the Federal Defendants and Mr. Slavitt, Dr. Gottlieb and Dr. Bourla argue that the allegations in Mr. Berenson's complaint fail to establish a conspiracy to deprive the journalist of his constitutional rights. (Dkt. 41 at 20-22.) Mr. Berenson addresses similar pleading sufficiency arguments in the Government Opposition and the Slavitt Opposition. (Government Opposition, Argument, § V.B.1; Slavitt Opposition, § IV.B.)

Dr. Gottlieb and Dr. Bourla charge Mr. Berenson with offering "conspiracy theory nonsense" regarding their connection to the federal government's efforts to censor his speech. (Dkt. 41 at 21.) Mr. Berenson has not just alleged meetings between the various players, particularly Dr. Gottlieb and Dr. Bourla's July 2021, COVID-19-vaccine-related discussions with Mr. Slavitt. (Dkt. 3 ¶¶ 144, 149.) Mr. Berenson further alleges the temporal proximity of Dr. Bourla's late-scheduled meeting with the White House, (*id.* ¶ 152), and Mr. Slavitt's sustained effort to deplatform Mr. Berenson from Twitter while Mr. Slavitt remained in "daily" contact with the White House and the Centers for Disease Control and Prevention. (Slavitt Opp., Factual Background.) Given the White House's ongoing concerns regarding COVID-19 misinformation, and Dr. Gottlieb and Dr. Bourla's own concerns regarding that issue, it is implausible to conclude the issue simply never came up during the doctors' repeated contacts with the White House and

Mr. Slavitt. That is particularly the case regarding Mr. Berenson, who the White House described as "ground zero for covid misinformation" in the April 2021 meeting. (Dkt. 3 ¶ 108.) What Mr. Berenson has alleged is "a factual backdrop that explains both the motivation and occasion for such a conspiracy," which is all he is required to do at this stage. *Glacken v. Inc. Vill. of Freeport*, No. 09 CV 4832 DRH AKT, 2012 WL 894412, at *9 (E.D.N.Y. Mar. 15, 2012). Relevant to Dr. Gottlieb and particularly to Dr. Bourla, the Second Circuit has also defined liability broadly in civil rights conspiracies. In 2001, it explained that someone who "participates in bringing about a violation of the victim's rights but does so in a matter that might be said to be 'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself" may still face liability. *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

Mr. Berenson's knowledge of the details and inner workings of the conspiracy are imperfect at this time, which is to be expected, as courts in this district have recognized. *See, e.g.*, *Haughey v. Cnty. of Putnam*, No. 18-CV-2861 (KMK), 2020 WL 1503513, at *7 (S.D.N.Y. Mar. 29, 2020) (holding allegations of "specific communications" sufficient to "suggest an agreement between a state actor and a private party" even though "Plaintiff has not alleged the specific content of the communications"); *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) ("A plaintiff is not required to list the place and date of defendants meetings and the summary of their conversations when he pleads conspiracy.")

Dr. Gottlieb and Dr. Bourla's suggestion that no conspiracy exists because no evidence emerged from his litigation with Twitter or the government in *Missouri v. Biden* is speculative. (Dkt. 41 at 21.) Mr. Berenson received partial discovery from Twitter as the company has not yet provided him "problematic documents" regarding Twitter's "internal deliberations and discussions" about Mr. Berenson's account, which would be "potentially harmful to our overall

enforcement efforts." (Ex. B to Caudill Decl.) Mr. Berenson is not a party in the latter case, so he does not fully know to what extent document production requests in that case targeted links between the doctors and the federal government.

Dr. Gottlieb and Dr. Bourla also raise the intracorporate conspiracy doctrine as a shield to Section 1985(3) liability. (*Id.* at 22 n.20). That doctrine is unavailable to the doctors here because the conspiracy is alleged to span beyond the confines of Pfizer to involve the Federal Defendants and Mr. Slavitt. (*See* Dkt. 3 ¶ 205.)

### D.  Mr. Berenson pleads necessary government action.

Mr. Berenson addresses many of the arguments Dr. Gottlieb and Dr. Bourla raise regarding government action in the Government Opposition. (*See* Government Opposition, Argument, § 4.) Since filing their motion to dismiss, the Fifth Circuit ruled that the Federal Defendants in this case (and others) "likely coerced or significantly encouraged social-media platforms to moderate content, rendering those decisions state actions. In doing so, the officials likely violated the First Amendment." likely coerced or significantly encouraged social-media platforms to moderate content, rendering those decisions state actions." *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697, at *27 (5th Cir. Oct. 3, 2023). The Fifth Circuit affirmed a modified injunction against the Federal Defendants to prevent them from "coerc[ing] or significantly encourag[ing] a platform's content moderation decisions." *Id.* at *32. The individual plaintiffs' claims in that case did not include the specific targeting by the White House that is at issue in this case, *see id.* at *8, making this an even more clear First Amendment violation.

