**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X
-

**ALEX BERENSON,**

       **Plaintiff,**

    v.

**JOSEPH R. BIDEN, JR.**, President of the
United States, in his official capacity;

**ANDREW M. SLAVITT**, in his individual
capacity;

**SENIOR ADVISOR TO THE COVID-19
RESPONSE COORDINATOR**, in his or
her official capacity;

**ROBERT FLAHERTY**, in his individual
capacity;

**CHRISTIAN L. TOM**, Director of Digital
Strategy at the White House, in his official
capacity;

**VIVEK MURTHY, M.D.**, Surgeon General
of the United States, in his official capacity,
and in his individual capacity;

**SCOTT GOTTLIEB, M.D.**, former FDA
Commissioner and Member of the Board of
the Directors of Pfizer, Inc.; and

**ALBERT BOURLA, PH.D., D.V.M.**,
Chief Executive Officer of Pfizer, Inc.,

       **Defendants**.

-------------------------------------------------------- X

Case No. 1:23-cv-03048-JGLC

**MEMORANDUM OF LAW IN SUPPORT OF
ANDREW M. SLAVITT'S RENEWED MOTION TO DISMISS COMPLAINT
(INCLUDING ALLEGATIONS IN PROPOSED FIRST AMENDED COMPLAINT)**

**ORAL ARGUMENT REQUESTED**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
Attorneys for Defendant Andrew M. Slavitt

## TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................................4

ARGUMENT ....................................................................................................................10

I.      Berenson Fails to State a Claim on the Merits...............................................10

      A.      Berenson Fails to Adequately Plead Causation for Any Claim. .........................11

      B.      Berenson Fails to State a First Amendment Claim. .............................................16

      C.      Berenson Fails to State a Claim Under Section 1985(3). ....................................19

      D.      Berenson Fails to State a Tortious Interference Claim........................................21

      E.      Section 230 Provides Immunity from Berenson's § 1985(3) and Tortious Interference Claims. ..............................................................................................22

II.     This Court Lacks Personal Jurisdiction Over Slavitt.......................................23

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abadi v. City of N.Y.*,
   2022 WL 347632 (S.D.N.Y. Feb. 4, 2022) .................................................................. 20, 21

*Admiral Ins. Co. v. Niagara Transformer Corp.*,
   57 F.4th 85 (2d Cir. 2023) ......................................................................................... 19

*Al-Ahmed v. Twitter, Inc.*,
   553 F. Supp. 3d 118 (S.D.N.Y. 2021) ......................................................................... 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 10, 14

*Bantam Books, Inc. v. Sullivan*,
   83 S. Ct. 631 (1963) ................................................................................................. 19

*Bell Atl. Corp. v. Twombley*,
   550 U.S. 544 (2007) ................................................................................................. 21

*Berenson v. Twitter, Inc.*,
   2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) .............................................................. 22

*Bivens v. Six Unknown Named Agents*,
   403 U.S. 388 (1971) ................................................................................................. 19

*Boddie v. Schnieder*,
   105 F.3d 857 (2d Cir. 1997) ....................................................................................... 20

*Bonhac World Corp. v. Mellin Works LLC*,
   2023 WL 346950 (S.D.N.Y. Jan. 20, 2023) ................................................................... 4

*Bristol-Myers Squibb Co. v. Superior Court*,
   582 U.S. 255 (2017) ................................................................................................. 25

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   140 S. Ct. 1009 (2020) .......................................................................................... 11, 14

*Doe v. Del. State Police*,
   939 F. Supp. 2d 313 (S.D.N.Y. 2013) ......................................................................... 24

*Dolan v. Connolly*,
   794 F.3d 290 (2d Cir. 2015) ....................................................................................... 20

*Domen v. Vimeo, Inc.*,
   433 F. Supp. 3d 592 (S.D.N.Y. 2020) ......................................................................... 23

# TABLE OF AUTHORITIES
## *(Cont'd.)*

Page(s)

*Feibelman v. Trustees of Columbia Univ. of City of New York,*
 2020 WL 882429 (S.D.N.Y. Feb. 24, 2020) ............................................................... 10, 13

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.,*
 141 S. Ct. 1017 (2021) ...................................................................................................25

*Gleason v. McBride,*
 869 F.2d 688 (2d Cir. 1989) ..........................................................................................20

*Griffin v. Breckenridge,*
 403 U.S. 88 (1971) .........................................................................................................20

*Lama Holding Co. v. Smith Barney Inc.,*
 668 N.E.2d 1370 (N.Y. 1996) .......................................................................................22

*Levin v. United States,*
 568 U.S. 503 (2013) .......................................................................................................21

*Manhattan Cmty. Access Corp. v. Halleck,*
 139 S. Ct. 1921 (2019) ...................................................................................................19

*In re Mexican Gov't Bonds Antitrust Litig.,*
 412 F. Supp. 3d 380 (S.D.N.Y. 2019) ...........................................................................23

*Missouri v. Biden,*
 83 F.4th 350 (5th Cir. 2023) ..........................................................................................12

*Murthy v. Missouri,*
 144 S. Ct. 1972 (2024) ................................................................................... 1, 11, 12, 13

*Nat'l Rifle Ass'n v. Vullo,*
 602 U.S. 175 (2024) ..............................................................2, 3, 4, 16, 17, 18, 19, 21

*Nat'l Union Fire Ins. Co. v. UPS Supply Chain Sols., Inc.,*
 74 F.4th 66 (2d Cir. 2023) .............................................................................................24

*O'Handley v. Weber,*
 62 F.4th 1145 (9th Cir. 2023) ........................................................................................18

*Penguin Grp. (USA) Inc. v. Am. Buddha,*
 609 F.3d 30 (2d Cir. 2010) ............................................................................................24

*Peralta v. St. Lukes Roosevelt Hosp.,*
 2015 WL 3947641 (S.D.N.Y. June 26, 2015) ...............................................................16

*Snyder v. Phelps,*
 562 U.S. 443 (2011) .......................................................................................................19

## TABLE OF AUTHORITIES
### *(Cont'd.)*

**Page(s)**

*Walden v. Fiore,*
    571 U.S. 277 (2014) ........................................................................................25

*Webb v. Goord,*
    340 F.3d 105 (2d Cir. 2003) ...........................................................................21

**STATUTES**

28 U.S.C. § 2679(b)(1) .......................................................................................21

42 U.S.C. § 1985(3) ............................................................................................19

47 U.S.C. § 230(c)(2)(A) ....................................................................................22

Civil Practice Law § 302(a)(3) ...........................................................................24

**OTHER AUTHORITIES**

Derek Thompson, *The Pandemic's Wrongest Man*, The Atlantic (Apr. 1, 2021)..........................6

Twitter Blog, *Coronavirus: Staying Safe and Informed on Twitter* (Jan. 29, 2020).....................4

Twitter, Terms of Service, https://twitter.com/en/tos/previous/version_16 (in effect as of August 19, 2021).....................................................................................10

**RULES**

Fed. R. Evid. 201 .................................................................................................4

N.Y. C.P.L.R. § 301 ............................................................................................24

Defendant Andrew Slavitt respectfully submits this memorandum of law in support of his renewed motion to dismiss Alex Berenson's complaint.  While Slavitt opposes Berenson's motion for leave to file a first amended complaint (referred to herein as the "Proposed FAC" or "PFAC"), Slavitt's renewed motion to dismiss addresses Berenson's operative complaint (Dkt. 3) as supplemented by the allegations in the Proposed FAC (*See* Dkt. 80-2).

