UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEX BERENSON,

                Plaintiff,

   -against-

JOSEPH R. BIDEN, JR., ANDREW M. SLAVITT,
ROBERT  FLAHERTY, VIVEK MURTHY, M.D.,
SCOTT GOTTLIEB, M.D., and ALBERT
BOURLA, PH.D, D.V.M.,

                Defendants.

---

Case No. 1:23-cv-03048-JGLC

**ORAL ARGUMENT REQUESTED**

<br>

## MEMORANDUM OF LAW IN SUPPORT OF
## DR. ALBERT BOURLA AND DR. SCOTT GOTTLIEB'S
## MOTION TO DISMISS THE PROFFERED AMENDED COMPLAINT

<br>

James P. Rouhandeh
Michael Scheinkman
David B. Toscano
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Dr. Albert Bourla and
Dr. Scott Gottlieb*

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ................................................................................................................4

       A.     Dr. Gottlieb and Dr. Bourla ...........................................................................4

       B.     Twitter's Efforts to Limit Misinformation About COVID-19.....................5

       C.     The Alleged Conspiracy and Twitter's Enforcement Actions
             Against  Berenson's Account...........................................................................6

       D.     Berenson's Lawsuit Against Twitter ..............................................................8

       E.     The Instant Action..........................................................................................9

ARGUMENT.......................................................................................................................9

      I.     The First Amendment Bars Berenson's Claims...........................................9

      II.    Berenson Fails to State a § 1985(3) Claim Against Dr. Gottlieb or
          Dr. Bourla ....................................................................................................14

       A.     Berenson Fails to Plead Class-Based Invidiously
             Discriminatory Animus....................................................................14

            1.     Berenson Fails to Plead a Class Protected by § 1985(3) ...............14

            2.     Berenson Fails to Plead Invidiously Discriminatory Animus........16

       B.     Berenson Fails to Plead Facts Plausibly Showing that Dr. Gottlieb
             or Dr. Bourla Conspired to Deprive Him of First Amendment Rights......17

       C.     Berenson Fails to Plead the Necessary Government Action .....................18

      III.   The Amended Complaint Fails to State a Claim for Tortious
          Interference with Contract ...........................................................................20

       A.     The Amended Complaint Fails to Plead that Defendants Intentionally
             and Improperly Interfered With a Contract ...............................................21

       B.     The Amended Complaint Fails to Plead a Breach of Contract..................22

       C.     The Amended Complaint Fails to Plead Defendants Knew of a Contract
             Created by Twitter's "Specific and *Direct* Assurances" to Berenson .......24

CONCLUSION...................................................................................................................25

**TABLE OF AUTHORITIES**

PAGE(S)

CASES

*Abadi v. City of New York*,
2022 WL 347632 (S.D.N.Y. Feb. 4, 2022) ........................................................... 16

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005) ................................................................................ 22

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) .................................................................... 21

*Behringer v. Cal. Polytechnic State Univ., San Luis Obispo*,
2023 WL 6811813 (C.D. Cal. Sept. 15, 2023), *report and recommendation adopted*,
2023 WL 6810244 (C.D. Cal. Oct. 16, 2023) ...................................................... 15

*Berenson v. Twitter, Inc.*,
2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) ............................................... *passim*

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ....................................................................................... 16, 17

*Brink v. Bormann*,
2023 WL 6213167 (D.N.J. Sept. 25, 2023) .......................................................... 15

*Brock v. City of New York*,
2022 WL 479256 (S.D.N.Y. Jan. 28, 2022) .......................................................... 16

*Butler Am., LLC v. Ciocca*,
2020 WL 6781488 (Conn. Super. Ct. Mar. 12, 2020) ........................................... 25

*Celle v. Filipino Rep. Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000) ................................................................................ 12

*Chandok v. Klessig*,
632 F.3d 803 (2d Cir. 2011) ................................................................................ 12

*Changizi v. HHS*,
602 F. Supp. 3d 1031 (S.D. Ohio 2022) ............................................................... 20

*Child.'s Health Def. v. Meta Platforms, Inc.*,
No. 21-16210, 2024 WL 3734422 (9th Cir. Aug. 9, 2024) .................................... 20

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018) ................................................................................ 25

*Conte v. Emmons*,
895 F.3d 168 (2d Cir. 2018) .............................................................................. 4, 22

*Coughlin v. New York State Unified Ct. Sys.*,
  2023 WL 7091904 (E.D.N.Y. Oct. 26, 2023) ........................................................................ 16

*Cox v. Twitter, Inc.*,
  2019 WL 2513963 (D.S.C. Feb. 8, 2019), *report and recommendation approved*,
  2019 WL 2514732 (D.S.C. Mar. 8, 2019) ............................................................................. 23

*Daniels v. Alphabet Inc.*,
  2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ...................................................................... 23

*Davis v. Avvo, Inc.*,
  345 F. Supp. 3d 534 (S.D.N.Y. 2018) ................................................................................... 13

*Delano Vill. Cos. v. Orridge*,
  147 Misc. 2d 302 (Sup. Ct. N.Y. Cty. 1990) ....................................................................... 12

*Dolan v. Connolly*,
  794 F.3d 290 (2d Cir. 2015) ........................................................................................... 14, 15

*Fabrikant v. French*,
  691 F.3d 193 (2d Cir. 2012) ................................................................................................. 18

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) ............................................................................................. 12

*Flamm v. Am. Ass'n of Univ. Women*,
  201 F.3d 144 (2d Cir. 2000) ................................................................................................. 12

*Ford v. Northam*,
  2023 WL 2767780 (W.D. Va. Mar. 31, 2023), *aff'd*,
  2023 WL 6057493 (4th Cir. Sept. 18, 2023) ....................................................................... 15

*Gleason v. McBride*,
  869 F.2d 688 (2d Cir. 1989) ................................................................................................. 16

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971) ............................................................................................................... 14

*Grillo v. New York City Transit Auth.*,
  291 F.3d 231 (2d Cir. 2002) ................................................................................................. 14

*Hammerhead Enters., Inc. v. Brezenoff*,
  707 F.2d 33 (2d Cir. 1983) ........................................................................................... *passim*

*Hart v. Facebook Inc.*,
  2022 WL 1427507 (N.D. Cal. May 5, 2022) ........................................................................ 20

*Huber v. Biden*,
  2022 WL 827248 (N.D. Cal. Mar. 18, 2022), *aff'd*,
  2022 WL 17818543 (9th Cir. Dec. 20, 2022) ...................................................................... 20

*Illoominate Media, Inc. v. CAIR Found.*,
2019 WL 13168767 (S.D. Fla. Nov. 19, 2019), *aff'd sub. nom.*
*Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132 (11th Cir. 2020) ................ 4, 20

*Illoominate Media, Inc. v. CAIR Fla., Inc.*,
841 F. App'x 132 (11th Cir. 2020) ..................................................................................... 23

*Iosilevich v. City of New York*,
2022 WL 19272855 (E.D.N.Y. Aug. 10, 2022) ..................................................................... 16

*Jansson v. Stamford Health, Inc.*,
2017 WL 1289824 (D. Conn. Apr. 5, 2017) .......................................................................... 12

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*,
175 F.3d 848 (10th Cir. 1999) .............................................................................................. 11

*Jones v. Deutsch*,
715 F. Supp. 1237 (S.D.N.Y. 1989) ..................................................................................... 18

*Kennedy v. Warren*,
66 F.4th 1199 (9th Cir. 2023) .............................................................................................. 11

*Khan v. Yale Univ.*,
27 F.4th 805 (2d Cir. 2022) .......................................................................................... 21, 23

*Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*,
318 Conn. 847 (2015) ........................................................................................................... 24

*Levine v. N.Y. State Police*,
2022 WL 4465588 (N.D.N.Y. Sept. 26, 2022) ..................................................................... 15

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ......................................................................................................... 17

*Maniscalco v. New York City Dep't of Educ.*,
563 F. Supp. 3d 33 (E.D.N.Y. 2021) .................................................................................... 16

