**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALEX BERENSON,** | |
| **Plaintiff,** | |
| **v.** | Case No.: 1:23-cv-03048-JGLC |
| **JOSEPH R. BIDEN, JR., et al.,** | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT ANDREW M. SLAVITT'S
RENEWED MOTION TO DISMISS COMPLAINT (INCLUDING ALLEGATIONS IN
THE PROPOSED FIRST AMENDED COMPLAINT)**

JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
ENVISAGE LAW
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law
        ajbiller@envisage.law

SEAN P. GATES (SBN 186247)*
Illovsky Gates & Calia LLP
155 N. Lake Avenue, Suite 800
Pasadena, CA 91101
Phone: 626.508.1715
E-mail: sean@illovskygates.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND .............................................................................................2

ARGUMENT......................................................................................................................7

    I.    Mr. Berenson adequately pled causation in support of his claims. ....................7

    II.    Mr. Berenson's first amended complaint states a First Amendment claim.......................11

    III.    Mr. Berenson states a claim against Mr. Slavitt under 42 U.S.C. § 1985(3).................13

        A.    The First Amendment does not bar Mr. Berenson's civil rights claim.......................13

        B.    Mr. Berenson has stated a Section 1985(3) claim against Mr. Slavitt........................14

        C.    Even if this Court finds the claims against the Federal Defendants are barred by qualified immunity, Mr. Berenson's Section 1985(3) claim should proceed against the private defendants.................................................................................................15

    IV.    Mr. Slavitt tortiously interfered with Mr. Berenson's contract with Twitter. .................16

        A.    Mr. Slavitt knew about Mr. Berenson's binding contract with Twitter, including the COVID-19 misleading information policy, and that any suspension of Mr. Berenson would be predicated on violations of the company's rules. ...........................................................17

        B.    Mr. Slavitt interfered with Mr. Berenson's enforceable contract with Twitter without justification, inducing Twitter to breach. ...............................................................18

    V.    Section 230 does not shield Mr. Slavitt from liability. ....................................20

    VI.    This Court has specific personal jurisdiction over Mr. Slavitt. ....................................23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Berenson v. Twitter, Inc.*,

   No. C 21-09818 WHA, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022)............................. 11, 18

*Bivens v. Six Unknown Named Agents*,

   403 U.S. 388 (1971) ..................................................................................................13

*Bostock v. Clayton Cnty., Georgia*,

   590 U.S. 644 (2020) ..................................................................................................10

*Bray v. Alexandria Clinic*,

   506 U.S. 263, 269 (1993) ....................................................................................14, 15

*Bristol-Myers Squibb Co. v. Superior Court*,

   582 U.S. 255 (2017) ..................................................................................................25

*Burger King Corp. v. Rudzewicz*,

   471 U.S. 462, 473 (1985) ..........................................................................................25

*Burrell v. Bd. of Trustees of Ga. Mil. Coll.*,

   970 F.2d 785 (11th Cir. 1992) ...................................................................................16

*Calder v. Jones*,

   465 U.S. 783 (1984) ..................................................................................................24

*Carvel Corp. v. Noonan*,

   3 N.Y.3d 182, 818 N.E.2d 1100 (N.Y. 2004) .............................................................18

*Chloe v. Queen Bee of Beverly Hills, LLC*,

   616 F.3d 158 (2d Cir. 2010) ......................................................................................23

*Commil USA, LLC v. Cisco Sys., Inc.*,

   575 U.S. 632 (2015) ..................................................................................................19

*Darnaa, LLC v. Google, Inc.*,

   No. 15-CV-03221-RMW, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016)................................21

*Domen v. Vimeo, Inc.*,

   433 Supp. 3d 592 (S.D.N.Y. 2020) ...........................................................................22

*Domen v. Vimeo, Inc.*,

   No. 20-616-CV, 2021 WL 4352312, at *1 n1 (2d Cir. Sept. 24, 2021)....................................22

*Elmasri v. England*,

    111 F. Supp. 2d 212 (E.D.N.Y. 2000)................................................................................16

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,

    946 F.3d 1040 (9th Cir. 2019)...............................................................................21, 22

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,

    141 S. Ct. 1017 (2021) .........................................................................................25

*Gelb v. Royal Globe Ins. Co.*,

    798 F.2d 38 (2d Cir. 1986)....................................................................................11

*Glacken v. Inc. Vill. of Freeport*,

    No. 09 CV 4832 DRH AKT, 2012 WL 894412 (E.D.N.Y. Mar. 15, 2012).............................15

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,

    50 N.Y.2d 183, 406 N.E.2d 445 (1980).......................................................... 17, 18, 19

*Guterman v. Costco Wholesale Corp.*,

    927 F.3d 67, 68 (2d Cir. 2019) ............................................................................9, 13

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*,

    241 F. Supp. 2d 246 (S.D.N.Y. 2002)......................................................................17

*Iconoclast Advisers LLC v. Petro-Suisse Ltd.*,

    17 Misc. 3d 1101(A), 851 N.Y.S.2d 58 (N.Y. Sup. Ct. 2007) ..................................................23

*Jordan's Ladder Legal Placements, LLC v. Major, Lindsey & Afr., LLC*,

    No. 21 CV 7124 (CM), 2022 WL 1500772 (S.D.N.Y. May 12, 2022) ...................................17

*Lama Holding Co. v. Smith Barney Inc.*,

    88 N.Y.2d 413, 668 N.E.2d 1370 (N.Y. 1996)...............................................................16, 18

*LaMarca v. Pak-Mor Mfg. Co.*,

    95 N.Y.2d 210, 735 N.E.2d 883 (N.Y. 2000)...................................................................23

*Lugar v. Edmondson Oil Co.*,

    457 U.S. 922 (1982) ...............................................................................................1

*Morgan v. United States*,

    304 U.S. 1 (1938)...................................................................................................12

*Murphy v. Sr. Investigator Neuberger*,

    No. 94 CIV. 7421 (AGS), 1996 WL 442797 (S.D.N.Y. Aug. 6, 1996) ...................................16

*Murthy v. Missouri*,

    144 S. Ct. 1972 (2024) ................................................................................................7, 8

*National Rifle Association of America v. Vullo*,

    602 U.S. 175 (2024) ................................................................................................ 11, 12

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,

    87 N.Y.2d 614, 664 N.E.2d 492 (N.Y. 1996)...............................................................18

*Okwedy v Molinari*,

    333 F.3d 339 (2d Cir. 2003)........................................................................................12

*Rattner v. Netburn*,

    930 F.2d 204 (2d Cir. 1991) .......................................................................................12

*Richardson v. McKnight*,

    521 U.S. 399 (1997) ...................................................................................................15

*State St. Glob. Advisors Tr. Co. v. Visbal*,

    431 F. Supp. 3d 322 (S.D.N.Y. 2020)........................................................................17

*Storck v. Suffolk County Dep't of Social Services*,

    62 F. Supp. 2d 927 (E.D.N.Y. 1999) .........................................................................16

*United States v. Rowlee*,

    899 F.2d 1275 (2d Cir. 1990)......................................................................................14

*Walden v. Fiore*,

    571 U.S. 277 (2014) ...................................................................................................25

