## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------

**ALEX BERENSON,**

        **Plaintiff**,

    v.

**JOSEPH R. BIDEN, JR.**, President of the
United States, in his official capacity;

**ANDREW M. SLAVITT**, in his individual
capacity;

**SENIOR ADVISOR TO THE COVID-19
RESPONSE COORDINATOR**, in his or
her official capacity;

**ROBERT FLAHERTY**, in his individual
capacity;

**CHRISTIAN L. TOM**, Director of Digital
Strategy at the White House, in his official
capacity;

**VIVEK MURTHY, M.D.**, Surgeon General
of the United States, in his official capacity,
and in his individual capacity;

**SCOTT GOTTLIEB, M.D.**, former FDA
Commissioner and Member of the Board of
the Directors of Pfizer, Inc.;

**ALBERT BOURLA, PH.D., D.V.M.**,
Chief Executive Officer of Pfizer, Inc., and

**THE UNITED STATES OF AMERICA**,

        **Defendants**.

-------------------------------------------------------

X
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
X

Case No. 1:23-cv-03048-JGLC

## REPLY MEMORANDUM IN SUPPORT OF
## ANDREW M. SLAVITT'S RENEWED MOTION TO DISMISS COMPLAINT
## (INCLUDING ALLEGATIONS IN THE PROPOSED FIRST AMENDED COMPLAINT)

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
*Attorneys for Defendant Andrew M. Slavitt*

**TABLE OF CONTENTS**

<strong>Page</strong>

I.      Berenson Fails to State a First Amendment Claim. ...........................................................1

II.     Berenson Does Not Attempt to Plead "But For" Causation for Any Claim. .....................6

III.    Berenson Fails to State a Claim Under Section 1985(3). ................................................8

IV.     Berenson Fails to State a Tortious Interference Claim. ...................................................9

V.      Section 230 Immunizes Slavitt from Berenson's Tort Claims. ......................................10

VI.     This Court Lacks Personal Jurisdiction Over Slavitt........................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bantam Books, Inc. v. Sullivan*,
    83 S. Ct. 631 (1963) ................................................................................................3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................9

*Bray v. Alexandria Clinic,*
    506 U.S. 263 (1993) ................................................................................................8

*Broidy v. Global Risk Advisors LLC*,
    2023 WL 6258135 (S.D.N.Y. Sept. 26, 2023) ....................................................6

*Calder v. Jones*,
    465 U.S. 783 (1984) ..............................................................................................10

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    589 U.S. 327 (2020) ................................................................................................6

*Egbert v. Boule*,
    596 U.S. 482 (2022) ................................................................................................1

*Fisk v. Letterman*,
    401 F. Supp. 2d 362 (S.D.N.Y. 2005)...................................................................2

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) ..............................................................................................10

*Glacken v. Incorporated Village of Freeport*,
    2012 WL 894412 (E.D.N.Y. Mar. 15, 2012) .......................................................9

*Griffin v. Breckenridge*,
    403 U.S. 88 ..............................................................................................................8

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ................................................................................................2

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)....................................................................................................1

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024)............................................................................................7

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ..............................................................................................7, 9

*National Rifle Ass'n v. Vullo*,
    602 U.S. 175 (2024) .........................................................................................2, 3, 5

# TABLE OF AUTHORITIES
## (Cont'd.)

**Page(s)**

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003)..................................................................................5

*Paladino v. Seals-Nevergold*,
  2020 WL 5544342 (W.D.N.Y. Sept. 15, 2020)......................................................4

*Pulizotto v. McMahon*,
  406 F. Supp. 3d 277 (S.D.N.Y. 2019).....................................................................9

*Rattner v. Netburn*,
  930 F.2d 204 (2d Cir. 1991)...................................................................................5

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)...................................................................10

*Trump v. United States*,
  603 U.S. 593 (2024) ...............................................................................................4

*Webb v. Goord*,
  340 F.3d 105 (2d Cir. 2003)....................................................................................9

## Statutes

47 U.S.C. § 230(c)(2)(A)..........................................................................................10

The U.S. Constitution entitles the government and private citizens alike to express their views about matters of public concern. Protected expression is all Alex Berenson alleges Andrew Slavitt offered. On top of this failure, Berenson pleads *no facts* to show that Slavitt caused Twitter to issue any of its five strikes. Berenson also points to *no facts* showing any actionable § 1985 "conspiracy" that could make Slavitt liable for another defendant's (protected) speech.