Dr. Gottlieb and Dr. Bourla assert that Mr. Berenson's complaint "confirm[s] that the decision to suspend his account was Twitter's alone." (Dkt. 41 at 23.) To the contrary, Mr. Berenson's complaint establishes in detail how the Federal Defendants targeted his speech on the platform in April 2021, Mr. Slavitt continued to press the company in July 2021, and Dr. Gottlieb

lobbied for a fifth, ban-inducing strike in August 2021. Dr. Gottlieb and Dr. Bourla also argue the internal Twitter dialogue Mr. Bernson cites in his complaint does not provide "any hint of coercion." (*Id.*) As noted above, though, the fact a government relations employee repeatedly contacted Twitter's content moderation team about the fifth strike represented a substantial departure from the company's apparent "strict separation" between these two corporate functions. Roth, *supra*. The company violated its own rules to give Dr. Gottlieb the outcome he desired. Regardless, these are fact issues which should not be resolved at the Rule 12 stage. That is even more true in this case when, if provided leave to amend, Mr. Berenson can plead that Twitter has documents showing the company's "internal deliberations" regarding his account which would be "more sensitive and potentially harmful to [the company's] overall enforcement efforts." (Ex. B to Caudill Decl.)

Dr. Gottlieb and Dr. Bourla's reliance on *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), is misplaced. The Fifth Circuit distinguished *O'Handley*, finding the officials in that case flagged a single tweet "with no strings attached." 2023 WL 6425697, at *23 (internal quotation marks). The Federal Defendants "did much, much more." *Id.* Integral to that effort was the White House itself, which "directs an army of federal agencies that create, modify, and enforce federal regulations." *Id.* at *21. *O'Handley* involved a state elections official possessing comparably less government power and who was certainly not sitting in the "the most powerful office in the world" like the Federal Defendants in *Missouri v. Biden*. 80 F.4th at 662.

## II.     Mr. Berenson's tortious interference claim is actionable.

Much of Dr. Gottlieb and Dr. Bourla's is duplicative of the rationale for dismissal presented in Mr. Slavitt's motion to dismiss. As such Mr. Berenson incorporates the arguments from Section V of the Slavitt Opposition here.

Relevant here, in New York, "[t]ortious interference with contract requires [(1)] the existence of a valid contract between the plaintiff and a third party, [(2)] defendant's knowledge of that contract, [(3)] defendant's intentional procurement of the third-party's breach of the contract without justification, [(4)] actual breach of the contract, [(5)] and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (N.Y. 1996). Connecticut requires a plaintiff "to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 212–13, 757 A.2d 1059, 1063 (Conn. 2000).

The fact that Mr. Berenson and Twitter were in a contractual relationship is not in dispute.[2] Nor do Dr. Gottlieb and Dr. Bourla claim Mr. Berenson did not suffer damages. The doctors deny four aspects of Mr. Berenson's claim: (1) that Mr. Berenson plausibly alleged breach of his contract with Twitter; (2) that the doctors lacked knowledge of the personal assurances Mr. Berenson received from Twitter; (3) that they did not engage any independently tortious conduct; and (4) Mr. Berenson's allegations fails to demonstrate causation.

### A.    Mr. Berenson adequately alleges breach of his contract with Twitter.

Dr. Gottlieb and Dr. Bourla begin with an ambitious claim: that the district court in *Berenson v. Twitter, Inc.*, No. C 21-09818 WHA, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022), got it wrong. As the doctors put it, "the court that upheld Berenson's contract claim against

---

[2] Nor could Dr. Gottlieb and Dr. Bourla, who are both Twitter users, (Dkt. 3 ¶ 51), and who thus agreed to Twitter's User Agreement, which the company called a "binding contract." (Dkt. 43-3 at 4). The company also conceded this in litigation against Mr. Berenson. (Dkt. 43-7 at 40:11-13 ("Twitter admits that its Terms and the Rules incorporated therein, including the COVID-19 misleading information policy, constitute a binding contract between [Mr. Berenson] and Twitter.").)

Twitter erred." (Dkt. 41 at 27.) Dr. Gottlieb and Dr. Bourla maintain that the assurances a Twitter executive provided were insufficient for allowing Mr. Berenson's breach of contract claim to survive a Rule 12(b)(6) motion. (*Id.* at 27-28.)