## PRELIMINARY STATEMENT

In the seventeen months since he filed this case, Berenson has had the benefit of purported "revelations" from the "Twitter Files" (PFAC ¶ 230), "discovery from federal officials in a lawsuit filed by the States of Missouri and Louisiana" (*id.* ¶ 7), materials released by a House subcommittee targeting the "Weaponization of the Federal Government" (*id.* ¶¶ 125, 232), and *thousands* of pages of documents that Twitter's sympathetic corporate successor X Corp. "voluntarily provided" to Berenson (*id.* ¶ 7, Exh. B).  But Berenson still does not offer a single non-conclusory allegation that would show Slavitt either caused Twitter to act on Berenson's account or threatened Twitter with adverse government action.

The Supreme Court recently held in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), that "the platforms, acting independently, had strengthened their pre-existing content moderation policies before the Government defendants got involved," and "continued to exercise their independent judgment even after communications with the defendants began." 144 S. Ct. at 1982.[1]  Berenson's allegations confirm Twitter's exercise of its "independent judgment."  He alleges *Twitter* developed and instituted a five-strikes policy—and issued its first strike to Berenson—before Slavitt or any past or present member of the U.S. government allegedly complained about him. PFAC ¶¶ 91, 95. *Twitter* then issued four subsequent strikes to Berenson in July and August 2021

---

[1] Internal quotations are omitted and emphasis added to citations herein unless otherwise stated.

consistent with evaluations by the company's Site Integrity team. *Id.* ¶¶ 174, 181, 205; *see* Exh B at 17, 27 of 28. For all the documents Berenson has received to help his case, he does not cite *one* in which Twitter claims it issued a strike and/or suspended Berenson's account because of Slavitt or any other defendant in this case.

Berenson's First Amendment claim also fails because he does not plausibly allege coercion. In a suit about "the federal government's censorship agenda" (PFAC ¶ 240), Berenson directly attributes to Slavitt just one interaction with Twitter in the five-month period Slavitt served as a government advisor on the COVID-19 response. Adopting a discovery response in the Missouri/Louisiana lawsuit, Berenson alleges Slavitt in that April 2021 meeting expressed "his view Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets," and that "employees from Twitter disagreed with that view." *Id.* ¶ 123.

That is not "censorship." Nor is it coercion. Berenson has had access to thousands of pages of Twitter documents and other materials, but points to nothing indicating Twitter was coerced, or even influenced, let alone censored. The Supreme Court recently confirmed "[t]he government can say what it wishes and select the views that it wants to express." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024) ("*NRA*"). When it does, there is no First Amendment violation because "the Free Speech Clause has no application." *Id.* Slavitt as a government employee was free to express his views, and Twitter was free to disagree with them, which it made clear it did.

The few other alleged communications between Slavitt and Twitter date from July and August 2021, when Slavitt was a private citizen. Those alleged emails that Slavitt sent and received on his private email account were observations—made by many other private citizens in much harsher terms—that several of Berenson's many posts appeared to violate Twitter policies

and were otherwise objectionable.  Slavitt allegedly wrote to a single Twitter "lobbyist" that Berenson was "begging for it," "knows he's gone," and "milk[ing] Twitter for audience."

None of these mundane communications is coercive, let alone the reason Twitter enforced on Berenson's account.  Even if Slavitt had expressed those views while working in the White House, "[a] government official can *share her views freely* and *criticize particular beliefs*, and she can do so *forcefully* in the hopes of persuading others to follow her lead."  *NRA*, 602 U.S. at 188.  Slavitt had no enforcement authority when he was a government advisor, let alone a private citizen.  All he could do was share his views and try to persuade.  And according to Berenson's own allegations, Slavitt did not convince Twitter to act.

Seemingly aware of the weakness of his allegations as to Slavitt, Berenson tries to manufacture a "conspiracy" in order to make Slavitt liable for others' statements.  Berenson does not adequately allege any agreement in the first place.  Furthermore, no defendant caused Twitter to take action or deprived Berenson of his First Amendment rights.  Berenson alleges "potential threats to section 230" through public White House comments (after Slavitt left) and a bill proposed by a non-party senator.  *See* PFAC ¶¶ 151, 155.  But Berenson does not mention Twitter's confident assessments about the White House messaging that "[w]e have not found any evidence to suggest it's a real thing yet," and about the proposed bill that "[a]t this point, no chance this passes" and "[t]his proposal does not have a chance of passing at this point in time."  *Id.* Exh. B at 2, 4 of 28.

At base, Berenson's suit against Slavitt in his personal capacity, at great personal expense to Slavitt and three thousand miles away from his home, is a textbook example of strategic litigation to stifle speech on a matter of public interest.  That speech is protected here both by the First Amendment and Section 230(c)(2) of the Communications Decency Act.  It threatens not just

the government's right to "say what it wishes" and "select the views that it wants to express" (*NRA*, 144 S. Ct. at 187) but the right of every *former* government employee to express their protected views about matters of public concern without being enmeshed in years of costly litigation.

With Berenson having failed multiple times to assert viable claims, it is time to end this meritless case for good.  The Court should dismiss the complaint against Slavitt with prejudice for failure to state a claim under Federal Rule 12(b)(6), or at a minimum dismiss it for lack of personal jurisdiction under Federal Rule 12(b)(2).[2]

## BACKGROUND

Slavitt served as a White House senior advisor on the federal COVID-19 response from January to June 2021.  PFAC ¶ 41.  Even accepting every allegation as true for purposes of this motion only, every action Twitter allegedly took as to Berenson's account—and as to COVID-19 vaccine misinformation more generally—either happened when Slavitt was not working at the White House or is not alleged to have been brought about by Slavitt.

In March and April 2020, Twitter instituted and then updated a policy barring posts that contained false or misleading information about COVID-19.  PFAC ¶¶ 76–77; *see also* Twitter Blog, *Coronavirus: Staying Safe and Informed on Twitter* (Jan. 29, 2020).[3]  The company's bar on misinformation included any "content that goes directly against guidance from authoritative sources of global and local public health information."  PFAC ¶ 76.