*Marciano v. de Blasio*,
589 F. Supp. 3d 423 (S.D.N.Y. 2022) .................................................................................. 16

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991) ....................................................................................................... 12, 13

*McTerrell v. N.Y.C. Health & Hosps. Corp.*,
2020 WL 1503194 (S.D.N.Y. Mar. 30, 2020) ..................................................................... 18

*Medtech Prod. Inc. v. Ranir, LLC*,
596 F. Supp. 2d 778 (S.D.N.Y. 2008) .................................................................................. 25

*Montano v. City of Watervliet*,
47 A.D.3d 1106 (3d Dep't 2008) .......................................................................................... 22

iv

*Moriarty v. Port of Seattle*,
  2024 WL 4290279 (W.D. Wash. Sept. 25, 2024) ................................................. 15

*Morton v. Twitter, Inc.*,
  2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) ...................................................... 23

*Murphy v. Twitter, Inc.*,
  60 Cal. App. 5th 12 (2021) ............................................................................... 23

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024) ..................................................................................... 19

*N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*,
  2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) ..................................................... 25

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ..................................................................................... 11, 12

*NRA of Am. v. Vullo*,
  602 U.S. 175 (2024) ......................................................................................... 19

*Owens v. Lead Stories, LLC*,
  2021 WL 3076686 (Del. Super. Ct. July 20, 2021), *aff'd*, 273 A.3d 275 (Del. 2022)............ 12

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub nom.*
  *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ........................................... 18

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) .......................................................................... 20

*Rangel v. Dorsey*,
  2022 WL 2820107 (N.D. Cal. July 19, 2022) ..................................................... 23

*Reid v. City of New York*,
  2022 WL 2967359 (S.D.N.Y. July 27, 2022) ...................................................... 15

*Rich v. Fox News Network, LLC*,
  939 F.3d 112 (2d Cir. 2019) ......................................................................... 21, 23

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ......................................................................................... 11

*Sweet v. Google Inc.*,
  2018 WL 1184777 (N.D. Cal. Mar. 7, 2018) ...................................................... 23

*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
  546 F.3d 255 (2d Cir. 2008) ............................................................................. 18

*Taboola, Inc. v. Ezoic Inc.*,
  2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020) ..................................................... 24

*Taboola, Inc. v. Ezoic Inc.*,
    2021 WL 2041639 at *9  (S.D.N.Y. May 21, 2021) ............................................................ 25

*United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*,
    463 U.S. 825 (1983)  ......................................................................................................... 17

*We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*,
    76 F.4th 130 (2d Cir. 2023)  .............................................................................................. 15

*Webb v. Goord*,
    340 F.3d 105 (2d Cir. 2003)  ............................................................................................. 17

*Williams v. Rosenblatt Sec. Inc.*,
    136 F. Supp. 3d 593 (S.D.N.Y. 2015)  .............................................................................. 17

*Yuksel v. Twitter, Inc.*,
    2022 WL 16748612 (N.D. Cal. Nov. 7, 2022)  ................................................................. 23

*Zhang v. Twitter Inc.*,
    2023 WL 5493823 (N.D. Cal. August 23, 2023)  .............................................................. 23

*Zilg v. Prentice-Hall, Inc.*,
    717 F.2d 671 (2d Cir. 1983)  ................................................................................... *passim*

## STATUTES & RULES

42 U.S.C. § 1985(3) ................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 8

## PRELIMINARY STATEMENT[1]

Like many other COVID-19 vaccine skeptics and critics, Plaintiff Alex Berenson had a social media account suspended for violating the platform's rules. His Amended Complaint concedes that the platform (Twitter) made the decision to suspend his account. He sued Twitter thereafter, the parties settled in mid-2022 on undisclosed terms, and Twitter lifted its suspension.

In this action, Berenson blames his suspension by Twitter on a supposed conspiracy, hatched at the White House by the President and members of his administration, to target Berenson's Twitter account for removal. Berenson gloms onto his alleged conspiracy two private citizens—Dr. Scott Gottlieb, an independent director on the board of Pfizer Inc. ("Pfizer"), and Dr. Albert Bourla, Pfizer's CEO—claiming they conspired to violate his First Amendment rights in violation of 42 U.S.C. § 1985(3) and tortiously interfered with his contractual relationship with Twitter.[2] Because the Amended Complaint pleads no facts plausibly showing that Dr. Gottlieb or Dr. Bourla did anything other than exercise their own free speech rights, and because Berenson's allegations face a litany of fatal legal defects under controlling Supreme Court and Second Circuit law, his claims against Dr. Gottlieb and Dr. Bourla fail as a matter of law.

Berenson's proffered Amended Complaint compounds—rather than cures—the flaws that beset his original complaint. Berenson's pleading failure is especially telling—and should result in dismissal of his claims against Dr. Gottlieb and Dr. Bourla with prejudice—given the posture of this motion. Berenson drafted his proffered Amended Complaint with the benefit of full briefing on motions to dismiss his original complaint. His Amended Complaint also reflects discovery in

---

[1]    Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

[2]    The Amended Complaint includes constitutional claims against President Joseph R. Biden, Jr., Surgeon General Dr. Vivek Murthy, and former White House employees Andrew M. Slavitt and Robert Flaherty (collectively, the "Government Defendants," and with Dr. Gottlieb and Dr. Bourla, the "Defendants"). Dr. Gottlieb and Dr. Bourla adopt the Defendants' arguments to dismiss the Amended Complaint, as applicable.

his lawsuit against Twitter, additional Twitter documents volunteered to Berenson by Twitter's corporate successor (X Corp.), discovery in a lawsuit against many of the Government Defendants (which went to the Supreme Court as *Murthy v. Missouri*), and a congressional inquiry into government influence on social media platforms' content moderation decisions, which yielded an 881-page report (that does not even mention Dr. Gottlieb or Dr. Bourla).

Berenson's new allegations highlight the dependence of his claims on Dr. Gottlieb's exercise of his ***own*** free speech rights. Berenson adds allegations that Dr. Gottlieb "threatened" to "use his access to television and media to air his view that Twitter had an 'affirmative obligation'" to moderate the tweets by users that Twitter had verified. These allegations—which have nothing to do with government coercion—illustrate that Berenson's claims against Dr. Gottlieb and Dr. Bourla are nothing more than constitutionally prohibited attempts to impose liability on Dr. Gottlieb's exercise, as a private citizen, of his free speech rights. The Second Circuit has held, in a closely analogous case, that the First Amendment is a complete defense to attempts to impose civil liability on noncoercive criticisms of another person's speech, reasoning that claims like Berenson's "undermine the very [free speech] principle [plaintiff] champion[s]." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 35 (2d Cir. 1983). The Second Circuit has extended the *Hammerhead* defense to tortious interference, holding that "[s]o long as the [challenged] expression of views is done in good faith and in a non-coercive way, it is not tortious." *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 678–79 (2d Cir. 1983) (citing *Hammerhead*). The court emphasized that "[a]uthors have no exclusive right to the ear of those who disseminate their works, for intelligent decisions by publishers and others distributing books are enhanced by the free flow of information" from critics of those works. *Id.* at 678. These precedents foreclose Berenson's claims. Allowing such claims would abrogate the rights of all social media users to complain to the publishers of

2

content about material they find objectionable, a right not only protected by the U.S. Constitution but specifically permitted by the terms and conditions of Twitter and other social media companies.

The Amended Complaint confirms that Berenson's § 1985(3) claim is a perversion of the Ku Klux Klan Act. Berenson's claim is foreclosed, as a matter of law, by longstanding binding precedent, under which Berenson fails to allege virtually every required element. Berenson's proffered class—"Americans who had chosen not to receive a COVID-19 vaccine"—is not cognizable under § 1985(3) because it is not defined by "inherited or immutable" characteristics, as the Supreme Court and Second Circuit require. No court has accepted § 1985(3) claims based on vaccination status, and courts in this Circuit have repeatedly held that COVID-19 vaccination status does not warrant treatment as a protected class.