*Zango, Inc. v. Kaspersky Lab, Inc.*,

    No. 07-CV-00807 (JCC), 2007 WL 5189857 (W.D. Wash. Aug. 28, 2007)...............22

*Ziglar v. Abbasi*,

    582 U.S. 120 (2017) ...................................................................................................16

**Statutes**

47 U.S.C. § 1985(3) ........................................................................................... 13, 14, 15

47 U.S.C. § 230.......................................................................................... 20, 21, 22, 23

N.Y. C.P.L.R. § 302(a)(3)(i) .................................................................................24

N.Y. C.P.L.R. § 302(a)(3)(ii) ................................................................................23

**Treatises**

Restatement (Second) of Torts § 766 .................................................................................19

Restatement (Second) of Torts § 767 .................................................................................20

**Rules**

Fed. R. Civ. P. 1 ................................................................................................................25

Fed. R. Civ. P. 12................................................................................................. 9, 11, 17

**Other Authorities**

Dareh Gregorian, *Top Biden coronavirus adviser Andy Slavitt announces last day at White House*, NBC News, June 8, 2021 ....................................................................................2, 3

Eric Lipton et al., *U.S. Agencies Fund, and Fight With Elon Musk. A Trump Presidency Could Give Him Power Over Them*, N.Y. Times, Oct. 21, 2024 .........................................................12

## INTRODUCTION

As he sat in the White House in early 2021, President Biden's COVID-19 advisor Andrew Slavitt faced a dilemma. Mr. Slavitt believed the COVID-19 vaccines saved lives and viewed mRNA COVID-19 vaccine critic Alex Berenson as a roadblock to convincing Americans to be vaccinated. Mr. Slavitt could have engaged Mr. Berenson on Twitter, as he had in the past, and tried to answer the questions the journalist was raising. But from Mr. Slavitt's point of view, Mr. Berenson was not just misguided, the former *New York Times* reporter was "ground zero" for "misinformation," a public health enemy in the way of saving the United States from COVID-19.

Mr. Slavitt continued this unconstitutional agenda even after he nominally left the White House in June 2021. He publicly resolved to take out "garbage" like Mr. Berenson's reporting. But as he worked to censor Mr. Berenson during the summer of 2021, Mr. Slavitt had a secret edge, namely his tight and ongoing relationship with the Biden Administration. Mr. Slavitt remained in close if not daily contact with the White House, spoke on its behalf to social media companies, and ran what he himself called "shuttle diplomacy" for its censorship efforts. At Twitter, his primary point of contact, Todd O'Boyle, was the *same* government affairs executive Mr. Slavitt had pressured about Mr. Berenson in April 2021.

In August 2021, the conspiracy Mr. Slavitt had orchestrated finally succeeded. Twitter banned Mr. Berenson. Throughout that summer, Mr. Slavitt easily met the standard of "joint participation with state officials" that the Supreme Court has found necessary to characterize a private party as a "state actor" for the purposes of constitutional deprivation—and his conduct should be judged on that basis. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). Mr. Slavitt would have this Court believe there are *two* Andy Slavitts, and that his behavior after leaving the White House cannot be linked to his actions before. But he is only one man—and he acted "under color of law" as a joint actor at all times relevant to Mr. Berenson's case.

1

To deflect his culpability, Mr. Slavitt contends it is actually his rights that are under attack, going so far as to say Mr. Berenson is violating his First Amendment rights with this lawsuit through "strategic litigation." Again he is wrong. Mr. Berenson has no interest in preventing Mr. Slavitt from speaking. Unlike Mr. Slavitt, Mr. Berenson values open, uncensored, free debate. He seeks to protect his rights to report and inform the public from would-be public-private partnership censors. Mr. Slavitt is both, and the guilty party in this action, not the victim.

In 2021, Mr. Slavitt violated one of Mr. Berenson's core constitutional rights, his First Amendment right to free speech. Now, despite reams of evidence, he seeks to undo another, Mr. Berenson's Seventh Amendment right to a jury trial—even before this Court has granted Mr. Berenson any discovery. This Court should reject that effort and allow this case to proceed.

## FACTUAL BACKGROUND

Alex Berenson is an independent journalist and former *New York Times* reporter who previously broke multiple front-page stories about questionable practices in the pharmaceutical industry. (Dkt. 80-1 ¶¶ 43-44.) Leaning on his training and experience, Mr. Berenson became a prominent critic of the public policy response to COVID-19 and later the COVID-19 vaccines, building a significant Twitter following while attracting critics of his own. (*Id.* ¶¶ 70-75, 223.)

One of those critics was Andrew Slavitt, who served as a COVID-19 advisor for the Biden Administration. Dareh Gregorian, *Top Biden coronavirus adviser Andy Slavitt announces last day at White House*, NBC News, June 8, 2021, https://www.nbcnews.com/politics/white-house/top-biden-coronavirus-adviser-andy-slavitt-announces-last-day-white-n1269962. Prior to joining the White House, Mr. Slavitt tangled with Mr. Berenson on Twitter. (Dkt. 80-1 ¶ 121.)

In the White House, Mr. Slavitt took his concerns about "misinformation" to the social media companies themselves, including Facebook and Twitter. Twitter's former head of government affairs for the United States and Canada, Lauren Culbertson, recounted that one of

the Biden White House's "first meeting requests" regarded "vaccines and high-profile anti-vaxxer accounts, including Alex Berenson." (*Id.* ¶ 115.) According to Rob Flaherty, the administration's director of digital strategy, during an April 2021 meeting with Twitter, "Mr. Slavitt express[ed] his view Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and that employees from Twitter disagreed with view." (*Id.* ¶ 123.) Twitter's internal record of that meeting provides that "they," meaning Mr. Slavitt, Mr. Flaherty, and a Department of Health and Human Services ("HHS") employee, asked "one really tough question about why Alex Berenson hasn't been kicked off from the platform." (*Id.* ¶ 117.) Twitter distinguished the pressure it faced about Mr. Berenson from the other comments the White House made, which it called "pointed but fair." (*Id.*) Mr. Slavitt "really wanted to know about Alex Berenson," and "suggested" that the journalist "was the epicenter of disinfo that radiated outwards to the persuadable public." (*Id.* ¶ 119.) The Biden White House held "several other calls" with Twitter, which were "very angry in nature," about how the officials "wanted Twitter to do more and to de-platform several accounts." (*Id.* ¶ 127.)

Two days before he sat down with Twitter in April 2021, Mr. Slavitt "was outraged" in a meeting with a Facebook executive about a meme circulating on that platform. (*Id.* ¶ 125.) The Facebook executive told Mr. Slavitt "removing content like that would represent a significant incursion into traditional boundaries of free expression in the US but" Mr. Slavitt insisted the post "directly compared Covid vaccines to asbestos poisoning in a way which demonstrably inhibits confidence in Covid vaccines." (*Id.* ¶ 126.)

Mr. Slavitt officially left his White House post in June 2021, Gregorian, *supra*, but he remained in close contact with his former colleagues. Not only was Mr. Slavitt "on the phone with and talking to the White House and the CDC" even "on a daily basis when things get to

crunch time" in July 2021, (*id.* ¶ 157), he acted as an intermediary between Facebook and the White House and the Surgeon General's Office, (*id.* ¶ 156). Mr. Slavitt confirmed these contacts on his podcast, where he also interviewed Surgeon General Vivek Murthy and White House Press Secretary Jen Psaki. (*Id.* ¶¶ 141, 143.)