Berenson's proposed amended complaint and the Twitter documents he attaches to it unambiguously confirm the fundamental flaws in Berenson's legal theories and foreclose any reasonable inference to the contrary. The "reams of evidence" on which Berenson relies (Dkt. 103 at 2) actually *disprove* his claims and make it clear his case against Slavitt does not belong in any court, let alone one in New York. Having had multiple chances to plead a viable case against Slavitt and failed each time, Berenson's claims against Slavitt should be dismissed with prejudice.

## I.    BERENSON FAILS TO STATE A FIRST AMENDMENT CLAIM.[1]

Berenson claims Slavitt "made repeated requests that Twitter censor Mr. Berenson." Dkt. 103 at 19. That is wrong both as to statements Slavitt made as a private citizen and when he worked in the White House. It is not a request for censorship to opine—as a private citizen, consistent with the views of many others—that Berenson is "begging for it," "knows he's gone" and is "milk[ing] Twitter for audience." FAC ¶¶ 174, 242(c). Nor is it a request for censorship to say that if Berenson "doesn't go permanently" after posting a tweet that trivialized the Holocaust, "the outcry will be justified." FAC ¶ 23. Those comments—made *after* Slavitt left the government —are not "requests" for anything. They are protected opinions. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which

---

[1] Berenson now argues the First Amendment creates a private right of action for money damages arising from an alleged constitutional violation (*i.e.*, a "*Bivens*" claim). *See* Dkt. 103 at 13 n.3. The U.S. Supreme Court recently reiterated that the Court has "never held that Bivens extends to First Amendment claims." *Egbert v. Boule*, 596 U.S. 482, 498 (2022).

1

does not contain a provably false factual connotation will receive full constitutional protection.").

Importantly, these comments also are not *government* speech.  Slavitt clearly was no longer part of the federal government when he made them.   Berenson claims Slavitt's private communications nevertheless were government speech because of Slavitt's "tight and ongoing relationship with the Biden Administration."  Dkt. 103 at 1.  But the one case Berenson cites to argue that Slavitt "easily met the standard of joint participation with state officials" (Dkt. 103 at 1) expressly limited its holding to "the particular context of prejudgment attachment."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n.21 (1982).  The FAC does not allege any actionable "joint action" between Slavitt and the government as to Berenson.  Indeed,  "[a]lleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights."  *Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005).  Moreover, Twitter did not view Slavitt as providing "government scrutiny" of Twitter in Summer 2021 (Dkt. 103 at 10 n.2); it understood he was a "*former* WH advisor" and current "frequent cable talker."  FAC Exh. B. at 26 of 28 (emphasis added).

Even for the few statements Berenson attributes to Slavitt or unnamed speakers during the handful of months in which Slavitt actually served in the White House, there was no "censorship." To express as a government COVID-19 response advisor "the view Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets" (which Twitter employees expressly "disagreed" with) (FAC ¶ 123)) or to attend a meeting where an unnamed person asked one *question* about why Twitter had not removed Berenson from its platform (*id.* ¶ 117) is to make clear the decision whether to act on Berenson's account was *Twitter's* and no one else's.

In *National Rifle Association v. Vullo*, 602 U.S. 175 (2024), the Supreme Court held that "[a] government official can share her views freely and criticize particular beliefs, and she can do

2

so *forcefully* in the hopes of persuading others to follow her lead." *Id.* at 188 (emphasis added). That is—at most—what Slavitt allegedly did in his government work on the COVID-19 response as a public health resource in the middle of a national emergency. Berenson does not even allege that Slavitt followed up with Twitter during his time in the White House after Twitter disagreed that Berenson's posts were at that time violating Twitter's policies.