This Court should not second-guess the district court's conclusion in *Berenson v. Twitter*. The court in that case acknowledged that "Twitter's terms of service stated at all relevant times that it could suspend user accounts for 'any or no reason'," *id.* at *1, but found "that Twitter's conduct here modified its contract with plaintiff and then breached that contract by failing to abide by its own five-strike policy and its specific commitments set forth through its vice president," *id.* at *2. The "conduct at issue" included not just the "*direct* assurances" the executive made to Mr. Berenson about the company's COVID-19 misleading information, but also the fact that the company had promulgated "a specific, detailed five-strike policy regarding COVID-19 misinformation." *Id.* (emphasis in original).

Under the rule in *Berenson*, once Twitter promulgated its specific policy, the company was bound to follow it. And ultimately, Twitter conceded it did not follow its own terms when it publicly acknowledged Mr. Berenson's tweets should not have led his suspension. (Dkt. 3 ¶ 178.) Twitter's in-house counsel also conceded the company had a "less than 50%" of prevailing in the company's litigation. (Ex. B to Caudill Decl.) This Court should not second guess the district court's decision or Twitter's own admission here.

**B.      Mr. Berenson plausibly alleges that Dr. Gottlieb knew the journalist was on his fourth strike under Twitter's COVID-19 misleading information policy, which the company was actively applying to Mr. Berenson.**

In New York, for tortious interference with contract to exist, a defendant must have "kn[own] this competitor had a contract with third party, [but] as a practical matter [a defendant] will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract (as distinguished, perhaps, from its economic or operational aspects)." *Guard-Life Corp.*

*v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193, 406 N.E.2d 445, 450 (N.Y. 1980); *see also State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) ("[U]nder New York law, a [defendant] must have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required.").[3] Connecticut, where "the Connecticut appellate courts have adopted the rules of the Restatement (Second) of Torts," *Waste Conversion Techs., Inc. v. Midstate Recovery, LLC*, No. AANCV044000948, 2008 WL 5481231, at *6 (Conn. Super. Ct. Dec. 3, 2008), is not to the contrary. *See* Restatement (Second) of Torts § 766, cmt. i (1979) (requiring "knowledge of the contract," but "it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract").

Here, both Dr. Gottlieb and Dr. Bourla are Twitter users. (Dkt. 3 ¶ 51.) As such, they agreed to Twitter's operative terms of service, which included "Twitter Rules and Policies," (Dkt. 43-1 at 7), and the company's five-strike COVID-19 misleading information policy, (Dkt. 43-3). Mr. Berenson has plausibly alleged that Twitter informed Dr. Gottlieb that Mr. Berenson was on his fourth strike under the policy on August 27, 2021. (Dkt. 3 ¶¶ 164-65.) That Dr. Gottlieb lacked knowledge of the assurances a Twitter executive gave Mr. Berenson, which is an open question,[4] does not negate the fact that Dr. Gottlieb knew generally about the COVID-19

---

[3] The court in *Taboola, Inc. v. Ezoic Inc.*, No. 17CIV9909PAEKNF, 2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020), which Dr. Gottlieb and Dr. Bourla cite, acknowledges knowledge does not require "perfect knowledge." *Id.* at *10. Mr. Berenson has provided "specific allegations of the defendant's knowledge of the contract here." *Id.* (internal quotation marks omitted).

[4] If given leave to amend, Mr. Berenson can allege that he posted about the personal assurances he received from a Twitter executive. Alex Berenson (@AlexBerenson), Twitter (May 12, 2020, 10:07 PM), https://twitter.com/AlexBerenson/status/1260391244204818434 (relating his conversation with Twitter executive and his assurances regarding debate on the platform). Mr. Berenson even posted his December 2020 correspondence with the executive to Twitter. Alex Berenson (@AlexBerenson), Twitter (Dec. 17, 2020, 5:15 PM), https://twitter.com/AlexBerenson/status/1339695810204880900. As Twitter users themselves concerned about COVID-19 vaccine issues, it is plausible Dr. Gottlieb and Dr. Bourla monitored Mr. Berenson's account and were aware of these tweets.

misleading information policy and knew the company was applying it to Mr. Berenson. Armed

with this knowledge, the very next day, Dr. Gottlieb reported the tweet that led to Mr. Berenson's

deplatforming. (*Id.* ¶ 167.)