---

[2] To the extent other defendants make arguments applicable to Slavitt that the Court finds meritorious, Slavitt joins such arguments by reference.

[3] Twitter's COVID policies in effect in 2020 and 2021 are posted at https://tinyurl.com/4rzfjbt8. Berenson extensively relies on these policies—and brings a tortious interference claim based on them—and therefore incorporates them by reference into the complaint.  PFAC ¶¶ 76–77, 86, 91, 262; *see also Bonhac World Corp. v. Mellin Works LLC*, 2023 WL 346950, at *2 (S.D.N.Y. Jan. 20, 2023).  These policies are also subject to judicial notice.  *See* Fed. R. Evid. 201.

Complaints about Berenson's Twitter activity by third parties (not Slavitt) began almost immediately.  In March 2020, the Imperial College of London "took its concerns to Twitter" concerning a series of "extremely popular and dangerously misleading" tweets Berenson had published about the research of one of its professors.  PFAC ¶ 74.  Throughout the rest of 2020, "[t]hird parties continued to complain about Mr. Berenson's reporting."  *Id.* ¶ 83.

In December 2020, Twitter launched "a new policy regarding misleading COVID-19 vaccine information," announcing that it would start to "remove Tweets which advance harmful or misleading narratives about COVID-19 vaccinations."  PFAC ¶ 86.  Then, on March 1, 2021, Twitter "announced a new five-strike policy as part of the company's bar on medical misinformation," under which "five or more violations" of the company's COVID misinformation policy could result in "permanent suspension."  *Id.* ¶ 91.  "Meanwhile," according to the complaint, "third party pressure to censor Mr. Berenson continued."  *Id.* ¶ 94.  As Berenson acknowledged in an email to Twitter in December 2020:  "Many people are complaining I'm raising questions about the vaccine."  *Id.* ¶ 88 (brackets and quotations omitted).

Notably, the "third party pressure" on Twitter was not coming from Slavitt or the U.S. government.  *See* PFAC ¶ 94.  Berenson alleges that Twitter had an entire unit, called the Global Escalation Team, or "GET," devoted to handling "complaints about tweets."  *Id.*  In mid-March 2021, a journalist sent an inquiry about Berenson's account that made its way to the GET.  *Id.*  The "deep dive" Twitter performed as a result of that inquiry revealed that Berenson cited "at times outdated" studies and that he made a misleading claim that had been "debunked by the CDC."  *Id.* ¶ 95 (emphasis omitted).  As a result, Twitter decided to "take action on one of Berenson's tweets that has been consistent with [its] past enforcements of the policy."  *Id.*  This March 14, 2021 action apparently was Berenson's first "strike."  *See id.*

At that time, public criticism of Berenson was growing.  The Atlantic published an article about Berenson on April 1, 2021, with the headline *The Pandemic's Wrongest Man*.  PFAC ¶ 112.  The article walked readers "point by point through his wrong positions" and concluded that "Berenson has mischaracterized just about every detail regarding the vaccines to make the dubious case that most people would be better off avoiding them."  Derek Thompson, *The Pandemic's Wrongest Man*, The Atlantic (Apr. 1, 2021).

By "mid-April," after publication of the Atlantic article, Berenson allegedly "had the White House's attention."  PFAC ¶ 115; *see also id.* ¶ 191 (alleging that the "White House started" targeting Berenson's account "in April 2021").[4]  Berenson points to an April 21, 2021 meeting between Slavitt and two of his White House colleagues and several Twitter employees.  *Id.* ¶ 115.  The government participants had seen a "data visualization" created by MIT researchers that identified Berenson's account as "ground zero for COVID-19 misinformation that radiates outward."  *Id.* ¶ 118.  One of the three White House officials allegedly asked Twitter "one really tough question about why Alex Berenson hasn't been kicked off from the platform."  *Id.* ¶ 117.  As to the other "pointed but fair" questions—but apparently not the question about Berenson—a Twitter employee wrote that "mercifully we had answers."  *Id.*  Slavitt supposedly suggested that Twitter "was not enforcing its content guidelines with respect to Alex Berenson's tweets," but "Twitter employees disagreed with that view."  *Id.* ¶ 123.

At the conclusion of the meeting, Twitter "agreed to examine the account again."  PFAC ¶ 122.  Following its independent review of Berenson's account, a Twitter employee, whom Defendant Flaherty allegedly thought was Todd O'Boyle, "called Mr. Flaherty and indicated that

---

[4]  The complaint asserts that Berenson had the White House's "attention" "[b]y mid-April, if not before."  PFAC ¶ 115.  But Berenson does not allege any link between the White House and Berenson prior to mid-April 2021.

Twitter would not be removing Mr. Berenson because Mr. Berenson had not violated Twitter policies at that time." *Id.* ¶ 123 (quotations omitted). There is no allegation Slavitt was aware of any follow-up between Flaherty and O'Boyle.

As alleged in the Proposed FAC, Slavitt's (and others') alleged "initial pressure campaign *failed*." PFAC ¶ 11 (emphasis added). Twitter communicated its "reluctance to suspend Mr. Berenson" and "told both the [alleged] conspirators and Mr. Berenson himself that he had done nothing wrong." *Id.* Throughout the spring of 2021, "Twitter continued to defend Mr. Berenson, and he continued to build his audience." *Id.* ¶ 128.

Berenson did not accumulate his second, third, fourth, and fifth strikes until July and August 2021, in the several months after Slavitt had left the government. PFAC ¶¶ 165, 181, 205. Berenson's Proposed FAC attaches a handful of the thousands of pages of internal Twitter documents that X Corp. "voluntarily provided" to Berenson and that "are the primary basis for this First Amended Complaint." *Id.* ¶ 7. The few documents Berenson includes speak to Twitter's enforcement process for the second, fourth, and fifth strikes.

As to Berenson's second strike on July 16, 2021 (PFAC ¶ 149), Berenson includes a Twitter email from a Senior Policy Specialist for MisinformationSite Integrity, who writes on behalf of their "Team" that "we will take action on @AlexBerenson for violating our COVID-19 misinformation policy, specifically by sharing false information regarding the efficacy of the COVID-19 vaccines as a health intervention." *Id.* Exh. B at 11 of 28. There is no mention in the internal Twitter email of Andy Slavitt or any third party having any impact on Twitter's enforcement decision. *See id.* Twitter's internal communications pointed to reasons for enforcing on Berenson's account that had nothing to do with anything allegedly raised by Slavitt.