The Amended Complaint also affirmatively negates the necessary "invidiously discriminatory animus." Berenson complains not that Defendants had animus toward the class, but instead that "Defendants bore animus *against Mr. Berenson's reporting*." As to the class, Berenson's allegations—including his acknowledgements that alleged conspirators "view COVID-19 vaccination as a life-saving measure" and "se[e] Americans' decision of whether to get a COVID-19 vaccine as a life-or-death choice"—demonstrate concern for, and attempts to advance, class members' well-being, the opposite of invidiously discriminatory animus.

Berenson's § 1985(3) claim fails for the independent reason that he does not plead facts that would demonstrate (if proven) the supposed government coercion that underpins his theory of a First Amendment violation—much less showing that Dr. Gottlieb or Dr. Bourla are, as private citizens, liable for any government coercion. Indeed, Berenson pleads the opposite—adding new allegations that the morning after Twitter suspended his account, intervention by Twitter's CEO and its general counsel resulted in Twitter deciding to "'restore [his] account' if Mr. Berenson

3

appealed." These and other allegations about Twitter's decision are incompatible with Berenson's speculation that Twitter had been cowed by any external pressure, let alone governmental pressure.

Berenson's remaining claim—alleged tortious interference with contract—fares no better. Taking Twitter up on its invitation to report content that potentially violates its policies is not a basis for tort liability. As one federal court aptly reasoned, the "suggestion that the mere reporting of a Twitter user … is sufficient to constitute tortious interference in a business relationship between Twitter and the targeted user is, to put it mildly, nonsensical."[3] Berenson alleges no facts showing that Dr. Gottlieb's communications with Twitter (on which Dr. Bourla's asserted liability also rests) entailed bad faith or coercion. Even if Berenson's allegations were true, the Second Circuit has in similar circumstances rejected tort liability as a matter of law where a defendant complains to a distributor of an author's work in order "to expose … negative aspects [of the work] in the hope of causing [the distributor] to abandon its plans" to distribute the work. *Zilg*, 717 F.2d at 677. The Amended Complaint's allegations also affirmatively establish that Dr. Gottlieb's communications with Twitter expressly concerned public health and safety, which cannot be the basis for a tortious interference claim. *See Conte v. Emmons*, 895 F.3d 168, 173 (2d Cir. 2018).

## BACKGROUND

### A.    Dr. Gottlieb and Dr. Bourla

Dr. Scott Gottlieb is a physician, author, and media commentator who served as FDA commissioner from 2017 to 2019. ¶¶ 18, 44.[4] After completing his public service, Dr. Gottlieb took positions as a senior fellow at a policy institute, partner at a venture capital firm, and director on

---

[3]    *Illoominate Media, Inc. v. CAIR Found.*, 2019 WL 13168767, at *3 (S.D. Fla. Nov. 19, 2019), *aff'd sub. nom.*, *Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132 (11th Cir. 2020).

[4]    Citations in the form "¶" or "¶¶" refer to the proffered Amended Complaint, ECF No. 80-1, the well-pleaded allegations of which are assumed to be true solely for purposes of this motion to dismiss, notwithstanding that the Amended Complaint's allegations are inaccurate, incomplete, and misleading.

the boards of multiple public companies, including as an independent director on the board of Pfizer, a research-based, global biopharmaceutical company headquartered in New York City. ¶¶ 158–60.  During the pandemic, Dr. Gottlieb used his expertise to inform the public about COVID-19, including the role of vaccines.  ¶¶ 108, 160, 164, 216.  He wrote columns for *The Wall Street Journal*, contributed to NBC News and CBS News, and published a book identifying gaps in the global response to COVID-19.  Among his many public health statements, he and 15 current and former public health officials issued a bipartisan call in April 2020 for investment in COVID-19 tracking and tracing.  ¶ 161.  Since 2019, Dr. Bourla has served as Pfizer's CEO, under whose leadership Pfizer co-developed the first FDA-approved COVID-19 vaccine.  ¶¶ 45, 163, 175, 179.

## B.    Twitter's Efforts to Limit Misinformation About COVID-19

Twitter (since renamed X) was a social media platform that allowed users to post messages called "tweets."  By using Twitter, a user agrees to its Rules and Terms of Service.  ¶ 262; *see* Ex. A.[5]  Twitter actively solicited users to help police its platform by reporting potential violations for Twitter's review.  Ex. B.  For instance, after Berenson commented on a study by Imperial College London, the college asked Twitter to "delete Berenson's tweets or at least flag them for making false claims."  ¶¶ 73–74.  After reviewing the tweets, Twitter took no action.  ¶ 75.

In late 2020, Twitter published a COVID-19 Misleading Information Policy (the "COVID Policy") barring content "advanc[ing] a claim of fact" that was "demonstrably false or misleading" and "likely to impact public safety."  ¶ 86; Ex. C at 1.  In March 2021, Twitter updated the COVID Policy to provide that five violations (or "strikes") would result in the user's permanent suspension. ¶ 91; Ex. D at 3.  That month, a journalist reported Berenson's account to Twitter, which conducted a "deep dive" and declined to issue any strike to Berenson.  ¶¶ 94–95.  By the time it stopped

---

[5]    Citations in the form "Ex. _" refer to an exhibit to the accompanying declaration of James P. Rouhandeh.

enforcing its COVID Policy in late 2022, Twitter had challenged actions taken by 11.72 million accounts, suspended 11,230 accounts, and removed 97,674 pieces of content globally.  Ex. E at 3.

### C.    The Alleged Conspiracy and Twitter's Enforcement Actions Against Berenson's Account

The Government Defendants and other senior federal officials allegedly touted the benefits of COVID-19 vaccines publicly, and sought to reduce vaccine misinformation, including by contacting social media companies.  ¶¶ 104–09.  Berenson asserts that at a "secret White House meeting"—that neither Dr. Gottlieb nor Dr. Bourla attended—"the conspirators … led by Andrew Slavitt … specifically targeted Mr. Berenson for removal" from Twitter.  ¶ 10.  On April 21, 2021, White House officials allegedly asked Twitter executives why Twitter had not removed Berenson's account, and Twitter responded that he had not violated its policies.  ¶¶ 95, 115–24.  Berenson alleges that there were "[m]ore meetings" between Twitter and White House officials, but he does not allege that Dr. Gottlieb or Dr. Bourla attended any such meetings.  ¶¶ 125–30.

In February 2021, President Biden spoke at a Pfizer manufacturing facility, with Dr. Bourla present.  ¶ 98.  In July 2021, Dr. Bourla and Pfizer's general counsel allegedly met at the White House with unspecified persons to discuss—on "information and belief"—"COVID-19 booster shots and vaccine skepticism."  ¶ 178.  Berenson does not allege that either meeting included any discussion of him.  After leaving the White House in June 2021, Slavitt hosted a podcast and interviewed Dr. Gottlieb (who Slavitt said was in "pretty regular" contact with the Biden administration), Dr. Murthy, and Dr. Bourla.  ¶¶ 141, 143–44, 162, 175.

In July and August 2021, Twitter issued four strikes against Berenson, who had apparently received his first strike earlier that year.  ¶ 95.  Twitter issued the second strike on July 16 for a tweet claiming "[t]he vaccines are failing"; the third strike on July 27; and the fourth strike on July 30 for a tweet arguing that Pfizer's COVID-19 vaccine "does nothing to reduce the overall

6

risk of death." ¶¶ 165, 174, 180–81.  There is no allegation that Dr. Gottlieb or Dr. Bourla knew about—much less played any role in—Twitter's issuance of these strikes.

On July 18, 2021, Slavitt, now a private citizen, used his personal email account to introduce Dr. Gottlieb to Todd O'Boyle, a public policy executive at Twitter.  ¶ 166.  The next day, Dr. Gottlieb emailed O'Boyle, flagging his concern about unspecified verified Twitter accounts that "are fueling dangerous and false narratives on key public health issues related to the pandemic" and "negatively impacting public health and harming patients."  ¶ 167.  This email did not mention Berenson.  On July 23, 2021, Dr. Gottlieb contacted O'Boyle again to gain the "benefit" of Twitter's views before "discussing some of [his] perspectives on TV this weekend."  ¶ 172.