Twitter suspended Mr. Berenson's account for the first time in July 2021, just four hours after President Biden accused social media companies of "killing people" for failing to censor speech about the COVID-19 vaccines. (*Id.* ¶ 136.) Earlier that week, on July 12, after listening to a soundbite of Mr. Berenson's remarks about COVID-19 vaccine hesitancy at a political conference, (*id.* ¶ 124), Mr. Slavitt referred to a need to "get rid of all this garbage coming out of CPAC," (*id.* ¶ 126). "I know nobody more worthy of being ignored than Alex Berenson," he said. (*Id.* ¶ 127.) Later, on his podcast, Mr. Slavitt said Mr. Berenson was "[s]omeone who frankly I don't intend to dignify by mentioning his name." (*Id.* ¶ 128.)

Mr. Slavitt did everything but ignore Mr. Berenson, though. On July 18, Mr. Slavitt contacted Twitter's Todd O'Boyle, one of the Twitter employees present at the April 2021 meeting, to gauge Mr. O'Boyle's interest in a "bipartisan convo" with him and former FDA Commissioner Dr. Scott Gottlieb to discuss "a policy matter." (*Id.* ¶ 166.) The next day, July 19, Dr. Gottlieb contacted Mr. O'Boyle to complain about Twitter accounts "fueling dangerous and false narratives" and which "are being frequently cited as authoritative sources by conservatives, even members of Congress." (*Id.* ¶ 167.) Mr. O'Boyle quickly suggested "the three of us," i.e., Mr. Slavitt, Dr. Gottlieb, and Mr. O'Boyle, "talk." (*Id.* ¶ 170.) Ms. Culbertson, Mr. O'Boyle's superior, routed the e-mail chain to her boss, the Vice President of Public Policy for the Americas, noting that "we **could be** next." (*Id.*) By that time, as Facebook founder and Chief Executive Officer Mark Zuckerberg recently explained, "senior officials from the Biden

Administration, including the White House, repeatedly pressured our teams for months to censor certain COVID-19 content." (*Id.* ¶ 129.) Ms. Culbertson reported that she and Mr. O'Boyle "are triaging" and that "we're on much better footing than FB but need to keep up the responsiveness." (*Id.* ¶ 170.) She hoped to "keep us [(Twitter)] in a good place." (*Id.*)

On July 23, the same day Mr. O'Boyle spoke to Mr. Flaherty at the White House about the company following a "whole-of-society" approach to COVID-19 misinformation—that is, helping rather than standing up to the Biden Administration's censorship efforts, (*id.* ¶ 173)—Mr. Slavitt and Mr. O'Boyle scheduled a call for July 26, (*id.* ¶ 171). The day after Mr. O'Boyle's scheduled call with Mr. Slavitt, Twitter issued its third strike. (*Id.* ¶ 174.) As shown below, on or around July 28, Mr. Slavitt sent a screenshot of the third strike e-mailed it to Mr. Boyle.



Mr. Slavitt followed up on July 28, including his White House e-mail in the signature line, arguing that Mr. Berenson was "milk[ing] Twitter for audience." (*Id.* ¶ 174.)

On July 29, Mr. Berenson publicly criticized Mr. Slavitt on Twitter for advocating that Americans be required to take the COVID-19 vaccine or submit to intrusive testing "several times/week," and cast doubt on Mr. Slavitt's credibility regarding COVID-19 while tagging his

@aslavitt account. Alex Berenson (@AlexBerenson), Twitter (July 29, 2021, 10:05 PM), https://twitter.com/AlexBerenson/status/1420928576258445312. The very next day, on July 30, Mr. O'Boyle sent Mr. Slavitt an e-mail with a link to Mr. Berenson's fourth strike, a tweet summarizing clinical trial results from the Pfizer COVID-19 vaccine. "Further violations of the rules will result in permanent suspension," Mr. O'Boyle advised. (*Id.* ¶ 182.) A Twitter attorney later wrote that "one of our employees [(Todd O'Boyle)] shared information about the account they probably should not have, informing the external party that Berenson was on his last strike and would be suspended if he violated again." (Dkt. 50-1 at 2.) Mr. O'Boyle did not cite the "any or no reason" language in Twitter's Terms of Service or otherwise inform Mr. Slavitt that the company's relationship with Mr. Berenson was "at will." As Mr. O'Boyle explained, Mr. Berenson's fate on the platform was tied to "[f]urther violations of the rules." (*Id.* ¶ 182.)

Mr. Slavitt contacted Mr. O'Boyle again on July 31. Mr. Berenson had tweeted three German words, "impfung macht frei," meaning "vaccines make free," a criticism of those arguing to restrain individiual freedom based on vaccination status. Mr. Slavitt wrote that "if [Mr. Berenson] doesn't go permanently after this, the outcry will be justified." (*Id.* ¶ 188.)[1] Mr. O'Boyle advised Mr. Slavitt to be patient, that Twitter's "process takes time." (*Id.*)

Mr. Berenson returned to Twitter on August 6. By this time, no action could be taken against his account without Twitter leadership approval. (*Id.* ¶ 184.) On August 23 and 24, Mr. Slavitt, the Biden Administration's Mr. Flaherty, and Dr. Gottlieb again contacted Mr. O'Boyle over its COVID-19 vaccine content. Mr. O'Boyle viewed the outreach as coordinated among the three men, according to an email he sent Ms. Culbertson. On August 24, Dr. Gottlieb contacted

---

[1] Mr. Berenson, who is Jewish, was not comparing Nazi concentration camps to the COVID-19 vaccines, rather he was making a sarcastic comment regarding what he saw as the false promises made by governments that the COVID-19 vaccines were the only possible solution to the COVID-19 epidemic. (*Id.* ¶ 189.)

6

Mr. O'Boyle again, this time directly complaining about Mr. Berenson and an article Mr. Berenson had written about Dr. Fauci. (*Id.* ¶ 194.) The article criticized Dr. Fauci but contained no threats of violence of any kind against him. Nonetheless, Dr. Gottlieb claimed it was dangerous to Dr. Fauci. "This is why Tony needs a security detail," Dr. Gottlieb said. (*Id.*) Four days later, Dr. Gottlieb again emailed Mr. O'Boyle to complain about a tweet of Mr. Berenson's. Based on this report, Twitter permanently suspended Mr. Berenson's account over its own executives' objections. (*Id.* ¶¶ 205, 210.) (A fuller description of Dr. Gottlieb's interactions with Mr. O'Boyle is presented in Mr. Berenson's response to Dr. Gottlieb and Dr. Bourla's renewed motion to dismiss and incorporated here by reference.) Mr. Slavitt immediately broadcast his approval of Twitter's censorship to his Twitter followers. (*Id.* ¶ 170.)

After Mr. Berenson sued Twitter over the company's decision to permanently suspend him, the company acknowledged publicly what its chief executive officer and general counsel had concluded privately in August 2021: "Mr. Berenson's Tweets should not have led to his suspension at that time." (*Id.* ¶ 205.) Following Mr. Berenson's reinstatement, and after he published evidence that the White House pushed Twitter to deplatform him, *The Atlantic* contacted Mr. Slavitt for comment. By that time, Mr. Slavitt had publicly and repeatedly criticized Mr. Berenson by name. He had promptly announced to his Twitter followers when Twitter suspended Mr. Berenson's account. He had targeted Mr. Berenson for much of 2021.