Berenson's claim of "censorship" exposes the deeper legal flaw of his case. He acts as if a supposed "request to censor" violates the First Amendment. *It does not.* Nothing prevents the government—let alone Slavitt when he was acting as a private citizen—from objecting to the dissemination of speech it disagrees with. Berenson can label it with any (inaccurate) pejorative he likes—"censoring," "silencing," "pressuring"—but a government official is entitled to share her views freely and forcefully "in the hopes of persuading others to follow her lead." *See NRA*, 602 U.S. at 188. What Berenson calls a request to censor—which in reality is the government exercising its right to "say what it wishes" (*NRA*, 602 U.S. at 187)—only is wrongful if it "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191.

As discussed in Slavitt's motion (Dkt. 90 at 16-19), and largely ignored by Berenson, the FAC alleges no threat like what the Court found actionable in cases like *NRA* and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). The only time his opposition brief even uses the word "threat" to describe any defendant's actions is in quoting a Twitter employee's reference in July 2021 (*after* Slavitt left government service) to the "White House . . . yet again threatening Section 230 action on COVID misinformation." Dkt. 103 at 10 (quoting Dkt. 80-4 at 2).

Berenson does not address the same Twitter employee's conclusion that Twitter had "no evidence to suggest it's a real thing yet," or that President Biden's statement was not made to

3

or about Twitter *See* Dkt. 80-4 at 2.  Nor does he say how the White House—let alone its former COVID advisor Slavitt, who is not alleged to have said anything about Section 230 to Twitter— could pass legislation or otherwise modify the scope of a decades-old statute enacted by Congress. *See, e.g.*, *Paladino v. Seals-Nevergold*, 2020 WL 5544342, at *4 (W.D.N.Y. Sept. 15, 2020) ("While Paladino tries to paint the Board as highly influential given its role in the petition process, the fact remains that it was powerless to remove him without a ruling by a separate party."). Berenson also makes no effort to distinguish the President's public stance on Section 230 from the non-coercive and "long-recognized aspect of Presidential power" to "persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump v. United States*, 603 U.S. 593, 629 (2024).[2]

To exaggerate the effect of President Biden's July 2021 statement on Twitter, Berenson repeatedly invokes Todd O'Boyle's statement that he sought to "keep the target off our back." Dkt. 103 at 10, 13.  Berenson tellingly omits the context of that statement showing the use of the word "target" had nothing to do with changing § 230.  O'Boyle wrote that:

> The Administration has said repeatedly they feel FB [Facebook] under communicates and has been less than forthcoming when they do talk.  I'm leaning into overcommunicating Twitter's covid work to keep the target off our back.

Dkt. 80-4 at 26.  The "target" reference was to Twitter being publicly criticized.  That explains why, when Lauren Culbertson wrote "we ***could be*** next" (*id.* at 5 (emphasis in original)), a Twitter colleague responded that "[w]e're working through some potential statements / a scenario plan should we get *called out* directly."  *Id.* (emphasis added).

The government is free to "call out" speech or conduct with which it disagrees.  And if

---

[2] Twitter was prepared to respond to this type of speech with speech of its own.  *Cf* Dkt. 80-4 at 2 (noting, with respect to a Section 230 bill introduced by Senator Amy Klobuchar, that there was "no chance this passes," and that Twitter was planning "public pushback" that it described as a "'diplomatically critique in private and have our trades blast you publicly' strategy").

Twitter were publicly criticized, the company was free to respond with its own public statements. This does not indicate any coercive threat of government action. Indeed, Slavitt was a COVID-19 response advisor with no alleged enforcement power, which is "relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." *NRA*, 602 U.S. at 191. By any reasonable measure, Slavitt's statements were not coercive.