Mr. Berenson's allegations regarding Dr. Bourla's involvement in the tortious interference

with the Twitter contract are not just "upon information and belief," conclusory assertions as the

doctors maintain. (Dkt. 41 at 29.) Mr. Berenson alleges that Dr. Bourla and Dr. Gottlieb

maintained a close working relationship, serving as two of the seven members of Pfizer's

executive committee. (Dkt. 3 ¶ 141.) The doctors both shared concerns about COVID-19

misinformation. Dr. Bourla himself called the purveyors of such speech "criminals because they

have cost literally millions of lives." (*Id.* ¶ 151.) Given Dr. Bourla's views, his connection to Dr.

Gottlieb, it would be odd if Pfizer's Chief Executive Officer did not know about or support Dr.

Gottlieb in his efforts to deplatform the journalist the White House considered "ground zero for

covid misinformation" and roadblock to vaccination efforts.

### C.     Dr. Gottlieb interfered with Mr. Berenson's tortiously interfered with Mr. Berenson's Twitter contract.

For there to be a claim for tortious interference with contract, a defendant must

"intentionally procure[] . . . the third-party's breach of contract without justification." *Lama*

*Holding*, 88 N.Y.2d at 424, 668 N.E.2d at 1375. "[W]here there is an existing, enforceable

contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff

may recover damages for tortious interference with contractual relations even if the defendant

was engaged in lawful behavior." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d

614, 621, 664 N.E.2d 492 (N.Y. 1996). As noted above, the Connecticut appellate courts follow

the *Restatement (Second)* on tortious interference with contract claims. *Waste Conversion Techs.,*

*Inc. v. Midstate Recovery, LLC*, No. AANCV044000948, 2008 WL 5481231, at *6.

Under New York law and the *Restatement (Second)*, all Mr. Berenson must show is that

Dr. Gottlieb acted "without justification" or "improperly." *Guard-Life*, 50 N.Y.2d at 189, 406

N.E.2d at 448. The *Restatement (Second)* notes that "[t]here is no technical requirement as to the

kind of conduct that may result in interference with the third party's performance of contract,"

and that even "a simple request or persuasion exerting only moral pressure" and/or a "statement

unaccompanied by any specific request but having the same effect as if the request were

specifically made" is enough. Restatement (Second) of Torts § 766, cmt. k (1979).

Dr. Gottlieb's conduct here meets this requirement. He contacted Twitter first under false

pretenses that Mr. Berenson was inciting physical threats against Dr. Fauci. Twitter's log of the

August 27 phone call indicate Dr. Gottlieb discussed those concerns with Twitter as well as the

Pfizer board members concerns about COVID-19 misinformation. The following day, Dr.

Gottlieb flagged the tweet that led to Mr. Berenson's suspension while offering zero rationale as

to why it was false or misleading or otherwise violated the platform's rules. Dr. Gottlieb went

beyond a mere request, but exerted pressure on Twitter to suspend Mr. Berenson. And Dr.

Gottlieb's contact, Todd O'Boyle, pressed the company's content moderation team to deliver the

result the doctor wanted.

Dr. Gottlieb and Dr. Bourla rely exclusively on Connecticut law to suggest Mr. Berenson

must show Dr. Gottlieb's request was based on "improper motive or improper means." (Dkt. 41

at 29). But the two decisions they cite, *American Diamond Exchange, Inc. v. Alpert*, 101 Conn.

83, 920 A.2d 357 (Conn. Ct. App. 2007), and *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766,

805, 734 A.2d 112, 134 (Conn. 1999), considered tortious interference with prospective

economic advantage and tortious interference with employment, respectively, where a higher

standard of misconduct applies. And Mr. Berenson even satisfies that higher standard here,

particularly given the advertising dollars at stake for Twitter in giving into Dr. Gottlieb's requests, business it promptly withdrew from the platform after Elon Musk acquired the company and reinstated banned accounts. (Dkt. ¶ 166.) Related, in Connecticut, a "conspiracy" which has "the purpose" or "the effect of . . . refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person" is per se unlawful. Conn. Gen. Stat. § 35-28(d). Consistent with this statute, Dr. Gottlieb and Dr. Bourla's collaboration with Mr. Slavitt and others to induce Twitter stop dealing with Mr. Berenson provides an independent basis for finding wrongful conduct supporting a claim for tortious interference here.

Finally, this case is not like *Illoominate Media, Inc. v. CAIR Found.*, No. 19-CIV-81179-RAR, 2019 WL 13168767 (S.D. Fla. Nov. 19, 2019), which found that "[a] cause of action for tortious interference simply cannot exist each time an individual reports another Twitter user." *Id.* at *3. Mr. Berenson is not suggesting such a cause of action exists or should exist. Individual reports in the ordinary course of business are one thing. Secret lobbying outside those channels by a defendant with financial and political leverage is another.