As to Berenson's third strike on July 27, 2021 (PFAC ¶ 174), Berenson alleges that

Twitter's general counsel "ultimately signed off" on it. *Id.* ¶¶ 155, 183. On July 28, 2021, between that third strike and Berenson's fourth strike, Slavitt expressed his personal opinion to Washington D.C. Twitter "lobbyist" Todd O'Boyle via Slavitt's personal Gmail account that Berenson "knows he's gone" and was "milk[ing] Twitter for audience." *Id.* ¶¶ 22, 174. Slavitt's email said nothing about the tweet resulting in Berenson's fourth strike, which made, in part, the widely disputed claim that the vaccine "does nothing to reduce the overall risk of death." *Id.* ¶ 180.

With respect to that fourth strike, which Twitter issued on July 30, 2021 (PFAC ¶ 181), Berenson attaches several Twitter emails describing its enforcement process. One such email notes that "SI-CAT ["SI" meaning "Site Integrity"] has determined that @AlexBerenson has violated the COVID-19 misinformation policy …." *Id.* Exh. B at 14 of 28. Twitter's general counsel signed off on the fourth strike, noting that Berenson's post "got a fair bit of attention from the public health community and was escalated to us for review because he misrepresents the conclusions about efficacy." *Id.* ¶ 183, Exh. B at 14, 17 of 28. According to Berenson, "Mr. Berenson's third and fourth strikes had undergone intensive review before being issued, with the company's top executives ultimately weighing in on them." *Id.* ¶ 202.

On July 31, after Twitter issued Berenson's fourth strike, Slavitt sent an email from his Gmail account to Todd O'Boyle, attaching a screenshot of a Berenson Twitter post with the phrase "Impung macht frei" ("Vaccinations set you free"), Berenson's invocation of "arbeit macht frei" ("work sets you free"), the inscription the Nazis posted on the entrance to Auschwitz. PFAC ¶ 189. Slavitt was far from alone in objecting to Berenson's tweet. *See* Slavitt RJN Ex. 1.

Slavitt wrote to Twitter's O'Boyle that "if he doesn't go permanently after this, the outcry will be justified." PFAC ¶ 188. O'Boyle responded: "I hear you. Trivializing the Holocaust is abhorrent. Our process takes time, but it catches malactors." *Id.* Exh. B at 16 of 28. Twitter

ultimately took no action against Berenson for the Auschwitz tweet about which Slavitt and many others complained. *See id.* Exh. B at 17, 27 of 28 (describing fourth and fifth strikes).

Berenson alleges a full month passed between Slavitt's alleged email exchanges with Twitter on July 28 and 31, 2021 and Berenson's permanent suspension from Twitter on August 28. PFAC ¶¶ 182, 188, 205. That day, August 28, 2021, Berenson posted a tweet that stated in part "Don't think of it as a vaccine." *Id.* ¶ 200. Todd O'Boyle "escalated the violative tweet based on a report by former FDA commissioner Scott Gottlieb," with whom O'Boyle and his boss Lauren Culbertson had spoken the previous day. PFAC, Exh. B at 25 of 28. After Twitter escalated the tweet for review, Twitter's Unified Escalations agent brought it to their "director," and they decided the post merited a fifth strike for Berenson. *Id.*

When Twitter's general counsel learned of the suspension and that it was not taken by Twitter's Site Integrity team, she told that group that "I'm mostly interested in understanding if this would have been supported by site integrity. And the rationale." PFAC, Exh. B at 27 of 28. The Site Integrity team responded that "SI is aligned with the decision that the tweet is in violation of the COVID-19 misinformation policy." *Id.* It continued, "In the Tweet, @AlexBerenson suggests that COVID-19 vaccines shouldn't be thought of as vaccines, which has been a common misleading narrative meant to incite fear and erode trust in the vaccines, especially mRNA vaccines. *We have previously enforced the policy related to this type of claim*." *Id.*

Twitter's general counsel did not believe a permanent suspension was warranted, but wrote to the Site Integrity team that "I realize this is a balancing act between potential harm and allowing people to engage in a robust public conversation (and different people may come out in slightly different places)." PFAC, Exh. B at 27 of 28. As part of that same email thread, a "senior Twitter official" (*id.* ¶ 29) told Yoel Roth, the head of Twitter's "trust and safety" division, that Berenson's

tweet garnering the fifth strike was "an edge case," noting that "[w]e believe that Berenson used the idea that the vaccine isn't a vaccine to make definitive claims about government mandates (non violative) and the safety of the vaccine (violative)."  *Id.*

Regarding the fifth strike, Twitter's general counsel asked Site Integrity, "can you let me know if the user appeals?  I'd like to reconsider our action here."  PFAC, Exh. B at 27 of 28.  They responded, in part, that "[a]s of right now, the user has not appealed the suspension," and "[f]or next steps, we'll keep an eye out to see if the user appeals the suspension, if so we'll review the appeal and take the above action to rescind the strike and restore the account."  *Id.*

Berenson does not allege that he promptly appealed his account suspension, as Twitter's terms of service plainly entitled him to do.  *See* Twitter, Terms of Service, https://twitter.com/en/tos/previous/version_16 (in effect as of August 19, 2021) (cited in PFAC ¶ 262 ("If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center.")).  Berenson, whom Twitter referred to internally as a "VIT" ("Very Important Tweeter"), also does not allege the Jack Dorsey-led Twitter would have rejected such an appeal if Berenson had simply submitted one.  *See* PFAC, Exh. B at 19, 21 of 28.

## ARGUMENT

### I.    BERENSON FAILS TO STATE A CLAIM ON THE MERITS.

To survive a motion to dismiss under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the Court must take the plaintiff's well-pleaded allegations as true for purposes of the motion, that principle does not apply to "a legal conclusion couched as a factual allegation."  *Id.*  Nor does it apply where even well-pleaded allegations of fact "are contradicted by other allegations, attached exhibits, or documentary evidence incorporated by the Complaint."  *Feibelman v. Trustees of Columbia Univ. of City of*

*New York*, 2020 WL 882429, at *8 (S.D.N.Y. Feb. 24, 2020).

> **A.    Berenson Fails to Adequately Plead Causation for Any Claim.**

A core failing of each of Berenson's three claims against Slavitt is that Berenson fails to adequately allege that Slavitt caused Berenson's alleged injury—his suspension from Twitter. "It is 'textbook tort law' that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).    Here, however, Berenson's own allegations show that Twitter implemented a five-strike COVID-19 misinformation policy, did a "deep dive" on Berenson's account in response to third-party complaints, and began issuing Berenson strikes *before* Berenson allegedly "had the White House's attention."  PFAC ¶¶ 91, 95, 115.

*Murthy v. Missouri*, 144 S. Ct. 1972 (2024), shows how these alleged facts undercut Berenson's case.  *Murthy* arose from a parallel suit filed by the attorneys general for Missouri and Louisiana and other plaintiffs against government defendants (and not Slavitt individually) concerning their communications with social media companies related to the COVID-19 pandemic.  The Fifth Circuit had concluded that government "officials' communications rendered them responsible for . . . private platforms' moderation decisions." *Id.* at 1981.  But, the *Murthy* Court held, "[t]he Fifth Circuit was wrong to do so." *Id.*

*Murthy* based its unanimous reversal on a lack of standing.  As also alleged by Berenson, White House officials had "peppered Facebook (and to a lesser extent, Twitter and YouTube) with detailed questions about their policies, pushed them to suppress certain content, and sometimes recommended policy changes." 144 S. Ct. at 1983.  But none of this was sufficient to show injury, or the likelihood of injury, that was "fairly traceable to the challenged action." *See id.* at 1986. The "primary weakness" in the record of restrictions on plaintiffs' social media accounts was "the lack of specific causation findings." *Id.* at 1987.  The state plaintiffs devoted "minimal attention"

to a "causal link between" any restriction of their social-media content "and the actions of any Government defendant."  Simply put, "evidence of causation [was] lacking."  *Id.*[5]

The *Murthy* Court thus rejected the Fifth Circuit's "overly broad assertion" that the "platforms' 'censorship decisions'" were "'likely attributable at least in part to the platforms' reluctance to risk' the consequences of refusing to 'adhere to the government's directives.'"  144 S. Ct. at 1987 (quoting *Missouri v. Biden*, 83 F.4th 350, 370 (5th Cir. 2023)).  It held that "the platforms moderated similar content long before any of the Government defendants engaged in the challenged conduct."  *Id.*  Indeed, they had "targeted speech they judge to be false or misleading" for "years," with Twitter beginning to enforce its polices "against users who post false or misleading content about the pandemic" in March 2020.  *Id.* at 1982.  Over time, "the platforms, acting independently, had strengthened their pre-existing content moderation policies before the Government defendants got involved."  *Id.* at 1987.

Berenson alleges the same thing.  He quotes a March 2020 Twitter email in response to the Imperial College of London's complaint about Berenson that refers to the company's "COVID-19 misleading information policy."  PFAC ¶ 74.  He also alleges that Twitter "announced further action on COVID-19 information" in May 2020, Twitter's "new policy regarding misleading COVID-19 vaccine information" announced in December 2020, and Twitter's new "COVID-19

---

[5] On August 23, 2024, Berenson filed a notice of supplemental authority citing a recent order in *Kennedy v. Biden* (W.D. La. Case No. 3:23-cv-00381-TAD-KDM) finding that plaintiffs Robert F. Kennedy and Children's Health Defense had standing in that case (in which Berenson is not a party).  The Supreme Court held that many of the same district court's factual findings in the *Murthy* case "unfortunately appear to be clearly erroneous."  144 S Ct. at 1988 n.4.  In any event, the *Kennedy* court's order does not indicate that social media companies took a specific action on the plaintiffs' accounts *because* of any purported government "orders" to "censor" rather than simply *after* such "orders."  *See, e.g.,* Dkt. 79-1 at 5 ("[I]n this type of a case, a court must make specific findings that a particular defendant pressured a particular platform to censor a particular topic before the platform suppressed a particular plaintiff's speech on that topic.").

misleading information policy" that implemented a "new five-strike policy" on March 1, 2021. *Id.* ¶¶ 77, 86, 91. That was all *before* the "White House started" targeting Berenson's account "in April 2021." *Id.* ¶ 191.

Critically, the *Murthy* Court concluded that Twitter and the other social media platforms "continued to exercise their independent judgment even after communications with the defendants began." 144 S. Ct. at 1987. As to Facebook, for example, the Court found that since it had targeted a plaintiff's pages "before almost all of its communications with the White House and CDC," that "weaken[ed] the inference that her subsequent restrictions are likely traceable to 'government-coerced enforcement' of Facebook's policies." *Id.* at 1992. In fact, because Facebook had targeted the user's posts (and others like hers) "before the White House entered the picture," it was "difficult to say that the White House was responsible (even in part) for all of [the user's] later restrictions—*especially* absent clear links between White House content-moderation requests to Facebook and Facebook's actions toward [the user]." *Id.* at 1992 n.8 (emphasis in original).

The alleged facts and evidence that Berenson offers here—as opposed to his mischaracterizations of them—not only fail to show any "clear links" between White House content modification requests and Twitter action; they conclusively disprove them. *See Feibelman*, 2020 WL 882429, at *8 ("[I]f the allegations are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference.").

Berenson alleges that Slavitt "specifically targeted Mr. Berenson for removal" during an April 2021 meeting between White House officials and Twitter employees. PFAC ¶ 7. But Berenson concedes that Slavitt's alleged entreaties to Twitter "failed." *Id.* ¶ 8. Twitter "took no action against" Berenson in response to the April 2021 meeting, when Slavitt made clear by citing Twitter's policies that any decision to act on Twitter accounts belonged to Twitter alone.

Twitter did not further act on Berenson's account for another *three months*, when it issued strikes two, three, and four in July 2021. *Id.* ¶¶ 8, 147, 155, 169.  Nor has Berenson shown that Twitter took any adverse action against him in response to undated "angry" phone calls between unnamed White House officials and Twitter in which Berenson does not even allege that Slavitt participated. *Id.* ¶ 115 (emphasis omitted).  To the contrary, Berenson alleges that "[m]any people" were "complaining" to Twitter about his online activity.  *Id.* ¶ 78 (quotations omitted).

As for Slavitt's personal emails to Twitter after Slavitt left government service, the text of the emails contradict Berenson's characterization of them as "demand[s]" to remove Berenson from Twitter.  *See* PFAC ¶¶ 182, 188.  Slavitt simply expressed his personal opinion as a private citizen that Berenson "knows he's gone" and that "the outcry will be justified" if Berenson's tweet that, in the words of Twitter's Todd O'Boyle, "trivializ[ed] the Holocaust" did not result in his permanent suspension.  *Id.*  Slavitt had no power over Twitter and no authority to make a "demand," which the alleged language plainly does not reflect.  He, like the many others offended and concerned by Berenson's tweets, could only voice their complaints.

In any event, Berenson offers no substantive allegation that Twitter removed Berenson from the platform because of Slavitt's emails.  His conclusory claims that any of Slavitt's actions "caused Mr. Berenson's deplatforming from Twitter," *id.* ¶¶ 246, 255, are insufficient to state a claim, particularly in light of the numerous other third-party complaints directed at Berenson's Twitter account and Twitter's repeated rejections of third parties' views.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Indeed, as to Berenson's tweet that garnered his fifth and final strike, Twitter's SI Team noted that "*We have previously enforced the policy related to this type of claim*." PFAC, Exh. B at 27 of 28.  Berenson does not come close to alleging—as he must—that Twitter would not have suspended him but for Slavitt's actions.  *See Comcast*, 140 S. Ct. at 1014.

In fact, the evidence Berenson submits with his Proposed FAC directly contradicts his claim that Slavitt—or any defendant—caused Berenson any harm. The internal Twitter emails do not reveal one communication between any current or former government official and *anyone* at Twitter other than members of Twitter's Washington D.C. "public policy" team. *See, e.g.*, PFAC ¶¶ 170, 193. Nor do they reveal any decision-maker mentioning purported government (or private citizen) "threats" in discussing Twitter's decision-making related to Berenson's account. X Corp. has handed Berenson thousands of pages of materials, including internal communications with Twitter's counsel that Twitter likely considered to be attorney-client privileged. If Twitter were running scared because of pressure from Slavitt or anyone else, it would have said so in those sensitive and confidential internal communications.

But it did nothing of the sort. Instead, the Twitter emails attached as Exhibit B to Berenson's Proposed FAC reflect an elaborate and independent enforcement process with checks and balances including "escalation" of enforcement decisions, the involvement of multiple "teams" and supervisors, and detailed justifications for enforcement decisions that cite Twitter's misinformation policies.

Members of the policy team wanted to avoid any change to Section 230, but there is zero indication they thought it actually might happen. Berenson also does not make any allegation that Slavitt ever raised Section 230 with Twitter. Moreover, when Twitter finally issued a fifth strike to Berenson and suspended his account (in a decision endorsed by the Site Integrity group), Twitter decided internally to reinstate Berenson's account if he simply exercised his right to appeal under the Twitter terms of service. *See* PFAC, Exh. B at 27 of 28. But Berenson inexplicably waited to do so. His suspension is not because of any defendant here; it is because Twitter independently decided in an "edge case" (*id.*) that Berenson had again violated Twitter policy, and then Berenson

sat on his explicit right to ask Twitter to re-evaluate the decision.

A federal court already rejected Berenson's tort claims. As in this case, Berenson alleged in his suit against Twitter that the government coerced Twitter into censoring him. *Compare*, *e.g.*, Ex. 2 ¶ 162 *with* PFAC ¶ 227; *see also* Ex. 2 ¶¶ 4–6, 12, 118, 122–29. But the Northern District of California court held that Berenson's similar allegations in the Twitter case were "consistent with Twitter's *good faith* effort to respond to clearly objectionable content posted by users on its platform." Ex. 3, at 3 (emphasis added). Because a court already rejected Berenson's allegation that government officials forced Twitter to remove him from the platform, the collateral estoppel doctrine precludes Berenson from relitigating the same causation question against Slavitt here. *See Peralta v. St. Lukes Roosevelt Hosp.*, 2015 WL 3947641, at *4 (S.D.N.Y. June 26, 2015) ("Issues of res judicata and collateral estoppel may be decided on a motion to dismiss.").

### B. Berenson Fails to State a First Amendment Claim.

Whereas *Murthy* undercuts Berenson's case against Slavitt, the Supreme Court's recent *NRA* decision simply decimates it. *NRA* recognized the well-established principle that government officials have a First Amendment right to engage in their own expressive conduct. *NRA*, 602 U.S. at 187. "The government can say what it wishes and select the views that it wants to express." *Id.* That "makes sense" because "the government could barely function otherwise." *Id.* The vast majority of Slavitt's alleged statements were made after he left government service and was a private citizen, so they cannot be the basis for a First Amendment claim.[6] But even accepting for the sake of argument Berenson's false assertion that Slavitt's Gmail account was an arm of the federal government, there was no coercion.

---

[6] Twitter's Todd O'Boyle expressly distinguished between "the WH" [*i.e.*, the White House] and "former WH advisor (and frequent cable talker) Andy Slavitt." PFAC, Ex. B at 26-28; *see also id.* ¶ 157 (Slavitt told Facebook in July 2021 that with respect to Facebook's discussions with the White House, "'I want to really stay out of the middle and want you guys to communicate.'").

In *NRA*, Maria Vullo was the superintendent of the New York Department of Financial Services (DFS), which "oversees insurance companies and financial services institutions doing business in the state." 602 U.S. at 180. In a meeting with senior executives of the insurer Lloyd's of London (Lloyd's), Vullo told Lloyd's executives that DFS would be less likely to pursue infractions "unrelated to any NRA business" as long as Lloyd's ceased providing insurance to gun groups, especially the NRA. *Id.* at 183. She and Lloyd's "struck a deal" under which "Lloyd's would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business" in exchange for DFS focusing its upcoming enforcement action "solely on those syndicates which served the NRA…." *Id.*

The Court held that the NRA plausibly alleged Vullo violated the First Amendment by coercing DFS-regulated entities to terminate their business relationships with the NRA. 602 U.S. at 198. Vullo "was free to criticize the NRA and pursue the conceded violations of New York insurance law," but "[s]he could not wield her power . . . to threaten enforcement actions against DFS-regulated entities in order to punish or suppress the NRA's gun-promotion advocacy." *Id.* Notably, however, the facts the Court cited to conclude that Vullo had crossed the line from permitted expression to coercion are very different from what Berenson alleges here.

The Court first considered Vullo's authority because the power a government official wields "is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." 602 U.S. at 191. Vullo "had direct regulatory and enforcement authority over all insurance companies and financial service institutions doing business in New York." *Id.* at 192. By contrast, Slavitt briefly was "Senior Advisor to the White House's COVID-19 Response Coordinator" before working as the "general partner of a private equity fund" "upon leaving the government." PFAC ¶¶ 10, 47. He is not alleged to have ever had

*any* enforcement power over Twitter or any other social media platform. Even if other government officials and elected representatives made public statements about evaluating Section 230's scope, "the Constitution relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *NRA*, 602 U.S. at 198.

In *NRA*, Vullo's message was "loud and clear" that Lloyd's could avoid liability if it terminated its relationships with gun groups. Here, Slavitt allegedly expressed his view that Twitter was not enforcing its policies as to Berenson and sent several tweets making no demands and no threats to a Twitter "lobbyist" who previously had been quite comfortable telling the government when he believed Berenson had not violated those policies. PFAC ¶ 123.

Likewise, in *NRA*, the reaction from Lloyd's "further confirm[ed] the communications' coercive nature." *NRA*, 602 U.S. at 193. At the very meeting in which Vullo made her demand, Lloyd's "agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business." *Id.* at 193. Here, Twitter repeatedly disagreed with Slavitt and others that Berenson had violated Twitter's policies and defended Berenson's right to express his views. *E.g.,* PFAC ¶¶ 75, 122, 123.

Twitter even labeled Berenson a "Very Important Tweeter," with then-CEO Jack Dorsey excusing as mere "queries" Berenson tweets that the Site Integrity team ruled were sharing false information in violation of Twitter's policies. *Id.*, Exh. B at 11 of 28. Slavitt flagged a post in which Berenson trivialized the Holocaust, and Twitter did nothing. Berenson attacked various government officials, and Twitter did nothing. *See id.* ¶¶ 131, 133, 194. It took Berenson five months to accrue the five strikes that resulted in his suspension under Twitter's independently administered enforcement process. *See O'Handley v. Weber*, 62 F.4th 1145, 1158, 1163 (9th Cir. 2023) (rejecting plaintiff's charge of state coercion because Twitter remained "free to ignore" the

state's request and "decided how to respond" to its recommendations "independently").

Vullo acted coercively in directly threatening an entity over which she had direct enforcement power.  The government Commission in *Bantam Books, Inc. v. Sullivan*, 83 S. Ct. 631 (1963) also had the power to investigate and recommend prosecution, and acted coercively in literally sending the police to a book distributor's door.  *Id.* at 60 n.1, 61.  But Slavitt had no enforcement power whatsoever over Twitter and nothing he or the other defendants  allegedly did went beyond "forcefully condemning views with which they disagree," which the *NRA* Court held was "permissible."  602 U.S. at 198.  Berenson's First Amendment claim thus fails.[7]

Even if Berenson could state a First Amendment claim, Slavitt is entitled to qualified immunity as to that claim (and Berenson's § 1985(3) claim, discussed *infra*) because Berenson had no "clearly established" right under the First Amendment that Slavitt supposedly violated for the reasons given by the U.S. Attorney, whose arguments Slavitt joins here.

### C.    Berenson Fails to State a Claim Under Section 1985(3).

This Court should dismiss Berenson's claim for conspiracy to violate his civil rights under the Ku Klux Klan Act, 42 U.S.C. § 1985(3), because every one of Slavitt's alleged conspiratorial acts consists of speech protected by the First Amendment.  A plaintiff cannot hold a defendant liable in tort for truthful speech or opinion speech on matters of public concern.  *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011).

---

[7] Berenson's First Amendment claim also fails because he cannot obtain a remedy.  Berenson has conceded he cannot recover damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  Dkt. 51 at 34.  In addition, Slavitt cannot be enjoined from prospective First Amendment violations because he cannot violate the First Amendment as a private citizen.  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).  And a declaratory judgment does not empower a federal court to issue an "abstract" pronouncement Slavitt violated Berenson's rights when he served as a government advisor more than three years ago.  *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 91 (2d Cir. 2023).

Apart from the claim's First Amendment defects, Berenson fails to plead that the conspiracy is driven by "class-based, invidiously discriminatory animus," *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), and that he is a member of the protected class, *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir. 1989). Section 1985(3) requires a class defined by "inherited or immutable characteristics." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). A loosely defined group of individuals united "in political and philosophical opposition" to the defendant's policy position, such as a class opposed to COVID vaccines, does "not constitute a cognizable class under section 1985." *Gleason*, 869 F.2d at 695; *see also Abadi v. City of N.Y.*, 2022 WL 347632, at *7 (S.D.N.Y. Feb. 4, 2022) (holding vaccination status does not give rise to a protected class for equal protection purposes). That class, moreover, is irrelevant to the § 1985(3) claim: Berenson does not allege Slavitt targeted his speech because he "had chosen not to receive a COVID-19 vaccine," PFAC ¶ 252, but because Berenson was spreading COVID misinformation on Twitter, *id.* ¶ 119.

Nor can Berenson paper over the deficiencies in his allegations as to Slavitt by relying on conspiracy liability. Berenson offers only "conclusory, vague, or general allegations" that Slavitt formed any "agreement" with his alleged co-conspirators concerning Berenson's Twitter account. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997). He does not allege one substantive communication between Slavitt and any government official about Berenson after Slavitt left the White House in June 2021. Even if Berenson made such an allegation, he would be targeting a private citizen's constitutionally protected petitioning activity.

As to Scott Gottlieb, Berenson alleges that Slavitt and Gottlieb allegedly "coauthored a letter to Congress" and "appeared on interviews together in 2020 and 2021." PFAC ¶ 161. They also sought to speak with Twitter's Todd O'Boyle about a "policy matter" (with no reference to Berenson) in a joint call that apparently never happened. *Id.*, Exh. B at 7, 10 of 28. Like many

other people, Slavitt and Gottlieb also allegedly expressed their views to Twitter about several of Berenson's tweets. *Id.* at 16, 27 of 28. But, "[w]ithout more, parallel conduct does not suggest conspiracy." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 556-57 (2007).

Most important, a conspiracy requires "an agreement, express or tacit, to achieve [an] *unlawful end*." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Here, Slavitt, Gottlieb, and the other defendants at most were sharing their views and criticizing particular beliefs. *NRA* expressly permits this, including doing so "forcefully." 602 U.S. at 188.

### D.    Berenson Fails to State a Tortious Interference Claim.

The Court should dismiss Berenson's tortious interference claim because he fails to show Slavitt induced a breach of his contract, let alone that he did so wrongfully or without justification.

At the outset, Berenson cannot recover damages in tort stemming from Slavitt's conduct as a federal officer. The Federal Tort Claims Act shields individual employees from personal liability for alleged torts committed in the scope of their employment and permits suits only against the United States. *See Levin v. United States*, 568 U.S. 503, 509 (2013) (citing 28 U.S.C. § 2679(b)(1)). The U.S. Attorney has certified that Slavitt "was acting within the scope of his federal employment" to the extent the tortious interference claim is "premised on actions he took during the time period he served as Senior Advisor." Dkt. 28. Accordingly, Berenson's tortious interference claim must rise or fall based on Slavitt's conduct as a private citizen.

The tortious interference claim fails because Berenson has not plausibly alleged Slavitt interfered with his contract with Twitter. That contract gives Twitter complete discretion to "suspend or terminate" a user's account for "any or no reason." PFAC ¶ 262. Berenson claims Twitter "modified" it when Twitter instituted the "five-strike" policy, *id.*, but even accepting that legal conclusion as true, Berenson does not plausibly allege that any Slavitt email to Twitter caused Twitter to issue a strike against him or otherwise interfered with his alleged contract. PFAC

¶¶ 182, 188; pp. 11-16, *supra*.  Even if Berenson could tie any strike to Slavitt's emails, he cannot establish that such communications were wrongful or unjustified.  *See supra*, pp. 16-19.

Berenson also alleges that Twitter privately assured him that his speech did not violate Twitter's policies.  *See* PFAC ¶¶ 78–82.  To the extent Berenson claims Slavitt induced a breach of an oral contract with Twitter, Berenson has not plausibly alleged Slavitt had "knowledge" of any such private agreement.  *See Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996).

**E.    Section 230 Provides Immunity from Berenson's § 1985(3) and Tortious Interference Claims.**

Section 230(c)(2)(A) immunizes a "provider *or user* of an interactive computer service" from civil liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider *or user* considers to be . . . objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A) (emphases added).  That provision plainly bars at least Berenson's § 1985(3) and tortious interference claims here.

Berenson already has litigated and lost on the application of § 230(c)(2)(A).  He brought eight causes of action against Twitter in the Northern District of California after it permanently suspended his account.  This included a First Amendment claim, five other tort claims, and breach of contract and promissory estoppel claims arising out of the purported modified agreement between Berenson and Twitter.  *See* Slavitt RJN Exh. 2.  The district court granted Twitter's motion to dismiss as to the First Amendment and other tort claims, holding that "[w]ith the exception of the claims for breach of contract and promissory estoppel, all claims in this action are barred by 47 U.S.C. Section 230(c)(2)(A). . . ."  *Berenson v. Twitter, Inc.*, 2022 WL 1289049, at *2 (N.D. Cal. Apr. 29, 2022).  Dismissal based on § 230(c)(2)(A) is equally warranted here.

The statute's application is simple.  It plainly applies both to providers like Twitter and to

Twitter *users*.  Berenson repeatedly alleges that Slavitt is a Twitter user.  PFAC ¶¶ 61, 68.  His allegations likewise make clear that Slavitt had a good-faith belief that Berenson's tweets represented dangerous and objectionable COVID-19 misinformation, *id.* ¶¶ 68, 99, 119, 143, 161; *see also Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 603–04 (S.D.N.Y. 2020) (recognizing that § 230(c)(2) "does not require that the material actually be objectionable; rather, it affords protection for blocking material that the provider or user considers to be objectionable").  As such, Slavitt is immune as a matter of law from liability for Berenson's statutory and common law claims based on Slavitt "expressing his view[s]" to Twitter."  PFAC ¶ 123.

Berenson has no legitimate basis to contest the plain application of § 230(c)(2)(A) here.  It does not matter, for example, if Slavitt flagged a Berenson post on the Twitter platform or sent an email to Twitter directly.  The statute applies to "*any action*" voluntarily taken in good faith to restrict access to or availability of material that the user considers to be objectionable.  Slavitt had a right to object to Berenson's speech, and Twitter had a right to choose to take it down.  Section 230(c)(2)(A) thus bars Berenson's claims against Twitter-user Slavitt just as the Northern District of California court held it barred Berenson's claims against Twitter itself.

## II.    THIS COURT LACKS PERSONAL JURISDICTION OVER SLAVITT.

Berenson's complaint, even if viewed as amended by his Proposed FAC, fails at the most basic level to allege personal jurisdiction over Slavitt.  Nevertheless, if the Court agrees with Slavitt that Berenson fails to state a claim, then it should conserve judicial and party resources by exercising its discretion to dismiss under Federal Rule 12(b)(6) rather than for lack of personal jurisdiction under Rule 12(b)(2).  *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 387 n.12 (S.D.N.Y. 2019) (The Federal Rules permit the Court to bypass the personal jurisdiction inquiry "by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction.").

As a threshold matter, Berenson cannot satisfy New York's long-arm statute. The only applicable subsection of the statute that could create specific jurisdiction is Civil Practice Law § 302(a)(3), which confers jurisdiction over a non-domiciliary under specific conditions and "is more stringent than any constitutional requirement." *Nat'l Union Fire Ins. Co. v. UPS Supply Chain Sols., Inc.*, 74 F.4th 66, 72 (2d Cir. 2023). Berenson must show the alleged acts "caused injury to a person or property within the state." *Nat'l Union*, 74 F.4th at 72. The situs of the injury is "where the *first effect* of the tort that ultimately produced the final economic injury is located." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 327 (S.D.N.Y. 2013). The best Berenson can do to meet this test is allege that "Twitter's records show the Twitter employee who issued the fifth strike against Mr. Berenson's account was located in New York and this judicial district at the time." PFAC ¶ 47. If the August 2021 fifth strike, which Berenson does not allege Slavitt had anything to do with, is the "first effect" of the alleged torts, that not only shows there is no personal jurisdiction over Slavitt but concedes that Slavitt's alleged communications to Twitter, which *all* predate that fifth strike, did not cause Berenson any harm. *See, supra*, pp. 11-16.[8]

Even if Berenson "could somehow shoehorn this case" into New York's long-arm statute, "exercising jurisdiction . . . would run afoul of due process." *Al-Ahmed v. Twitter, Inc.*, 553 F. Supp. 3d 118, 130 (S.D.N.Y. 2021). Berenson "does not challenge Mr. Slavitt's contention that general personal jurisdiction does not exist here."[9] He thus must carry his burden of making the required "prima facie showing" of specific personal jurisdiction. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010).

---

[8] Berenson also fails to satisfy other elements of § 302(a)(3), including that Slavitt "should reasonably have expected" his communications with Twitter "to have consequences in the state" or that Slavitt "derives substantial revenue from interstate or international commerce." *Nat'l Union*, 74 F.4th at 72.

[9] Dkt. 52 at 9 n.1. He has no basis to do so in any event. *See* N.Y. C.P.L.R. § 301.

For a court to exercise specific jurisdiction consistent with due process, the defendant must not only undertake "some act by which it purposefully avails itself of the privilege of conducting activities within the forum," but the plaintiff's claims must also "*arise out of or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).  "What is needed . . . is a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 265 (2017). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on 'random, fortuitous, or attenuated' contacts he makes by interacting with persons affiliated with the State." *Walden v. Fiore*, 571 U.S. 277, 286 (2014).

Berenson alleges only that Slavitt once "used an employee of Town Hall Ventures to schedule a conference call with Twitter to discuss moderating speech regarding the COVID-19 vaccines, to include, upon information, and belief, Mr. Berenson's speech."  PFAC ¶ 47. Berenson's own allegations indicate that call never happened. *See id.* ¶ 171.  Moreover, Berenson does not even allege that the employee, Slavitt's "executive assistant" (*id.* ¶ 171), was in New York.  These allegations do not create a "meaningful connection" between the alleged suit-related conduct and New York; it is the type of random, fortuitous, and attenuated contact that cannot justify forcing someone to litigate three thousand miles from their home.

## CONCLUSION

Berenson purports to rely on abundant evidence from Twitter and a House committee to support his case.  But even with the benefit of those materials and multiple attempts to plead a viable claim against Slavitt, he still fails to do so.  The law and alleged facts show plainly that this Court should dismiss the claims against Slavitt with prejudice and end Berenson's baseless attack on Slavitt's protected speech once and for all.

Dated: October 11, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:/s/ *Theodore J. Boutrous Jr.*
     Theodore J. Boutrous Jr.

Theodore J. Boutrous Jr.
Michael H. Dore
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  (213) 229-7000
TBoutrous@gibsondunn.com
MDore@gibsondunn.com

*Attorneys for Defendant Andrew M. Slavitt*