On August 1, 2021, Berenson tweeted a reference to a notorious quote from the gates of the Auschwitz concentration camp.  Dr. Gottlieb tweeted an image of Berenson's tweet, along with criticism of the tweet by the Auschwitz Memorial, and shared it with O'Boyle.  ¶¶ 189–90.

On August 24, 2021, Dr. Gottlieb allegedly emailed O'Boyle forwarding a link to a Substack post by Berenson criticizing Dr. Anthony Fauci, with the cover message: "This is what[']s promoted on Twitter.  This is why Tony [Fauci] needs a security detail."  ¶¶ 194–95.  Dr. Gottlieb did not mention the possibility of any adverse action against Berenson's account.  In response, O'Boyle arranged a call with Dr. Gottlieb.  ¶¶ 196–97.

On August 28, 2021, Berenson tweeted: "It doesn't stop infection.  Or transmission.  Don't think of it as a vaccine.  Think of it—at best—as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS.  And we want to mandate it?  Insanity." ¶ 201.  Dr. Gottlieb forwarded the tweet to O'Boyle without comment.  *Id*.  O'Boyle sent the tweet to the internal team responsible for review.  ¶ 202.  A different Twitter team later labeled it as misleading, issued Berenson his fifth strike, and suspended his account.

¶¶ 204–05.  "The next morning," after Twitter's CEO and its general counsel intervened, Twitter decided to "restore the account if Mr. Berenson appealed." ¶ 210.  The next day, Berenson notified his Substack followers that he had created a new Twitter account under a pseudonym.  Dr. Gottlieb forwarded this post to O'Boyle, writing: "seems he switched accounts on you." ¶ 212.

### D.    Berenson's Lawsuit Against Twitter

On December 20, 2021, Berenson sued Twitter in the United States District Court for the Northern District of California.  *See* Ex. F.  He asserted, among other claims, that Twitter's permanent suspension of his account had breached a contract and violated his First Amendment rights.  Ex. F ¶¶ 157–64, 198–208.  His contract claim focused on his alleged interactions with a Twitter vice president named Brandon Borrman.  Concerned about Twitter's new COVID Policy, Berenson in December 2020 contacted Borrman, who allegedly told him that "[t]he points you're raising should not be an issue at all," because the "policy is designed to allow debate and discussion," but not "conspiracy theories."  Ex. F ¶¶ 102–03.  Months later, Borrman allegedly told Berenson that "your name has never come up in the discussions around these policies" and "[i]f it does I will try to ensure you're given a heads up before an action is taken."  Ex. F ¶ 110.

On Twitter's Rule 12(b)(6) motion, the court held that Berenson had stated claims only for breach of contract and promissory estoppel.  *Berenson v. Twitter, Inc.*, 2022 WL 1289049, at *2–3 (N.D. Cal. Apr. 29, 2022).  Based on Borrman's alleged statements, the court concluded that Berenson "plausibly avers that Twitter's conduct here modified its contract with plaintiff and then breached that contract by failing to abide by its own five-strike policy and its specific commitments set forth through its vice president."  *Id.* at *2.  On June 30, 2022, the parties settled.  Twitter reinstated Berenson's account and publicly stated: "Upon further review, Twitter acknowledges Berenson's Tweets should not have led to his account's suspension at that time." ¶ 178.  The court rejected Berenson's claim under the First Amendment, "which only prohibits government

abridgement of speech." *Berenson*, 2022 WL 1289049, at *3. It held that Twitter's suspension of Berenson was not "state action," including because "general cajoling from various federal officials regarding misinformation on social media platforms do[es] not plausibly assert Twitter conspired or was otherwise a willful participant in government action." *Id.*

### E.      The Instant Action

Berenson filed the complaint in this action on April 14, 2023. ECF No. 3. On August 21, 2023, Defendants, including Dr. Gottlieb and Dr. Bourla, moved to dismiss Berenson's initial complaint. ECF Nos. 38–45. Berenson chose to oppose Defendants' motions to dismiss and proffered new documents in his opposition papers. ECF Nos. 50–54. Defendants' motions to dismiss were fully briefed as of November 22, 2023. ECF No. 63.

After Berenson served subpoenas on nonparties, Dr. Gottlieb, Dr. Bourla, and Slavitt moved to stay discovery pending the resolution of the motion to dismiss. ECF Nos. 67, 68. The Court granted Defendants' stay motion, and also stayed the matter in its entirety pending the Supreme Court's decisions in *Murthy v. Missouri*, 144 S. Ct. 1972, and *National Rifle Association v. Vullo*, 602 U.S. 175. ECF No. 71 at 2. After the Supreme Court issued decisions in both cases, the Court set oral argument for September 12, 2024. ECF No. 75. Just over a week before oral argument, Berenson moved to file a first amended complaint. ECF No. 80. This motion follows.

### ARGUMENT

### I.      The First Amendment Bars Berenson's Claims

The Amended Complaint confirms that Berenson attempts to impose civil liability on Dr. Gottlieb and Dr. Bourla for speech that lies at the heart of protected expression—contrary to the First Amendment and state constitutional free speech guarantees. Berenson's claims stem from Dr. Gottlieb's alleged communications with Twitter about the use of its platform to spread what Dr. Gottlieb viewed as misinformation about matters of public health. ¶¶ 26, 28, 167, 169, 171–

9

72, 189, 194, 197–98, 200, 212, 242(d)–(g), 264.  Dr. Gottlieb's discourse with Twitter supposedly

included a "threa[t]" that he would (continue to) publicly express his "views" concerning the plat-

form's dissemination of "dangerous and false narratives on key public health issues."  ¶ 172; *see*

¶ 264 ("Dr. Gottlieb also threatened to use his access to television and media to air his view that

Twitter had an 'affirmative obligation' to censor speech from Twitter users like Mr. Berenson.").[6]

As a former FDA Commissioner, Dr. Gottlieb regularly spoke out about public health, including

as "the author of a book on the COVID-19 pandemic" and "a vocal advocate for COVID-19 vac-

cinations." ¶¶ 44, 164.  Indeed, Berenson alleges that Twitter referred to Dr. Gottlieb internally as

a "frequent cable talker." ¶¶ 28, 193.  Berenson seeks to impose liability on Dr. Bourla for his

alleged "knowledge and approval" of Dr. Gottlieb's challenged speech, which Dr. Bourla allegedly

"never addressed or otherwise distanced himself from." ¶¶ 214, 216, 264.

Dr. Gottlieb's and Dr. Bourla's constitutional rights to free speech are a complete defense

to Berenson's attempt to hold them liable for supposedly censoring him.  In a closely analogous

case, the Second Circuit rejected a § 1983 claim asserting censorship premised on a defendant's

exercise of his own free speech rights.  The court reasoned:

> Having boldly entered the flames of public discussion the First Amendment specif-
> ically is designed to kindle, [the plaintiffs] now seek our rescue from the sparks of
> controversy they ignited.  In the absence of any evidence that [the defendant] at-
> tempted to do more than express his view concerning the distasteful nature of [the
> plaintiffs' speech], we decline to come to their assistance.

*Hammerhead*, 707 F.2d at 35 (2d Cir. 1983).  Like the defendant in *Hammerhead*, Dr. Gottlieb

was exercising his "right to expound his belief" that Berenson was tweeting misinformation that

---

[6]    When Dr. Gottlieb supposedly threatened "to air his views about Twitter's so-called 'affirmative obligation' to
censor speech," he ***had already appeared, four days earlier***, on a national cable television program and opined
that Twitter can be "a very big platform to distribute information," and has "an affirmative responsibility." CNBC,
*Dr. Scott Gottlieb Urges Social Media Platforms to Curb Covid Vaccine Misinformation,* (July 19, 2021, 3:23
PM),  https://www.cnbc.com/2021/07/19/scott-gottlieb-social-media-must-act-to-curb-covid-vaccine-misinfor-
mation.html.

"should not be circulated." *Id.* at 40. "Ironically," by seeking to limit that right, Berenson "undermine[s] the very [free speech] principle [he] champion[s]." *Id.* Following *Hammerhead*, the Ninth Circuit has held that no constitutional right bars even a public official (much less a private citizen like Dr. Gottlieb) from "attempt[ing] to convince [an online platform] to be more proactive in suppressing misinformation." *Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023). "[A]ny such right 'would stand the Constitution on its head' by cutting off political discourse." *Id.* (quoting *Hammerhead*, 707 F.2d at 35).

As in these cases, the challenged speech here did not threaten government action. *See Hammerhead*, 707 F.2d at 39 (city official's requests that stores not sell the plaintiffs' board game "refer[red] to no adverse consequences" to noncomplying stores, and official had no "power to impose sanctions"); *Kennedy*, 66 F.4th at 1208 ("[N]othing in Senator Warren's call to action directly suggests that compliance was the only realistic option to avoid government sanction."). Berenson alleges that, far from threatening any government action, Dr. Gottlieb "threatened" to (continue to) express his "views" on television as someone Twitter explicitly perceived as a "frequent cable talker" rather than a government actor. ¶¶ 28, 172, 193, 264.

Dr. Gottlieb's and Dr. Bourla's free speech rights are also a complete defense to Berenson's tortious interference claim. "The Free Speech Clause of the First Amendment … can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *see also*, *e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 891, 915 (1982) (holding that liability for torts including "malicious interference with the plaintiffs' businesses" cannot be based on speech protected by the First Amendment). Protected speech cannot be the basis for a tortious interference claim because it is lawful, regardless whether it "was motivated … by a desire to interfere with a contract." *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 857–58 (10th Cir.

11

1999); *see also*, *e.g.*, *Claiborne*, 458 U.S. at 910 ("Speech does not lose its protected character … simply because it may … coerce [others] into action."); *Delano Vill. Cos. v. Orridge*, 147 Misc. 2d 302, 310 (Sup. Ct. N.Y. Cty. 1990) (constitutionally protected speech cannot, as a matter of law, be "unlawful" means to tortiously interfere).

As one court held in an action involving misinformation on social media, "[a] tortious interference claim cannot survive if the claim is premised solely on statements that are protected by the First Amendment because the exercise of constitutionally protected speech cannot be an 'improper' or 'wrongful' action." *Owens v. Lead Stories, LLC*, 2021 WL 3076686, at *17 (Del. Super. Ct. July 20, 2021), *aff'd*, 273 A.3d 275 (Del. 2022); *see Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("The First Amendment considerations that apply to defamation … apply also to [the plaintiffs'] coun[t] for … tortious interference.") (citing cases).

The First Amendment protects Dr. Gottlieb's challenged statements, which concerned issues of public concern, ¶ 38, and an alleged public figure, ¶¶ 2, 112, because Berenson has not—and cannot—allege facts showing that Dr. Gottlieb spoke with "actual malice," which requires "deliberate or reckless falsification." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991); *accord Chandok v. Klessig*, 632 F.3d 803, 813 (2d Cir. 2011).

Most of Dr. Gottlieb's alleged speech is constitutionally protected for the additional reason that it "cannot reasonably be interpreted as stating actual facts about" Berenson that could be false, much less deliberately or recklessly falsified. *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000); *see also Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) ("Unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions."); *Jansson v. Stamford Health, Inc.*, 2017 WL 1289824, at *8 (D. Conn. Apr. 5, 2017) ("[T]he Connecticut Supreme Court has held that Section 4 of article first of the Connecticut

12

constitution provides at least as much protection of speech as the federal first amendment.").

For example, Dr. Gottlieb's "*argument*" that Twitter has an "obligation" to hold "verified accounts" to "some appropriately higher standard" is, on its face, an inherently subjective viewpoint. ¶ 169. Indeed, Berenson alleges that Dr. Gottlieb subsequently "threatened" to discuss these same "*views*" on television. ¶¶ 172, 264.[7] Berenson also challenges Dr. Gottlieb's tweet of a reprint of Berenson's own tweet along with the Auschwitz Memorial's response opining that Berenson's tweet was "painful" and "a sad symptom of moral and intellectual decline." ¶ 189. Even if Dr. Gottlieb's tweet is interpreted as endorsing the response, it is subjective.

Berenson also alleges that Dr. Gottlieb "pretext[ually]" expressed "supposed safety *concerns* for Dr. Anthony Fauci" arising from a Substack post by Berenson, ¶ 194, which Berenson had concluded by insinuating that Dr. Fauci should be "forced to change – his attitude."[8] Dr. Gottlieb sent Twitter a link to that Substack post along with his commentary: "This is what[']s promoted on Twitter. This is why [Dr. Fauci] needs a security detail." ¶ 162; *see* ¶ 214. A reasonable reader would understand Dr. Gottlieb's "concerns" as his subjective evaluation of Berenson's post—and could evaluate it independently because Dr. Gottlieb included a link to it. *See Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 540 (S.D.N.Y. 2018) (holding that "the defendant's evaluation" is a constitutionally protected opinion).

To the extent Dr. Gottlieb's statements could be interpreted as "stating actual facts" about Berenson, no alleged facts plausibly show "deliberate or reckless falsification." *Masson*, 501 U.S. at 499. Dr. Gottlieb's August 28 message to Twitter merely quoted a tweet by Berenson, without commentary. The only facts this message implied—the contents of the tweet—were concededly

---

[7]    Berenson labels the views as "proto-legal analysis," ¶ 169, which appears to mean moral or ethical analysis.

[8]    Alex Berenson, *Unreported Truths* (Aug. 24, 2021), https://alexberenson.substack.com/p/quite-frankly.

correct.  ¶ 200.  Dr. Gottlieb's report to Twitter that Berenson had switched to another account after being suspended also was true.  ¶ 212.  Nor does Berenson plead any facts showing that, for example, Dr. Gottlieb did not sincerely believe that Twitter should hold verified accounts to "some appropriately higher standard," and that Berenson's insinuation that Dr. Fauci should be "forced to change – his attitude" supported "concerns" about Dr. Fauci's safety.

## II.      Berenson Fails to State a § 1985(3) Claim Against Dr. Gottlieb or Dr. Bourla

To state a § 1985(3) claim, a plaintiff must plead: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) resulting injury to a person or his property or deprivation of any right or privilege of a citizen of the United States. *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).  Berenson's claim that Dr. Gottlieb, Dr. Bourla, and the Government Defendants conspired to suspend his Twitter account in violation of his First Amendment rights fails to plead these essential elements.

### A.      Berenson Fails to Plead Class-Based Invidiously Discriminatory Animus

Berenson's § 1985(3) claim is squarely precluded by controlling law.  He cannot plead that any Defendant was motivated by "racial, or perhaps otherwise class-based, invidiously discriminatory animus."  *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Grillo v. New York City Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (requiring "racial animus or ill-will").

#### 1.      Berenson Fails to Plead a Class Protected by § 1985(3)

The class that Berenson posits—"Americans who had chosen not to receive a COVID-19 vaccine," ¶ 252—is not cognizable.  The Second Circuit has held that only "inherited or immutable characteristics" are "sufficient to satisfy the class-based animus requirement."  *Dolan*, 794 F.3d at 296.  "[T]he term class unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors."  *Id.*  As a result, courts

14

routinely reject § 1985(3) "classes" defined by reference to individuals' choices, especially when they are untethered to any formal organization. *See*, *e.g.*, *Dolan*, 794 F.3d at 296 ("jailhouse lawyers and members of an [inmate liaison committee]"); *Levine v. N.Y. State Police*, 2022 WL 4465588, at *9 n.10 (N.D.N.Y. Sept. 26, 2022) (formerly incarcerated individuals); *Reid v. City of New York*, 2022 WL 2967359, at *21 (S.D.N.Y. July 27, 2022) (pre-trial detainees).

Courts have uniformly rejected § 1985(3) claims based on person's vaccination status. With good reason. "A person's vaccination status, which is based on his choice as to whether to accept a vaccine, however 'coerced,' is not a 'discrete, insular, and immutable characteristic[] comparable to those characterizing classes such as race, national origin, and sex.'" *Ford v. Northam*, 2023 WL 2767780, at *9 (W.D. Va. Mar. 31, 2023), *aff'd*, 2023 WL 6057493 (4th Cir. Sept. 18, 2023); *Moriarty v. Port of Seattle*, 2024 WL 4290279, at *14 (W.D. Wash. Sept. 25, 2024) (rejecting argument that differing "treatment of vaccinated and masked employees … was motivated by racial animosity or the type of "class-based invidiously discriminatory animus" required by Section 1985(3)"); *see also Brink v. Bormann*, 2023 WL 6213167, at *6–7 (D.N.J. Sept. 25, 2023) (ruling that class based on "purported political view and 'request to send anti-vaccination guidance'" was not viable under § 1985(3)); *Behringer v. Cal. Polytechnic State Univ., San Luis Obispo,* 2023 WL 6811813, at *6 (C.D. Cal. Sept. 15, 2023) (ruling that plaintiffs' claim to be "in a group (still) opposed to (now-defunct) Covid-19 public health measures" is insufficient under § 1985(3)), *report and recommendation adopted*, 2023 WL 6810244 (C.D. Cal. Oct. 16, 2023).

Recognizing Berenson's purported "class" would upend settled Circuit law that vaccination status is not a constitutionally relevant distinction that warrants heightened scrutiny. *See We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 156 (2d Cir. 2023). As Judge Engelmayer put it, "the distinction … between vaccinated and non-vaccinated persons

15

has an amply rational basis," and vaccination status is not a "constitutionally protected characteristic." *Abadi v. City of New York*, 2022 WL 347632, at *8 (S.D.N.Y. Feb. 4, 2022).[9]

Nor are those fatal flaws overcome by invoking race, religion, or politics. Berenson's proffered class allegedly "includes a disproportionate number of African-Americans, political conservatives, and evangelical Christians." ¶ 252. But "disparate impact" discrimination is not cognizable under § 1985(3). *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 n.4 (1993). And the Second Circuit has held that a plaintiff claiming discrimination because he or she stood "in political and philosophical opposition to the defendants" and were "outspoken in their criticism of the defendants' political and governmental attitudes and activities do not constitute a cognizable class under Section 1985." *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir. 1989).

### 2.   *Berenson Fails to Plead Invidiously Discriminatory Animus*

Even if Berenson's class were cognizable, he fails to plead that Dr. Gottlieb or Dr. Bourla had any "invidiously discriminatory animus" toward it, and *affirmatively* pleads the opposite.

The Supreme Court has explained that this element requires "an *animus based on class*" and that "the characteristic … formed the basis of the targeting." *Bray*, 506 U.S. at 273 n.4. But Berenson does not allege "a purpose that focuses upon [unvaccinated individuals] *by reason* of their [vaccination status]." *Id.* at 270. On the contrary, he alleges "animus against *Mr. Berenson's reporting*." ¶ 253; *see also*, *e.g.*, ¶ 177 (alleging Dr. Bourla criticized "people who spread misinformation on Covid vaccines"); ¶ 195 (alleging Dr. Gottlieb faulted "Mr. Berenson's reporting"). Alleging that the relevant animus was personal, rather than class-based, is fatal to the claim.

Moreover, the class-based animus must be "invidious," an intentionally "harsh description"

---

[9]   *See also Coughlin v. New York State Unified Ct. Sys.*, 2023 WL 7091904, at *7 (E.D.N.Y. Oct. 26, 2023); *Iosilevich v. City of New York*, 2022 WL 19272855, at *4 n.14 (E.D.N.Y. Aug. 10, 2022); *Marciano v. de Blasio*, 589 F. Supp. 3d 423, 434–35 (S.D.N.Y. 2022); *Brock v. City of New York*, 2022 WL 479256, at *6 (S.D.N.Y. Jan. 28, 2022); *Maniscalco v. New York City Dep't of Educ.*, 563 F. Supp. 3d 33, 38–40 (E.D.N.Y. 2021).

befitting "such derogatory association with racism." *Bray*, 506 U.S. at 274. But Berenson again alleges the opposite: that Defendants believed that his "reporting … was leading to preventable deaths," ¶ 253, because they "view[ed] COVID-19 vaccination as a life-saving measure," ¶ 229. To the extent that Berenson asserts, without any plausible factual basis, that Dr. Gottlieb and Dr. Bourla had "financial" motivations, ¶ 32, that is not a cognizable theory of invidiously discriminatory animus. *See United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 838 (1983); *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 610 (S.D.N.Y. 2015) (holding that "a financial motivation" is not "a class-based motivation").

### B. Berenson Fails to Plead Facts Plausibly Showing that Dr. Gottlieb or Dr. Bourla Conspired to Deprive Him of First Amendment Rights

Even with the benefit of extensive discovery,[10] Berenson cannot allege an actionable conspiracy involving Dr. Gottlieb or Dr. Bourla, which would require facts plausibly showing "a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). And because the First Amendment "prohibits only ***governmental*** abridgment of speech," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (emphasis in original), Berenson must plead that Dr. Gottlieb and Dr. Bourla, as private citizens, conspired with a then-current government official.

Berenson's allegations attempting to tie Dr. Gottlieb and Dr. Bourla to then-government actors are threadbare: (1) Dr. Bourla appeared alongside President Biden at a public event on February 19, 2021; (2) Dr. Bourla attended a July 28, 2021 White House meeting with unspecified attendees; and (3) Mr. Slavitt said he was in "pretty regular" contact with Dr. Gottlieb during "the winter and spring of 2021." ¶¶ 98, 162, 178. Berenson has no allegation that Dr. Gottlieb or

---

[10] Berenson relies on documents from his Twitter settlement, ¶¶ 7, 174, 178; documents voluntarily released by Twitter's corporate successor, ¶¶ 7, 153, 155, 166, 167, 171–73, 183–89, 193, 196, 206, 209, 219; discovery in a lawsuit against federal officials, ¶¶ 4, 26, 125; ECF No. 3-1, and a congressional report, ¶¶ 125, 126, 129, 156.

Dr. Bourla *ever* discussed Berenson's account with government actors, much less agreed with any government official (or anyone else) to cause Twitter to violate Berenson's free speech rights. *See McTerrell v. N.Y.C. Health & Hosps. Corp.*, 2020 WL 1503194, at *5 (S.D.N.Y. Mar. 30, 2020). At most, these contacts "might demonstrate a meeting of the minds to promptly address" vaccine-related issues, but do not show "a meeting of the minds to violate constitutional rights, let alone [Berenson's] constitutional rights." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1184 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). While the Amended Complaint adds allegations about communications involving Dr. Gottlieb and Mr. Slavitt, it merely describes actions taken by Mr. Slavitt *after* he indisputably left government service. *See* ¶ 156 (conceding that actions took place after Mr. Slavitt "officially … left the White House").

### C.    Berenson Fails to Plead the Necessary Government Action

Berenson does not state a § 1985(3) claim for the independent reason that he has not adequately alleged that Twitter's suspension of his account is "fairly attributable" to the government. *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012). The binding case law requires Berenson to plead facts showing that (1) the government coerced Twitter to suspend him; (2) his suspension constituted "joint action" by the government and Twitter; or (3) the government delegated a public function to Twitter pursuant to which he was suspended. *See Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008); *Jones v. Deutsch*, 715 F. Supp. 1237, 1248 (S.D.N.Y. 1989) (applying substantively similar tests to § 1985(3) claim). But the new allegations in the Amended Complaint, paired with intervening law, doom Berenson's claims.

As a factual matter, Berenson's allegations confirm that the decision to suspend his account was Twitter's. He concedes that Twitter had previously rejected third parties' requests to flag or delete his tweets, including a March 2020 request from a university, a March 2021 request from a journalist, and an April 2021 request from White House officials. ¶¶ 74–75, 94, 122–23. Later,

18

Twitter employees engaged in uninhibited discussions as to whether Berenson's misleading tweet constituted a strike under Twitter's policies. *See* ¶ 204. And after Twitter issued the fifth strike, it publicly took responsibility for its suspension of Berenson, telling "media outlets [that Berenson] had committed 'repeated violations of our COVID-19 misinformation rules.'" ¶ 208.

Berenson's new allegations confirm that his suspension was Twitter's decision. Berenson acknowledges that his tweet was reviewed pursuant to Twitter's "routine" processes. ¶ 203. He claims that Twitter's CEO and another senior executive *disagreed* with the suspension—just as they had disagreed with Twitter's previous strikes against Berenson. ¶¶ 29, 209–210. Berenson also now alleges that these senior executives were waiting for Berenson to appeal so that they could reinstate his account—an allegation flatly inconsistent with the government "coerc[ing]" Twitter to suspend him in the first place. *See NRA of Am. v. Vullo*, 602 U.S. 175, 191 (2024).

These new allegations simply do not amount to coercion under applicable law. The Supreme Court's decision in *Murthy v. Missouri* explained that social media platforms made "independent content moderation" decisions, and "moderated similar content long before any of the Government defendants engaged in the challenged conduct." 144 S. Ct. 1972, 1987, 1995 (2024); *see* ¶ 76 (describing Twitter's unveiling of content moderation policies around COVID-19 misinformation in March 2020). In addition, "the platforms continued to exercise their independent judgment even after communications with the defendants began," and the sum total of the allegations "indicates that the platforms had independent incentives to moderate content and often exercised their own judgment." *Murthy*, 144 S. Ct. at 1987–88. Likewise, the Ninth Circuit ruled that "[s]tatements that government officials 'engaged' with social media companies to ensure that those companies 'understand the importance of misinformation and disinformation and how they can get rid of it quickly' are consistent with the explanation of parallel objectives and do not show the

19

specific agreement that [plaintiff] suggests." *Child.'s Health Def. v. Meta Platforms, Inc.*, No. 21-16210, 2024 WL 3734422, at *7 (9th Cir. Aug. 9, 2024).  Nor did the government "coerce" Twitter by using a dedicated portal to "fla[g] for Twitter's review posts that potentially violated the company's content-moderation policy," reasoning that the state merely "suppl[ied] Twitter with information," which Twitter could "decid[e] how to utilize."  *O'Handley*, 62 F.4th at 1160.[11]

As in those cases, the allegations here show that Twitter independently decided what to do in response to reports about Berenson's account.  Berenson's allegations that Twitter's leadership **disagreed** with the decision to suspend him undermines any inference that they were beholden to outside pressure, much less from private citizens like Dr. Gottlieb or Dr. Bourla.

### III.    The Amended Complaint Fails to State a Claim for Tortious Interference with Contract

Any "suggestion that the mere reporting of a Twitter user—however insistent such reporting may be—is sufficient to constitute tortious interference in a business relationship between Twitter and the targeted user is, to put it mildly, nonsensical."  *Illoominate*, 2019 WL 13168767, at *3.  Twitter provided its users a "process for reporting … violations" of its Terms of Service.  Ex. A at 5, 14.  Participating in Twitter's crowd-sourced processes for identifying content that potentially violates its policies cannot give rise to tort liability.  Under both New York and Connecticut law,[12] a claim for tortious interference with contract "generally requires [Berenson] to plead (1) each Defendant's knowledge of the contract, (2) each Defendant's intentional and

---

[11]    *See also Huber v. Biden*, 2022 WL 827248, at *7 (N.D. Cal. Mar. 18, 2022), *aff'd*, 2022 WL 17818543 (9th Cir. Dec. 20, 2022) ("[S]tatements about working together with the government to prevent the spread of misinformation do not equate to working in concert to violate constitutional rights."); *Hart v. Facebook Inc.*, 2022 WL 1427507, at *8 (N.D. Cal. May 5, 2022) ("Hart has not alleged any connection between any (threat of) agency investigation … and Twitter's decisions."); *Changizi v. HHS*, 602 F. Supp. 3d 1031, 1053 (S.D. Ohio 2022) (holding that Surgeon General's public comments could not be construed as "threats" against Twitter).

[12]    Dr. Gottlieb lives in Connecticut, but the Court need not undertake a choice-of-law analysis because the tortious interference claim is barred, and fails to state a claim, under both New York law and Connecticut law.

improper procurement of a breach of that contract, and (3) damages proximately caused by the Defendant's conduct." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 65 (S.D.N.Y. 2016); *see also Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (New York law); *Khan v. Yale Univ.*, 27 F.4th 805, 817 (2d Cir. 2022) (Connecticut law).  Berenson's tortious inference claim fails at each step.

**A.      The Amended Complaint Fails to Plead that Defendants Intentionally and Improperly Interfered With a Contract**

Put simply, the Amended Complaint pleads no tortious conduct.  Each of Berenson's theories runs directly into controlling Second Circuit law foreclosing tort liability here.

*First*, if a defendant's "expression of views" about an author's writings to a publisher or distributor of those writings "is done in good faith and in a non-coercive way, it is not tortious." *Zilg*, 717 F.2d at 678–79 (following *Hammerhead*, 707 F.2d at 33).  In *Zilg*, the DuPont Company had complained about the plaintiff's book, which concerned the DuPont family, to the plaintiff's publisher and to a distributor. *Id.* at 677.  DuPont "wanted to expose … negative aspects [of the book] in the hope of causing [the distributor] to abandon its plans [to distribute the book] and of inducing [the publisher] to reconsider publication without substantial revisions." *Id.*  The Second Circuit found that DuPont had a "substantial interest" in "communicating its views" because the company "could reasonably believe that it might suffer damage to its public image and good will if the book was given widespread credence." *Id.*  Concluding that DuPont communicated in good faith and noncoercively, the Second Circuit affirmed the dismissal of a tortious interference claim.

Here, the Amended Complaint fails to plead any facts showing that Dr. Gottlieb or Dr. Bourla acted in bad faith.  Berenson asserts, without any plausible factual basis, that their motivations were "financial." ¶ 32.  But the Second Circuit rejected such arguments in *Zilg*. *See* 717 F.2d at 677.  Under controlling law, "[a]uthors have no exclusive right to the ear of those who

21

disseminate their works, for intelligent decisions by publishers and others distributing books are enhanced by the free flow of information." *Id.* at 678.  And Dr. Gottlieb has his own rights under Twitter's Terms of Service to report potentially violative content.  *See*, *e.g.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 589 (2d Cir. 2005) (holding that the "exercise of [a] contractual right … cannot support a claim for tortious interference").

*Second*, a claim for tortious interference with contract cannot "rest on conduct that is incidental to some other lawful purpose," such as "genuine municipal/public health and safety concerns."  *Conte*, 895 F.3d at 173 (quoting *Montano v. City of Watervliet*, 47 A.D.3d 1106, 1110 (3d Dep't 2008)).  The Amended Complaint's allegations show that Dr. Gottlieb's expressed his concerns about public health and safety to Twitter.  ¶¶ 164, 167, 172.  Berenson pleads no facts plausibly showing that Dr. Gottlieb's concerns were not genuine.  To the contrary, Dr. Gottlieb's concerns are consistent with being a medical doctor, a former FDA Commissioner, and a "prominent" voice in the public discourse over ways to prevent COVID-19's spread.  ¶¶ 44, 64, 160–61.

*Finally*, the allegations of the Amended Complaint foreclose any conclusion that Twitter was *coerced* by Dr. Gottlieb.  None of the statements attributed to Dr. Gottlieb are even remotely coercive.  In any event, Berenson's conclusory assertions of coercion are once again negated by his own allegations.  Berenson alleges that Twitter was "trapped," not by any external threat, but "by *its own* public statement" that it had suspended Berenson's account. ¶ 111.  Further, as a result of intervention by Twitter's CEO and its general counsel, ¶ 155, Twitter decided "[t]he next morning" to restore Berenson's account if he appealed.  ¶ 210.  Twitter's immediate willingness to restore Berenson's account *if only he would ask* is entirely inconsistent with Berenson's theory that Twitter's decisions were driven by irresistible external pressure.

## B.      The Amended Complaint Fails to Plead a Breach of Contract

Berenson frames his tort claim in terms of interference with a *contract* between him and

22

Twitter.  ¶¶ 220, 260; ECF No. 54 at 21–28.  That claim fails because Berenson fails to plausibly plead any breach of contract.  *Rich*, 939 F.3d at 126–27; *Khan*, 27 F.4th at 817.

Berenson's reliance on the decision upholding a contract claim in his lawsuit against Twitter is misplaced.  ¶ 262.  Dr. Gottlieb and Dr. Bourla were not parties to the *Twitter* lawsuit, so they are not bound by the ruling in that case which, in any event, has been undermined by Berenson's new allegations in this lawsuit.  As Berenson concedes, Twitter's Terms of Service allowed it to suspend or terminate his account for "any or no reason."  ¶ 262.  Given Twitter's broad discretion, courts universally have rejected claims that Twitter breached its Terms of Service by suspending accounts.[13]  Nor did Twitter's COVID Policy contain any enforceable promises, much less promises that superseded the Terms of Service.  So courts have rejected contract claims based on Twitter's alleged violation of policies outside its Terms of Service.  *See Morton v. Twitter, Inc.*, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021) (content moderation policies); *Murphy*, 60 Cal. App. 5th at 38–39 ("promises" in Twitter's rules, enforcement guidelines, and safety page).[14]

*Berenson v. Twitter* found that the "contract" was not merely the Terms of Service or the COVID Policy but also the "specific and ***direct*** assurances" allegedly provided by a Twitter executive (Borrman) to Berenson about Twitter's COVID Policy.  *Berenson*, 2022 WL 1289049, at *2.[15]  Even if the assurances formed a binding agreement, however, the Amended Complaint still

---

[13]  *See*, *e.g.*, *Illoominate Media, Inc. v. CAIR Fla., Inc.* 841 F. App'x 132, 137 (11th Cir. 2020); *Zhang v. Twitter, Inc.*, 2023 WL 5493823, at *5 (N.D. Cal. August 23, 2023); *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *5 (N.D. Cal. Nov. 7, 2022); *Rangel v. Dorsey*, 2022 WL 2820107, at *3 (N.D. Cal. July 19, 2022); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 35 (2021); *Cox v. Twitter, Inc.*, 2019 WL 2513963, at *4 (D.S.C. Feb. 8, 2019), *report and recommendation approved*, 2019 WL 2514732 (D.S.C. Mar. 8, 2019).

[14]  As a general matter, social media platforms' policies ***do not*** limit the broad discretion granted in the terms of service.  *See*, *e.g.*, *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *8 (N.D. Cal. Mar. 31, 2021); *Sweet v. Google Inc.*, 2018 WL 1184777, at *9–10 (N.D. Cal. Mar. 7, 2018).

[15]  That ruling was erroneous because Borrman's alleged "assurances" to Berenson were not promises—and, in any event, Borrman caveated them with the disclaimer that "I am not always made aware of [Twittter's actions against users] before they're executed," so Berenson should "let me know if you run into any issues."  ¶¶ 89, 93.

fails to allege an actionable breach.  *First*, if Borrman's alleged March 21, 2021 statements to Berenson, ¶ 93, had created a contract, it was superseded by Twitter's August 19, 2021 updated Terms of Service, which restored Twitter's right to terminate Berenson's account for "any or no reason."[16]  *Second*, Berenson pleads new allegations here showing that Borrman honored his explicitly caveated statements—the "contract" identified in *Berenson v. Twitter*.  Berenson now concedes that, as a result of intervention from "top Twitter executives," Twitter decided "[t]he next morning" to "'rescind the strike and restore the account' if Mr. Berenson appealed."  ¶¶ 4, 210. But despite the contract incorporating Borrman's repeated requests that Berenson "let [him] know" if he ran into any issues, ¶¶ 89, 93, Berenson does not allege that he either communicated with Borrman about his suspension or exercised his right to appeal formally under Twitter's Terms of Service.[17]  Berenson also complains that Twitter did not "notify him that he might appeal the suspension," ¶ 211—but his Amended Complaint incorporates Twitter's Terms of Service, which show that Twitter explained "the process for … appealing violations." ECF No. 43-1 at 5.

> **C.     The Amended Complaint Fails to Plead Defendants Knew of a Contract Created by Twitter's "Specific and *Direct* Assurances" to Berenson**

A tortious interference claim requires that the defendant have "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached." *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020); *see also Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 864 (2015) (requiring defendants' knowledge

---

[16]     *See* Ex. A.  The Terms provided that "the most current version of the Terms … will govern our relationship"; by "continuing to access or use [Twitter] after those revisions become effective, [users] agree to be bound by the revised Terms"; "[n]o advice or information, whether oral or written, obtained from the Twitter Entities or through the Services, will create any warranty or representation not expressly made herein"; and Twitter "may suspend or terminate [a user's] account … at any time for any or no reason."  *Id.*

[17]     Berenson complains that Twitter "never even sent him any notice" of the suspension, ¶¶ 29, 211, but he simultaneously alleges that "[t]he effect of the suspension on [him] was immediate," as his account displayed "Account suspended" and all his tweets became "invisible to all users," and the suspension "rapidly" became international news.  ¶¶ 202, 207–08.

of contractual relationship).  Even if Borrman's "direct" personal assurances to Berenson created a contract, no alleged facts show that Dr. Gottlieb or Dr. Bourla knew of such assurances.

The conclusory allegation that Dr. Gottlieb was "aware of that contract, including Twitter's COVID-19 misleading information policy" misses the mark.  ¶ 263.  Berenson fails to allege facts showing that Dr. Gottlieb knew of ***the private exchanges between Borrman and Berenson.***  *See N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333, at *4 (S.D.N.Y. Apr. 12, 2013) (requiring knowledge of specific provision that allegedly was breached); *Butler Am., LLC v. Ciocca*, 2020 WL 6781488, at *3 (Conn. Super. Ct. Mar. 12, 2020) (same).  Absent knowledge of the "direct assurances" that allegedly modified that contract, *Berenson*, 2022 WL 1289049, at *2, the only plausible inference is that Dr. Gottlieb would understand that Berenson's "contract" with Twitter was freely terminable at Twitter's discretion, just like Twitter's "contracts" with hundreds of millions of other users.  This dooms Berenson's tortious interference claim.  *See Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 796–97 (S.D.N.Y. 2008) (dismissing tortious interference claim based on "wholly conclusory allegation that [defendant] knew of the contracts at issue").

As to Dr. Bourla, Berenson merely alleges that "[u]pon information and belief … Dr. Bourla was … aware of Mr. Berenson's contract with Twitter."  ¶ 263.  But those "conclusory assertion[s] of knowledge" made on "information and belief" do not suffice, especially where Ber-enson fails to plead any facts underlying this belief.  *Taboola, Inc. v. Ezoic Inc.*, 2021 WL 2041639 at *9  (S.D.N.Y. May 21, 2021); *see also Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) (plaintiff cannot "merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory").

## CONCLUSION

For the reasons stated above, Dr. Gottlieb and Dr. Bourla respectfully request that the Court dismiss the Amended Complaint with prejudice.

25

Dated: October 11, 2024
       New York, New York

Respectfully submitted,

**DAVIS POLK & WARDWELL LLP**


By: */s/ James P. Rouhandeh*

James P. Rouhandeh
Michael Scheinkman
David B. Toscano
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Dr. Albert Bourla and
Dr. Scott Gottlieb*