Nevertheless, Mr. Slavitt told *The Atlantic*, "I think his name was in a magazine article," but "I don't remember anything else about him." (*Id.* ¶ 215.)

## ARGUMENT

### I.    Mr. Berenson adequately pled causation in support of his claims.

Mr. Slavitt asserts that Mr. Berenson has not adequately pled causation. (Dkt. 90 at 16.) Mr. Slavitt cites the Supreme Court's decision in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), for

support. Mr. Berenson previously addressed these *Murthy*-related arguments in his opposition to the Federal Defendants' motion to dismiss, and particularly the substantial differences between his traceability theory and the *Murthy* plaintiffs.

Mr. Slavitt argues that Mr. Berenson largely "alleges the same thing" as the *Murthy* litigants, and that his allegations even "disprove" links between the third party contacts and his censorship. (Dkt. 90 at 17-18.) As part of this effort, Mr. Slavitt points to the Imperial College London's contacts regarding Mr. Berenson and Twitter's content moderation policies which predated White House contacts. (*Id.*) Mr. Slavitt apparently fails to recognize that his argument actually works against him. Indeed, Twitter had misinformation policies around COVID-19 in 2020 and early 2021, but in March 2021 a Twitter executive told Mr. Berenson his "name has *never* come up in discussions around these policies." (Dkt. 80-1 ¶ 92 (emphasis added).) In other words, the evidence shows whatever Twitter's policies, the company did not use them to block Mr. Berenson from speaking until after the White House began targeting him at Twitter. This fact alone differentiates him from the *Murthy* litigants.

Mr. Slavitt cites the *Murthy* Court's discussion of Facebook as an example of post-government-contact independent moderation. (Dkt. 90 at 18.) The Supreme Court found that the district court in *Murthy* "erroneously stated that Facebook agreed to censor content that did not violate its policies," and that "Facebook explained that certain content did not qualify for *removal* under its policies but did qualify for other forms of moderation." *Murthy*, 144 S. Ct. at 1988 n.4 (emphasis in original). That is not the case here. Mr. Berenson was permanently suspended over the company's chief executive officer and general counsel's objections. (Dkt. 80-1 ¶ 210.) And Twitter later stated, prior to being acquired by Elon Musk, that "Mr. Berenson's Tweets"—i.e., all five strikes—"should not have led to his suspension at that time." (*Id.* ¶ 205.)

Mr. Slavitt diminishes the April 2021 White House meeting, contending he "made clear by citing Twitter's policies that any decision to act on Twitter accounts belong to Twitter alone." (Dkt. 90 at 18.) Twitter's internal report regarding the "really tough question" asked during that meeting—and which the employee distinguished from other "questions [which] were pointed but fair" and to which "mercifully we had answers"—"about why Alex Berenson hasn't been kicked off from the platform," (Dkt. 80-1 ¶ 117), suggests otherwise.  In any event, at the Rule 12 stage, "all reasonable inferences" are to be drawn "in favor of" Mr. Berenson as the plaintiff, not Mr. Slavitt. *Guterman v. Costco Wholesale Corp.*, 927 F.3d 67, 68 (2d Cir. 2019).

Next, Mr. Slavitt asserts that the April 2021 meeting failed and that "Twitter did not further act" with respect to Mr. Berenson until three months later in July 2021. (Dkt. 90 at 19.) The meeting failed to produce an immediate ban, but as Mr. O'Boyle explained to Mr. Slavitt later on in July 2021, Twitter's "process takes time." (Dkt. 80-1 ¶ 188.) The April meeting induced further internal review of Mr. Berenson's account by Twitter, (*id.* ¶ 122), marking the journalist for future censorship by the company. As Mr. Berenson has argued in his response to the Federal Defendants, that fact alone compels a finding that the "really tough question" violated his First Amendment rights.

Mr. Slavitt casts his July 2021 contacts with Twitter as him "express[ing] his personal opinion as a private citizen." (Dkt. 90 at 19.) Mr. Slavitt also says he "had no power over Twitter and no authority." (*Id.*) But throughout this period, Mr. Slavitt worked in concert with Mr. Flaherty at the White House and Dr. Murthy, the Surgeon General—and both Twitter and Facebook viewed him as doing so. After Mr. Slavitt and Dr. Gottlieb's joint outreach to the company in July 2021, Lauren Culbertson, Mr. O'Boyle's supervisor, warned her own superiors Twitter "**could be** next" and needed to "keep up the responsiveness" in order to "keep us in a

good place" in contrast to Facebook. (*Id.* ¶ 170 (emphasis in original).) The next day, Ms. Culbertson noted "the White House is yet again threatening Section 230 action on COIVD [sic] misinformation." (Dkt. 80-4 at 2.) And in August 2021, Mr. O'Boyle grouped Mr. Slavitt with the White House, concluding his goal was "to keep the target off our back." (*Id.* ¶ 193.)[2] Twitter itself did not view Mr. Slavitt as someone with "no power." To the contrary, the company linked him to the ongoing federal efforts to restrict speech.

Mr. Slavitt further argues Mr. Berenson does not allege that the company "removed [him] from the platform" on account of Mr. Slavitt's contacts with Twitter. (Dkt. 90 at 19.) Again, this overlooks Mr. Slavitt's role in moving Mr. Berenson through Twitter's "process" to ultimate ban. Along that path, as noted above, Mr. Slavitt flagged Mr. Berenson's third strike, which resulted in an account lockout. "Often, events have multiple but-for causes." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). All Mr. Berenson has to do is set forth a plausible claim at this stage of the litigation, and he has done that.

Mr. Slavitt argues that Twitter's moderation of Mr. Berenson's account "reflect[ed] an elaborate and independent enforcement process." (Dkt. 90 at 20.) He emphasizes that Mr. Berenson's first amended complaint only includes members of the company's public policy team. (*Id.*) But that fact underscores Mr. Berenson's argument. A former Twitter content moderation executive claimed the company maintained a separation between its government relations and content moderation teams precisely to protect its users from outside political or government pressure to censor them. (Dkt. 80-1 ¶ 217.) That wall broke down in Mr. Berenson's case, with Mr. O'Boyle, Mr. Slavitt's contact from April 2021, personally shepherding Mr.

---

[2] Mr. Slavitt argues Mr. O'Boyle "expressly distinguished between" himself and the White House, and also cites Mr. Slavitt's apparent desire to "stay out of the middle" of communications between the White House and Facebook. (Dkt. 90 at 21 n.6.) In fact, Mr. O'Boyle expressly *grouped* Mr. Slavitt with the White House (and Dr. Gottlieb) while expressing a desire to avoid the government scrutiny surrounding Facebook at the time. (Dkt. 80-1 ¶ 193.)

10

Berenson's ban through the company's "process" on a Saturday night without even notifying the company's leadership. (*Id.* ¶¶ 203-10.) That is not indicative of an "independent" process, as Mr. Slavitt maintains, and particularly not at the Rule 12, pre-discovery stage of this litigation.

Finally, Mr. Slavitt cites the decision in *Berenson v. Twitter, Inc.*, No. C 21-09818 WHA, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022), and asserts that "the doctrine of collateral estoppel" precludes Mr. Berenson's claims. (Dkt. 90 at 21.) For collateral estoppel to apply, the following four facts must be true: "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986). The court in *Berenson v. Twitter* did not decide anything about Mr. Slavitt's conduct. Mr. Slavitt was not a part to that case, and Mr. Berenson did not allege anything about Mr. Slavitt in that lawsuit. Collateral estoppel is inapplicable for at least these reasons.

## II.     Mr. Berenson's first amended complaint states a First Amendment claim.

Mr. Berenson addresses the merits of his First Amendment claim in his opposition to the Federal Defendants' renewed motion to dismiss, which he incorporates here. For his part, Mr. Slavitt relies primarily on *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), which he says "decimates" Mr. Berenson's free speech claim. (Dkt. 90 at 21.)

Mr. Slavitt misconstrues *Vullo*. Contrary to Mr. Slavitt's posturing, *Vullo* went *against* the government defendant, not for her. In that case, the Supreme Court determined that the NRA "plausibly alleg[ed] that Vullo threatened to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy." *Id.* at 194. It did so even though it acknowledged Vullo was pursuing the NRA for "conceded violations of the law," as she had the

11

right to do. *Id.* at 187. It also brushed aside "the argument that a ruling in the NRA's favor would interfere with the government's ability to function properly." *Id.* at 197. The correct way to analyze the NRA's complaint, the Supreme Court found, was to look at *all* its allegations together and in context, and the Second Circuit had failed to do so when it initially ruled for Vullo. As the Supreme Court explained, "[g]iven the obligation to draw reasonable inferences in the NRA's favor and consider the allegations as a whole, the Second Circuit erred in reading the complaint as involving only individual instances of 'permissible government speech' and the execution of Vullo's 'regulatory responsibilities.'" *Id.* at 195.

So too here. This Court should note the Federal Defendants' repeated specific and general contacts, including the April 2021 meeting where Mr. Slavitt and his colleagues asked their "really tough question" regarding why Mr. Berenson was still on Twitter. (Dkt. 80-1 ¶ 117.) And as described above, even after Mr. Slavitt nominally left the White House, Twitter internally viewed his (and Dr. Gottlieb's) outreach as part of the Federal Defendants' ongoing campaign.

Mr. Slavitt says "he had no enforcement power whatsoever over Twitter." (Dkt. 90 at 24.) That is a substantial understatement of the White House's power. Congress has given executive branch agencies "vast powers." *Morgan v. United States*, 304 U.S. 1, 22 (1938). Not only can those agencies promulgate rules impacting social media companies, they had direct oversight of Twitter's business interests. Eric Lipton et al., *U.S. Agencies Fund, and Fight With Elon Musk. A Trump Presidency Could Give Him Power Over Them*, N.Y. Times, Oct. 21, 2024, https://www.nytimes.com/2024/10/20/us/politics/elon-musk-federal-agencies-contracts.html. The fact the pressure came from the White House makes it even more coercive than other cases where the Second Circuit has found viable First Amendment claims based on communications

12

from a borough president, *Okwedy v Molinari*, 333 F.3d 339 (2d Cir. 2003), and village

administrator, *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991).

Mr. Slavitt points to language in *Vullo* recognizing that government officials can

"criticize" others, even "forcefully," without violating the First Amendment. (Dkt. 90 at 24.) To

be sure, *Vullo* held that "nothing . . . prevents government officials from forcefully condemning

views with which they disagree." *Id.* at 198. If Mr. Slavitt were simply criticizing Mr.

Berenson's views that would be one thing. Instead, he pressed Twitter to silence Mr. Berenson

"in . . . private meetings behind closed doors." *Id.* He did that without explaining once how

anything Mr. Berenson said violated Twitter's rules.

Next Mr. Slavitt raises factual arguments. He says Twitter's Todd O'Boyle "previously

had been quite comfortable telling the government when he believed [Mr.] Berenson had not

violated those policies." (Dkt. 90 at 23.) Whatever "comfort" Mr. O'Boyle may once have had,

by August 2021 he was writing about his efforts, which included reporting back to Mr. Slavitt,

"to keep the target off our back." (Dkt. 80-1 ¶ 193.) Mr. Slavitt also says that Twitter "did

nothing" in response to Mr. Slavitt flagging one of Mr. Berenson's tweets. (Dkt. 90 at 23.) But

the fact that Mr. Slavitt's conspiracy needed time to ripen and flower does not change its

ultimate success. And again, at this stage, inferences are to drawn in Mr. Berenson's favor.

*Guterman*, 927 at 68. Mr. Slavitt's qualified immunity defense is addressed below.[3]

**III.    Mr. Berenson states a claim against Mr. Slavitt under 42 U.S.C. § 1985(3).**

**A.    The First Amendment does not bar Mr. Berenson's civil rights claim.**

Mr. Slavitt argues that Section 1985(3) does not apply because the "alleged conspiratorial

acts consists of speech protected by the First Amendment." (Dkt. 90 at 24.) But as the Second

---

[3] Mr. Slavitt argues that Mr. Berenson has no First Amendment remedy. (Dkt. 90 at 24.) Mr. Berenson now does not
reserve but rather presses a claim under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

Circuit has explained in the criminal law context, "speech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990). Mr. Slavitt's First Amendment arguments are addressed above.

**B.      Mr. Berenson has stated a Section 1985(3) claim against Mr. Slavitt.**

Mr. Berenson already detailed why he has stated a prima facie claim under Section 1985(3) in his opposition to the Federal Defendants' renewed motion to dismiss, and he incorporates those arguments here.

Mr. Slavitt challenges Mr. Berenson's pleading of "class-based animus" in three ways. First, Mr. Slavitt maintains Mr. Berenson did not plead "he is a member of the protected class," (Dkt 90 at 25), but Mr. Berenson did that, (Dkt. 80-1 ¶ ("Mr. Berenson is not vaccinated against COVID-19.")). Second, Mr. Slavitt also argues that vaccination status is not a cognizable Section 1985(3) class, an issue he addressed at length in the above-referenced opposition. (Dkt. 90 at 25.) Third, Mr. Slavitt maintains that Mr. Berenson did not allege Mr. Slavitt targeted his speech on account of his vaccination status, but because of what he was saying. Mr. Berenson addresses all these arguments in his response to the Federal Defendants—where he also explains in detail why this Court should view Mr. Slavitt as a "state actor" for the entire period of the conspiracy. Mr. Berenson incorporates those arguments here. Put briefly, people who chose not to take a COVID-19 vaccine can and should be viewed as a Section 1985(3) class given how the Second Circuit has previously extended its protections to other groups.

Additionally, in 1993, the Supreme Court warned against defining Section 1985(3) classes as groups "seeking to engage in the activity the defendant has interfered with." *Bray v. Alexandria Clinic*, 506 U.S. 263, 269 (1993). Doing so risked turning the statute into a general federal tort law, the Court explained. *Id.* But in the same ruling, the court found that Section 1985(3) protection could be extended to groups that had suffered either "maliciously motivated"

14

or "assertedly benign (though objectively invidious), discrimination" if the discriminatory acts attempted to deprive the group of a right that existed *outside* their membership in it. The court used the example of "'*saving' women because they are* women *from a combative, aggressive profession such as the practice of law*." *Id.* at 270.

This finding is exactly analogous to Mr. Berenson's claim. He is not alleging that Mr. Slavitt or the other defendants violated the rights of unvaccinated people by forcing them to receive vaccines. Rather, he alleges Mr. Slavitt hoped to strip unvaccinated people, including him, of a fundamental right *which stood and stands outside their membership in that class.* The right at issue is Mr. Berenson's First Amendment right to provide to his unvaccinated readers information that might discourage them from becoming vaccinated—and, equally important, their right as unvaccinated people to hear him, a right which the "Constitution protects." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)

Mr. Slavitt also argues Mr. Berenson did not adequately allege conspiracy. (Dkt. 90 at 25-26.) What Mr. Berenson has alleged is "a factual backdrop that explains both the motivation and occasion for such a conspiracy," which is enough to state a plausible conspiracy claim. *Glacken v. Inc. Vill. of Freeport*, No. 09 CV 4832 DRH AKT, 2012 WL 894412, at *9 (E.D.N.Y. Mar. 15, 2012). Mr. Slavitt says Mr. Berenson has not alleged "one substantive communication" with "any government official" after he left the White House. (Dkt. 90 at 25.) Not so. Mr. Berenson alleged ongoing contacts with the White House, even up to a "daily basis." (Dkt. 80-1 ¶ 157)

**C.       Even if this Court finds the claims against the Federal Defendants are barred by qualified immunity, Mr. Berenson's Section 1985(3) claim should proceed against the private defendants.**

Mr. Slavitt contends he is entitled to qualified immunity, (Dkt. 90 at 24), but that defense only applies to the portion of the conspiracy during which he officially worked as a government employee. *See, e.g.*, *Richardson v. McKnight*, 521 U.S. 399 (1997) (holding that employees of

15

privately managed prison operated pursuant to state contract were not entitled to qualified immunity in Section 1983 action); *Murphy v. Sr. Investigator Neuberger*, No. 94 CIV. 7421 (AGS), 1996 WL 442797, at *11 (S.D.N.Y. Aug. 6, 1996) ("Qualified immunity only applies in suits against officials in their personal capacity."). Even if this Court were to grant the Federal Defendants their qualified immunity defense, the Section 1985(3) case should still proceed against Mr. Slavitt.

The same rationale that denies purportedly "private" state actors qualified immunity in Section 1983 cases applies here. District courts in the Second Circuit have followed this rule, declining to dismiss civil rights claims against private plaintiffs based on findings of immunity for public officials. *See*, *e.g.*, *Elmasri v. England*, 111 F. Supp. 2d 212, 218 (E.D.N.Y. 2000) ("Liability for participating in a Section 1983 conspiracy may be imposed on private individuals *even if the state actor is immune from liability*.") (emphasis added); *Storck v. Suffolk County Dep't of Social Services*, 62 F. Supp. 2d 927, 940 (E.D.N.Y. 1999) (same). "Private individuals who associate themselves with a public official to encroach on another's constitutional rights must bear the risk of trial." *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 970 F.2d 785, 796 (11th Cir. 1992).[4] So should Mr. Slavitt.

## IV.    Mr. Slavitt tortiously interfered with Mr. Berenson's contract with Twitter.

In New York, "[t]ortious interference with contract requires [(1)] the existence of a valid contract between the plaintiff and a third party, [(2)] defendant's knowledge of that contract, [(3)] defendant's intentional procurement of the third-party's breach of the contract without justification, [(4)] actual breach of the contract, [(5)] and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (N.Y. 1996).

---

[4] In *Ziglar v. Abbasi*, 582 U.S. 120, which was decided in 2017, the Supreme Court abrogated *Burrell*'s holding that qualified immunity is unavailable to Section 1985(3), but this language remains good law in the Eleventh Circuit.

The first and fifth elements of tortious interference are not in dispute. The remaining elements are knowledge, intentional procurement without justification, and actual breach, for which Mr. Slavitt argues Mr. Berenson fails to state a claim.

**A.    Mr. Slavitt knew about Mr. Berenson's binding contract with Twitter, including the COVID-19 misleading information policy, and that any suspension of Mr. Berenson would be predicated on violations of the company's rules.**

For tortious interference with contract to exist, a defendant's knowledge of the contract at issue "need not have been perfect or precise." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 279 (S.D.N.Y. 2002). Specifically, knowledge of the "legal particulars of the contract" is not required. *Id.*; *see also State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) ("[U]nder New York law, a [defendant] must have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required."). As the New York Court of Appeals has explained, this rule makes sense because, "as a practical matter [a defendant] will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract (as distinguished, perhaps, from its economic or operational aspects)." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193, 406 N.E.2d 445, 450 (1980).

Mr. Slavitt appears to concede knowledge of Mr. Berenson's contract with Twitter,[5] and instead points to his purported lack of knowledge of the private assurances Twitter made. That is beside the point. Mr. Slavitt knew about the COVID-19 misleading information policy and, most importantly, he knew the company was applying it to Mr. Berenson. Mr. Slavitt also understood

---

[5] Mr. Slavitt knew about Twitter's terms of service and that the company was applying its misinformation rules to Mr. Berenson. (Dkt. 80-1 ¶ 123). That goes beyond the level of knowledge required. *See, e.g.*, *Visbal*, 431 F. Supp. 3d at 349 (holding knowledge allegations sufficient because accused party "had some knowledge of the terms" even though "it lacked detailed knowledge about that agreement"). Further, this a Rule 12 motion, and Mr. Berenson "does not need to *prove* anything at this stage in the litigation; instead, [he] need only *allege* that" Mr. Slavitt knew of the contract. *Jordan's Ladder Legal Placements, LLC v. Major, Lindsey & Afr., LLC*, No. 21 CV 7124 (CM), 2022 WL 1500772, at *7 (S.D.N.Y. May 12, 2022) (emphasis in original).

the company was not treating Mr. Berenson as an "at will" user whom the company could toss from its platform at any time for "any or no reason." Consistent with that knowledge, Mr. Slavitt closely monitored Mr. Berenson's account to find a predicate tweet he or his co-conspirator Mr. Gottlieb could send to his familiar contact at Twitter to bring about Mr. Berenson's ban.

**B.      Mr. Slavitt interfered with Mr. Berenson's enforceable contract with Twitter without justification, inducing Twitter to breach.**

For there to be a claim for tortious interference with contract, a defendant must "intentionally procure[] . . . the third-party's breach of contract without justification." *Lama Holding*, 88 N.Y.2d at 424, 668 N.E.2d at 1375. "[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621, 664 N.E.2d 492 (N.Y. 1996); *see also Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189–90, 818 N.E.2d 1100 (N.Y. 2004) (quoting, discussing, and approving this language from *NBT*). Distinct from tortious interference with an existing contract is tortious interference "with prospective contract rights," which includes interference with "voidable contracts and contracts terminable at will." *Guard-Life*, 50 N.Y.2d at 192, 406 N.E.2d at 449. The latter category requires showing "more culpable conduct on the part of the defendant." *NBT*, 87 N.Y. 2d at 621.

As a threshold matter, Mr. Berenson's contract with Twitter was not voidable or at-will. In *Berenson v. Twitter*, No. C 21-09818 WHA, 2022 WL 12890491 (N.D. Cal. Apr. 29, 2022), the district court construed the very contract at issue. Noting that "Twitter's terms of service stated at all relevant times that it could suspend user accounts for 'any or no reason'," *id.* at *1, the court nonetheless found "that Twitter's conduct here modified its contract with plaintiff and then breached that contract by failing to abide by its own five-strike policy and its specific

18

commitments set forth through its vice president," *id.* at \*2. In other words, the court found that Twitter could not terminate its contract with Mr. Berenson at any time for any or no reason—the company had to follow its own policy, a policy Mr. Slavitt not only knew of in general, but knew Twitter was actively applying to Mr. Berenson's speech.

Mr. Slavitt's contrary position, that the "contract gives Twitter complete discretion to 'suspend or terminate a user's account for 'any or no reason'," (Dkt. 90 at 30), conflicts with the district court's conclusion. Mr. Slavitt accepts the district court's opinion where it helps him. (*Id.* at 21.) Regardless, "[w]hile the invalidity of a contract is a defense to tortious interference, belief in validity is irrelevant." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 646 (2015) (citing Restatement (Second) Torts § 766 cmt. i (1979)). Or, as *BLP* says, quoting the same source the Supreme Court cited, "an individual is subject to liability for tortious interference even if he or she believes that the agreement is *not legally binding or has a different legal effect from what it is judicially held to have.*" *BLP*, 2005 WL 1138474, at \*13 n.11 (emphasis added).

Mr. Berenson need not show "more culpable conduct" here—only that Mr. Slavitt acted "without justification"—which New York courts generally define as economic justification—or "improperly." *Guard-Life*, 50 N.Y.2d at 189, 406 N.E.2d at 448. *Guard-Life* cited and relied on the *Restatement (Second) of Torts*. *Id.* The *Restatement* notes "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of contract," and even "a simple request or persuasion exerting only moral pressure" or a "statement unaccompanied by any specific request but having the same effect as if the request were specifically made" is enough. Restatement (Second) of Torts § 766, cmt. k (1979).

Mr. Slavitt's conduct here meets this threshold. He made repeated requests that Twitter censor Mr. Berenson—not just that the company censor individual tweets, but that it shut down

Mr. Berenson's entire account. He did so in secret, outside the company's normal reporting channels. He also did so while failing to offer any rationale as to how Mr. Berenson violated any of the company's policies.

If anything, Mr. Slavitt's conduct meets the more demanding "wrongful means" standard that applies to tortious intereference with prospective economic advantage. Again, the nature of Mr. Berenson's contract with Twitter does not require this showing, but he could make it even if it did. To recount, Mr. Slavitt did not use Twitter's ordinary reporting channels when he informed on Mr. Berenson's speech. He leaned on the same Twitter emplyee present at the April 2021 meeting. In the unlikely event Mr. O'Boyle forgot about these interactions, Mr. Slavitt included his White House e-mail address in his e-mail signature. That Twitter employee also grouped Mr. Slavitt with the White House. At the very least, a jury could conclude that Mr. Slavitt, who continued to talk openly about his ongoing, even "daily" conversations with the White House, might continue to "enlist the powers of government" on his side to "prejudice the public interest in public administration" against Twitter. Restatement (Second) of Torts § 767, cmt. c (1979).

Mr. Slavitt also argues Mr. Berenson did not allege "that any Slavitt email to Twitter caused Twitter to issue a strike against him or otherwise interfered with his alleged contract. (Dkt. 90 at 26.) As noted above, Mr. Slavitt flagged Mr. Berenson's third strike, causing his temporary suspension from the platform. And this is at the pre-discovery stage.

**V.    Section 230 does not shield Mr. Slavitt from liability.**

Mr. Slavitt raises section 230 of the Communications Decency Act, 47 U.S.C. § 230, as a bar to Mr. Berenson's claims. (Dkt. 90 at 27-28.) This defense fails for three reasons. First, Section 230(c)(2) covers "user[s] of an interactive computer service." While it is true Mr. Slavitt is a Twitter user, his contacts with Twitter were outside the scope of his usership. As noted above, he did not flag Mr. Berenson's post as a user, but rather contacted Twitter directly over e-mail.

20

Further, Mr. Slavitt maintained both a personal and government Twitter account, (Dkt. 80-1 ¶¶ 61, 68), which presents the issue of what category of "user" was he at the time—private or public. For purposes of this defense, Mr. Slavitt does not distinguish between the two.

Second, for this defense to apply, Mr. Slavitt's actions had to be "taken in good faith." 47 U.S.C. § 230(c)(2). As one district court explained, for good faith to exist, at a minimum "the provider" (or the user in this case) "must actually believe that the material is objectionable for the reasons it gives." *Darnaa, LLC v. Google, Inc.*, No. 15-CV-03221-RMW, 2016 WL 6540452, at *8 (N.D. Cal. Nov. 2, 2016) (internal quotation marks). Again, despite knowing Twitter's COVID-19 rules were in force and being applied to Mr. Berenson's reporting, Mr. Slavitt gave no explanation to Twitter as to how any of the posts he complained about violated Twitter's rules. Despite all this, and inconsistent with his litigation-induced claims of "good faith," Mr. Slavitt denied "remember[ing] anything else about" Mr. Berenson beyond that "his name was in a magazine article." (Dkt. 80-1 ¶ 215.)

Third, Section 230(c)(2) protection extends to "the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Courts have criticized an expansive reading of "otherwise objectionable," with the Ninth Circuit acknowledging the rationale for decisions "recognizing limitations in the scope of the immunity to be persuasive." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1050 (9th Cir. 2019). In *Enigma Software*, the court rejected an interpretation that would "give providers unbridled discretion to block online content." *Id.* at 1051. There, the court allowed a claim to move past a motion to dismiss even though the defendant claimed the plaintiff's products "use deceptive tactics" because there was "anticompetitive animus." *Id.* at 1052

21

(internal quotation marks omitted). There is ample reason to conclude animus exists here and even that it has anti-competitive undertones.[6]

Mr. Slavitt cites *Domen v. Vimeo, Inc.*, 433 Supp. 3d 592 (S.D.N.Y. 2020), to advance an expansive reading of "otherwise objectionable." (Dkt. 90 at 28.) The court in *Domen* quoted a district court decision in *Zango, Inc. v. Kaspersky Lab, Inc.*, No. 07-CV-00807 (JCC), 2007 WL 5189857, at *4 (W.D. Wash. Aug. 28, 2007), but the *Enigma Software* court made clear that the Ninth Circuit's affirmance of *Zango* did *not* provide that "the immunity was limitless," *Enigma Software*, 946 F.3d at 1045, nor did the Ninth Circuit even consider construction of "otherwise objectionable" in *Zango*, *id.* at 1049. *Domen* must be read in view of *Enigma Software*.[7]

Mr. Slavitt also argues that Mr. Berenson "already litigated and lost on the application of § 230(c)(2)(A)," again citing the outcome in *Berenson v. Twitter*. (Dkt. 90 at 27.) But that decision considered Twitter's actions, not Mr. Slavitt's.

Finally, Mr. Slavitt was a state actor at all times for the purposes of this complaint, and not even Section 230 protects parties acting under color of law when they violate other Americans' First Amendment rights. The Federal Defendants cannot and have not pled they have immunity for their acts under Section 230, and neither can Mr. Slavitt.

The implications of Mr. Slavitt's broad reading of section 230 are troubling. Under his interpretation, so long as there is a "good faith" subjective objection to content, powerful third parties are free to take almost any action to force social media platforms to censor other users while retaining complete immunity from liability. Government "users" might even try to leverage the "any action" language in Section 230(c)(2)(A) to engage in censorship of disfavored

---

[6] Mr. Slavitt used Twitter to sell his book on the COVID-19 pandemic. (Dkt. 80-1 ¶ 41.) Because of his deplatforming, Mr. Berenson could not promote his book and long-form journalism on Twitter. (*Id.* ¶ 216.)
[7] The Second Circuit affirmed the district court's dismissal of the claims in *Domen*, but not on section 230 grounds. *Domen v. Vimeo, Inc.*, No. 20-616-CV, 2021 WL 4352312, at *1 n1 (2d Cir. Sept. 24, 2021).

22

views. But this unprecedented expansion of Section 230 would undermine the very "diversity of political discourse" Congress enacted Section 230 to protect. 47 U.S.C. § 230(a)(3).

**VI.    This Court has specific personal jurisdiction over Mr. Slavitt.**

"To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the Court must engage in a two-step analysis." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). The first step involves determining whether the long-arm statute of the forum state, in this case New York, applies; the second is "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Id.*

For the first step, N.Y. C.P.L.R. § 302(a)(3)(ii) provides for jurisdiction over non-resident defendants for torts that impact New Yorkers. As the New York Court of Appeals explained:

> The conferral of jurisdiction under this provision rests on five elements: First, that defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.

*LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214, 735 N.E.2d 883, 886 (N.Y. 2000).

The first and second elements are not in dispute. Mr. Slavitt challenges the third element, arguing the "first effect" of Mr. Berenson's injury was felt outside New York. (Dkt. 90 at 29.) "In a tortious interference with contract claim, the first effects are felt where the contract was to be performed by plaintiff, who was prevented from performing and reaping the benefits thereof." *Iconoclast Advisers LLC v. Petro-Suisse Ltd.*, 17 Misc. 3d 1101(A), 851 N.Y.S.2d 58 (N.Y. Sup. Ct. 2007). Here, Mr. Slavitt's acts caused New York-based Mr. Berenson to be blocked from tweeting, i.e., performing, from his residence in this forum. Further, Mr. Slavitt used an executive assistant at a New York City-based venture fund to schedule a call with Twitter to discuss his concerns about COVID-19 misinformation. (Dkt. 80-1 ¶ 47.) The fifth-ban-inducing

23

strike was issued by a Twitter employee based in New York. (*Id.* ¶ 47.) This was the culmination of the "process" Mr. O'Boyle advised Mr. Slavitt "takes time." (*Id.* ¶ 188.)

Regarding the fourth element, Mr. Berenson's New York location was not a secret. At all relevant times, including when Mr. Slavitt was communicating with Mr. Berenson on Twitter in May 2020, Mr. Berenson listed his New York location on his Twitter profile. (Dkt. 52-3 at 3.) Mr. Slavitt could have submitted a declaration contending he was unaware of Mr. Berenson's location, but he did not. Given how closely Mr. Slavitt monitored Mr. Berenson's Twitter account, it is nearly impossible to imagine he was unaware of Mr. Berenson's location. Finally, regarding the fifth element, interstate commerce, Mr. Berenson alleged Mr. Slavitt markets his book on Twitter and broadcasts his revenue-generating podcast on the Internet. (Dkt. 80-1 ¶ 41; *id.* ¶ 124 (linking to podcast transcript acknowledging sponsors).)

Relevant here, under N.Y. C.P.L.R. § 302(a)(3)(i), Mr. Slavitt also regularly does and solicits business, visits, and derives revenues in New York. In addition to his private equity fund, Mr. Slavitt published a book on the COVID-19 pandemic with a publisher in this forum. (Dkt. 80-1 ¶ 47.) These contacts provide a separate basis for long-arm jurisdiction over Mr. Slavitt.

The second personal jurisdiction question is whether Mr. Slavitt's contacts with New York are sufficient under the Due Process Clause. Under *Calder v. Jones*, 465 U.S. 783 (1984), personal jurisdiction is appropriate where the "effects" of out-of-state conduct are absorbed in the forum. *Id.* at 789. Like the plaintiff in *Calder*, Mr. Berenson absorbed the harm at issue in this case, his Twitter ban, in New York. It is reasonable, particularly in view of Mr. Slavitt's other contacts with New York, to require him to defend this case in this forum.

Mr. Slavitt argues his contacts with New York lack a sufficient connection to this lawsuit. (Dkt. 90 at 30.) But the Supreme Court clarified in *Ford Motor Co. v. Montana Eighth Jud. Dist.*

24

*Ct.*, 141 S. Ct. 1017 (2021), that "some relationships will support jurisdiction without a causal showing" and it has never required "proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Id.* at 1026. The Supreme Court also explained that the non-resident plaintiffs in *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017), "were engaged in forum-shopping." *Ford Motor Co.*, 141 S Ct. at 1031. That is not so here.

Finally, Mr. Slavitt's complaint about being required "to litigate three thousand miles from [his] home" overlooks the alternative. (Dkt. 90 at 30.) Mr. Berenson sued the Defendants jointly in one forum because they engaged in a joint conspiracy. Defendants based on the East Coast would have had the same complaint had Mr. Berenson commenced this action in Mr. Slavitt's home forum. It is the interest of *all* parties to exercise jurisdiction over all Defendants involved to expedite justice, promote a uniform policy, and vindicate Mr. Berenson's rights in one proceeding. *Cf.* Fed. R. Civ. P. 1. New York also has a "manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). Mr. Slavitt would discard that interest.[8]

**CONCLUSION**

For the foregoing reasons, Mr. Berenson respectfully prays that this Court denies Mr. Slavitt's motion to dismiss. In the alternative, regarding Mr. Slavitt's motion to dismiss for lack of personal jurisdiction, Mr. Berenson respectfully moves this Court for jurisdictional discovery regarding Mr. Slavitt's contacts with New York, including his ownership, use, or possession of any real property, and his knowledge of Mr. Berenson's location during the time period at issue.

---

[8] Mr. Slavitt also cites *Walden v. Fiore*, 571 U.S. 277 (2014). (Dkt. 90 at 30-31.) But the "relevant conduct occurred entirely in Georgia." *Walden*, 571 U.S. at 291. The defendant also lacked any "physical presence" in the forum, which is not the case here. *Id.* at 285.

Respectfully submitted, this 15th day of November, 2024.

By: */s/ James R. Lawrence, III*
JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
ENVISAGE LAW
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law
        ajbiller@envisage.law

SEAN P. GATES (SBN 186247)
Illovsky Gates & Calia LLP
155 N. Lake Avenue, Suite 800
Pasadena, CA 91101
Phone: 626.508.1715
E-mail: sean@illovskygates.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice

26