The holdings in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), and *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991), on which Berenson relies are readily distinguishable from this case. In *Okwedy*, a Borough President noted the "substantial economic benefits" the billboard company derived from all its billboards on Staten Island, not just the targeted billboards, and called on the company to contact the Borough President's legal counsel. 333 F.3d at 342. Rather than disagree and refuse to remove the challenged material like Twitter did here, the billboard company in *Okwedy* took the billboards down the same day it received the letter. *Id.* In *Rattner*, "a threat was perceived and its impact was demonstrable." 930 F.2d at 210. Unlike here, the government communication in *Rattner* is what caused the recipient to cease publication of the challenged statements, with the *Rattner* court noting that "the Chamber immediately capitulated to what may reasonably be viewed as an implicit threat." *Id.*

Berenson's own proposed pleading alleges Twitter rejected Slavitt's view when he was a government official that Berenson had violated Twitter's policies. FAC ¶ 11 (the "initial pressure campaign failed"). That same FAC and attached Twitter documents indicates that Twitter's enforcement teams concluded months later that Berenson was violating Twitter policies without any reference to the opinions Slavitt (and many others) expressed as a private citizen. *See infra* at 3-4. Slavitt's protected expression could not be—and was not—reasonably perceived by Twitter

as a "threat."  Berenson's First Amendment claim thus is fatally flawed.[3]

## II.    BERENSON DOES NOT ATTEMPT TO PLEAD "BUT FOR" CAUSATION FOR ANY CLAIM.

"It is 'textbook tort law' that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 331 (2020).  But Berenson fails to allege that Slavitt caused his purported harm.

Berenson claims "Mr. Slavitt flagged Mr. Berenson's third strike, which resulted in an account lockout."  Dkt. 103 at 10.  This is sleight of hand.  The third strike—which Berenson alleges the Twitter head lawyer "signed off on" (FAC ¶¶ 155, 183)—resulted in a lockout.  But Berenson never alleges that *Slavitt's email*—saying Berenson was "Begging for it" over a screenshot of his tweet advocating that people catch the highly contagious COVID-19 virus— caused Twitter to issue the strike.  *See* Dkt. 103 at 10.  Nor could he possibly pin this on Slavitt; Berenson's tweet spawned more than 400 replies on Twitter, including multiple posts that tagged "@TwitterSupport" or indicated users had reported the tweet, Dore Decl. Ex. 4.  Berenson alleges no facts suggesting Twitter would have declined to act in the face of these complaints "but for" Slavitt's *July 28* email to O'Boyle.  *See* Dkt. 53 at 5.  Indeed, the Twitter documents he attaches to the FAC show that *no* user complaint had any role in Twitter's decision to enforce.

Berenson also argues that the April 2021 meeting between White House officials and Twitter "induced further internal review of Mr. Berenson's account by Twitter, ([FAC] ¶ 122), marking the journalist for future censorship by the company."  Dkt. 103 at 9.  But Twitter *already*

---

[3] Berenson already litigated and lost the issue of whether federal officials' coercion turned Twitter's content-moderation decisions into a form of state action.  *See* Dore Decl. Ex. 3, at 5. Though Slavitt was not a defendant in his case against Twitter, nonmutual defensive collateral estoppel "prevents the losing party from relitigating an issue against *a different party*."  *Broidy v. Global Risk Advisors LLC*, 2023 WL 6258135, at *12 (S.D.N.Y. Sept. 26, 2023) (emphasis added).

had done a "deep dive" on Berenson's account before anyone from the government ever asked about him. FAC ¶¶ 94-95. It was *that* review, prompted by complaints from third parties having nothing to do with Slavitt or anyone at the White House, that resulted in Berenson's first strike. As the Supreme Court held in *Murthy v. Missouri*, 603 U.S. 43 (2024), this shows Twitter "had independent incentives to moderate content and often exercised [its] own judgment." *Id.* at 60. Twitter's exercise of editorial discretion in enforcing its policies on Berenson's account was independent and protected speech activity that Berenson cannot override through litigation. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2399 (2024) ("The Fifth Circuit was wrong in concluding that Texas's restrictions on the platforms' selection, ordering, and labeling of third-party posts do not interfere with expression.").

Berenson argues Twitter did not "block Mr. Berenson from speaking until after the White House began targeting him at Twitter." Dkt. 103 at 8. But *Murthy* concluded social media platforms acted "independently" based on their past moderation of "similar content" (here, misinformation) not just the posts of a particular plaintiff. 603 U.S. at 59; *see id.* at 49 ("For years, the platforms have targeted speech they judge to be false or misleading."). Moreover, Berenson concedes both that Twitter implemented its COVID-19 misinformation policy *before* the alleged "censorship" here and that the government had nothing to do with his first strike. That Twitter temporarily locked Berenson out of his account after his *second* strike—per its policy (*see* FAC ¶ 149)—rather than his first only confirms that the company exercised "independent judgment" in following its pre-established policy.

The Supreme Court held in *Murthy* that another indicator of a social media company's "independent judgment" in enforcing on an account is where a platform explained that content flagged by the White House "did not violate company policy." 603 U.S. at 60. That is exactly

7

what happened here. *See* FAC ¶¶ 123, 128. Berenson's conclusory argument that he alleges causation based on a theory (lacking a cite to the FAC) that Berenson was "marked for future censorship" is contradicted by Berenson's own pleading and should be rejected.[4]

### III.    BERENSON FAILS TO STATE A CLAIM UNDER SECTION 1985(3).

Berenson's § 1985(3) claim fails because he does not allege a First Amendment violation. Beyond that, no case holds that Berenson can state a § 1985(3) claim based on his alleged membership in a shapeless class of persons "unvaccinated against COVID-19." Dkt 102 at 46.

Berenson relies on *Bray v. Alexandria Clinic* for an expansive definition of a non-race-based class. 506 U.S. 263, 269–72 (1993). But in such cases, the plaintiff must show the defendant targeted the plaintiff "by reason of" the plaintiff's membership in the alleged protected class. *Id.* at 270. Here, Berenson does not allege the required "*class-based*" animus. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (emphasis added). Berenson himself alleges that Slavitt "specifically targeted" him because he believed Berenson's tweets violated Twitter's platform policies. FAC ¶¶ 123, 242; *see also id.* ¶ 118 (alleging White House "targeted" him because he was "ground zero for COVID-19 misinformation"). And even Berenson has acknowledged "Twitter's legitimate interest in reducing the visibility of claims that the virus is not real or that it's part of a UN conspiracy to sterilize America or similar nonsense." *Id.* ¶ 80; *see id.* ¶ 110 (Berenson distinguishing himself from "vaccine skeptics" who "made bizarre, inflammatory claims" about vaccines that "attracted significant attention and mockery").

Berenson also fails to satisfy the "conspiracy" element of his § 1985 claim. "[T]o maintain

---

[4] Berenson also cites his allegation that in March 2021 a Twitter executive told Berenson his "name has never come up in discussions around these policies." Dkt. 103 at 8. Whatever the executive knew or meant, Berenson alleges there were complaints to Twitter about Berenson's posts, articles about Berenson's posts, a Twitter review of Berenson's posts and repeated updates to Twitter's misinformation policy all *before* the executive's alleged statement. FAC ¶¶ 74-76.

an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (quotations omitted).  Berenson does not satisfy the well-established "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Berenson relies on *Glacken v. Incorporated Village of Freeport*, but that case involved a "plan" where the conspirators allegedly met with each other to "coordinate attacks on [the plaintiff]," formed an alliance, and had a "meeting of the minds."  2012 WL 894412, at *8 (E.D.N.Y. Mar. 15, 2012).  Here there is no such alleged agreement.  *Glacken* also involved "threats" (*id.* at *7)—the "*unlawful end*" Berenson must plead to state a viable claim.  Even if Berenson alleged an agreement, he does not plausibly allege one to pursue government *coercion* rather than merely to complain about Berenson's tweets.[5]

## IV.    BERENSON FAILS TO STATE A TORTIOUS INTERFERENCE CLAIM.

Berenson must allege Slavitt knew of a valid contract between Twitter and Berenson and that Slavitt intentionally procured Twitter's breach of *that contract* without justification.  Berenson alleges nothing that would plausibly show Slavitt was aware of Twitter's alleged "personal assurances" to Berenson purportedly modifying Twitter's existing terms of service.  *See* FAC ¶¶ 78, 108.  Even if Slavitt believed Twitter was applying its COVID-19 misinformation policy to Berenson, the FAC does not plausibly allege Slavitt had reason to believe Twitter had chosen to waive its pre-existing right to remove Berenson from its platform for any reason (*e.g.*, an offensive

---

[5] Additionally, where there is an independent "plausible, direct and immediate reason" to act against the plaintiff, that creates an "independent motivation" that undermines a conspiracy allegation. *Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 294 (S.D.N.Y. 2019).  Here, Twitter had an independent reason to suspend Berenson: a violation of its COVID misinformation policy. *See Murthy*, 603 U.S. 43, 60-61 (2024) (Alleged "censorship decisions" must be evaluated "in light of the platform's independent incentives to moderate content.").

post about the Holocaust).  In any event, because Slavitt's speech was constitutionally protected, *see supra* pp. 1-5, its expression was justified.

## V.     SECTION 230 IMMUNIZES SLAVITT FROM BERENSON'S TORT CLAIMS.

Berenson's allegations fall squarely within the plain language of 47 U.S.C. § 230(c)(2)(A)'s immunity from civil liability.  Berenson concedes "Mr. Slavitt is a Twitter user." Dkt. 103 at 20.  He also concedes Slavitt's good faith by arguing that "Mr. Slavitt believed the COVID-19 vaccines saved lives" and viewed Berenson "as a roadblock to convincing Americans to be vaccinated."  Dkt. 103 at 1.  And he cannot reasonably dispute that Slavitt—who publicly spoke about "the life-and-death stakes regarding vaccination" and called misinformation about the virus and vaccine a "legitimate killer" and "public health crisis" (FAC ¶¶ 68, 99, 143)—considered misinformation Berenson posted about the COVID-19 vaccine to be "objectionable."

## VI.    THIS COURT LACKS PERSONAL JURISDICTION OVER SLAVITT.

Berenson cites *Calder v. Jones*, 465 U.S. 783 (1984), and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021), to argue this Court has personal jurisdiction over Slavitt.  *See* Dkt. 103 at 24-25.  But the libelous report in *Calder* was "expressly aimed at" the forum state.  465 U.S. at 789.  And the Supreme Court held in *Ford* that claims must "arise out of or relate to" the defendant's contacts with the forum.  592 U.S. at 360.  Berenson's claims against Slavitt allege no such tie to New York.  He fails to satisfy the specific jurisdiction inquiry.[6]

Berenson has failed multiple times to assert a viable claim and the documents he attached to his FAC conclusively rebut his allegations and preclude any contrary inference in his favor. Berenson's claims against Slavitt should be dismissed with prejudice.

---

[6] Because Berenson's allegations "are insufficient to make out a prima facie case of jurisdiction," the Court should deny his request for jurisdictional discovery.  *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 599 (S.D.N.Y. 2017).

Dated: December 4, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000


By:/s/ *Theodore J. Boutrous Jr.*
      Theodore J. Boutrous Jr.

Theodore J. Boutrous Jr.
Michael H. Dore (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  (213) 229-7000
TBoutrous@gibsondunn.com
MDore@gibsondunn.com


*Attorneys for Defendant Andrew M. Slavitt*

11