        **D.**    **Mr. Berenson's allegations are sufficient to demonstrate causation.**

Dr. Gottlieb and Dr. Bourla argue Mr. Berenson fails to allege causation. (Dkt. 41 at 30.) To the contrary, Mr. Berenson alleges that Dr. Gottlieb, without using the company's primary reporting channels, reported Mr. Berenson's fifth strike to Twitter. (Dkt. 3 ¶ 167.) Mr. Berenson also maintains Twitter's government relations employee, Todd O'Boyle, pressed the company's content moderation team for action, reaching out repeatedly to ensure the fifth, ban-inducing strike was issued. What Twitter's former Head of Trust and Safety called the company's policy of "strict separation" between Twitter's government affairs and content moderation team broke down in Mr. Berenson's case. Further, provided leave to amend, Mr. Berenson can plead that

Twitter's own internal counsel linked Mr. Berenson's ban to Dr. Gottlieb, writing he "flagged the Tweet that led to Berenson's suspension." (Ex. A to Caudill Decl.)

## III. The First Amendment does not insulate Dr. Bourla and Dr. Gottlieb from liability.

Dr. Bourla and Dr. Gottlieb maintain that the First Amendment blocks Mr. Berenson from holding them to account. (Dkt. 41 at 30-33.) To the extent these arguments apply to Mr. Berenson's Section 1985(3) claim, they fail for the threshold reason that the Federal Defendants, the doctors' co-conspirators, violated the First Amendment for the reasons provided above, not the least of which is the Fifth Circuit's holding in *Missouri v. Biden*.

The doctors cite, *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983), calling it "an analogous case." (Dkt. 41 at 31.) In *Hammerhead*, the plaintiff created a board game mocking those using public assistance as "lazy, dishonest and in some cases intoxicated and promiscuous individuals who take unfair advantage of government largesse." *Id.* at 35. A New York official, who lacked any regulatory authority over merchants, sent a letter urging "stores to refrain from carrying" the game. *Id.* at 36-37. The Second Circuit held that the official's letter did not violate the First Amendment, because the official also had the "right to expound his belief that [the game should be circulated.' *Id.* at 40.

*Hammerhead* is distinguishable. Unlike the official in that case, Dr. Gottlieb did not publicly call for Twitter to censor Mr. Berenson. Instead, Dr. Gottlieb leveraged one of Mr. Slavitt's connections at Twitter to inquire about Mr. Berenson's account in secret. He started the conversation by falsely conveying the impression that Mr. Berenson was inciting threats of harm to Dr. Anthony Fauci. Knowing of the company's COVID-19 misleading information policy, and that Twitter was applying it to Mr. Berenson's account, Dr. Gottlieb reported the very tweet that led to the journalist's suspension. And Dr. Gottlieb did all this while standing in the position of a board member of an advertiser spending millions of dollars with Twitter.

Mr. Berenson is not trying to hold Dr. Gottlieb liable because the Pfizer board member disagreed with his views about the COVID-19 vaccines. At all relevant times, Dr. Gottlieb was free to challenge those perspectives, including on Twitter. What gives rise to Mr. Berenson's claims is not Dr. Gottlieb's speech alone, but the pressure he applied to Mr. Berenson's relationship with Twitter, leading to the deplatforming.

Nor is Mr. Berenson disguising a defamation claim as a cause of action for tortious interference with contract. The claim is unlike *Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013), which arose out of the defendant's publication of a satirical claim about the plaintiff, or the mere publication of opinions regarding a false light claim, as the court determined in Jan. 12, 2018), *MiMedx Grp., Inc. v. Sparrow Fund Mgmt.* LP, No. 17CV07568PGGKHP, 2018 WL 847014, at *9 (S.D.N.Y. Jan. 12, 2018). Mr. Berenson's claim is about deliberate, secret, targeted interference with an ongoing contractual relationship—interference that caused him significant harm. Again, Dr. Gottlieb is free to his opinions, and to disagree with Mr. Berenson, but the First Amendment does not license his effort to silence Mr. Berenson's reporting.

## CONCLUSION

For the foregoing reasons, Mr. Berenson respectfully prays that this Court denies Dr. Gottlieb and Dr. Bourla's motion to dismiss or otherwise provides Mr. Berenson leave to amend his complaint.

Respectfully submitted, this 4th day of October, 2023.

By: */s/ James R. Lawrence, III*
JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
Envisage Law
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law
         ajbiller@envisage.law


SEAN P. GATES (SBN 186247)*
CHARIS LEX P.C.
301 N. Lake Ave., Ste. 1100
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.1730
E-mail: sgates@charislex.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice